# Exhibit 2

# The Curious Case of *Stolt-Nielsen S.A. v. United States*

**Jim Walden and Kristopher Dawes**

On February 25, 2003, Stolt-Nielsen S.A. (SNSA) announced that it and its U.S.-based subsidiary had received conditional amnesty under U.S. and European Union corporate leniency programs for antitrust matters. According to a press release, SNSA sought amnesty because an internal investigation disclosed "possible collusive behavior" in the parcel tanker industry.[1] While online publications heralded this "surprise announcement"[2] in a large and lucrative industry, no one could have imagined the surprises to come.

Less than two months later, on April 8, 2003, SNSA became the first company ever to be suspended from the U.S. Department of Justice's Corporate Leniency Program (Amnesty Program). The Antitrust Division of the Department of Justice charged that SNSA failed to (a) take "prompt and effective action" to end conspiratorial activities and (b) cooperate fully and completely.[3] Both are requirements of the Amnesty Program.[4]

After the Division revoked SNSA's amnesty, SNSA promised to "vigorously challenge" the decision.[5] The Division responded with a press release of its own:

> All companies that apply to the Corporate Leniency Program must meet certain requirements and make accurate representations to the Division. Corporate applicants are accepted on a conditional basis. As part of its enforcement efforts, throughout the investigation, the Division verifies the representations of the corporate leniency applicant. At any time throughout the process, the Division may expel an applicant after concluding that a company has made false representations to the Division or has otherwise not fully complied with the leniency policy requirements.[6]

With this pronouncement, the Division essentially said it would hold companies to their end of the bargain. In addition, Division officials publicly promised a "full accounting" of the basis for SNSA's ejection from the Amnesty Program.[7]

---

■

*Jim Walden is a partner, and Kristopher Dawes is an associate at O'Melveny & Myers LLP, New York, NY.*

[1] Press Release, Stolt-Nielsen S.A., Stolt-Nielsen Transportation Group Granted Conditional Amnesty in Parcel Tanker and Inland Barge Investigations (Feb. 25, 2003), *available at* http://www.stolt-nielsen.com/.

[2] *In a Surprise Announcement, the Stolt-Nielsen Transportation Group Has Been Granted Conditional Amnesty from Prosecution and Fines* (Apr. 3, 2003), *available at* http://www.purchasing.com/article/CA287718.html?text=%22stolt%2Dnielsen%22.

[3] *See* Stolt-Nielsen S.A. v. United States, 352 F. Supp. 2d 553, 568 (E.D. Pa. 2005).

[4] U.S. Dep't of Justice, Corporate Leniency Policy (Aug. 10, 1993), *available at* http://www.usdoj.gov/atr/public/guidelines/0091.htm.

[5] Press Release, Stolt-Nielsen S.A., Stolt-Nielsen S.A. Reports Withdrawal of Amnesty by Department of Justice (Mar. 22, 2004), *available at* http://www.stolt-nielsen.com/.

[6] Press Release, U.S. Dep't of Justice, Justice Department Statement Regarding Antitrust Division's Corporate Leniency Program (Mar. 22, 2004), *available at* http://www.usdoj.gov/atr/public/press_releases/2004/202940.pdf.

[7] *Stolt-Nielsen Misled U.S. on Timing of Price Fixing*, BLOOMBERG, Apr. 2, 2004, *available at* http://quote.bloomberg.com/apps/news?pid=10000085&sid=acF20WAQJJis&refer=europe.

With the battle lines drawn, SNSA pursued a novel strategy: it moved for an injunction in federal court to stave off any indictment of the company. While the antitrust bar waited in anticipation, January 14, 2005, brought the biggest surprise of all: the district court granted SNSA's application and enjoined the indictment of SNSA and one of its executives.[8]

As the dust starts to settle, some will inevitably characterize both events—the revocation of SNSA's amnesty and the decision to enjoin SNSA's indictment—as watersheds in the development of criminal enforcement policy. It is unlikely, though, that either event will have lasting legal or practical significance, except to the parties in the ongoing litigation.[9] As discussed below, the court's curious decision to enjoin the indictment has dim chances of surviving an appeal. Moreover, the Division's decision to oust SNSA from the Amnesty Program is not likely a portent of more ejections to come.

### SNSA's Amnesty Agreement

The Antitrust Division, like most other divisions of the Department of Justice, has standard cooperation agreements.[10] SNSA's amnesty agreement, like all other such agreements authored by the Division, contained corporate representations that are a condition precedent to admission into the amnesty program.[11] In that regard, SNSA represented that it:

(a) "took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity"; and
(b) "did not coerce any other party to participate in the activity, and was not the leader or the originator of the activity." [12]

The agreements are specifically conditioned on the Division's "verification of [these] representations," and on an applicant's full, complete and unconditional cooperation. The agreements also provide a broadly worded termination provision:

> If the Antitrust Division at any time determines that [the applicant] has violated this Agreement, this Agreement shall be void, and the Antitrust Division may revoke the conditional acceptance of [the applicant] into the Corporate Leniency Program. Should the Antitrust Division revoke the conditional acceptance of [the applicant] into the Corporate Leniency Program, the Antitrust Division may thereafter initiate a criminal prosecution against [the applicant], without limitation.[13]

As described in the district court's opinion, the basis for SNSA's representation about "prompt and effective" termination of conspiratorial activities was supplied to the Division at a meeting on December 4, 2002.[14] At that meeting, SNSA sought to establish a "marker" for amnesty protection. A Division official made reference to an article that had appeared in the *Wall Street Journal*, which reported that SNSA's former general counsel had initiated a lawsuit against SNSA based on

*SNSA represented that it . . . took prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity.*

---

[8] *Stolt-Nielsen*, 352 F. Supp. 2d at 562–63.

[9] The Division has not yet filed a notice of appeal.

[10] Department of Justice, Model Amnesty Letter, in Gary R. Spratling, The Corporate Leniency Policy: Answers to Recurring Questions, Presented at the ABA Section of Antitrust Law Spring Meeting (Apr. 1, 1998), *available at* http://www.usdoj.gov/atr/public/speeches/1626.htm.

[11] *See* Corporate Leniency Policy, *supra* note 4, Part A.

[12] *Stolt-Nielsen*, 352 F. Supp. 2d at 558.

[13] Model Amnesty Letter, *supra* note 10.

[14] *Stolt-Nielsen*, 352 F. Supp. 2d at 565.

constructive termination. In essence, the general counsel claimed that he had discovered collusive activities and brought them to the attention of senior management, who failed to take action to stop the conduct. Therefore, the general counsel said he was forced to make a choice: resign or become complicit.[15]

In referring to the *Wall Street Journal*'s coverage, the Division official said that SNSA would be ineligible for amnesty if these facts were true because it could not show "prompt and effective termination" of collusive activities. In response to these concerns, SNSA's outside counsel confirmed that the former general counsel had found evidence of the antitrust activities, but characterized his allegations of constructive termination (due to the company's failure to act) as spurious.[16] SNSA's counsel produced documentary evidence that SNSA had actually notified its co-conspirators of its withdrawal from the conspiracy, and claimed that SNSA had implemented "remedial steps to enhance its antitrust compliance program."[17] The Division official explicitly warned SNSA's counsel that it could not secure amnesty if the general counsel's claims were true and the remedial steps were merely a "head fake."[18]

The Division terminated SNSA's amnesty when it determined that the representations made at the December 4 meeting were untrue. The Division's continuing investigation revealed that two of SNSA's high-level executives, who were not disciplined or terminated after discovery of the collusive activity, continued to participate in the conspiracy until at least November 2002, nine months after discovery by the former general counsel.[19]

In spite of this evidence, the court in *Stolt-Nielsen* handed the company a major victory (although possibly a temporary one) by enjoining indictment.

### Good Facts Led to Questionable Law

There are many striking aspects of the *Stolt-Nielsen* opinion, as much for what it omits as for what it says. The opinion took no issue with the Division's evidence concerning the continuation of the conspiracy. The opinion made no mention of the "conditional" nature of the amnesty protection afforded by the agreement, including the express right to "verify" the company's representations about "prompt and effective" termination. The opinion did not discuss the express right the Division retained to "revoke the conditional amnesty protection" and declare the agreement "void" upon breach, including the right to institute a prosecution against the company "without limitation."

While these important provisions of the agreement certainly bear on whether the Division bargained for the right to, in good faith, unilaterally declare the agreement void, as is a common provision of the DOJ's cooperation agreements,[20] the court also made glaringly inconsistent statements about the underlying facts. Importantly, the court stated that the Division "did not and does

---

[15] James Bandler & John McKinnon, *Stolt-Nielsen Is Probed for Traffic with Iran*, WALL ST. J., Nov. 22, 2002, at A3.

[16] *Stolt-Nielsen*, 352 F. Supp. 2d at 565.

[17] *Id.* at 557. Indeed, SNSA's counsel also apparently indicated that an SNSA executive, Richard B. Wingfield, personally advised his co-conspirators that SNSA could no longer have collusive contact. *See* Stolt-Nielsen v. U.S., 04-CV-537 (TJS), Government's Proposed Findings of Fact, ¶ 47(g).

[18] Government's Proposed Findings of Fact, supra note 17, ¶ 47(k).

[19] *Id.*, ¶ 36.

[20] In other circumstances, courts—including the Third Circuit—have been very reluctant to second-guess the government's decision to declare a cooperation agreement in breach. *See, e.g.*, United States v. Fuentes, No. 03-3215, 2004 WL 1179256, at *2 (3d Cir. May 28, 2004) ("Thus, the government need not prove a defendant's breach of a plea agreement by any measure of evidence, but must only act without unconstitutional motive and in good faith.").

not claim that [SNSA] failed to cooperate in the investigation," [21] even though the court's findings of fact explicitly reflect that the Division did, indeed, assert SNSA's failure to cooperate as grounds for breach.[22] As is clear from the record below, the Division asserted that SNSA "falsely represent[ed] the true duration of [SNSA's] participation in the conspiracy and fail[ed] to fully disclose the roles played by some of its senior executives."[23]

There is a more striking and surprising aspect to the decision: the issuance of an injunction against a federal indictment. Targets of criminal investigations have, from time to time, sought to prevent their indictment through injunctions. Those actions have generally failed. In evaluating such claims, courts typically begin with the "basic doctrine of equity jurisprudence that courts of equity should not act, and particularly should not act to restrain a criminal prosecution, when the moving party has an adequate remedy at law and will not suffer irreparable injury if denied equitable relief."[24]

Because *Stolt-Nielsen* was decided by a district court in the Third Circuit, another Third Circuit case, *United States v. Kenny*,[25] is of particular interest. There, a defendant was originally indicted in a state criminal case, but the state voluntarily delayed trial pending a subsequently-issued federal indictment. In the federal case, the defendant was severed from the case and granted transactional immunity, after which he testified against his former co-defendants. After his testimony in the federal case, the defendant sought an injunction in federal court against the state prosecution.[26] The district court granted the injunction and the court of appeals reversed.[27] In so doing, the court of appeals held: "[T]he record fails to demonstrate that the pending state prosecution posed any threat to defendant's rights that could not be eliminated by assertion of an appropriate defense in the state courts."[28]

Based on similar reasoning, the Division argued that SNSA had an adequate remedy at law because it could raise the immunity agreement as grounds to dismiss an indictment under Rule 12(b)(1) of the Federal Rules of Criminal Procedure.[29] Students of the *Younger* abstention doctrine might have rated this argument a proverbial "slam dunk" in light of the Supreme Court's clear and unequivocal holding that "the cost, anxiety, and inconvenience of having to defend against a single criminal prosecution could not by themselves be considered 'irreparable' in the special legal sense of that term."[30]

On the issue of "adequate remedy at law," the *Stolt-Nielsen* Court did not cite *Younger*, nor did it refer to *Kenny*. Instead, in a footnote, the Court quoted language from a 1947 Second Circuit opinion, *In re Fried*, in which a criminal defendant moved for pre-indictment suppression of evidence: "'[A] wrongful indictment . . . works a grievous, irreparable injury to the person indicted'

---

[21] *Stolt-Nielsen*, 352 F. Supp. 2d at 561.

[22] *Id.* at 569.

[23] Letter from James M. Griffin, Deputy Assistant Att'y Gen., U.S. Dep't of Justice Antitrust Division, to J. Mark Gidley, White & Case LLP at 2 (Mar. 2, 2004) (on file with author).

[24] Younger v. Harris, 401 U.S. 37, 43–44 (1971).

[25] 462 F.2d 1230 (3d Cir. 1972).

[26] *Id.* at 1231.

[27] *Id.* at 1233.

[28] *Id.* at 1232.

[29] *Stolt-Nielsen*, 352 F. Supp. 2d at 560.

[30] *Younger*, 401 U.S. at 46.

resulting in damage to the person's reputation which, because the public remembers the accusation and suspects guilt, cannot be simply cured by a subsequent finding of not guilty."[31]

As a brief aside, it is difficult to imagine how SNSA could have experienced the particular "harm" identified by *In re Fried*—damage to its reputation from an unfounded accusation—since it publicly announced that it was involved in collusive activities and had received amnesty. In effect, SNSA had already publicly announced its guilt.

Putting aside the factual problems inherent in the court's finding of harm to SNSA, the court's reliance on *In re Fried* is, at least, contextually awkward. The *In re Fried* opinion is a polemic against the then-prevalent use of coercive and unconstitutional interrogation techniques. Calling these techniques "foul exploits" and "miserable behavior," the opinion promotes the "vigorous exercise" of equity powers to restrain them.[32]

Although the historical context makes the sweeping language of *In re Fried* understandable, the overwhelming weight of authority rejects the notion that equity jurisdiction should, in any case, be "vigorously" exercised.[33] Rather, courts have consistently held that such equity powers should be exercised with "caution and restraint."[34] Courts have also rejected the more specific suggestion in *In re Fried* that "irreparable harm" flows from the threat of indictment. Instead, courts have held that "[t]he mere threat of prosecution is not sufficient to constitute irreparable harm."[35]

This rule has been followed in the Third Circuit. In *Johnson v. United States*, the official liquidator of an offshore bank brought an action to recover computer tapes that were stolen by a former managing director and given to the FBI.[36] Although the liquidator argued that the unlawfully obtained tape might result in "widespread investigation and possible prosecution of the [bank's] clients,"[37] the court rejected the contention that such prosecutions constituted "irreparable harm."[38] Indeed, the court noted that it "must exercise 'caution and restraint'" before exercising equitable jurisdiction to restrain the criminal process.[39]

*Stolt-Nielsen* makes no mention of *Johnson*, nor of the hundreds of federal cases urging caution in the use of equity powers to restrain the criminal process when an adequate remedy at law is available. Instead, *Stolt-Nielsen* relied on *United States v. Meyer*,[40] for the proposition that due process required a pre-indictment determination concerning whether SNSA breached the amnesty agreement.

*Stolt-Nielsen makes no mention of . . . the hundreds of federal cases urging caution in the use of equity powers to restrain the criminal process*

---

[31] *Stolt-Nielsen*, 352 F. Supp. 2d at 560 n.9 (quoting *In re Fried*, 161 F.2d 453, 458–59 (2d Cir. 1947)).

[32] *In re Fried*, 161 F.2d at 459.

[33] *See, e.g.*, Ramsden v. United States, 2 F.3d 322, 324 (9th Cir. 1993).

[34] *Id.*

[35] *Ramsden*, 2 F.3d at 326; *see also* United States v. Search of Law Office, Residence and Storage Unit Alan Brown, 341 F.3d 404, 415 (5th Cir. 2003) ("[W]e conclude that the irreparable harm . . . must have focused on the injury . . . from loss of the property, not simply harm from the grand jury's reliance on the illegally seized evidence in indicting [petitioner]."); Blinder, Robinson & Co. v. United States, 897 F.2d 1549, 1557 (10th Cir. 1990) ("We . . . hold that the mere threat of imminent indictment does not establish irreparable injury[.]"); Matter of Search of 4801 Fyler Ave., 879 F.2d 385, 389 (8th Cir. 1989) ("[I]f we were to allow the mere threat of future prosecution to constitute irreparable harm these procedures would not be extraordinary, but quite ordinary. Every potential defendant could point to the same harm, thereby invoking the equitable powers of the court.").

[36] 971 F. Supp. 862, 863 (D.N.J. 1997).

[37] *Id.* at 865 n.2.

[38] *Id.* at 868.

[39] *Id.* at 866 (quoting Ramsden, 2 F.3d at 324).

[40] 157 F.3d 1067 (7th Cir. 1998).

This reliance is curious. The *Meyer* Court did not hold that due process required a pre-indictment determination. In *Meyer*, the defendant moved to dismiss a pending indictment based on a prior immunity agreement. The district court rejected that motion, and the defendant was later convicted at trial. On appeal, the defendant again claimed that the indictment should have been dismissed based on the immunity agreement. In addition, the defendant claimed that the government should have obtained a pre-indictment determination of his breach before presenting the case to the grand jury. The *Meyer* court rejected this argument, holding that "[o]n the facts of the present case, . . . [the defendant] received all of the protection demanded by due process."[41] However, citing the Seventh Circuit's decision in *United States v. Verrusio*,[42] the court said, "we again stress that, in cases such as these, the preferred procedure, absent exigent circumstances, would be for the government to seek relief from its obligations under the immunity agreement prior to indictment."[43]

In spite of *Meyer*'s reliance on *Verrusio*, even a cursory reading reveals that *Verrusio* recognized no such requirement. In *Verrusio*, like *Meyer*, the defendant moved to dismiss a pending indictment based on a prior plea agreement.[44] Like *Meyer*, *Verrusio* held that due process required no pre-indictment determination about whether a breach occurred.[45] Instead, the court held that a post-indictment motion to dismiss was an "acceptable procedural mechanism" to resolve the issue. The court went on to say, in dicta:

> It would of course be preferable for the government to notify a defendant that it intends to reindict because he has breached the plea agreement . . . Perhaps an even better procedure would be a motion by the government for relief from its obligations under the plea agreement, before it proceeds to the indictment stage.[46]

Thus, the *Meyer* court's pronouncement about the "preferred procedure" was dicta, which relied on dicta from *Verrusio*—and neither case holds that due process requires the government to obtain a judicial determination concerning the breach of an immunity agreement before presenting an indictment to the grand jury.

*Stolt-Nielsen* went further: "Due process dictates that a court must decide whether there has been a breach of the agreement before it can be voided, and the decision should be made before indictment."[47] As striking as this leap may be, it is more striking that the *Stolt-Nielsen* opinion failed to even mention, let alone discuss, substantial contrary authority.

---

[41] *Id.* at 1077.

[42] 803 F.2d 885 (7th Cir. 1986).

[43] *Meyer*, 157 F.3d at 1077.

[44] *Verrusio*, 803 F.2d at 887.

[45] *Id.* at 889 ("We merely hold that, under the circumstances of this case, an evidentiary hearing on Verrusio's motion to dismiss is sufficient to satisfy the demands of due process.").

[46] *Id.*

[47] *Stolt-Nielsen*, 352 F. Supp. 2d at 555. The court in *Stolt-Nielsen* found equitable relief imperative because SNSA "gave up significant constitutional rights" when in entered into the immunity agreement. The only example given by the court is as follows: "At the same time it provided evidence against its co-conspirators, [SNSA] incriminated itself in the same illegal activities. Now the government wants to use [SNSA's] self-incriminating evidence against it and [its executive] in prosecuting them." To read this passage, one might believe SNSA gave up its constitutional right against self-incrimination, a right that a corporation does not possess. *See* Braswell v. United States, 487 U.S. 99, 104–08 (1988) ("[W]e have long recognized that, for purposes of the Fifth Amendment, corporations and other collective entities are treated differently from individuals . . . . the Fifth Amendment privilege applies only to natural individuals . . . .").

theantitrustsource ∎ www.antitrustsource.com ∎ March 2005    Case 1:06-cv-00474-RJL   Document 1-3   Filed 03/15/2006   Page 8 of 13

7

Until *Stolt-Nielsen*, courts have generally refused to enjoin federal prosecutions.[48] "[I]n no case that we have been able to discover," one circuit court wrote, "has a federal court enjoined a federal prosecutor's investigation or presentment of an indictment."[49] Indeed, courts have repeatedly rejected defendants' attempts to enjoin federal indictments,[50] holding that a motion to dismiss an indictment under Rule 12(b)(1) constitutes an adequate remedy at law. Courts have reached this conclusion even where—as in *Stolt-Nielsen*—the movant sought to enforce an immunity agreement with an injunction against an indictment.[51]

*Stolt-Nielsen*'s failure to address these authorities, and its reliance on dicta to announce a broad new due process protection, may give it a short shelf-life. If appealed, it will not escape the Third Circuit's attention that the announced rule also would create a glaring anomaly: it provides an avenue of appellate redress to one set of litigants (grand jury targets who file for pre-indictment injunctions) that is denied to others (defendants who file motions to dismiss under Rule 12(b)(1)), in spite of the fact that the latter is generally afforded greater protections than the former.[52]

Long ago, the Supreme Court held that a defendant cannot obtain interlocutory appeal from a district court's denial of a motion to dismiss a pending indictment based on a prior immunity or plea agreement.[53] Predictably, this rule has been followed by every circuit to address the issue.[54]

---

[48] In the few cases in which such extraordinary relief is granted, the injunctions are necessary to protect the movants' constitutional rights. *See, e.g.*, PHE, Inc. v. U.S. Dep't of Justice, 743 F. Supp. 15, 26–27 (D.D.C. 1990) (enjoining simultaneous prosecutions designed to suppress constitutionally protected speech); Freedberg v. U.S. Dep't of Justice, 703 F. Supp. 107, 112 (D.D.C. 1988) (enjoining successive federal prosecutions which would be inconsistent with the Double Jeopardy clause of the Fifth Amendment).

[49] Deaver v. Seymour, 822 F.2d 66, 69 (D.C. Cir. 1987); *see also* Doe Corp. v. United States, 714 F.2d 604, 606 (6th Cir. 1983) (finding no jurisdiction to take interlocutory appeal of denial of injunction of indictment); Christoforu v. United States, 842 F. Supp. 1453, 1456 (S.D. Fla. 1994) ("Prospective defendants cannot, by bringing ancillary equitable proceedings, circumvent federal criminal procedure.") (quoting *Deaver*, 822 F.2d at 71); Doe v. United States, 534 F. Supp. 652, 655 (D. Kan. 1982) ("No reported case is found in which the injunctive powers of a federal court have been used to prevent federal prosecutorial functions.").

[50] *See Deaver*, 822 F.2d at 68; Doe Corp., 714 F.2d at 604 (noting district court's denial of injunction); *Christoforu*, 842 F. Supp. at 1456; *Doe*, 534 F. Supp. at 655.

[51] *See Doe Corp.*, 714 F.2d at 604; *Doe*, 534 F. Supp. at 653.

[52] See United States v. Quam, 367 F.3d 1006, 1008 (8th Cir. 2004) (recognizing that neither "the Fifth Amendment privilege [nor] due process rights required an effective warning against self-incrimination be given to a witness before a grand jury"); *In re* Grand Jury Investigation, 182 F.3d 668, 671 (9th Cir. 1999) (noting that "the rights of grand jury witnesses are less broad than those of criminal defendants").

[53] Heike v. United States, 217 U.S. 423, 431 (1910) (A grant of statutory immunity is not intended to "secure to a person making such a plea immunity from prosecution but to provide him with a shield against successful prosecution, available to him as a defense . . . . [and does not] operate to give a right of review upon any other than final judgments.").

[54] *See* United States v. Ecker, 232 F.3d 348, 350 (2d Cir. 2000) ("The law of this Circuit remains that an order denying a motion to dismiss on the ground of an allegedly breached plea agreement is not appealable prior to the entry of final judgment."); United States v. Green, 139 F.3d 1002, 1004 (4th Cir. 1998) ("[T]he district court's decision on [defendant's] contract and due process claims is not an appealable final order."); United States v. Ledon, 49 F.3d 457, 460 (8th Cir. 1995) ("[W]e must dismiss the plea agreement appeal for lack of jurisdiction."); United States v. Crosby, 20 F.3d 480, 487 (D.C. Cir. 1994) ("[W]e conclude that we are without jurisdiction to review" the district court's denial of a motion to dismiss counts in an indictment based on a prior plea agreement); United States v. Dederich, 825 F.2d 1317, 1321 (9th Cir. 1987) ("Indeed, the majority of courts have denied interlocutory appeals grounded in plea-bargain promises or grants of immunity."), *overruled on other grounds* by Midland Asphalt Corp. v. United States, 489 U.S. 794 (1989); United States v. Bird, 709 F.2d 388, 392 (5th Cir. 1983) ("By refusing to hear this interlocutory appeal, of course, we subject [the defendant] to the personal strain, embarrassment and expense of a trial, notwithstanding the possibility that her claim [of immunity from prosecution] might eventually be held well-founded."); United States v. Eggert, 624 F.2d 973, 975–76 (10th Cir. 1980).

Thus, an allegedly immunized defendant must wait until after a conviction to have the district court's denial of a motion to dismiss reviewed.[55]

Under the *Stolt-Nielsen* rule, a putative defendant can make an end-run around this rule by seeking an injunction against the indictment in the first instance, the denial of which is potentially subject to interlocutory review.[56] For this very reason, the *Deaver* court refused to countenance an injunction against a potential indictment:

> Were [appellant] to bring this same claim as a Rule 12(b)(1) motion, we think it likely the final judgment rule would bar any appeal of a denial of that motion until after conviction. Were we to allow [appellant] to bring a civil challenge, with its attendant rights of appeal, before a prosecution even begins, we would thereby undermine the final judgment rule.[57]

Putting aside the many other curiosities in Stolt-Nielsen, the Third Circuit will likely pause before putting its imprimatur on this anomaly.[58]

### Omen or Outlier?

The Division's decision to suspend SNSA from the Amnesty Program sent shock waves through the antitrust bar. One publication announced the Division's decision to suspend SNSA's amnesty with the headline "DOJ In Leniency Shock."[59] Commentators quickly predicted that the Division's decision would cause "some uncertainty for the advisors of companies or individuals . . . if there are questions about the timeliness or quality of their cooperation."[60] Such concern in the immediate aftermath of the *Stolt-Nielsen* decision may well prove unwarranted, given the Division's interest in a continuing—and even increasing—flow of amnesty applications.

Before the Amnesty Program was revised in 1993, transparency in the amnesty process was practically nonexistent. Because corporations could not accurately predict whether their applica-

*Before the Amnesty Program was revised in 1993, transparency in the amnesty process was practically nonexistent.*

---

[55] *See Ecker*, 232 F.3d at 350 ("The law of this Circuit remains that an order denying a motion to dismiss on the ground of an allegedly breached plea agreement is not appealable prior to the entry of final judgment."); *Green*, 139 F.3d at 1004 (noting that defendant can "subsequently raise these [plea agreement] issues if he is convicted"); *Ledon*, 49 F.3d at 459–60 ("[T]he order denying the motion to dismiss for breach of the plea agreement is not final or appealable."); *Crosby*, 20 F.3d at 487 (holding that review of defendant's plea agreement violation claim is prohibited until after conviction and sentencing); *Dederich*, 825 F.2d at 1321 ("The guarantee afforded by the immunity can be adequately protected by appeal after conviction."); *Bird*, 709 F.2d at 392 ("[Defendant's] plea that the agreement bars her prosecution can be fully vindicated, if appropriate, in an appeal from any conviction the government obtains in her case."); *Eggert*, 624 F.2d at 975 ("[Defendant's plea agreement claim] can be fully reviewed by this court on direct appeal in the event of a conviction.").

[56] *See* Blalock v. United States, 844 F.2d 1546, 1548 (11th Cir. 1988) (affirming district court's denial of motion to enjoin grand jury's investigation); *Deaver*, 822 F.2d at 68 (noting that "the denial of [appellant's] application for a preliminary injunction [to prevent independent counsel from obtaining an indictment] is an interlocutory order appealable under 28 U.S.C. § 1292(a)(1)"); *but see Doe Corp.*, 714 F.2d at 605 (treating a denial of a civil motion to enjoin indictment as a criminal pretrial order which is not subject to interlocutory appeal).

[57] *Deaver*, 822 F.2d at 71.

[58] *See* United States v. Johns, 858 F.2d 154, 160 (3d Cir. 1988) (noting "the long-standing principle that disfavors piecemeal appeals" in refusing to recognize a new exception to the final judgment rule).

[59] *See DOJ in Leniency Shock*, GLOBAL COMPETITION REV., Mar. 26, 2004, *available at* http://www.globalcompetitionreview.com/ (subscription required).

[60] *See* D. Martin Low, Cartel Enforcement, Immunity and Jurisdiction: Some Recent Canadian Developments, Address Before International Bar Ass'n, Communications and Competition Law Conference 8 (May 17–18, 2004), *available at* http://www.mcmillanbinch.com/Upload/Publication/Cartel%20Enforcement%20Immunity%20and%20Jurisdiction_Some%20Recent%20Canadian%20Developments_Low_0504.pdf.

tions would be granted, the Division received approximately one amnesty application per year.[61] Since its revision in 1993, the Amnesty Program has been one of the Division's most potent tools in prosecuting criminal antitrust violations.[62] The Division currently receives amnesty applications at a rate of approximately two per month. Since 1997, the program has generated nearly $2 billion in criminal fines, as well as scores of convictions.[63] The Division therefore has a strong interest in encouraging corporations to seek amnesty by making the amnesty process transparent.

To ensure transparency, the 1993 revisions to the Program provided that amnesty would be granted automatically to any corporation that satisfied the enumerated requirements. The Division has characterized the surrender of prosecutorial discretion in these circumstances as "the ultimate sacrifice for transparency,"[64] which provides companies with a high degree of certainty about the program and its benefits.

The Amnesty Program took time to catch on with an antitrust bar skeptical of the program's benefits. The Division sought to encourage participation in the Amnesty Program by engaging in a number of activities designed to alleviate concerns about the fairness of the program's administration. Such activities included the publication of a number of papers, the drafting of a model conditional amnesty letter, and speeches before various legal associations and the media.[65] This enthusiastic and extended effort on the part of the Division illustrates the Amnesty Program's value to the Division.

Because amnesty applications are so highly valued by the Division, the decision to grant or deny amnesty is made at the highest levels. The Division's Corporate Leniency Policy states that the final decision on an amnesty application will be made by the Assistant Attorney General.[66] Because the Division has entrusted one high-level decision-maker with the authority to approve amnesty applications, corporate applicants are assured of greater consistency in the evaluation of amnesty applications.

Division officials are well aware that both the Division and the antitrust bar have an interest in predictability in the enforcement of amnesty agreements. From the Division's perspective, the Amnesty Program will cease to be a valuable tool in the prosecution of antitrust conspiracies unless it challenges amnesty applicants that fail to make a good-faith effort to comply with the terms of the agreement. Failure to police will mean encouragement to continue collusive activities. Nevertheless, practitioners are well aware that the Division's interpretation of the rules has been generous. Even Division officials admit they have "had to swallow hard on a number of amnesty applicants that they would have preferred to prosecute."[67] However, if the Division completely abdicated its responsibility to enforce the promises made in the amnesty agreement, the Division

> *The Division . . . has a strong interest in encouraging corporations to seek amnesty by making the amnesty process transparent.*

---

[61] Scott D. Hammond, An Overview of Recent Developments in the Antitrust Division's Criminal Enforcement Program, Address Before the American Bar Association Midwinter Leadership Meeting 8–9 (Jan. 10, 2005), *available at* http://www.usdoj.gov/atr/public/speeches/207226.htm.

[62] *See id.* (discussing benefits of revised program).

[63] *Id.* at 9.

[64] *See* Scott D. Hammond, Cornerstones of an Effective Leniency Program, Address Before the ICN Workshop on Leniency Programs 20 (Nov. 22–23, 2004), *available at* http://www.usdoj.gov/atr/public/speeches/206611.pdf.

[65] *Id.* at 19–20.

[66] *See* Corporate Leniency Policy, *supra* note 4, at 4–5.

[67] Hammond, *supra* note 64.

would forgo the benefit of the program (prosecuting the most culpable antitrust violators) while enduring the cost (granting amnesty to culpable corporations).

From the point of view of potential applicants, enforcement of the terms of the amnesty agreement is critical to the fair application of the Program. When a conspirator secures the "amnesty chair," it deprives another conspirator of the benefits of amnesty. Many companies endure prosecution and hefty fines (not to mention jail time for senior executives) for being second in line. If the Division turned a blind eye to flagrant violations of the Amnesty Program, the program would be pervaded with a real sense of unfairness, and deserving applicants would be foreclosed from attaining the benefits of the Program. Thus, the Division's actions in *Stolt-Nielsen* should be welcome news to companies seeking amnesty in good faith.

The unusual facts in *Stolt-Nielsen* also reinforce its place as an outlier. As noted above, SNSA did not apply for amnesty on a completely clean slate. The Division's interest in SNSA, and the parcel tanker industry as a whole, was triggered by an article in the *Wall Street Journal*.[68] The article described a lawsuit by SNSA's former general counsel, alleging that he was forced to resign because he would not support various illegal activities, including "price fixing and other collusive conduct."[69] The Division warned SNSA at the outset of the amnesty discussions that the corporation would be ineligible for the Amnesty Program if the conduct continued after the general counsel's discovery. SNSA represented that the conduct stopped because of the company's remedial actions.[70]

SNSA's "remedial actions" certainly appear to have been a "head fake." SNSA apparently failed to suspend or terminate the culpable employees, allowing them to continue their collusive activities.[71] These were not low-level employees in distant places, whom the company had little hope of controlling, but high-level executives and the very targets of the company's internal investigation.[72] Moreover, the continuation of criminal activities was protracted.[73] It would have contravened clearly articulated policies issued by two Deputy Attorney Generals if the Division had ignored these clear signs that the company failed to take meaningful action to terminate the conduct.[74]

### Lesson in Remediation

The lesson of Stolt-Nielsen is clear: when a company discovers collusive activity, it must take decisive action to ensure termination of its involvement in that activity. Obviously, culpable employees are the direct source of the criminal activity. However, these same employees are the source of the company's cooperation, allowing them to "perfect" the company's "marker" for amnesty protection. Indeed, it is common for the government to request interviews with these individuals

---

[68] Bandler & McKinnon, *supra* note 15, at A3.

[69] *Id.* Other allegations included the illegal conduct of business with Iran.

[70] *Stolt-Nielsen*, 352 F. Supp. 2d at 557.

[71] Government's Proposed Findings of Fact, *supra* note 17, ¶¶ 27–36.

[72] *Id.* ¶¶ 5, 8, 19, 20.

[73] *See id.* ¶ 36 (noting that the conspiracy allegedly ran from 1998 through November 2002).

[74] *See* Memorandum from Larry D. Thompson, Deputy Attorney General, to Heads of Department Components and United States Attorneys (Jan. 20, 2003) (citing a corporation's remedial actions as one consideration when determining whether to charge a corporation), *available at* http://www.usdoj.gov/dag/cftf/business_organizations.pdf; Memorandum from Eric Holder, Deputy Attorney General, to All Component Heads and United States Attorneys (June 16, 1999) (same), *available at* http://www.usdoj.gov/criminal/fraud/policy/Chargingcorps.html.

before action is taken to terminate their employment. Thus, it is often impossible to take immediate action to terminate the employees. In these circumstances, what can a company do to prevent further transgressions?

Most importantly, the company must give clear, unequivocal instructions about contact with competitors. With *rare* exception, the rules should proscribe competitor contact. With *no* exception, the rules must prohibit any employee who was suspected of collusive activity from having any competitor contact, and these employees should be reassigned to roles that make the prohibition enforceable. With *no* exception, the rules should forbid sharing competitive intelligence with, or receiving it from, competitors.

If some employees must have contact with competitors for legitimate business reasons, any meeting or contact should be preceded by notice to the company's legal department. The company should adopt clear policies about procedures for such meetings, including the preparation of an agenda, which should be reviewed by the legal department, and the mandatory attendance of company counsel during any competitor contact. All informal and social contact with competitors must be prohibited, and the prohibition must be clearly conveyed to the business units.

To make these prohibitions meaningful, the company must conduct some regular surveillance. While distasteful to many corporate executives and general counsel, the least-intrusive surveillance program could have disclosed the continuing competitor contact at SNSA: monitoring the company's e-mail system. The Information Technology divisions at most companies can monitor employees' communications with specified e-mail addresses, and in the aftermath of an antitrust problem, that system should be used to monitor employees' contact with competitors. If ABC Company is a competitor with which employees were conspiring, the IT systems can send an alert whenever an employee corresponds with an employee of ABC Company. IT need not review the e-mail itself; rather, those e-mails can be escalated to the legal or compliance departments, which can determine whether the contact is permitted or prohibited. This simple technique could have easily revealed the continuing problem at SNSA because some of the continuing contact was via the company's e-mail system.

In addition to specific rules for potential violators and surveillance to make the rules meaningful, the company should immediately implement general ethics policies, including an anonymous hotline to report criminal or unethical activity, and a specific antitrust compliance program, with mandatory participation by all employees. If the company has such programs, they should be enhanced to ensure effectiveness. The company must invest sufficient resources to train employees and make the rules widely known and comprehensible. Certifications for these training sessions should be maintained for each employee in attendance, and the programs should be followed by periodic refresher courses (including on-line training).

Best practices also demand that a senior-level compliance officer (with reporting lines to the chief executive officer, the general counsel, and the audit committee of the board of directors) should oversee the compliance and ethics programs. That officer should be given sufficient resources, and managers at all levels of the company should be given compliance responsibilities. Performance of compliance duties and adherence to the program's requirements should be an aspect of evaluation and compensation for all employees. Audits of the program's effectiveness should occur on a regular basis.

Although all these steps are necessary, they are not enough to create a complete record of the company's efforts to terminate and remediate illegal conduct. Senior management is responsible for ensuring that a company's culture is guided by ethics and integrity, and it must set an appropriate course. Senior management must have "zero tolerance" for ethical lapses, and that mes-

> *Senior management is responsible for ensuring that a company's culture is guided by ethics and integrity, and it must set an appropriate course.*

sage must be clearly and repeatedly conveyed to the business. This "tone from the top" is a critical element of the overall success of the company's ethics and compliance programs.

While these many steps cost the company resources, especially in the short term, the long-term benefits far outweigh the costs. However, even all of these efforts may not constrain a rogue employee from continuing to violate the law. If that happens, a company can have complete confidence that, if all of these efforts were undertaken in good faith, its amnesty will not be in peril. *Stolt-Nielsen* teaches that remediation must be taken seriously. ●