# Exhibit 2



# DEPARTMENT OF JUSTICE

"An Update of the Antitrust Division's
Criminal Enforcement Program"

SCOTT D. HAMMOND
Deputy Assistant Attorney General
for Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Before the

ABA Section of Antitrust Law
Cartel Enforcement Roundtable

2005 Fall Forum

Washington, DC

November 16, 2005

# An Update of the Antitrust Division's
# <u>Criminal Enforcement Program</u>

The detection, prosecution, and deterrence of cartel offenses continue to be the highest priority of the Antitrust Division. The Division places a particular emphasis on combating international cartels that target U.S. markets because of the breadth and magnitude of the harm that they inflict on American businesses and consumers. This enforcement strategy has succeeded in cracking dozens of international cartels, securing convictions and jail sentences against culpable U.S. and foreign executives, and obtaining record-breaking corporate fines. For example:

- *Since May 1999*, more than 107 individuals have served, or are currently serving, prison sentences in cases prosecuted by the Antitrust Division. This total includes 20 foreign nationals from nine different countries who were sentenced to incarceration in U.S. prisons for violating U.S. antitrust laws.

- *In FY 2005*, 18 individual defendants prosecuted by the Antitrust Division were sentenced to a total of 13,157 days in jail; the highest number of jail days in the Division's history. The trend toward more frequently imposed and longer average prison terms for antitrust offenders has resulted in an average jail sentence over the past three years of approximately 19 months – more than two times the average jail sentence in the 1990's. The 11 longest jail sentences in the Division's history have all been imposed in the last five years.

- *Since FY 1997*, nearly $3 billion in criminal fines have been imposed in Division cases, well over 90 percent of this total were obtained in connection with the prosecution of international cartel activity.

- *FY 2005* was the third highest fine year in the Division's history, with over $338 million in criminal fines obtained against 13 corporations and 20 individuals. This total includes a $185 million criminal fine imposed against Hynix Semiconductor, Inc. – the fourth largest criminal antitrust fine ever – for its role in a conspiracy to fix the price of dynamic random access memory (DRAM) sold to computer manufacturers. FY 2006 started off strong on October 13, 2005, when Samsung Electronics Company, Ltd., a Korean manufacturer of DRAM and its U.S. subsidiary, Samsung Semiconductor Inc., were charged with participating in the DRAM price-fixing conspiracy and agreed to plead guilty and to pay a $300 million fine. Samsung's fine is the second largest criminal antitrust fine in U.S. history and the largest criminal fine since 1999.

- *In FY 2005*, three companies in addition to Hynix agreed to pay fines of $10 million or more. It is worth noting that the Supreme Court's decision in <u>Blakely v. Washington</u>, 124 S.Ct. 2531 (2004), has not limited the Division's ability to obtain heavy fines as nine corporate defendants have agreed to pay fines of $10 million or more since the <u>Blakely</u> decision.

As outlined further in the summary below, the stakes will continue to rise for companies

and their executives who engage in antitrust offenses. In June 2004, the maximum penalties for Sherman Act violations were raised significantly by Congress. The new law, the Antitrust Criminal Penalty Enhancement and Reform Act of 2004 (ACPERA), increased the maximum Sherman Act corporate fine to $100 million, the maximum individual fine to $1 million, and the maximum Sherman Act jail term to 10 years. The increased sentences will bring antitrust prison sentences in line with those for other white-collar crimes and ensure that corporate fines accurately reflect the enormous harm inflicted by cartels on our economy. The U.S. Sentencing Commission has promulgated a revised Antitrust Guideline which will provide for the imposition of sentences in accordance with the new statutory maximum. The revised Antitrust Guidelines will go into effect on November 1, 2005. ACPERA also enhances the incentive for corporations to self report illegal conduct by limiting the damages recoverable from an applicant to the Division's Corporate Leniency Program, that also cooperate with private plaintiffs in their damage actions against remaining cartel members, to the damages actually inflicted by the amnesty applicant's conduct.

## INTERNATIONAL CARTEL ENFORCEMENT

**Investigations**. Currently, there are approximately 56 sitting grand juries investigating suspected international cartel activity. International cartel investigations account for almost half of the Division's grand jury investigations. The subjects and targets of the Division's international investigations are located on six continents and in roughly 25 different countries. However, the geographic scope of the criminal activity is even broader than these numbers reflect. Our investigations have uncovered meetings of international cartels in well over 100 cities in more than 35 countries, including most of the Far East and nearly every country in Western Europe.

**Cartels Prosecuted**. Since the beginning of FY 1997, the Division has prosecuted international cartels affecting well over *$10 billion* in U.S. commerce. The Division has prosecuted international cartels operating in a number of sectors including vitamins, textiles, construction, food and feed additives, food preservatives, chemicals, graphite electrodes (used in steel making), fine arts auctions, ocean tanker shipping, marine construction, marine transportation services, rubber chemicals, synthetic rubber and dynamic random access memory used in computers and servers. The cartel activity uncovered in these cases has cost U.S. businesses and consumers billions of dollars annually.

**Fines Imposed**. Of the nearly $3 billion in criminal fines imposed in Division cases since FY 1997, well over 90 percent were obtained in connection with the prosecution of international cartel activity. The Division has obtained fines of $10 million or more against U.S., Dutch, German, Japanese, Belgian, Swiss, British, Luxembourgian, Norwegian, Korean and Liechtenstein-based companies. In 42 of the 51 instances in which the Division has secured a corporate fine of $10 million or greater, the corporate defendants were foreign-based. These numbers reflect the fact that the typical international cartel likely consists of a U.S. company and three or four of its competitors that are market leaders in Europe, Asia, and throughout the world. (See Attached Chart of Sherman Act Violations Yielding a Corporate Fine of $10 Million or More.)

**Foreign Corporate Defendants**. Since the beginning of FY 1998, roughly 50 percent of corporate defendants in criminal cases brought by the Division were foreign-based. In FY 2001, the percentage of foreign-based firms charged by the Division rose to nearly 70 percent, and then returned to around 44 percent over the past four years.

## PROSECUTION OF INDIVIDUALS

The Division has long supported the belief that the most effective way to deter and punish cartel activity is to hold the most culpable individuals accountable by seeking jail sentences. For reasons that cannot be explored in this summary, that view has taken hold.[1] Antitrust offenders are being sent to jail with increasing frequency and for longer periods of time.

**Jail Sentences Reach an All-Time High**. The average jail sentence in the 1990's was eight months but has more than doubled over the past five years, rising to an average of 18 months. The average jail sentence rose to 10 months in FY 2000, to 15 months in FY 2001, to 18 months in FY 2002, to 21 months in FY 2003, dipped back to 12 months in FY 2004 and rose to an all-time high of 24 months in FY 2005. In the last five years, over 100 years of imprisonment have been imposed on Antitrust Division offenders, with more than 40 defendants receiving jail sentences of one year or longer, including nine defendants in FY 2005.

**Conviction Of Foreign Executives**. The Division has prosecuted foreign executives from Austria, Belgium, Canada, France, Germany, Italy, Japan, Korea Mexico, Norway, the Netherlands, Sweden, Switzerland, and the United Kingdom for engaging in cartel activity, resulting in heavy fines and, in some cases, imprisonment. Since FY 2001, roughly one-fourth of the individual defendants in our cases have been foreign nationals. Foreign defendants from Canada, France, Germany, Sweden, Switzerland, the Netherlands, Norway, the United Kingdom, and Japan have served, or are currently serving, prison sentences in U.S. jails for violating U.S. antitrust laws.

**Tracking Down International Fugitives**. In 2001, the Division adopted a policy of placing indicted fugitives on a "Red Notice" list maintained by INTERPOL. A red notice watch is essentially an international "wanted" notice that, in many INTERPOL member nations, serves as a request that the subject be arrested, with a view toward extradition. Multiple fugitive

---

[1] For more information on Division policies and initiatives directed toward the prosecution of individual offenders, see, "Negotiating the Waters of International Cartel Prosecutions" speech by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before Thirteenth Annual National Institute On White Collar Crime (March 4, 1999), available at http://www.usdoj.gov/atr/public/speeches/2275.htm; and "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?" speech by Scott D. Hammond, Director of Criminal Enforcement, Antitrust Division, before Fifteenth Annual National Institute On White Collar Crime (March 8, 2001), available at http://www.usdoj.gov/atr/public/speeches/7647.htm.

defendants have already been apprehended through a Division INTERPOL red notice. The Division will seek to extradite any fugitive defendant apprehended through the INTERPOL red notice watch. The Division's use of red notices clearly raises the stakes for foreign executives who hope to avoid prosecution by simply remaining outside of the United States.

The Antitrust Division will seek to extradite international fugitives to the U.S. to stand trial for antitrust crimes and related offenses. Ian Norris, the former Chairman and CEO of Morgan Crucible, was indicted in 2004 for fixing the price of carbon brushes, carbon current collectors, and mechanical carbon products, and for orchestrating a conspiracy to obstruct justice, tamper with witnesses, and corruptly persuade others to destroy documents. The Division is seeking his extradition from the UK on all counts of his indictment. On June 1, 2005, the Bow Street Magistrates' Court in London ruled that Norris is extraditable on both the price-fixing and obstruction charges and referred the case to the UK's Secretary of State. On September 29, 2005, the Secretary of State approved the extradition request on all counts. Further appeals by the defendant are expected. During the extradition hearing before the magistrate court, Norris argued that the charged price fixing is not an extraditable offense because it was not a criminal offense in the UK during the time alleged in the indictment, and that the obstruction charge should not be extraditable because the alleged obstruction was not obstruction of an investigation into conduct punishable in the UK. The magistrate court rejected these arguments and ruled that the conduct underlying the price-fixing charge would constitute the UK offense of conspiracy to defraud.

With the stiffening resolve that foreign governments are taking toward punishing cartel activity and their increased willingness to assist the United States in tracking down and prosecuting cartel offenders, the safe harbors for antitrust offenders are rapidly shrinking.

## INCREASED COOPERATION WITH FOREIGN ANTITRUST AUTHORITIES

Our ability to detect and prosecute international cartel activity has been enhanced by the increased cooperation and assistance that we have received from foreign governments, and from their own enforcement efforts. Over the past several years there has been a growing worldwide consensus that international cartel activity is pervasive and is victimizing businesses and consumers everywhere. This shared commitment to fighting international cartels has led to the establishment of cooperative relationships among competition law enforcement authorities around the world in order to more effectively investigate and prosecute international cartels.

**International Anti-Cartel Enforcement Workshops**. In the autumn of 1999, the Division hosted the first-ever international meeting of cartel investigators and prosecutors. Representatives from the competition law enforcement agencies of more than 25 countries and the EU gathered in Washington for a two-day program devoted to the practical aspects of investigating and prosecuting international cartels. Since then the event has enjoyed great success and has taken place in England, Canada, Brazil and Brussels. In 2004, the sixth international cartel workshop, for the first time under the umbrella of the International Competition Network (ICN), was attended in Sydney, Australia by over 100 representatives from more than 30 jurisdictions; the workshop was held in conjunction with a separate workshop

focusing solely on leniency programs. In November 2005, the seventh international cartel workshop will be held in Seoul, Korea and a day and a half will focus solely on issues related to the complex area of electronic evidence gathering. These workshops provide enforcers with the valuable opportunity to develop close working relationships, which then serve as the basis for future formal and informal cooperation. This informal cooperation among competition law enforcers is best evidenced by a number of recent investigations in which dawn raids, searches, service of grand jury subpoenas, and drop-in interviews were coordinated to occur simultaneously in multiple jurisdictions.

**Assistance In Obtaining Foreign-Located Evidence**. The improved cooperation with foreign law enforcement authorities already has provided us with increased access to foreign-located evidence and witnesses that has proven to be instrumental in the cracking of a number of international cartels. While there are constraints as to what can be revealed about the nature of this assistance, there is one example and one compelling statistic that demonstrate the breadth of this cooperation. The example – our investigation of bid-rigging on wastewater treatment plant construction contracts in Egypt, which were funded by USAID, was assisted by the execution of search warrants by foreign authorities on the Division's behalf to seize evidence abroad. In that investigation, over 100 German police officers assisted in the simultaneous execution of search warrants on multiple companies at several locations across Germany. The searches induced cooperation from subjects of the investigation, which previously had been lacking, and that was critical to the success of the cases we later brought. The statistic – in the past few years, foreign authorities from five different countries have executed search warrants at our request in more than a half-dozen of our international cartel investigations. This is a remarkable advancement in international cooperation.

**Cooperation And Coordination Of Investigations**. Our cooperation with foreign antitrust authorities has never been better or more effective. In February of 2003, four enforcement authorities, the Antitrust Division, the EC Directorate-General for Competition, the Canadian Competition Bureau, and the Japanese Fair Trade Commission, coordinated searches and drop-in interviews in an unprecedented level of cooperation. This represented the first time that an international cartel investigation had gone overt simultaneously in four jurisdictions. As noted in the EC's press release, inspectors from the EC and Member States searched 14 companies located in six Member States as a part of these parallel efforts. Overall, more than 250 investigators and agents were involved in the simultaneous launching of these investigations on three continents. Such coordination among multiple jurisdictions will occur more frequently and be a part of the next frontier of cartel investigations. Convergence in leniency programs has led to an increased number of simultaneous amnesty applications, which has resulted in more opportunities for multi-jurisdictional cooperation. It is no longer uncommon for international antitrust authorities to discuss investigative strategies and to coordinate searches, service of subpoenas, drop-in interviews, and the timing of charges in order to avoid the premature disclosure of an investigation and the possible destruction of evidence. Such cooperation will lead to more effective antitrust enforcement in the future and the detection, prosecution, and elimination of more cartels.

**Adoption Of Legislation And Agreements To Foster Cooperation**.  Another example of governments' increased willingness to assist each other in the enforcement of anti-cartel laws can be seen in the May 2001 agreement between the U.K. and U.S. governments to remove a "side letter" to the U.K.-U.S. Mutual Legal Assistance Treaty ("MLAT"), which had excluded antitrust matters from the scope of the cooperation provisions of the MLAT.  The types of assistance in antitrust matters that the U.K. can now provide to the Division include the use of the U.K. courts to take testimony from witnesses, obtain documents, and assist in the collection of criminal fines.  In addition, the U.K. government recently adopted legislation that creates a new criminal offense for individuals who engage in hardcore cartel activity and provides for maximum jail sentences of up to five years for antitrust offenders.  In addition, in the past few years, the Division has entered into antitrust cooperation agreements with four foreign governments -- Brazil, Israel, Japan, and Mexico.  These new agreements complement agreements previously reached with Australia, Canada, the European Union, and Germany, and will foster cooperation between the U.S. and those governments with respect to the investigation and prosecution of international cartels and other aspects of antitrust enforcement.  In November 1999, the Division's International Antitrust Enforcement Assistance Agreement with Australia became effective.  This agreement is a comprehensive antitrust mutual legal assistance agreement, which allows the two countries to exchange evidence and assist each other's civil and criminal antitrust investigative efforts.  The exchange of evidence between antitrust enforcement authorities certainly will increase in the years to come.  In 1998 the OECD encouraged member countries to "co-operate with each other in enforcing their laws against [hard core] cartels" and the OECD's Competition Law and Policy Committee's Working Party 3 currently is considering a set of recommended practices to govern the formal exchange of evidence between competition law enforcement authorities.  The adoption of recommended practices by the OECD will assist member countries to remove obstacles to effective co-operation in the enforcement of laws against hard-core cartels (including the adoption of national legislation and/or entering bilateral agreements) and will result in increased exchanges of evidence between competition law enforcement authorities.

**Increased Foreign Enforcement**.  Of course, antitrust authorities in Asia, Europe, Australia and Canada and around the world are not merely assisting our investigations.  They also have become increasingly aggressive in investigating and sanctioning cartels that victimize their consumers.  Seemingly with each passing day, the antitrust community learns of a foreign government that has enacted a new antitrust law, created a new cartel investigative unit, obtained a record antitrust fine, or developed a new Corporate Leniency program.  On February 2, 2005, the Australian Government announced that it will amend its competition law to introduce criminal penalties for serious cartel conduct.  Australia's legislation is still pending. Effective September 5, 2005 the Australian Competition and Consumer Commission (ACCC) implemented a revised "First-In Immunity Policy for Cartel Conduct."  The revised policy confers full amnesty from prosecution and penalty to the first eligible cartel participant to report its involvement in a cartel and cooperate with the ACCC's investigation and prosecution of other cartel members.  In April 2005 major revisions to Japan's Antimonopoly Act were adopted, effective January 4, 2006.  The amendments include a substantial increase in the administrative fine that the JFTC imposes on cartel participants, authority for JFTC to obtain compulsory search warrants in investigations on cartel conduct that is likely to be prosecuted criminally, and

6

introduction of a leniency program that eliminates the administrative fine (and criminal prosecution) for the first company in the door prior to the commencement of a JFTC investigation, and reduction in the administrative fines imposed on the second and third leniency applicants. Also in April 2005, a number of measures were implemented that should strengthen the KFTC's anti-cartel program. The maximum administrative fine was doubled to 10% of sales. Furthermore, the KFTC revised its leniency program to provide that only the first two qualifying applicants will benefit from the leniency program, with the first applicant receiving a complete exemption from administrative fines and corrective measures and the second applicant receiving a 30% reduction in the administrative fine. The KFTC also added an amnesty plus program.

These examples of worldwide convergence in anti-cartel enforcement and commitment to investigating and severely sanctioning international cartels will certainly enhance the international deterrence and detection of cartel activity.

## CRIMINAL FINES

Since the beginning of FY 1997, the Division has imposed nearly $3 billion in criminal fines. Sherman Act violations prosecuted by the Antitrust Division have yielded more than 50 corporate criminal fines of $10 million or more, including nine fines of $100 million or more, and one fine of $500 million – the largest criminal fine ever imposed in the United States under any criminal statute.

Corporate Fines Have Increased Dramatically. International cartels affect massive volumes of commerce. In some matters currently under investigation, the volume of commerce affected by the suspected conspiracy is over $1 billion per year and in roughly two-thirds of our international investigations, the volume of commerce affected is over $100 million over the term of the conspiracy. Because international cartels affect such a large volume of U.S. commerce and the U.S. Sentencing Guidelines fines are based in large part on the amount of commerce affected by the cartel, fines obtained by the Division have increased dramatically since FY 1997.

- Year-End Total Fines. In the 10 years prior to FY 1997, the Division obtained, on average, $29 million in criminal fines annually. In FY 1997, the Division collected $205 million in criminal fines – which was 500 percent higher than during any previous year in the Division's history. In FY 1999, the Division secured over $1.1 billion, which was more than the total fines the Antitrust Division had secured in the first 109 years of Sherman Act enforcement. In FYs 2000-2004, fines obtained exceeded $150 million, $280 million, $75 million, $107 million, and $350 million respectively. In FY 2005, the Division obtained more than $338 million in total fines, the third highest total in Division history, including:

    - In March 2005, Zeon Chemicals L.P. pled guilty and was sentenced to pay a $10.5 million criminal fine for participating in a conspiracy to fix prices of the synthetic rubber acrylonitrile-butadiene, also known as nitrile butadiene rubber

- (NBR), which is used to manufacture a variety of products including automotive parts.

- Also in March 2005, in another rubber-related case, Dupont Dow Elastomers LLC, a company formed in 1996 by E.I. du Pont de Nemours & Company and The Dow Chemical Company, pled guilty and was sentenced to pay an $84 million criminal fine for participating in an international conspiracy to fix prices of polychloroprene rubber, also known as chloroprene rubber. Chloroprene rubber is a type of synthetic rubber which is used in a variety of products including tires, fabrics, furniture, and shoes. Both Zeon and DDE were part of a highly-successful line of cases in various rubber-related industries which yielded a total of more than $200 million in fines.

- Over the past year, the Division's high-profile investigation of the dynamic random access memory (DRAM) cartel has yielded total fines of more than $646 million. Three of the Division's five largest corporate fines resulted from this investigation. Most recently, on October 13, 2005, Samsung Electronics Company, Ltd., a Korean manufacturer of dynamic random access memory (DRAM) and its U.S. subsidiary, Samsung Semiconductor, Inc., were charged with participating in an international conspiracy to fix the price of DRAM sold to certain customers and agreed to plead guilty and to pay a $300 million fine. In May 2005, Korean DRAM manufacturer Hynix Semiconductor, Inc. pled guilty to participating in the same conspiracy and was sentenced to pay a $185 million criminal fine. In November 2004, German DRAM manufacturer Infineon Technologies also pled guilty to participating in the same conspiracy and was sentenced to pay a $160 million criminal fine. These fines were respectively the second, fourth and fifth largest criminal fines in Division history.

- FY 2005 was also a record year for domestic cartel enforcement. In June 2005, Irving Materials, Inc., an Indiana ready mixed concrete producer, pled guilty to fixing the price of ready mixed concrete in the Indianapolis area and was sentenced to pay a $29.2 million criminal fine. This fine was the largest ever in a domestic antitrust investigation.

- <u>Higher Top-End Fines</u>. Before 1994, the largest corporate fine ever imposed for a single Sherman Act count was $6 million. However, today Sherman Act violations have yielded fines of $10 million or more against more than 50 corporate defendants. The Division has obtained fines of $100 million or more in nine cases:

    - **$500 million** against F. Hoffmann-La Roche (vitamin cartel - May 1999), largest fine ever imposed in a U.S. criminal prosecution of any kind;

- **$300 million** against Samsung (DRAM - October 2005);

- **$225 million** against BASF AG (vitamin cartel - May 1999);

- **$185 million** against Hynix Semiconductor (DRAM - September 2004);

- **$160 million** against Infineon Technologies AG (DRAM - September 2004);

- **$135 million** against SGL Carbon AG (graphite electrodes cartel - May 1999);

- **$134 million** against Mitsubishi Corp. (graphite electrodes cartel - May 2001);

- **$110 million** against UCAR International (graphite electrodes cartel - April 1998); and

- **$100 million** against Archer Daniels Midland Company (lysine and citric acid cartels - October 1996).

## CORPORATE LENIENCY PROGRAM

In August 1993, the Division revised its Corporate Leniency Program to make it easier and more attractive for companies to come forward and cooperate with the Division.[2] Three major revisions were made to the program: (1) amnesty is automatic if there is no pre-existing investigation; (2) amnesty may still be available even if cooperation begins after the investigation is underway; and (3) all officers, directors, and employees who cooperate are protected from criminal prosecution.[3] As a result of these changes, the Leniency Program is the Division's most

---

[2] Antitrust Division, U.S. Department Of Justice, Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/atr/public/guidelines/lencorp.htm

[3] For more information on the requirements and application of the Division's Amnesty Program, see, Antitrust Division, U.S. Department of Justice Corporate Leniency Policy (1993), *available at* http://www.usdoj.gov/atr/public/guidelines/0091.htm; "Cornerstones of an Effective Leniency Program" speech by Scott D. Hammond, before ICN Workshop on Leniency Programs (November 22 - 23, 2004), *available at* http://www.usdoj.gov/atr/public/speeches/206611.htm; "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," speech by Scott D. Hammond, Fifteenth Annual National Institute On White Collar Crime (March 8, 2001), *available at* http://www.usdoj.gov/atr/public/speeches/7647.htm; "Detecting And Deterring Cartel Activity

9

effective generator of international cartel cases, and it is the Department's most successful leniency program. Moreover, it has served as a model for similar corporate leniency programs that have been adopted by antitrust authorities around the world.

**Application Rate**. The revised Corporate Leniency Program has resulted in a surge in amnesty applications. Under the old policy, the Division obtained roughly one amnesty application per year. Under the new policy, the application rate has jumped to roughly two per month. As a result of this increased interest, the Division frequently encounters situations where a company approaches the government within days, and in some cases less than one business day, after one of its co-conspirators has secured its position as first in line for amnesty. Of course, only the first company to qualify receives amnesty.

**Case Generator**. Since the Division revised its leniency program, cooperation from amnesty applications has resulted in scores of convictions and more than $2 billion in criminal fines. In fact, the majority of the Division's major international investigations have been advanced through the cooperation of an amnesty applicant.

**Foreign Authorities Following The U.S. Model**. The extraordinary success of the Division's leniency program has generated widespread interest around the world. We have advised a number of foreign governments in drafting and implementing effective leniency programs in their jurisdictions. As a result, countries such as Japan, Australia, Brazil, Canada, Germany, Ireland, Korea, and the United Kingdom have announced new or revised leniency programs, with still other countries in the process of following. Most significant was the European Union's adoption of a revised leniency program in February 2002. The new program establishes a far more transparent and predictable policy than its predecessor and brings the EC's program closely in line with the Division's Corporate Leniency Policy. In fact, in greatly reducing the amount of discretion involved in assessing amnesty applications and in creating the opportunity for companies to qualify for full immunity after an investigation has begun, the blockbuster revisions are similar to the ones made by the Division when we successfully expanded our program in August 1993. The convergence in leniency programs has made it much easier and far more attractive for companies to simultaneously seek and obtain leniency in the United States, Europe, Canada, and in other jurisdictions where the applicants have exposure.

---

Through An Effective Leniency Program," speech by Scott D. Hammond, before International Workshop on Cartels (November 21-22, 2000), *available at* http://www.usdoj.gov/atr/public/speeches/9928.htm; "Making Companies An Offer They Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999), *available at* http://www.usdoj.gov/atr/public/speeches/2247.htm; "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998), *available at* http://www.usdoj.gov/atr/public/speeches/1626.htm.

**Amnesty Rewards**. The DRAM vitamin, graphite electrodes, fine arts auctions, USAID construction, and rubber chemicals investigations offer five prime examples of the stunning incentives and rewards to companies *and their executives* that take advantage of the Amnesty Program. In each of these matters, the amnesty applicant paid *zero* dollars in criminal fines, and its cooperating executives received nonprosecution protection.

- **DRAM.** In the DRAM, investigation, the amnesty applicant's cooperation allowed the Division to quickly crack this high-tech international cartel leading to plea agreements with Samsung, Hynix, Infineon and four Infineon executives. Total fines resulting from this investigation currently exceed $646 million. Four former Infineon executives, including three German nationals, plead guilty and served jail sentences ranging from four to six months. This investigation is ongoing.

- **Rubber Chemicals**. The amnesty applicant's cooperation resulted in the prosecution of Crompton Corporation and Bayer AG and fines totaling $116 million. In addition, two former Crompton executives and two former Bayer executives pled guilty to participating in the rubber chemicals conspiracy and are cooperating with the investigation. Two former top Bayer AG executives were indicted in August 2005 for their participation in the rubber chemicals conspiracy and remain international fugitives. This investigation is ongoing.

- **Vitamins**. In the vitamin investigation, the amnesty applicant's cooperation directly led to F. Hoffmann-La Roche's (HLR) and BASF AG's decision to plead guilty and pay fines of $500 million and $225 million, respectively. Six Swiss and German executives from HLR and BASF were convicted for their role in the reported conspiracy, and all served time in U.S. prisons.

- **Graphite Electrodes**. In the graphite electrodes investigation, the second company in the door after the amnesty applicant paid a $32.5 million fine, the third company in paid a $110 million fine, and a fourth company pled guilty and paid a $135 million fine. Mitsubishi was later convicted at trial for its role as an aider and abettor of the cartel and was sentenced to pay a $134 million fine. Two U.S. executives were sentenced to lengthy prison terms and paid over $2 million in fines, and a German executive was fined $10 million.

- **Fine Arts Auctions**. The amnesty applicant's cooperation directly resulted in Sotheby's decision to plead guilty and pay a $45 million fine. Sotheby's former Chairman, Alfred Taubman, was subsequently convicted at trial and sentenced to one year in jail and a $7.5 million fine.

- **USAID Construction.** The assistance of an amnesty applicant led to the conviction of four companies who engaged in a scheme to rig bids on water

treatment construction contracts funded abroad by the United States Agency for International Development (USAID). Fines totaling more than $140 million were imposed in addition to over $10 million in restitution to the U.S. government. A U.S. executive for one of the late pleading companies was convicted at trial and sentenced to three years imprisonment.

**Amnesty Plus**. Currently, there are roughly 56 sitting grand juries investigating suspected international cartel activity. Nearly half of these investigations were initiated by evidence obtained as a result of an investigation of a completely separate industry. For example, a new investigation results when a company approaches the Division to negotiate a plea agreement in a current investigation and then seeks to obtain more lenient treatment by offering to disclose the existence of a second, unrelated conspiracy. Under these circumstances, companies that choose to self-report and cooperate in a second matter can obtain what is referred to as "Amnesty Plus." In such a case, the company will receive amnesty, pay zero dollars in fines for its participation in the second offense, and none of its officers, directors, and employees who cooperate will be prosecuted criminally in connection with that offense. Additionally, the company will receive a substantial additional discount by the Division in calculating an appropriate fine for its participation in the first conspiracy.

**Penalty Plus**. Companies that elect not to take advantage of the Amnesty Plus opportunity risk potentially harsh consequences. If a company participated in a second antitrust offense and does not report it, and the conduct is later discovered and successfully prosecuted, where appropriate, the Division will urge the sentencing court to consider the company's and any culpable executives' failure to report the conduct voluntarily as an aggravating sentencing factor. We will request that the court impose a term and conditions of probation for the company pursuant to U.S.S.G. §8D1.1, and we will pursue a fine or jail sentence at or above the upper end of the Guidelines range. Moreover, where multiple convictions occur, a company's or individual's Guidelines calculations may be increased based on the prior criminal history. In one recent "penalty plus case," the Division asked the court to depart upward from the top of the guidelines range pursuant to U.S.S.G. § 5K2.0 due to the company's recidivism as an antitrust offender, and to impose a sentence that was almost 30% above the top of the guideline fine range. In that case, the VOC was $17 million and the company paid a fine of $12 million – 70% of the VOC. Furthermore, three of the executives were "carved out" of the plea agreement. If the company had reported the conduct when it had the chance in connection with the earlier prosecution, it would have paid zero fine and its executives, who now are subject to prosecution, would have been given full nonprosecution protection. For a company, the failure to self-report under the Amnesty Plus program could mean the difference between a potential fine as high as 80 percent or more of the volume of affected commerce versus no fine at all on the Amnesty Plus product. For the individual, it could mean the difference between a lengthy jail sentence and avoiding jail altogether.

**Confidentiality Policy**.  The Division's policy is to treat as confidential the identity of amnesty applicants and any information obtained from the applicant.  The Division will not disclose an amnesty applicant's identity, absent prior disclosure by or agreement with the applicant, unless authorized by court order.  Further, in order to protect the integrity of the Amnesty Program, the Division has adopted a policy of not disclosing to foreign authorities, pursuant to cooperation agreements, information obtained from an amnesty applicant unless the amnesty applicant agrees first to the disclosure.  Notwithstanding this policy, the Division frequently obtains waivers to share information with another jurisdiction in cases where the applicant has also sought and obtained leniency from that jurisdiction.  Such waivers are helpful in ensuring that the Division is able to coordinate investigative steps with the other jurisdictions involved.  In addition, amnesty applicants may issue press releases or, in the case of publicly traded companies, submit public filings announcing their conditional acceptance into the corporate amnesty program thereby obviating the need to maintain their anonymity.

## RECENT LEGISLATIVE AMENDMENTS

On June 22, 2004, President Bush signed into law H.R. 1086, which includes the Antitrust Criminal Penalty Enhancement and Reform Act of 2004.  The Act increases the maximum Sherman Act corporate fine to $100 million, the maximum individual fine to $1 million, and the maximum Sherman Act jail term to 10 years.  The Act also enhances the incentive for corporations to self report illegal conduct by limiting the damages recoverable from a corporate amnesty applicant, that also cooperates with private plaintiffs in their damage actions against remaining cartel members, to the damages actually inflicted by the amnesty applicant's conduct.

The increase in criminal penalties will bring antitrust penalties in line with those for other white-collar crimes and will ensure the penalties more accurately reflect the enormous harm inflicted by cartels in today's marketplace.  In addition, the detrebling provision of the Act removes a major disincentive for amnesty applications and hence, will lead to the exposure of more cartels, making the Division's Corporate Leniency Program even more effective in detecting and prosecuting cartels.  The detrebling amendment applies to a corporation and its executives, who cooperate with the government investigation through the Antitrust Division's Corporate Leniency Policy.  The amendment limits the liability of a successful leniency applicant and its executives to single damages without joint and several liability -- i.e., the applicant would only be liable for actual, compensatory damages attributable to the harm its own conduct caused.  In return, the bill requires the applicant and its executives to provide full cooperation to the victims in their lawsuit against the other conspirators for treble damages.  Because all other conspirator firms remain jointly and severally liable for treble damages caused by the conspiracy, the victims' potential total recovery is not reduced by this legislation.  Furthermore, the amendment likely will (1) increase the number of criminal antitrust conspiracies that are exposed and prosecuted; (2) increase compensation to victims of criminal antitrust conspiracies through the required cooperation provided to the victims by the amnesty applicant; (3) further destabilize, and deter the formation of, criminal antitrust conspiracies by creating an additional major

incentive to self-report the violation; (4) reduce the costs of investigating and prosecuting criminal antitrust conspiracies; and (5) reduce the cost for victims to recover the damages they suffer from criminal antitrust conspiracies.

The U.S. Sentencing Commission promulgated a revised Antitrust Guideline which provides for the imposition of sentences in accordance with the new statutory maximums. The revised Antitrust Guideline, which increases the base offense level and the affected commerce table to align Guideline sentences more closely with the new statutory maximums, went into effect on November 1, 2005.