# Exhibit 4



# DEPARTMENT OF JUSTICE

The Fifteenth Annual

NATIONAL INSTITUTE ON WHITE COLLAR CRIME

Presented By The
ABA's Criminal Justice Section

"WHEN CALCULATING THE COSTS AND BENEFITS OF
APPLYING FOR CORPORATE AMNESTY,
HOW DO YOU PUT A PRICE TAG ON
AN INDIVIDUAL'S FREEDOM?"

By

SCOTT D. HAMMOND
Director of Criminal Enforcement
Antitrust Division
U.S. Department of Justice

Presented at

The Westin St. Francis Hotel
San Francisco, California

March 8, 2001

# WHEN CALCULATING THE COSTS AND BENEFITS OF APPLYING FOR CORPORATE AMNESTY, HOW DO YOU PUT A PRICE TAG ON AN INDIVIDUAL'S FREEDOM?

## I. The Fork In The Road

When a company discovers that it has committed an antitrust crime, it has two options. It can either report the conduct and seek corporate amnesty or take cover and hope to avoid prosecution. Since this is often a difficult decision, the Antitrust Division has tried to make it easier by making the consequences of pursuing each option as clear and distinct as possible. We developed a Corporate Leniency Program ("Amnesty Program") that provides the ultimate prize for companies that choose to self report -- no criminal conviction, no criminal fine, and non-prosecution protection for all officers, directors, and employees -- and we made the requirements for entering the program as transparent and attainable as possible.[1] No other governmental voluntary disclosure program creates as great an opportunity or incentive for corporations to come forward and cooperate.

Conversely, companies that do not take advantage of the Amnesty Program and elect to hunker down risk enormous legal, financial, and human consequences. The Division has raised the stakes for companies that choose the wait-and-see approach by instituting policies and strategies that (1) dramatically increase the risk that antitrust violations will ultimately be detected, and (2) result in severe consequences for companies and their executives who fail to provide timely cooperation. This paper will explore some of these policies and, in particular, will explain how a company's failure to seek corporate amnesty or, at least, provide timely cooperation can have potentially devastating consequences on a company's greatest asset -- its officers, directors, and employees.

---

[1] For a more detailed discussion of the requirements and application of the Division's Amnesty Program, see, "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998); "Making Companies An Offer They Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999); and "Lessons Common To Detecting And Deterring Criminal Activity," speech by Scott D. Hammond, before 3rd Nordic Competition Policy Conference (September 12, 2000). All of the Division speeches cited in this paper can be found at the Division's website at www.usdoj.gov/atr.

## II. Choosing Not To Come Forward Is An Increasingly Risky Strategy

It is a far riskier proposition today to roll the dice and choose not to report antitrust wrongdoing than it used to be. The Division simply has more investigative tools in its arsenal than ever before. Our ability to discover and investigate antitrust offenses has dramatically improved based on a number of developments, including: (1) the high incidence of self reporting by amnesty applicants, as well as early cooperation from companies and individuals, even when amnesty is no longer available; (2) the Division's highly successful proactive use of amnesty, referred to as "Amnesty Plus," complemented by its proactive efforts to profile markets where cartel activity may be ongoing; and (3) the increased enforcement efforts and assistance provided by foreign antitrust authorities.[2]

### A.    The Amnesty Race

Over the last five years, the Amnesty Program has been responsible for detecting and prosecuting more antitrust violations than all of our search warrants, consensual-monitored audio or video tapes, and cooperating informants combined. It is, unquestionably, the single greatest investigative tool available to anti-cartel enforcers. Since we expanded our Amnesty Program in 1993, there has been more than a ten-fold increase in amnesty applications. In the last two years, cooperation from amnesty applicants has resulted in scores of convictions and well over $1 billion in fines. Moreover, a number of other countries, including Canada, the United Kingdom, Germany, and Brazil, as well as the European Union (EU), have followed with their own leniency programs. With the global interest and attention on leniency programs, the percentage of foreign-based companies applying for amnesty in the United States is approaching the rate of U.S.-based applicants.

The Amnesty Program works because it offers a very predictable and favorable alternative to the potentially devastating corporate and individual consequences if we discover the conduct the hard way. The catch is that it is only available to the first one in the door. If you are second, even if only by a matter of a few hours, which has happened on a number of occasions, the second firm and all of its culpable executives will be subject to full prosecution. This "winner-take-all" approach sets up a race, and this dynamic leads to tension and mistrust among the cartel members. For example, consider the very common situation when a cartel first learns that it is under investigation, and each member of that cartel knows that any of its co-conspirators can be the first to come forward in exchange for total amnesty -- a decision that will seal the fate of the rest.

---

[2]Other factors which have contributed to our success in fighting international cartels, such as the reallocation of additional resources to fighting international cartels and our improved working relationships with the FBI and the INS, are discussed in more detail at "Are the Recent Titanic Fines in Antitrust Cases Just the Tip of the Iceberg?," speech by Gary R. Spratling, before ABA National Institute On White Collar Crime (March 6, 1998).

Imagine the vulnerability of being in that position and asking yourself, "Can I really put my trust in my competitors?"

    1.    <u>Opening Up The Race By Not Requiring "Decisive Evidence" For Admission</u>

The Division has adopted a number of policies and strategies to further fuel the amnesty race dynamic. For example, the Division's Amnesty Program does not impose the "decisive evidence" requirement found in the EU leniency model.[3] Under our program, applicants must report their involvement with candor and completeness and must provide full, continuing, and complete cooperation that advances the investigation. In some cases, an amnesty applicant's cooperation will provide sufficient evidence to convict all of the remaining cartel members. However, in other cases, the applicant's full cooperation will not, in and of itself, amount to "decisive" evidence of the existence of the cartel, but it may *lead to* such evidence. In fact, some of the best results under our amnesty program were achieved with the help of amnesty applicants that, because of their peripheral role, would not have qualified under a decisive evidence standard.[4] The absence of a decisive evidence requirement intensifies the race by expanding the field of players that are eligible to claim the big prize. In addition, this policy removes any incentive for a company to settle on a strategy to sit back after conducting its internal investigation in hopes that it will be able to leapfrog over another company that may subsequently bring the matter to our attention by quickly coming forward and giving us the case with a nice bow on it. Such a strategy simply will not work.

    2.    <u>Securing Your Place In Line With A Marker</u>

Consistent with the Division's message that guilty parties should come forward as soon as possible in order to obtain amnesty, the Division has adopted a policy that allows a company to secure its place at the front of the line by reporting the criminal conduct and putting down a "marker." The company will then be given a certain period of time to complete its internal investigation, report its findings to the Division, and perfect its amnesty application. The period

---

[3] The Canadian, U.K., and Brazilian leniency programs also do not have decisive evidence requirements.

[4] For example, in our graphite electrodes investigation, the amnesty applicant played only a peripheral role in the conspiracy and thus was not able to provide us with "decisive evidence." In this respect, the company's limited role made it more attractive as an amnesty applicant than the other members of the cartel that were far more culpable. While the amnesty applicant did not attend the key conspiratorial meetings, it provided the Division with information that allowed us to obtain warrants to search the offices of several of the cartel members. The execution of the warrants, together with the other cartel members' knowledge of an insider's cooperation, quickly led to the guilty pleas of other co-conspirators.

of time afforded to a company for perfecting its application will vary depending on the circumstances. For example, if a company comes forward to report criminal conduct and requests a marker on a matter in which there is no open investigation, it may be appropriate to grant the company several weeks to complete its internal investigation. On the other hand, if a company comes forward and reports criminal conduct in an ongoing investigation, depending on the circumstances, the marker may be available for only a few days or may not be available at all.

The use of the marker system underscores the importance of companies coming forward as soon as possible after detection of the offense. While the company has a marker, no other company will be permitted to jump over the amnesty applicant at the front of the line, even one prepared to perfect its amnesty application immediately. If the company holding the marker fails to perfect its application within the allotted time frame, it will lose its place in line and other companies will then be considered for amnesty in the order in which they came forward.

To ensure that companies are not penalized for coming forward before they have completed their internal investigation, the Division's policy is to protect amnesty applicants if, as a result of the company's good faith efforts, their executives disclose additional antitrust offenses that were not reported in the original amnesty application. For example, if an ensuing investigation uncovers anticompetitive activity that is more extensive than the conduct originally reported or falls outside of the non-prosecution protection of the conditional amnesty letter,[5] then the amnesty coverage will be expanded to include the newly discovered conduct so long as the company has met its cooperation obligations and the company can meet the criteria for amnesty on the newly discovered conduct.

### B. Amnesty Plus, Cartel Profiling, And Other Proactive Strategies
#### 1. The Division's Track Record

There are over 30 sitting grand juries currently investigating suspected international cartel activity. Amazingly, over half of these investigations were initiated as a result of leads generated during an investigation of a completely separate market. What that simply means is that every time the Division opens an international cartel investigation, the chances are better than even that it will also uncover a second, separate conspiracy. This recurring pattern has led the Division to develop a number of proactive strategies for uncovering antitrust offenses. Before discussing these strategies, however, let me offer two prime examples of the "rollover" pattern.

It has been widely acknowledged that one of the keys to the Division's success in cracking the worldwide vitamin cartel was the cooperation provided by Rhône-Poulenc SA pursuant to its amnesty application. However, what may not be fully appreciated is that the Division had been investigating the vitamin industry for more than two years before Rhône-Poulenc came forward. By the time Rhône-Poulenc sought amnesty, the investigation had already uncovered conspiracies to fix prices and allocate markets in smaller vitamins, such as naicin, naicinamide, and choline

---

[5]For example, an applicant's cooperation may lead to evidence showing that the anticompetitive activity was broader in terms of its geographic scope or the number of products covered by the conspiracy.

4

chloride. These investigations were generating leads that indicated the existence of cartel activity in the massive vitamin A, C, and E markets. It was the development of these leads that precipitated Rhône-Poulenc's decision to seek amnesty. With one investigation rolling over into the next, the Division has to date uncovered cartel activity in 12 different vitamin markets. These investigations have led to the prosecution of 11 companies and 13 individuals, nearly $1 billion in fines, and the incarceration of 11 executives, including 6 foreign nationals. The investigation is continuing.

The second example involves the fruits of the Division's investigation of the worldwide lysine cartel. This example is particularly instructive because, while the targeted markets here are not nearly as closely related as they were in the vitamin cases, each investigation led directly to the next. The connection between the Division's lysine and citric acid investigations is generally known because of the publicity surrounding the prosecution of ADM and its former high-ranking executives. However, what is not as evident is that the investigation and prosecution of the international *citric acid* cartel led to the investigation and prosecution of the international *sodium gluconate* cartel which resulted in the investigation and prosecution of the international *sodium erythorbate* cartel which, in turn, led to the investigation and prosecution of the *maltol* cartel. In all, 10 companies and 11 individuals from 7 different countries were convicted and paid over $225 million in criminal fines as a result of the these five inter-connected investigations.

### 2.   The Amnesty Plus Program

In response to the recurring patterns described above, the Division has developed a number of proactive strategies for uncovering antitrust offenses. First, the Division has developed a policy called "Amnesty Plus." The policy takes a proactive approach to attracting amnesty applications by encouraging subjects and targets of ongoing investigations to consider whether they may qualify for amnesty in other markets where they compete. So, even though a company may not qualify for amnesty for the initial offense, the value of its assistance in disclosing a second cartel will lead to amnesty for the latter offense and a substantial additional reduction in the fine it would pay for its participation in the first offense. The Division's Amnesty Plus program creates an attractive inducement for encouraging companies who are already under investigation to report the full extent of their antitrust crimes and begin to put the matters behind them.[6]

### 3.   Cartel Profiling

However, as indicated from the vitamin and lysine examples discussed above, the Division will not relax and wait for companies to come forward and report new violations. Instead, the Division has had success engaging in "cartel profiling" aimed at ferreting out these violations. The Division will target its proactive efforts in industries where we suspect cartel activity in adjacent markets or which involve one or more common players from other cartels. The Division

---

[6]For a more detailed discussion of the Division's Amnesty Plus program, see, "Making Companies An Offer They Shouldn't Refuse" at pp. 7-8.

has developed a proven track record of digging deep and uncovering related offenses through the "cartel profiling" technique. A company that is fortunate enough to uncover its participation in a second conspiracy before we do is advised to take advantage of the Amnesty Plus program while it is still available.

        4.    <u>Penalty Plus -- The "Stick" Side To The Amnesty Plus Carrot</u>

Companies that elect not to take advantage of the Amnesty Plus opportunity risk potentially harsh consequences. If a company is knowledgeable about a second offense and decides not to report it, and the conduct is later discovered and successfully prosecuted, where appropriate, we will urge the sentencing court to consider the company's and any culpable executive's failure to report the conduct voluntarily as an aggravating sentencing factor. We will request that the court impose a term and conditions of probation for the company pursuant to U.S.S.G. §8D1.1, and we will pursue a fine or jail sentence at or above the upper end of the Guidelines range. Moreover, where multiple convictions occur, a company's or individual's Guidelines calculations may be increased based on the prior criminal history. For a company, the failure to self report under the Amnesty Plus program could mean the difference between a potential fine as high as 80 percent or more of the volume of affected commerce versus no fine at all on the Amnesty Plus product. For the individual, it could mean the difference between a lengthy jail sentence and avoiding jail altogether.

        C.    **<u>Increased Assistance From Foreign Antitrust Authorities</u>**

Our ability to detect and prosecute international cartel activity has been enhanced by the increased cooperation and assistance that we have received from foreign governments, and from their own enforcement efforts. The Division has been at the forefront in building a worldwide consensus that international cartel activity is pervasive and is victimizing businesses and consumers everywhere, and in establishing cooperative relationships with the competition authorities in other countries in order to more effectively investigate and prosecute international cartels. For example, in the Fall of 1999, the Division hosted the first ever international meeting of cartel investigators and prosecutors. Representatives from the competition law enforcement agencies of over 25 countries and the EU gathered in Washington for a two-day program devoted to the practical aspects of investigating and prosecuting international cartels. The event was such a success that the U.K.'s Office of Fair Trading hosted a similar conference last year, and the Canadian Bureau of Competition is already planning for the next workshop in November 2001. Perhaps even more important than the exchange of ideas and "best practices" at these meetings, the workshops have provided enforcers with the opportunity to develop close working relationships which then serve as the basis for future formal and informal cooperation.

The improved cooperation with foreign law enforcement authorities has provided us with increased access to foreign-located evidence and witnesses that has proven to be instrumental in the cracking of a number of international cartels. While I am constrained as to what I can reveal

about the nature of this assistance, I will offer one compelling statistic to demonstrate the breadth of this cooperation. *In the last year alone,* foreign authorities from *five* different countries have executed *search warrants* at our request in more than a half-dozen of our international cartel investigations. For anyone who is familiar with the history of foreign assistance in antitrust matters, this is a remarkable advancement in international cooperation.

Of course, antitrust authorities in Europe, Asia, and around the world are not content with merely assisting our investigations and are becoming increasingly aggressive in investigating and sanctioning cartels that victimize their consumers. Seemingly with each passing day, the antitrust community learns of a foreign government that has enacted a new antitrust law, created a new cartel investigative unit, obtained a record antitrust fine, or developed a new Corporate Leniency program. Suffice to say, the world is changing, antitrust authorities are working more closely together than ever, and the safe harbors for cartel activity are shrinking.

### D. Financial Benefits Of Seeking Amnesty

Given the risks of detection described above, it is not surprising that so many U.S. and foreign companies are choosing to come forward and seek corporate amnesty instead of hunkering down and taking their chances. Quite often the difference between first or second in the door can be measured in tens, if not hundreds, of millions of dollars in fines, as well as criminal exposure for the culpable executives. For example, the vitamin, graphite electrode, marine construction, and fine arts auction investigations are prime examples of the stunning financial advantages for companies that take advantage of the Amnesty Program.[7] In each of these matters, the amnesty applicant paid *zero* dollars in criminal fines.

- Vitamins. In the vitamin investigation, the applicant's cooperation directly led to F. Hoffman-La Roche's and BASF's decision to plead guilty and pay fines of $500 million and $225 million, respectively.

- Graphite Electrodes. In the graphite electrode investigation, the next company in the door after the amnesty applicant paid a $32.5 million fine, the third company in paid a $110 million fine, and a fourth company pled guilty and paid a $135 million. Mitsubishi was recently convicted at trial for its role in the cartel and is scheduled to be sentenced in May 2001.

---

[7]The Division's policy is to treat as confidential the identity of amnesty applicants and any information obtained from the applicant. Thus, the Division will not disclose an amnesty applicant's identity, absent prior disclosure by or agreement with the applicant, unless required to do so by court order. In the four cases noted herein -- vitamins, graphite electrodes, marine construction, and fine arts auctions -- the amnesty applicants issued press releases announcing their conditional acceptance into the Corporate Amnesty Program thereby obviating the need to maintain their anonymity.

- <u>Marine Construction</u>. In the marine construction investigation, a corporate co-conspirator agreed to plead guilty and cooperate with the government's investigation shortly after the investigation went overt based on information provided by the amnesty applicant. Though the company provided very valuable cooperation and received a significant reduction in its fine for that cooperation, it still paid a fine of $49 million.

- <u>Fine Art Auctions</u>. The amnesty applicant's cooperation directly resulted in Sotheby's decision to plead guilty and pay a $45 million fine.

Some commentators have downplayed the financial benefits of the Amnesty Program by noting that any savings are more than outweighed by the company's exposure to treble damage actions by the victims and the possible exposure to financial penalties in other jurisdictions. Some have advised that, before making a decision to seek amnesty, companies should conduct a cost/benefit analysis factoring in only the companies' potential financial exposure -- to other jurisdictions, to the victims, to indirect purchasers, to shareholders, and to others. There are two serious problems with this approach.

One, the analysis makes sense only if you assume that the company can avoid prosecution and the parade of financial horribles if *it* chooses not to come forward. However, for the reasons described above, that outcome is almost always going to be out of the company's control. A company that elects not to come forward and puts itself and its best interests at the mercy of its competitors (and all of their current and former executives with knowledge of the conspiracy) is taking a grave risk. In most cases, by the time the inside or outside counsel learns of the offense, it is already too late to contain the leakage of information to the government. The boat is already sinking, and the only question is whether you are going to grab the life preserver.

As discussed below, the second problem with approaching the decision whether to seek amnesty through a financial cost/benefit analysis is that there is no way to quantify the value of the program's greatest benefit -- non-prosecution protection for all officers, directors, and employees. How do you put a price tag on an individual's freedom?

### III. **Individuals Have The Most At Stake In The Amnesty Decision**

### A. **Individual Defendants Face An Increasing Risk Of Jail**

A company's failure to seek corporate amnesty can have potentially devastating consequences on its executives. If the company gambles that it can avoid prosecution and loses, its executives will pay what most would consider the heaviest price. In the past two years, the

stakes have increased for individuals. While many observers have focused on the record corporate fines over the last few years, fewer have recognized the recent dramatic increase in the

8

length and incidence of individual jail sentences.

- **Number of Individuals Jailed.** An individual defendant faces a greater risk of jail time today than even a few years ago. Approximately 50 individual defendants were imprisoned for antitrust and related offenses in FYs 1999 and 2000, which is more than the total number of individuals imprisoned in the previous *five years combined.*

- **Total Jail Days.** Similarly, individual defendants were sentenced to more jail days in FYs 1999 and 2000 (12,246 days) than in the prior five years combined (9,920 days). That equates to nearly 34 years of jail time imposed in FYs 1999 and 2000, including *15* sentences of 12 months or more.

- **Foreign Nationals Jailed.** The Division has convicted foreign executives from Germany, Belgium, The Netherlands, England, France, Switzerland, Italy, Canada, Mexico, Japan, and Korea for engaging in cartel activity, resulting in heavy fines and, in some cases, imprisonment. In FYs 1999 and 2000, six foreign nationals were sentenced to serve time in U.S. prisons for antitrust offenses. Just last month, the United States entered into a plea agreement in which, for the first time ever, a Japanese executive has agreed to face a possible jail sentence for a violation of U.S. antitrust law.

B. <u>Individuals Pay A Heavy Price When Their Companies Don't Provide Timely Cooperation</u>

In order to properly "incentivise" the Amnesty Program, and timely cooperation in general, the Division has adopted a number of policies aimed at the treatment of companies and their executives who do not provide timely cooperation. Again, while the consequences of these policies may not fit neatly into a company's financial cost/benefit analysis in deciding whether or not to seek corporate amnesty or to provide timely cooperation, the fate of the company's executives ought to be front and center in assessing what is in the best overall interest of the company's welfare.

1. <u>The Division's "Carve-Out" Policy.</u>

Companies that come forward too late in the investigation risk more than a heavier fine -- while the Division will negotiate a corporate disposition (which may require a mid- to upper-end Guidelines fine), the culpable officers, directors, and employees will be carved out of the non-prosecution protection of the plea agreement. Individuals who are carved out of the plea agreement will then have to negotiate separate plea agreements or be subject to indictment. This policy is meant to, and does, take a serious toll on the companies and their executives.

The sorbates investigation provides an example of the impact of this policy. The sorbates investigation uncovered a seventeen-year international price-fixing conspiracy in the food

9

preservatives industry. To date, the investigation has produced cases against five corporate defendants and nine individuals and resulted in over $130 million in criminal fines. Daicel Chemical Industries Ltd. (Daicel) and Ueno Fine Chemicals Industry Ltd. (Ueno), two Japanese firms, were the last two companies to plead guilty in the investigation. Daicel paid a $53 million fine, and Ueno has been sentenced to pay an $11 million fine.

Perhaps of more significance than the corporate fines, four current top executives from both Daicel and Ueno were carved out of the non-prosecution protection of the corporate agreements. Seven of those executives were indicted, including a Managing Director from Daicel and a member of Ueno's Board of Directors, and are now international fugitives. As such, they could be arrested, detained, and held for trial if they travel to or through the United States or one of its territories. In addition, they could be arrested, detained, extradited to the United States, and held for trial if they travel to or through any one of a host of countries with which the United States has an extradition treaty covering antitrust crimes. If jurisdiction is obtained over any of these individuals and they are convicted, then they will each face the serious prospect of a lengthy jail sentence. While they may ultimately escape U.S. jurisdiction and the inside of a prison cell, they will forever be looking over their shoulders, unable to regain their lives as international businesspeople, and forever marked as international fugitives.

Of course, the carve-out policy also takes an enormous toll on the company, which can find its senior management left in shambles. Imagine, as was the case in the matters described above, having key members of your senior management -- individuals who are the face and link of the company to its customers -- indicted and labeled as international fugitives. What is the impact on a multi-national company when these individuals can no longer travel to serve those customers or even to visit a company's facilities in the United States or elsewhere? Companies who wait too long to come forward and cooperate will find that when the time comes, it may be very difficult to put the matter behind them.

    2.  <u>Restricting The Use Of No-Jail Deals</u>

Because of the frequent problems we face in obtaining jurisdiction over foreign nationals living abroad, multi-national companies and their foreign executives often have a unique, but limited, opportunity. Foreign executives who come forward (with or without the company) and provide timely cooperation often can leverage their jurisdictional advantage to secure either immunity or a plea agreement with a "no-jail deal." However, the window of opportunity for this offer is limited. If a U.S. individual co-conspirator of equal or lesser culpability has either entered into a plea agreement calling for jail time or has been sentenced to jail time, we will not consider a no-jail deal for foreign national, regardless of how remote the chances are of ever obtaining jurisdiction over that individual.

Moreover, regardless of whether a U.S. executive has agreed to or has been sentenced to jail time, foreign nationals who don't provide timely cooperation that can advance the

10

investigation will still not be considered for no-jail deals. Obviously, what constitutes timely and valuable cooperation will depend entirely on the circumstances of the investigation. So, in some cases, an amnesty applicant may provide sufficient information to remove the possibility of a no-jail deal for the executives of a company that is second in the door. In other cases, where the evidence is not as developed, no-jail deals may be available deeper into the investigation.

The Division's policies on no-jail deals for foreign nationals also affect U.S. corporations and individuals who are potential targets in international cartel investigations. Counsel representing these targets must be aware of the pressing incentives for foreign companies and executives to come forward early and cooperate while the opportunity for amnesty or no-jail deals exist and may want to consider getting in to see the Division first. While a U.S. executive does not have the same jurisdictional shield to leverage his offer of cooperation, timely cooperation will always be generously rewarded.

The "no-jail deal" and "carve out" policies will hopefully provide companies and individuals with clear and distinct alternatives. Companies and their culpable executives should expect that, if they do not provide timely cooperation, the executives will be carved out of any corporate plea resolution. Moreover, the individuals should understand that any subsequent plea disposition with the Division would have to include a jail component. If no deal can be reached, then the individuals will be indicted.

The Division understands, of course, that in many cases our insistence on jail time will result in no possibility of a plea agreement resolution and the indictment of the foreign defendant. For that reason, corporate and individual counsel routinely approach the Division with lucrative offers to pay heavy corporate and individual fines in exchange for no-jail deals for the key executives. In support of these offers, counsel will often argue that the conviction and fine are better than "an empty indictment." However, that is clearly not the case for a law enforcement authority whose interest is deterrence. As discussed above, the stigma and uncertainty of being an international fugitive is a far greater deterrent than a no-jail conviction, no matter the amount of the individual fine.

### 3. Rejecting The Cultural Immunity Defense

As discussed above, under certain circumstances, the Division may make concessions when it can not obtain personal jurisdiction over a foreign national. When a foreign national provides timely cooperation, that could mean a no-jail deal or even immunity. When cooperation by the foreign national is not timely, it may simply mean a shorter jail sentence than would otherwise be warranted absent the jurisdictional shield. However, the Division will not mitigate a foreign national's sentence or make other concessions based on a "cultural immunity" defense.

In pre-indictment "pitch" meetings for foreign nationals, the Division is frequently asked to take into consideration the following arguments in exercising its prosecutorial discretion:

11

(1) the individual could not be prosecuted criminally for the cartel activity under the laws of the country where he/she resides; and (2) even if the conduct would violate the criminal, civil, or administrative laws of the defendant's home country, the cartel activity is still a culturally accepted way of doing business there. Neither argument will be given any credit by the Division. First, regardless of the cultural or legal norms in the defendant's home country, the foreign nationals we have prosecuted, without fail, were fully aware that their conduct violated U.S. antitrust laws, and they still targeted U.S. businesses and consumers as part of their fraudulent schemes. In fact, in most cases, cartel members go to great lengths to conceal their conduct by avoiding meeting in the United States or by not involving U.S. employees, while continuing to target the U.S. market. Second, even assuming cartel activity is culturally accepted abroad, where it adversely impacts U.S. consumers, the Division has an obligation to deter such conduct not reinforce it with lenient treatment.

### C.    The Amnesty Program's Biggest Reward

The promise of immunity for officers, directors and employees who come forward with the company and cooperate will often be the Amnesty Program's biggest reward. While this is certainly demonstrated in the incarceration statistics cited above, concrete examples from two recent investigations may make this point even clearer.[8]

- **Graphite Electrodes.** Compare the fate of the executives from the two U.S. companies involved in the graphite electrode conspiracy. The Carbide/Graphite Group, Inc. obtained corporate amnesty, and so *all* of its officers, directors, and employees received full non-prosecution protection for any crimes committed in connection with the antitrust conspiracy. UCAR International, on the other hand, did not come forward and offer its cooperation until after the search warrants were executed and one other company had agreed to plead guilty and cooperate. Three of UCAR's top executives were carved out of the non-prosecution protection of its plea agreement and were subsequently charged. UCAR's president was convicted and sentenced to serve 17 months in jail *and* to pay a $1.25 million individual fine (the second largest individual antitrust fine ever imposed).[9] UCAR's vice-president was also convicted and sentenced to serve 9 months in jail

- *and* to pay a $1 million individual fine (the third largest individual antitrust fine ever imposed). The third UCAR executive carved out of the corporate plea agreement was indicted and remains at large as an international fugitive.

---

[8] As noted above, the amnesty applicants in these examples have already publicly announced their acceptance into the Amnesty Program.

[9] The highest antitrust fine ever imposed against an individual is $10 million. It was obtained against the president of a German company in this same investigation.

12

- **Vitamins.** The second example compares the treatment of the executives from the three foreign companies involved in the worldwide vitamin cartel. Rhône-Poulenc obtained corporate amnesty, and *all* of its officers, directors, and employees in the United States and abroad received full non-prosecution protection for any crimes committed in connection with the antitrust conspiracy. F. Hoffmann-La Roche (HLR) and BASF AG, on the other hand, did not offer their cooperation until after they heard the bad news from Rhône-Poulenc. Four employees from both HLR and BASF were carved out of the non-prosecution protection of the corporate plea agreements. To date, six of these employees, all foreign nationals (three each from HLR and BASF), have been charged and have pleaded guilty. All six defendants submitted to U.S. jurisdiction, paid heavy fines, and served time in U.S. prisons.

### D.  Who Is Looking Out For The Best Interests Of The Individuals?

In light of the tremendous impact that a company's decision whether to seek corporate amnesty can have on its officers, directors, and employees, it is fair to ask (1) whether it is possible to quantify the potential rewards and consequences as they relate to individuals with exposure, and (2) who is looking out for the best interests of those individuals. Some of the commentary from the private bar on the pros and cons of pursuing corporate amnesty seems to be reduced to a cost/benefit analysis where the risks and benefits are measured in dollars and cents. However, as explained above, monetary cost savings may not be the most important consideration when the freedom of individuals is hanging in the balance. If the company is more concerned about the financial consequences of a decision to self report than it is about the fate of its executives with culpability, then the interests of the company and those individuals are almost assuredly in conflict. If that is the case, who is looking out for the best interests of those individuals?

If company counsel claims to represent company employees with potential criminal exposure then, once a decision has been made not to seek corporate amnesty (or should corporate amnesty be denied), does counsel not have an ethical obligation to: (1) advise those individuals of the nature of the potential conflict that exists between the company and the individuals; (2) inform individuals of the need to seek separate counsel to advise them on the conflict and future representation; or (3) obtain informed consent (assuming such consent is even possible) before engaging in further representation of the individuals; and (4) if dual representation continues, advise those individuals of *their* personal alternatives, including the possibility of seeking amnesty personally, irrespective of what the company does, under the Division's Individual Leniency Policy?

If company counsel does not claim to represent company employees with potential criminal exposure then, once a decision has been made not to seek corporate amnesty (or should corporate amnesty be denied), does counsel not have an ethical obligation to: (1) advise those individuals that he/she does not represent them; (2) advise those individuals of the potentially

13

adverse positions of the company and the individual employees; and (3) advise them of the right (or need) to consult with counsel of their own choosing?

These are serious ethical dilemmas for the company and its counsel. In a number of recent pre-indictment "pitch" meetings, the Division has heard from independent counsel representing foreign nationals that they were brought belatedly into the investigation when it was already too late to save the individual from indictment and incarceration, if convicted. These attorneys have urged us not to hold the foreign individual responsible for what they claim was, in essence, a corporate decision not to provide timely cooperation. In support of this argument, they have claimed: (1) the individuals were not separately represented until too late in the process and so were never adequately advised as to the personal consequences of not providing timely cooperation; and (2) it would have been unthinkable by the prevailing cultural norms to believe that the individuals could have elected to cooperate without the company's concurrence. As to the first argument, the fact that company counsel may have labored under a conflict of interest will rarely, under these circumstances, be seen as a factor in mitigation for the individual. As for the second argument, to the extent such norms exists, the Division will not credit this sort of "cultural immunity" defense and will direct its enforcement efforts to dispel, rather than reward, their continued observance. Foreign-based companies, just like their U.S. counterparts, need to be aware that, if they choose not to take advantage of the Corporate Amnesty Program, they leave themselves vulnerable to executives who may go it alone under the Individual Leniency Program in order to protect their personal interests.

## IV. Conclusion

Particularly in international cases where we face jurisdictional hurdles, it is critical that there be big incentives for companies and their executives to come forward and cooperate and, conversely, big adverse consequences for companies and their executives that elect to hunker down and hope that we never make our case. By being vigilant in adhering to the policies described above, we can present a company and its executives with two clear and distinct paths from which to choose. It's critical that the company then make the right choice. Because, with the freedom of its executives potentially on the line, what is at stake can not be measured on a balance sheet.