# Exhibit 5

# DEPARTMENT OF JUSTICE

THE 3RD NORDIC COMPETITION POLICY CONFERENCE

FIGHTING CARTELS - WHY AND HOW?

LESSONS COMMON TO DETECTING
AND DETERRING CARTEL ACTIVITY

By

Scott D. Hammond
Director Of Criminal Enforcement
U.S. Department of Justice
Antitrust Division

Presented at

Modern Museum
Stockholm, Sweden

September 12, 2000

# LESSONS COMMON TO DETECTING AND DETERRING CARTEL ACTIVITY

## I. Introduction

It is a pleasure to be here and to share with you the United States' experiences in detecting and deterring cartel activity. In discussing these two topics -- detection and deterrence -- I will focus on our experience with our Corporate Leniency Program, or as it is also known, the Corporate Amnesty Program ("Amnesty Program"). The Amnesty Program has been largely responsible for uncovering the majority of the large international cartels that we have recently prosecuted. Its success has already led a number of countries -- such as Canada, the United Kingdom, Germany, and France -- as well as the European Union to develop their own programs with still other countries considering whether to follow. From our perspective, the Amnesty Program is unquestionably the most important investigative tool available for detecting and cracking cartel activity. The success of the Amnesty Program also provides an appropriate lesson on deterrence, the second topic on the agenda. That is because the bedrock principles that apply to effectively *preventing* cartels are also at the core of implementing a successful amnesty program for *detecting* cartel activity once it does occur.

I will focus today on three hallmarks for both a successful Amnesty Program and an enforcement program that deters cartel activity. First, one's antitrust laws must provide the threat of stiff sanctions for those who participate in hardcore cartel activity. Second, antitrust authorities must cultivate a law enforcement environment in which business executives perceive a significant risk of detection by antitrust authorities if they either enter into, or continue to engage in, cartel activity. Third,

antitrust authorities must provide transparency, to the greatest

extent possible, throughout the anti-cartel enforcement program so that prospective cooperating parties can predict with a high degree of certainty their treatment following cooperation. These three major cornerstones -- stiff potential penalties, heightened fear of detection, and transparency in enforcement policies -- are at the heart of both our Amnesty Program and our deterrence efforts.

## II. The Corporate Amnesty Program

Before I address these three principles, I need to share with you some background information on how the Amnesty Program was developed and how it works in order to put its impact into perspective. The original version of our Amnesty Program actually dates back to 1978. Under that program, violators who came forward and reported their illegal activity before an investigation was underway were *eligible* to receive a complete pass from criminal prosecution. The grant of amnesty, however, was not automatic and the Division retained a great deal of prosecutorial discretion in the decision making process. Unfortunately, for reasons that I will discuss in more detail a little later, it became clear over time that this program was flawed. It resulted in relatively few amnesty applications and did not lead to the detection of a single international cartel.

In 1993, the Antitrust Division dramatically expanded its Amnesty Program to increase the opportunities and raise the incentives for companies to report criminal activity and cooperate with the Division. The Amnesty Program was revised in three major respects. First, the policy was changed to ensure that amnesty is *automatic* if there is no pre-existing investigation. That is, if a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is

2

certain and is not subject to the exercise of prosecutorial discretion. Second, the Division created an alternative amnesty, whereby amnesty is available even if cooperation begins *after* an investigation is underway. Third, if a corporation qualifies for automatic amnesty, then all directors, officers, and employees who come forward with the corporation and agree to cooperate also receive automatic amnesty. (See attached Corporate Leniency Policy). One aspect of the program that did not change is that amnesty applies only to criminal sanctions, and firms accepted into the Amnesty program are required, where possible, to make full restitution to their victims in the United States.

Because of the novelty and uniqueness of this policy, it took some time before the private bar and business community gained confidence in the program. However, over the last five years, the results have been staggering. There has been more than a ten-fold increase in amnesty applications during this time frame. Moreover, in the last two years alone, cooperation from amnesty applications have resulted in scores of convictions and well over $1 billion in fines. More than anything else, the expansion of the Amnesty Program has been responsible for the success that we have had in cracking international cartels.

### III. The Threat Of Severe Sanctions

Treating Cartel Activity As A Crime. With that background, I want to address the first element common to both deterring cartel activity and creating a successful Amnesty Program and that is the threat of severe sanctions for violators. In the United States, hardcore cartel activity -- such as price-fixing, bid-rigging, and customer and market allocation agreements -- is a felony violation of our criminal laws, and both corporations and individuals may be held liable. Corporations risk heavy criminal fines with the maximum potential fine being the greatest of $10 million, twice the gross gain to the cartel, or

3

twice the gross loss suffered by the victims of the conspiracy. The maximum sentence for individuals is three years imprisonment and a fine which is the greatest of $350,000, twice the gross gain to the cartel, or twice the gross loss suffered by the victims of the conspiracy.

Of course, the United States is in the minority, albeit a growing one, in treating hardcore cartel activity as a crime and prosecuting offending corporations and individuals as criminals. I will not take this opportunity to explore all of the arguments in favor of prosecuting cartel activity criminally except to make the following point relevant to the discussion on deterrence. Based on our experience, there is no greater deterrent to the commission of cartel activity than the risk of imprisonment for corporate officials. Corporate fines alone are simply not sufficient to deter many would-be offenders. For example, in some cartels, such as the graphite electrode cartel, individuals personally pocketed millions of dollars as a direct result of their criminal activity. A corporate fine alone, no matter how punitive, is unlikely to deter such individuals.

<u>The Perceived Risks Must Outweigh The Potential Rewards</u>. While there is no current consensus as to whether cartels should be prosecuted criminally, there should be no dispute that cartel activity will not be deterred if the potential penalties are perceived by firms and their executives as outweighed by the potential rewards. If the potential sentences are not sufficiently punitive, then the potential sanctions will merely be seen as a cost of doing business. Just as the loss of one's liberty will certainly not be viewed in this manner, a heavy corporate fine may also send a powerful deterrent message. To this end, we have recently "upped the ante" by obtaining record-breaking fines against firms who engage in cartel activity. At the time the Amnesty Program was revised in 1993, the highest antitrust fine ever obtained in the United States was less than $3 million. Today, fines of $10 million or

4

more have become almost commonplace with more than 30 imposed in the last five years. In fact, the Division has obtained fines of $100 million or more against five corporate defendants, including a $500 million fine against F. Hoffmann-La Roche (HLR) for its participation in the worldwide vitamin cartel. This dramatic leap in the level of criminal fines, however, is more than just a reflection of our aggressive approach for deterring cartel activity. Rather, because fines in the United States are based in large part on a company's sales in the United States affected by the conspiracy, the record fine levels demonstrate the mammoth size of the international cartels that we have been uncovering, largely through the amnesty program; cartels that simply dwarf the domestic conspiracies that we have previously encountered.

The prosecution of HLR in the vitamin investigation also offers some sobering insight as to the risks companies are willing to take in order to profit from cartel activity and to how inadequate fines may be to ensure specific, let alone, general deterrence. In 1997, two years before HLR's participation in the vitamin conspiracy was exposed, HLR was investigated and convicted of participating in a separate international cartel in the citric acid industry. The firm entered into a plea agreement, agreed to cooperate, and was ordered to pay a $14 million fine -- which at the time was the third largest antitrust fine ever obtained in the United States. As part of its cooperation, HLR was told of the Division's then-covert investigation into the vitamin industry and offered the opportunity to cooperate. The Division interviewed two top executives from HLR who participated in the citric acid conspiracy and who also had dual responsibilities in HLR's vitamin business. HLR and its top executives denied to investigators any knowledge of, or participation in, a vitamin cartel. Of course, we would later learn that HLR had, in fact, engaged in a decade-long, worldwide vitamin cartel, and

5

continued to lead that cartel even after it pled guilty in the citric acid investigation and learned that its vitamin business was under investigation. Instead of being deterred, top-level HLR executives orchestrated false statements to enforcement authorities, took steps to further conceal the firm's illegal activities, and continued to lead the world's other producers in a global cartel. This decision will end up costing HLR well over a billion dollars in criminal fines and civil settlements. In addition, three European executives from HLR, including the two executives who blew their opportunity to come clean in the citric acid investigation, served time in U.S. prisons for their participation in the vitamin conspiracy. Clearly, the $14 million fine in the citric acid prosecution was not nearly enough to deter HLR or its top executives from continuing to participate in the vitamin cartel. Time will tell if the $500 million fine and jail sentences for the HLR executives will.

<u>Corporate Amnesty Can Mean Zero Fines and No Jail</u>. Of course, the Amnesty Program offers companies and their executives an alternative to these potentially harsh sentences. If a company detects an antitrust violation before we do, it has to chose whether to report the violation and seek leniency or to remain silent and hope for the best. When we revised our Amnesty Program, we sweetened the carrot by increasing the opportunities and incentives for companies to self report and cooperate. At the same time, our recent record of successful prosecutions and heavy sentences has sharpened the stick for companies who risk the alternative path.

The question is often raised as to whether an Amnesty Program will work in a jurisdiction where there is no individual liability and, therefore, no possibility of incarceration for culpable executives. Clearly, the opportunity to avoid imprisonment for corporate officials is a major inducement for firms to seek amnesty. However, in my opinion, an Amnesty Program can still succeed if the threat

of heavy fines is significant enough. This belief is supported by our experience with foreign-based firms who have sought and obtained amnesty in international cases at a rate almost equal to their domestic counterparts. For example, the worldwide vitamin cartel was cracked by the cooperation provided by French-based Rhône-Poulenc SA.[1] The company made the decision to come forward even though the culpable French executives resided outside of the United States and our extradition treaty with France does not cover antitrust offenses. So, the opportunity to avoid incarceration for its culpable executives was probably not the major inducement to Rhône-Poulenc's decision to come forward, but rather the desire to avoid a criminal conviction and heavy fine for the corporation. And, indeed, while Rhône-Poulenc paid zero dollars in fines, its principal co-conspirators, HLR and BASF, paid fines of $500 million and $225 million, respectively.

## IV. Fear Of Detection

Building A Strong Enforcement Record. Of course, if firms perceive the risk of being caught by antitrust authorities as very small, then stiff maximum penalties will not be sufficient to deter cartel activity. Likewise, if cartel members do not fear detection, they will not be inclined to report their wrongdoing to authorities in exchange for leniency. Therefore, antitrust authorities must cultivate a law enforcement environment in which business executives perceive

a significant risk of detection by antitrust authorities if they either enter into, or continue to engage in,

---

[1] The Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. However, confidentiality is not required in this case with respect to Rhône-Poulenc's amnesty status, because the company has already issued a press release announcing its acceptance into the Amnesty Program.

cartel activity.

For example, think back to the tapes of the lysine cartel meetings that you watched yesterday. At the time of these meetings, there had been virtually no international cartel prosecutions in the United States, and the revised Amnesty Program was in its infancy. The cartel members took precautions like setting up bogus trade association meetings, creating false documents, and staggering their arrival times at meetings in order to conceal their scheme. It was plain, however, that the cartel members did not fear detection by U.S. or foreign antitrust authorities. In fact, they literally laughed at the very idea of it.

Well, times have changed. In 1993, when the lysine investigation was underway, there were only a handful of Division investigations of alleged international cartel activity. By comparison, the Division currently has roughly *30* grand juries investigating suspected international cartel activity. Similarly, at the time of the lysine investigation, less than 2 percent of our corporate defendants were foreign-based, as compared to nearly 50 percent of our corporate defendants last year. These investigations are uncovering massive cartels and leading to record fines. For example, in the 10 years prior to 1993, the Division obtained, on average, less than *$30 million* in criminal fines annually. The Division's total fines imposed over the last three fiscal years increased from $205 million in FY 1997, to $267 million in FY 1998, to $1.1 billion in FY 1999. Well over 95 percent of these fines were imposed in connection with investigations of international cartel activity.

The Race To The Courthouse. So, have the $100 million-plus fines had a deterrent effect by either stifling the formation of cartels or disbanding them if they already exist? There is no way to quantify the number of cartels that are deterred before they are ever formed, but we are witnessing how our enforcement efforts are influencing cartels that already exist. To put it plainly, cartel

8

members are starting to sweat, and the Amnesty Program feeds off that panic.

The more anxious a company is that its cartel participation may be discovered by the government, the more likely it is to report its wrongdoing in exchange for amnesty. The promise of zero dollars in fines and immunity for culpable executives looms large. Of course, amnesty is only available to the first one in the door. If you are second, even if only by a matter of a few hours, which has happened on a number of occasions, the second firm and all of its culpable executives will be subject to full prosecution.

The "winner-take-all" race dynamic leads to tension and mistrust among the cartel members. For example, consider a scenario where five members of a cartel are scheduled to hold an emergency meeting. When the meeting starts there is an empty seat at the table -- one of the conspirators has not returned calls and has unexpectedly not arrived at the meeting. Red flags go up. One of the cartel members at the meeting starts to get nervous. Has the missing cartel member had a change of heart and abandoned the cartel? Has he gone to the Feds? Or, did he just miss his plane? In this environment, with the risk of detection and the stakes so high, who can you trust? Or consider the very common situation when a cartel first learns that its under investigation. Each member of that cartel knows that any of its co-conspirators can be the first to come forward in exchange for total amnesty and seal the fate of the rest. Imagine the vulnerability of being in that position and asking yourself, "Can I really trust my competitors?"

<u>The Safe Harbors Are Shrinking</u>. Of course, antitrust authorities in Europe and around the world share the credit for the heightened fear of detection by those who are engaging in, or are considering, cartel activity. This conference has already highlighted many of the changes in antitrust

9

laws, the enforcement victories, and the commitment to anti-cartel enforcement that is taking hold throughout the world, so I will not try and summarize them here. Suffice to say, the world is changing, antitrust authorities are working more closely together than ever, and the safe harbors for cartel activity are shrinking.

However, if you needed any more proof of how significantly attitudes have changed toward anti-cartel enforcement or how seriously the risks are now perceived by the international business community, consider the case of the six high-level European executives from HLR and BASF who led their companies' decade-long participation in the worldwide vitamin cartel. Each of these foreign executives voluntarily traveled to the United States to plead guilty and to serve time in a U.S. prison. They were all citizens of either Switzerland or Germany, residing abroad, with no family or other ties to the United States. Therefore, the United States courts had no personal jurisdiction over any of these individuals so long as they did not set foot on U.S. soil. Moreover, the United States does not have an extradition treaty with either Switzerland or Germany covering antitrust offenses. And so, you may wonder why did these six international executives agree to leave their families behind, submit to the jurisdiction of a U.S. court, agree to plead guilty, cooperate with our investigation, and serve time in a U.S. jail? I am sure there are many diverse and intensely personal reasons why these individuals arrived at the decisions they made. However, I'm convinced that all of these executives were driven, in large part, by the recognition that Europe and the rest of the world are changing their attitudes toward cartel activity. They did not want to live their lives as international fugitives in this changing world.

The risk is too great. To me, this is the best indication that cartel members are getting the message.

## V. <u>Transparency In Enforcement Policies</u>

<u>Transparency In Enforcement Maximizes Cooperation</u>. The third and final hallmark of both an effective Amnesty Program and an anti-cartel enforcement program is the need for transparency. Self reporting and cooperation from offenders have been essential to our ability to detect and prosecute cartel activity. Cooperation from violators, in turn, has been dependent upon our readiness to provide transparency, to the greatest extent possible, throughout our anti-cartel enforcement program. If prospective cooperating parties cannot predict, with a high degree of certainty, their treatment following cooperation, then they are less likely to come forward.

Transparency must include not only explicitly stated standards and policies but also clear explanations of prosecutorial discretion in applying those standards and policies. The Division has sought to provide transparency in the following enforcement areas: (1) transparent standards for opening investigations; (2) transparent standards for deciding whether to file criminal charges; (3) transparent prosecutorial priorities; (4) transparent policies on the negotiation of plea agreements; (5) transparent policies on sentencing and calculating fines; and (6) transparent application of our Amnesty Program.[2] With the time I have remaining, I will address how transparency is critical to an effective Amnesty Program.

<u>Transparency In The Amnesty Program</u>. The Division has a written Amnesty Policy and has

---

[2] For a more detailed discussion on transparency in enforcement with references to Antitrust Division public statements in each of the areas outlined above, see, "Transparency In Enforcement Maximizes Cooperation From Antitrust Offenders," by Gary R. Spratling, Deputy Assistant Attorney General, Antitrust Division, before Fordham Corporate Law Institute (October 15, 1999).

11

published a number of papers in order to clarify the Division's application of its Corporate Amnesty Program.[3] In addition, representatives from the Division regularly speak about the Amnesty Program before national and international bar associations, trade groups, other law enforcement agencies, and the media. However, in order for an Amnesty Program to work, you need to do more than just publicize your policies and educate the public. You have to be willing to make the ultimate sacrifice for transparency - the abdication of prosecutorial discretion.

The Division's Amnesty Program by its nature is transparent because we have eliminated, to a great extent, the exercise of prosecutorial discretion in its application. If a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is automatic and is not subject to the exercise of prosecutorial discretion. For those in the audience who are not current or former government officials, I can assure you that this is a very difficult thing to do. We have had to swallow hard on a number of amnesty applicants that we would have much preferred to prosecuted. However, remember we had roughly 15 years of experience with an Amnesty Program that was designed to maintain a greater degree of prosecutorial discretion, and it simply did not work. Prospective amnesty applicants come forward in direct proportion to the predictability and certainty of whether they will be accepted into the program. Uncertainty in the qualification process will kill an amnesty program.

---

[3]See e.g., "The Corporate Leniency Policy: Answers To Recurring Questions," speech by Gary R. Spratling, before ABA Antitrust Section 1998 Spring Meeting (April 1, 1998); "Making Companies An Offer They Shouldn't Refuse," speech by Gary R. Spratling, before Bar Association of the District of Columbia's 35th Annual Symposium on Associations and Antitrust (February 16, 1999).

## VI. Conclusion

In closing, the formula for a successful anti-cartel enforcement program should include equal parts of stiff potential penalties, high detection rates, and transparent enforcement policies. This recipe will serve to prevent most companies from ever engaging in cartel activity. However, when cartels are formed, we have found that the Amnesty Program, with its lure of leniency in exchange for self reporting and full cooperation, is the most effective investigative tool for cracking cartel activity.

## CORPORATE LENIENCY POLICY

The Division has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. "Leniency" means not charging such a firm criminally for the activity being reported. (The policy also is known as the corporate amnesty or corporate immunity policy.)

### A. Leniency Before an Investigation Has Begun

Leniency will be granted to a corporation reporting illegal activity before an investigation has begun, if the following six conditions are met:

1. At the time the corporation comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source;

2. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

3. The corporation reports the wrongdoing with candor and completeness and provides full,

continuing and complete cooperation to the Division throughout the investigation;

4. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

5. Where possible, the corporation makes restitution to injured parties; and

6. The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity.

B. **Alternative Requirements for Leniency**

If a corporation comes forward to report illegal antitrust activity and does not meet all six of the conditions set out in Part A, above, the corporation, whether it comes forward before or after an investigation has begun, will be granted leniency if the following seven conditions are met:

1. The corporation is the first one to come forward and qualify for leniency with respect to the illegal activity being reported;

2. The Division, at the time the corporation comes in, does not yet have evidence against the company that is likely to result in a sustainable conviction;

3. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

4. The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation;

5. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

6. Where possible, the corporation makes restitution to injured parties; and

7. The Division determines that granting leniency would not be unfair to others, considering the

nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward.

In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. The burden of satisfying condition 7 will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity. That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

### C. Leniency for Corporate Directors, Officers, and Employees

If a corporation qualifies for leniency under Part A, above, all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation. If a corporation does not qualify for leniency under Part A, above, the directors, officers, and employees who come forward with the corporation will be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

### D. Leniency Procedure

If the staff that receives the request for leniency believes the corporation qualifies for and should be accorded leniency, it should forward a favorable recommendation to the Office of Operations, setting forth the reasons why leniency should be granted. Staff should not delay making such a recommendation until a fact memo recommending prosecution of others is prepared. The Director of

Operations will review the request and forward it to the Assistant Attorney General for final decision. If the staff recommends against leniency, corporate counsel may wish to seek an appointment with the Director of Operations to make their views known. Counsel are not entitled to such a meeting as a matter of right, but the opportunity will generally be afforded.

Issued August 10, 1993