# Exhibit 8A

Page 1

1

2

3

4

5

6

7

8           Welcome to the 19th Annual National Institute

9                on White Collar Crime 2005

10          Presented by the American Bar Association

11          Criminal Justice Section and the Center

12              for Continuing Legal Education

13                    March 3, 2005

14          Recent Developments in Antitrust Law

15            Recorded live in Las Vegas, Nevada

16

17

18

19

20

21

22

23

24

25

Page 2

1

2

3

4

5

6

7

8

9                              VOLUME 1

10                           19th ANNUAL

11                     NATIONAL INSTITUTE

12                    WHITE COLLAR CRIME

13                              2005

14

15

16

17

18

19

20

21

22

23

24

25

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime                    March 3, 2005
                                                Las Vegas, NV

Page 3

1                              I N D E X

2

3     REMARKS                                              PAGE

4     MR. GARY SPRATLING                                      4

5     MR. SCOTT HAMMOND                                      11

6     MR. JIM WALDEN                                         28

7     MR. JOE LINKLATER                                      35

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
Las Vegas, NV

Page 4

```
 1                 T R A N S C R I P T

 2        Narrator: Welcome to the 19th Annual National

 3    Institute on White Collar Crime 2005.  Presented by

 4    the American Bar Association, Criminal Justice

 5    Section and the Center for Continuing Legal

 6    Education.  Held March 3rd and 4th, 2005.  We now

 7    join this session, Recent Developments in Antitrust

 8    Law.  Recorded live in Las Vegas, Nevada.

 9        GARY SPRATLING: -- This particular aspect of

10    the activity that you look at, whether it's the

11    growing number of fines above $10 million dollars,

12    which is now 46 companies, or the total amount of

13    fines in the hundreds of millions that they add

14    every year to this nest egg that has been built up

15    as a result of cartel enforcement.  You can look at

16    the increase in the imposition of jail sentences on

17    antitrust offenders, now 80 individuals in the

18    last five years, or you can look to the growing

19    percentage of individuals from each company, a

20    growing number of people from each company, against

21    whom the Antitrust Division will seek to obtain jail

22    sentences.  The most recent example being four

23    criminal sentences and jail sentences against the

24    number two cooperating firm in the DRAM

25    investigation.
```

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 5

```
 1         You can look at the 50 grand juries continuing

 2    at that pace -- 50 grand juries looking at

 3    international cartel enforcement.  The expanding

 4    number of countries where executives are

 5    currently serving or have served time in jail.

 6    Currently 18 individuals from nine countries.  The

 7    number of times that a company from a foreign

 8    jurisdiction has paid more than a $10 million

 9    dollar fine.  That's now 39 times.

10         You can look at the increase in collaboration

11    among competition law enforcement agencies from

12    around the world.  And you can look at it in terms

13    of what people typically think of, which is a

14    coordination on the service of a search warrant, or

15    as they're called in other jurisdictions, dawn raids,

16    or inspections.  And that type of activity.

17         Or you can look at it in terms of the

18    collaboration that's now occurring in terms of

19    exchange of techniques and tactics, and training.

20    A very large amount of that going on.  Or the rate

21    of amnesty applications still coming in at the

22    just unbelievable rate of two a month.  So, that's

23    one perspective.

24         Another perspective that you get, and something

25    we did last year, that I thought was fun, and I
```

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime                    March 3, 2005
                                         Las Vegas, NV

                                                                            Page 6

1      think the audience thought it was okay was to look

2      at -- I keep a file of all the Division press

3      releases.  And you just look through and you flip

4      through the Division press releases, and just look at

5      the headlines, or the subscript on that.  And if you

6      pull out just a few of those, it gives you an

7      amazing picture of the comprehensiveness and the

8      vigor of antitrust enforcement, not just in the

9      United States, but around the world.

10         And so, looking at my file from just last

11     year, from March of last year.  Two weeks after we

12     had this panel last year, there's a press release

13     "Crompton Corporation Agrees to Plead Guilty in the

14     Rubber Chemicals Cartel.  Company agrees to pay a

15     $50 million dollar fine."  And then a related press

16     release, "Bayer AG Agrees to a $66 Million Fine for

17     Participating in Rubber Chemicals Cartel."  In another

18     topic, "Five Indicted in Connection with a Scheme to

19     Defraud the Federal E-Rate Program."  "Four

20     Individuals  Arrested, One a Fugitive" was the

21     subtitle.  And then  a related press release, "Two

22     Pakistani Citizens Face Incarceration in the United

23     States."

24         Another topic, "Dutch Shipping Company Agrees

25     to Plead Guilty in International Parcel Tanker

ABA White Collar Crime 2005 Speech       ABA - White Collar Crime                March 3, 2005
Las Vegas, NV

Page 7

1    Shipping Cartel."  Another, "DeBeers Pleads Guilty.

2    Agrees to Plead in an International Price

3    Fixing Indictment."  Of course, an indictment which

4    had been returned 10 years earlier, in 1994.

5    Another, "Japanese Executive Agrees to Plead Guilty

6    to International Antitrust Conspiracy."  Subtitle

7    "Would be the first Japanese citizen to serve prison

8    sentence in the United States for antitrust

9    offense."

10       And then the last topic, "Infineon Technologies

11   Agrees to Plead Guilty to DRAM Price Fixing

12   Conspiracy, Agrees to Pay $160 Million Dollar Fine."

13   "Third highest fine in United States history for an

14   antitrust offense."  And then a related press

15   release, "Four Infineon Executives Agree to Plead

16   Guilty."  Subtitle, "Three German Citizens Face Jail

17   Time in the United States."  Those titles, I submit

18   to you reveal so much about the Antitrust Division's

19   practice, in both the domestic cartel enforcement

20   and the international cartel enforcement.

21       But, that's not the only picture.  Another

22   perspective is provided by the anti-international

23   cartel enforcement frenzy, and I use that word

24   advisedly, frenzy around the globe.  Competition

25   law enforcement agencies in jurisdiction after

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 8

1    jurisdiction -- particularly the major law

2    enforcement agencies, have made -- have specifically

3    identified anti-cartel enforcement as their number

4    one priority.  Their number one objective.  Not one

5    of the top priorities, not among the top priorities,

6    not "this is something that we think really seriously

7    about."  But, is the number one priority for the

8    competition enforcement group.

9         Hew Pate did it a number of times last year in

10   the speeches that you have read.  You may be

11   interested that Graham Samuel, who's the head of the

12   ACCC, and Neelie Kroes, who's the Commissioner of

13   Competition now for the EU, have each said in the

14   last four months, it is the number one enforcement

15   priority of their jurisdiction.  And it's not just

16   talk, it's action.  The Australian ACCC, the Czech

17   Anti-Monopoly Office, the Hungarian GDH, the Japan

18   JFTC, the Korean KFTC, have all announced that over

19   the last year, they either imposed the highest level

20   of fines in the history of their organizations

21   against cartel activity, or have imposed the

22   highest fine for a particular cartel in that

23   jurisdiction.

24        And on top of that we see the EU charging

25   longer time periods and imposing fines that are a

Page 9

1    greater percentage of the volume of affected

2    commerce than their North American sister

3    jurisdictions.  More than the Department of

4    Justice, more than Canada in related offenses.  And

5    we've got the UK announcing that it's now getting

6    amnesty applications.  The UK, with this infant

7    program is now getting amnesty applications at the

8    rate of once a month.  And on top of all that -- on

9    top of all that, we've got -- during the last year

10   we've seen legislation pass that increased the

11   level of fines and jail sentences for antitrust

12   offenses in the United States.  And most recently,

13   legislation making price fixing a predicate offense

14   for wire tap.

15       This is almost getting to be not a fair game

16   for those of us who are charged with representing

17   those who are the subjects of the investigations.

18   But I think no matter what your perspective,

19   prosecutor or defense counsel, I think you will

20   concur that the level and breadth of activity in

21   this arena, and the number of developments in just

22   the last year, is just jaw-dropping.

23       We've got a panel here this morning to talk

24   about that.  It is a panel that has extensive

25   experience in both the domestic and international

1    cartel fields.  And for that reason, as is

2    consistent with most of the programs at the

3    National White Collar Crime Institute, we are

4    going to engage in what we call bare minimum

5    introductions of people, with one exception.

6         To my far left is Joe Linklater who's a partner

7    with Baker & Mackenzie, in its Chicago office.

8    Next to him is Jim Walden, a partner with O'Melveny

9    & Myers in its New York office.  I am Gary Spratling.

10   I'm a partner with Gibson, Dunn & Crutcher in its San

11   Francisco office.

12        And when we get to Scott Hammond, this is the

13   exception to the bare minimum introduction.  And

14   that's not because I'm trying to curry favor with

15   this guy.  It is because he is the person you have

16   all come to hear this morning.  He is the person who

17   is going to do most of the talking this morning, by

18   design.  Not because he told us that's the way he

19   wanted it.  Although, he probably does like it that

20   way.  But also because he has a completely unique

21   experience level.  And by that I mean, he is now the

22   Deputy Assistant Attorney General for Criminal

23   Enforcement for the Antitrust Division.  Before

24   that, for a period of four years, he was the Director

25   of Criminal Enforcement.  Before that, for five

Page 11

```
 1    years, he was a Special Assistant to the Deputy

 2    Assistant Attorney General.  And in those three

 3    positions, in those three positions, he has been

 4    involved in every international cartel prosecution

 5    that the Department of Justice has brought in the

 6    last decade.  And there's no one else who can say

 7    that.  And so, given that background, we're going to

 8    see how he does with a few questions.

 9         And Scott, the first question, and we oftentimes

10    put this question to you as kind of a kick

11    off, is:  in your opinion what do you think have been

12    the two most significant developments in the past

13    year in criminal antitrust enforcement?

14         SCOTT HAMMOND: Well, I mean there has been so

15    many blockbuster developments just in the past

16    three or four months.  But, if I was going to stick

17    with two, I would say the removal, or the attempt to

18    remove Stolt from the Corporate Leniency Program,

19    would be number one.  And the second one would be --

20         Audience: You've got to speak up --

21         SCOTT HAMMOND: I'm sorry.  And the second -- can

22    you hear me now?

23         Audience: Yes.

24         SCOTT HAMMOND: All right.  The second major

25    development would be our efforts to extradite a UK
```

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime                March 3, 2005
Las Vegas, NV

Page 12

1    executive, Ian Norris, from the UK for antitrust and

2    obstruction offenses.

3         GARY SPRATLING: Now Scott, those are two major

4    topics.  Why don't we split the discussion on both,

5    in terms of your commentary and then the follow-up

6    questions that we may have.

7         SCOTT HAMMOND: Okay.

8         GARY SPRATLING: So, let's start with Stolt-

9    Nielsen, then we'll break and then we'll hit

10   Ian Norris.

11        SCOTT HAMMOND: The Stolt-Nielsen -- the removal

12   of Stolt-Nielsen from our Leniency Program is such a

13   significant development from our perspective.  And

14   I would think from yours as well.  Significant, not

15   just because the Leniency Program has been the

16   centerpiece of our international cartel enforcement

17   program, and has become, I think unquestionably

18   the most celebrated and successful voluntary

19   disclosure program in the entire Department of

20   Justice.  But, also very significant because this

21   is the first time that we have ever sought to

22   remove a company from our Corporate Leniency

23   Program since it was -- the program was revised in

24   1993.

25        I say we tried to remove them because earlier

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 13

1      this year, in January the -- a District Court Judge,

2      in the Eastern District of Pennsylvania granted a

3      preliminary injunction that was requested by the

4      amnesty applicant preventing us from removing Stolt

5      from the Leniency Program.   I am -- the Division

6      hasn't announced it's intentions yet, whether it's

7      going to appeal.   So I'm going to be -- I'm not

8      going to spend a lot of time talking about the

9      judge's decision.   Instead, what I would like to

10     focus on is the facts of that case.   Facts that

11     unfortunately you won't see in the findings of

12     fact.   But, facts that are in the record, and are a

13     matter of public record.

14          The judge, in deciding to grant this

15     preliminary injunction, became the first court in

16     the land to decide that a -- someone who receives a

17     non-prosecution agreement with the government, can

18     challenge and seek preliminary equitable relief

19     prior to the bringing of an indictment.   Of course,

20     that's usually dealt with in a post-indictment

21     motion to dismiss.   No court has found that a

22     defendant has a right to pre-indictment relief.

23     Judge Savage in the Eastern District of

24     Pennsylvania has made that call and decided that

25     a due process right exists.   There's a paper that

Page 14

1    is in the -- that Jim Walden has done, that does --

2    that talks a great deal about that decision.

3    Obviously, it's something we take great issue with.

4    But, I'm not going to talk about that here now.

5    Because -- well, for reasons that I'll explain in a

6    minute, it's not nearly as important as some other

7    issues that I'd like to spend some time speaking to

8    you about.

9        You know we care very much about that case.

10   We care what the judge -- about the judge's

11   decision.  But, frankly we care a great deal more

12   what you think about the decision.  And by that I

13   mean, what you think about the Division's decision

14   to revoke leniency, and to remove them from the

15   program.

16       You are in effect our jury.  You are the

17   audience that is the antitrust bar, the white

18   collar bar, the business community.  You're the

19   folks that we rely upon the most in deciding

20   whether or not this program will continue to have

21   the transparency and predictability, and fairness

22   which has been its hallmark all along.

23       I submit to you that if you look at the record

24   in this case, you will find that this is a company

25   that deserved to be removed from the Leniency

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime                    March 3, 2005
Las Vegas, NV

Page 15

1    Program.  It did everything wrong, every step of

2    the way.  And that you would think it would be in

3    the best interest of this Leniency Program, the

4    continued success and availability of this

5    Leniency Program, that companies such as this are

6    removed.  Let me give you some facts so that you

7    can reach your own conclusion.

8        The investigation involving Stolt -- the

9    investigation of the tanker industry, basically

10   began in November of 2002 when the Wall Street

11   Journal published an article on page 2A, in which

12   it described a lawsuit that was being brought by

13   the former general counsel of Stolt.  The lawsuit

14   that was brought was basically on a theory of

15   constructive termination.

16       The general counsel claimed that he had

17   discovered that Stolt was involved in a price

18   fixing cartel.  And that he had brought that

19   information to the attention of senior management.

20   And that the senior management had ignored it.  And

21   had allowed it to continue.  And that in fact the

22   conspiracy continued even after the discovery by

23   the general counsel.  And so, that he faced a

24   decision he must, either to resign from the company

25   or to be complicit in the continued participation

Page 16

 1    by the company in this international cartel

 2    activity.

 3        Those allegations, as I said were front and

 4    center in the Wall Street Journal.  As you can

 5    imagine, it didn't take us long to open an

 6    investigation.  And as it turns out it didn't take

 7    long for us to receive a call also from counsel

 8    for Stolt asking and requesting to enter into

 9    our Corporate Leniency Program.

10        Well, as I mentioned, this program is very

11    successful.  And one of the reasons why it is very

12    successful is because it's very generous.  Our

13    Leniency Program provides the greatest

14    opportunities -- probably the most generous

15    voluntary disclosure program out there.  But there

16    are a couple of conditions.  And one of those

17    conditions is that before you can be -- in order to

18    be accepted into the program, to receive a grant of

19    leniency, you must have taken prompt and effective

20    action to terminate participation in the cartel,

21    once it was discovered.

22        Now, we have also interpreted that condition

23    very generously.  We wanted to make clear that for

24    example if you were the owner of the company, and

25    you were involved in the conspiracy from the get

Page 17

```
 1      go, could the company still qualify?  I mean,

 2      could the company take prompt and effective action

 3      to terminate once it was discovered, if the owner

 4      of the company was involved from the get go?  We

 5      wanted to remove that uncertainty, so we defined

 6      the company discovering the conduct in this way:

 7      We said, the company will only be deemed to have

 8      discovered the conduct, once either general

 9      counsel, or outside counsel discovers it, or the

10      Board of Directors discovers it.  If one of those

11      three entities discovers the conduct, then under

12      the program, it has been discovered, and there must

13      be prompt and effective action to terminate the

14      company's role in the conspiracy.

15          And so, when we received that call we said,

16      "you're not eligible."  I mean, at least if the

17      allegations that are in the Wall Street Journal are

18      correct, that your general counsel is claiming that

19      he discovered this conduct in March of 2002, he

20      brought it to the attention of the senior management,

21      and the conduct continued, you can't be eligible.

22          And the company said, "let us come in and talk

23      to you about that.  Let us come in and talk to you

24      about this former general counsel, who we think is

25      extorting this company.  It's simply not true."  And
```

Page 18

1    so we met with the company, we laid out our

2    concerns again.

3        And they said, "take a look at this."  And they

4    laid before us letters -- they laid before us letters

5    that they had sent to each of their competitors, the

6    co-conspirators in this case.  Letters that informed

7    those companies that effective immediately, Stolt

8    company has a new corporate compliance program, which

9    is attached to this letter.  And all Stolt employees,

10   without deviation, will follow the scriptures of this

11   program.  And they said, "this is unequivocal proof

12   that the general counsel is lying.  And that we put

13   an end to this activity.  We withdrew, we sent

14   letters out to our co-conspirators and told them,

15   without deviation we will abide by the new, strict

16   antitrust compliance program at Stolt-Nielsen."

17       We said, can we step outside for a minute?  We

18   went in the hall.  We looked at those letters.  We

19   thought about it.  And we said, "that's pretty good."

20   I mean the program doesn't require you to report

21   the conduct -- more on this later -- to report the

22   conduct as soon as you discover it, it says you

23   have to withdraw.  You have to terminate.  And

24   these letters suggested that they may have done that.

25       So, we went back into the meeting and we said,

Page 19

1    to Stolt's counsel, "all right.  If it turns -- you

2    can come into this program, but we want you to know

3    two things.  Number one, if it turns out that these

4    letters -- that the allegations of the general

5    counsel are true, you're out.  If it turns out that

6    these letters that were sent were simply a head

7    fake, and that in fact the company had

8    continued to participate and simply sent the

9    letters out to create the illusion of terminating

10   its participation, you're out.

11        And keep in mind this, you'll have -- here's a

12   copy of our model corporate leniency letter.  You

13   will notice it is a conditional grant of leniency.

14   It's conditioned on a number of things.  It's

15   conditioned on your representation that you're not

16   the ring leader or organizer of the conspiracy.

17   It's conditioned on your representation that you

18   will make complete, continuing, and full

19   cooperation.  It's continued on your representation

20   that you took prompt and effective action to

21   terminate your role in the conspiracy once it was

22   discovered.

23        Two months after that letter was issued, we

24   suspended Stolt's participation in the conspiracy.

25   Two months later, after talking to just two Stolt

Page 20

 1    witnesses, we had discovered that we had been lied to.

 2    We had discovered that we have been provided

 3    with false information; we had discovered that they

 4    had withheld information.  We had discovered that

 5    in fact the allegations in the Wall Street Journal

 6    article that we read from day one, were true.

 7        We ended up prosecuting the other

 8    co-conspirators.  We ended up getting guilty pleas.

 9    We provided 5-K assistance to executives who told us

10    that they had continued to conspire with Stolt right

11    up until the time of the Wall Street Journal article.

12    We provide 8C4.1 downward departures for the

13    companies who also cooperated.  We made those

14    cases.  We provided downward departures for the

15    assistance that allowed us to make those cases.  As

16    I said, we had already long ago suspended the

17    cooperation obligations of the company.  And then

18    we moved to kick out Stolt from the Leniency Program

19    under two grounds.

20        Number one, that they had misrepresented to

21    us, and were not eligible for admission in the

22    program because they didn't take prompt and

23    effective action.  And number two, because they

24    had failed to fully cooperate, they had provided us

25    with misleading information, false information that

Page 21

1    had prejudiced our investigation.

2        As I said, the District Court in Philadelphia

3    didn't see it that way.  If you read the opinion,

4    the focus of that opinion is on our letter.  The

5    judge decided that basically that the Antitrust

6    Division attorneys including myself, that we were

7    pretty poor contract writers.

8        The judge understandably said, you are the

9    author of the letter here, and you could have put in

10   that letter if you wanted -- it says the

11   representation is they took prompt and effective

12   action to terminate their role in the conspiracy

13   once it was discovered.  The judge said, "you should

14   have stuck in that letter, once it was discovered,

15   insert 'in March of 2002.'  You didn't stick that in

16   the letter, you could have stuck it in the letter,

17   and I'm going to hold that against you."

18       Now obviously I disagree with that decision

19   very much.  But again for purposes of going forward,

20   it doesn't really matter to the Leniency Program.

21       I mean hell we may get more leniency

22   applications if you think that we're that easily --

23   if you think we're bad contract writers, we write

24   loose contracts, and that a clever attorney can pull

25   one past us very easily.  Come on in.  That is not

Page 22

1    going to stop us from getting leniency applications.

2    It shouldn't give you one bit of pause.

3        It's the second part of the opinion that I'm

4    here to talk about.  We removed them on two

5    bases.  The second basis was failure to cooperate.

6    The judge really doesn't spend much time addressing

7    this.  At the beginning of it, he says he

8    acknowledges that they were kicked out for that,

9    but later on in the agreement he says the

10   government did not and does not claim, this is a

11   quote "did not and does not claim that Stolt

12   failed to cooperate, or that it withheld evidence."

13       I'm speechless.  We do claim; we did claim.

14   They did.  And then what the judge did, is he said,

15   "hey government, you got the benefit of the bargain

16   here.  You made cases, you got convictions, what

17   else do you want?"

18       He ignored the contract, what it said about

19   cooperation.  He ignored what the Third Circuit

20   says about cooperation.  And he said, cooperation

21   equals cases.  How would you like to see that in

22   your plea agreements, or your amnesty agreements?

23   I mean obviously they'd be thrown out.

24       Nobody would like to see that, our cross

25   examination would be killed and you know, courts

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 23

1      don't allow that anyways.  But that was the test

2      that was applied in this case.

3          What you need to -- really it's so important.

4      I mean as guardian of this Leniency Program, it's

5      so important for me to answer your questions and

6      for you to understand.  This was not about gotcha.

7      This was about an issue that was identified from

8      the beginning.

9          This was about a company that did everything

10     wrong from the beginning.  This was about a company

11     that did everything wrong from the beginning, this

12     was about a company that discovered the conduct, and

13     didn't report it.  This was about a conduct that

14     continued after it was discovered and this was a

15     situation in which a company received leniency based

16     on false representations, that it shouldn't have

17     received.

18         GARY SPRATLING: Scott, I have a question for you

19     at the risk of hitting on an emotional subject.

20     Let's accept that Stolt's conduct is at the far end

21     of the spectrum.  But my concern is that the Division

22     feeling that it doesn't want to be in this situation

23     again, will become more cautious and will become

24     better draftsmen and will tighten things up.  And then

25     I'll be in a situation where I've quote "discovered

Page 24

1  something" and be accused of not taking prompt and

2  effective action.

3       Let's say I'm a lawyer representing a multi-

4  national corporation.  I discover the conduct.

5  It's difficult to stop a multi-national company on

6  a dime.  And it's difficult to be confident that I

7  am shutting off everything that I have to shut off

8  in a remote location.  Let's say I've got a division,

9  an operation in Hong Kong and I've got a Vice

10 President of Sales in Hong Kong that I haven't

11 interviewed yet.  And I'm in to talk to you because

12 I want to make sure that I'm the first person in.

13      Can I be confident that if that divisional Vice

14 President in charge of sales in Hong Kong is still

15 engaging in conduct before I've gotten there, that

16 I won't be kicked out of the program later because

17 I haven't taken prompt and effective action?

18      SCOTT HAMMOND: Yeah, I mean you know what what

19 I'm saying to you basically is we've got a 12 year

20 history of enforcing this program.  This is the first

21 company that we have kicked out.  We have a history

22 of enforcing it in a way in which we do not play

23 gotcha, and in which  we're looking for ways to help

24 companies qualify.

25      But let's -- you mentioned that what if I got a

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime                    March 3, 2005
                                                    Las Vegas, NV

Page 25

1    trader over in Hong Kong who I haven't interviewed

2    yet, who is continuing to have contacts with his

3    competitors.

4         Just to be clear, what we had in this case

5    were the very top executives who were involved in

6    the conspiracy, once it was discovered by the

7    general counsel, the top two are still

8    participating in it afterwards.  The same people

9    that we had identified from the beginning as being

10   the high level executives that were involved, and

11   that were identified to the company that if they

12   continued to be involved, would be grounds for

13   removing them from the program.

14        So I -- we're talking about, I think in this

15   case, a much different scenario than concern about

16   stopping this multi-national company and not being

17   in control of what people are doing everywhere.

18   But you know there is one thing you have to be

19   aware of.

20        I would suggest to you, that once you

21   discovered that, for reasons that were explored this

22   morning and we could spend more time talking about

23   it.  When you discover the conduct before the

24   government, I don't think you do have an option.  I

25   think you need to come in while the getting is

Page 26

1    good.  But in this case, if you decide not to

2    report the conduct and you try to soft pedal the

3    withdrawal -- at best, that happened here -- then

4    you are at a great risk.

5         This company, remember the executives I just

6    mentioned before, you know, the executives that were

7    identified by the general counsel in March of 2002.

8    They weren't fired.  They didn't even have their

9    work reassigned.  They didn't have their

10   responsibilities changed.  Not only were they

11   allowed to continue to meet and talk with

12   competitors in violation of this so called paper

13   compliance program, but they were allowed to do

14   it without any in house or outside counsel

15   involved.

16        Even under Stolt's version of the events,

17   this managing director was up to his eyeballs in

18   the conspiracy beforehand and who delivers the new

19   -- I told you about the letter that was sent to the

20   company saying here's our new corporate compliance

21   program.  The letters to the two key conspirators

22   say, "pursuant to our recent conversation," comma,

23   "attached" they sent this managing director to

24   deliver the so called withdrawal by himself, in one

25   on one meetings with his competitors.

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
                                                     Las Vegas, NV

Page 27

1          Anybody in this room think that's a good way

2     to conduct corporate compliance programs?  Anyone

3     would give advice to their client if they've

4     discovered, if they're fortunate enough to discover

5     the conspiracy before we do, an effective way to

6     terminate your involvement is to have your

7     executive who's involved in the conspiracy, go out

8     and deliver the news, one on one, without counsel

9     present, that we're not going to participate anymore?

10         That's the kind of soft pedal withdrawal that

11    I'm talking about.  That if it turns out it doesn't

12    end, we will not be receptive to a company saying,

13    "hey we did everything we could."

14         So just to circle back to the beginning of the

15    question, no.  There's not going to be a backlash

16    here.  We're not looking to catch the next person

17    who did this.

18         We're talking about facts, which I've just got

19    to believe that we're all in agreement on this, are

20    so egregious, if we were talking about facts,

21    different facts, in which the company has done

22    everything it can, a company that has come in and

23    reported the conduct to us as quickly as it can,

24    which has done exactly what we have sent them to do,

25    which is come in before you've finished your

Page 28

```
 1    internal investigation.  That's what we're telling

 2    people to do.  We're not going to penalize that

 3    company if it hasn't been able to terminate on a

 4    dime.

 5         GARY SPRATLING: Thank you Scott. Jim, you have

 6    studied and analyzed the Stolt-Nielsen situation,

 7    and shared a lot of that in a paper which everyone

 8    has in the program materials.  Based upon that, do

 9    you think that Stolt-Nielsen is a situation that's

10    likely to repeat itself, and that's just a follow-up

11    question.  What I'm asking here, what, if any impact

12    will this have on your advice to your clients

13    in dealing with the Division and amnesty situations?

14         JIM WALDEN: Well I mean I agree that Stolt is

15    surprising, but for two different reasons.  One I'm

16    surprised that it hasn't happened sooner, because

17    anyone who practices on the Criminal Division side,

18    knows that it's not uncommon for U.S. Attorneys

19    offices to rip up cooperation agreements from time

20    to time and no one makes a big deal out of it.

21         And so, given the fact that there's so many

22    leniency applications and there's so many companies

23    that are now participating either as amnesty

24    applicants, or amnesty plus applicants, I'm just

25    surprised that it hasn't happened sooner.  And I'm
```

ABA White Collar Crime 2005 Speech      ABA - White Collar Crime                March 3, 2005
                                              Las Vegas, NV

1   surprised that there is a high level Division

2   official sitting and being completely transparent

3   about the reasoning behind it, which is not

4   something that you often see on the Criminal

5   Division side.  So the answer to the second part of

6   your question though, it's not something that's

7   keeping me awake at night, and I hope it's not

8   something that's keeping my clients awake at night.

9      The problem with Stolt-Nielsen's remediation,

10  was that if you look at the record of remediation

11  that you need to establish in order to be able to

12  live up to your representation that you've

13  terminated the agreement.  It was like a glacier

14  that was a mile wide, but only an inch deep.  It

15  looked like great evidence when you first saw it,

16  but then there was really nothing behind it.

17     And of course sophisticated clients know that

18  if you wish to remediate a problem like this,

19  knowing that in a company that's got international

20  operations with sales and marketing divisions all

21  over the world, you can't really control -- there

22  has to be very robust remediation.

23     And the first thing that has to happen is a

24  company has to create the prohibition against

25  competitor contact, period, unless the counsel is

ABA White Collar Crime 2005 Speech     ABA - White Collar Crime          March 3, 2005
                                              Las Vegas, NV

Page 30

1    present.  And many companies don't want to do that,

2    but Stolt-Nielsen will be a cautionary tale to them

3    to convince them that that is the right way to

4    proceed after there is initial evidence of an

5    antitrust violation.

6         You've got to stop the business people from

7    interacting with competitors except for legitimate

8    business reasons with a clear agenda, and with

9    counsel present to ensure that antitrust rules are

10   being complied with.  And many companies operate

11   under those rules even without antitrust

12   investigations in their midst.

13        The second thing you have to do, is you have to

14   have an efficient internal investigation that finds

15   the culprits and then neutralizes them as quickly as

16   possible.  And we're going to talk a little bit later

17   about the difficulty in making those decisions.  It's

18   certainly more like three dimensional chess, than

19   it is like checkers.

20        But you need to identify the employees,

21   neutralize them in the sense of limiting their

22   responsibilities, moving them to other areas where

23   they're not going to have competitor contact, and

24   ultimately transitioning them out of the business as

25   a way to create the tone from the top that you need

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime          March 3, 2005
Las Vegas, NV

Page 31

1    on a go forward basis to show the other employees

2    that the conduct's not going to be tolerated in the

3    future.

4         That's the way that you create a record of

5    remediation.  That's the way that you ensure that

6    you can live up to the representation in the

7    agreement and that's the way that most companies, at

8    least in my experience, behave because they see the

9    risks associated with not -- obviously there's a

10   tremendous difference between being the amnesty

11   applicant and being the second chair.  And getting

12   kicked out of the first chair is obviously an

13   extraordinary thing that no one wants to endure.

14   So I don't think it's going to change the advice

15   that I give my clients, it's just going to give one

16   more cautionary tale that if they don't follow my

17   advice, here's what can happen.

18        GARY SPRATLING: I know that Joe and I had some

19   follow-up comments on these points during the

20   practice session, but I suggest we just go by them

21   to keep on track here time wise and jump to -- Scott,

22   your second major development in the last year, that

23   is the Division's request to extradite Ian Norris.

24        SCOTT HAMMOND: Okay, I'll be briefer on this.

25   Ian Norris was the former CEO of a very large UK

ABA White Collar Crime 2005 Speech         ABA - White Collar Crime                March 3, 2005
Las Vegas, NV

Page 32

1    conglomerate, and he was indicted on multiple counts

2    for orchestrating a price fixing conspiracy, as well

3    as a very extensive attempt to obstruct the

4    investigation involving document destruction,

5    witness tampering and a few other conspiracy counts.

6    He was arrested in the UK in January of this year,

7    and he will face an extradition hearing back to the

8    United States, in May.

9        Some awful good facts here, that I'm not going

10   to spend a lot of time talking about, but we have

11   some speeches in terms of describing the obstruction

12   here, and I'm going to move through those now.

13   From the Division's perspective obviously this is

14   very important.  It's very important to me in one

15   sense, because the last few years here at the White

16   Collar Crime Conference, I have been forecasting that

17   this day would come when we would be seeking to

18   extradite a foreign national back to the United

19   States.  And I'm glad to be back in front of you this

20   time and be able to have delivered on that promise.

21   At least the promise that we will seek it.

22       As you know and Gary mentioned at the

23   beginning, we have done a pretty good job of

24   turning up the heat on foreign nationals who target

25   U.S. businesses and consumers for antitrust

Page 33

 1    crimes.  I think Gary said 18, I believe the number

 2    is 19 foreign nationals have now served time, or

 3    are serving time in U.S. prisons for violating U.S.

 4    antitrust laws.  I mentioned last year, our policy

 5    of putting fugitives who decide not to return,

 6    accept responsibility and cooperate in our

 7    investigations, by putting them on Interpol Red

 8    Notice Watches.  And you know this is the first

 9    thing that we're going to be doing.  And that is

10    try to extradite those executives that we can.

11        It's a promise that I made as I said, I've

12    made before that we're intent on delivering on.

13        The other thing that's somewhat remarkable but

14    it's really -- to get the full import of this, you

15    need to have practiced in this area internationally

16    for a while, but to have the UK be the first

17    government to go to bat for us, and assist us in

18    seeking extradition is remarkable.

19        It wasn't that long ago, in fact I would say

20    about six or seven years ago, six years ago

21    Gary and I were over in the UK talking to the UK

22    government about just getting a cartel law period.

23    It wasn't even a civil offense as late as the '90s.

24    Not only did they adopt a criminal offense in 2000,

25    but then they went one step further a few years

Page 34

1    later, and now they actually have made cartel

2    activity a criminal offense in the UK.

3         But this is just one more example of what Gary

4    said in his introductory remarks about the changing

5    attitudes abroad -- that we have the UK assisting us

6    here in our first extradition effort.

7         GARY SPRATLING: You know I will tell you, Scott,

8    that I think that the Antitrust Division's move to

9    extradite Norris is potentially the most significant

10    development in anti-international cartel enforcement

11    in years.

12        If this signals both the willingness and the

13    commitment of the Antitrust Division to seek

14    extradition of individuals who have been convicted

15    of offenses in all jurisdictions where treaties

16    would allow the extradition and where the

17    relationship between the competition law

18    enforcement authorities will allow it, then I think

19    it is an absolutely huge development.  And I think it

20    has the chance to change the face of international

21    cartel enforcement forever.  If executives believe

22    that they are no longer safely harbored within the

23    boundaries, national boundaries of their

24    jurisdiction, it is going to change completely

25    their calculus as to what they do in response to an

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 35

1    investigation, or what they do in response to an

2    indictment.  It's going to change how their

3    counsel advise them.  It's going to change the

4    incentives to self report and I think it will

5    result, if the Division goes through and keeps

6    doing this in other jurisdictions, I think it's

7    going to result in a wave of self reporting from

8    jurisdictions where that has not occurred before

9    and open up whole new areas of cartel enforcement.

10        So I think that the Ian Norris matter is hugely

11    more significant than the Stolt-Nielsen matter.

12        And Joe, do you have any thoughts on that?

13        JOE LINKLATER: Well, I agree with what you say

14    here, I think it's the big change.  I don't think

15    Stolt-Nielsen is really much of a change.  I agree

16    with Jim on that.  But what this means is you can't

17    hunker down in your manor house in rural England,

18    as one fellow recently did and say "come and get

19    me, I know you can't."

20        This, if people don't know about it, this

21    decision, the Norris decision and the three bankers

22    that are being extradited, has caused enormous furor

23    in England.  The notion of extraditing your own

24    citizens to the United States to go to jail is a big

25    deal.  And lawyers are talking about it, the

Page 36

1    newspapers, and everybody is talking about it.

2        And I think Scott you ought to take another

3    minute, and talk about how the Fast Track Treaty will

4    change the process, because you mentioned the speed

5    at which this is going and I think it's worth telling

6    people that the whole process is changing.

7        Audience Question: [Question partially inaudible]

8    How many countries in Europe and elsewhere is an

9    antitrust violation a criminal offense?

10        SCOTT HAMMOND: I can answer that question

11    also by answering his question, because the Fast

12    Track Extradition Treaty that the UK and the United

13    States entered into, in I think January of 2004,

14    has an impact on this particular extradition in a

15    number of different ways.

16        So first I'll get to your point Larry, this way.

17    It requires dual criminality.  The conduct, Mr.

18    Norris's price fixing conduct predates the Enterprise

19    Act, the act that I mentioned earlier, that made

20    cartel offenses in the UK a criminal offense.  Okay.

21    So his conduct predates the point in time when it

22    became a criminal offense in the UK.  While the

23    Enterprise Act also allows for extradition on

24    conspiracy to defraud, the UK government has looked

25    at the information that we have provided in support

Page 37

1    of the extradition, and said "you know what, that

2    looks like conspiracy to defraud to us."  And so

3    again, this is the attitude shift I'm talking about.

4    These are governments who are looking for ways to

5    cooperate, as opposed to looking for ways not to

6    cooperate.

7         It answers Larry's question with respect to, how

8    many countries out there that have dual criminality,

9    that allow for extradition on antitrust? A

10   handful.  How many have conspiracy to defraud as a

11   crime?  A heck of a lot more.

12        If those companies start making the same

13   judgment that the UK has, man that changes

14   everything.

15        Oh by the way, that changes everything, not just

16   in terms of counseling your client who's over in the

17   UK.  I would think it changes what you're saying also

18   to your U.S. executive who may be feeling pretty

19   comfortable with the people that I conspire are

20   over there and they're probably not coming back.

21   That's going to change, right.  You can't be so

22   cozy sitting in the United States either, because

23   you have to now realize that there is a huge amount of

24   incentive for those foreign executives to come in

25   and cooperate early as well.

ABA White Collar Crime 2005 Speech    ABA - White Collar Crime    March 3, 2005
Las Vegas, NV

Page 38

1       Now to answer the question about the Fast

2    Track Treaty some more, it has changed significantly

3    the time frame for these extraditions.  It's changed

4    the amount of evidence that we have to present.  No

5    longer do we have to make a prima facie case in

6    support of the extradition request.  We don't have

7    to submit witness affidavits.  A hearsay affidavit by

8    the prosecutor is enough.  Appeal rights have been

9    curtailed.  This used to be a process that would

10   likely take a couple of years.  It's now been

11   reduced to a couple of months.  In this case, the

12   request was received in January of 2005.  The

13   defendant was immediately arrested, and his hearing

14   is set for May.  The Enron defendants we talked

15   about, that entire process just took three or four

16   months.  So it's moving very quickly.

17       THIS PRESENTATION IS CONTINUED ON THE NEXT CD

18

19

20

21

22

23

24

25

Page 39

```
 1
 2
 3
 4
 5
 6
 7
 8
 9                    VOLUME 2
10                  19th ANNUAL
11             NATIONAL INSTITUTE
12             WHITE COLLAR CRIME
13                    2005
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 40

```
 1                    T R A N S C R I P T

 2          NARRATOR: Welcome back to the 19th Annual

 3      National Institute on White Collar Crime 2005.

 4          We now join this session, Recent Developments

 5      in Antitrust Law, already in progress.

 6          GARY SPRATLING: No, after indictment,

 7      I'm sorry I misspoke.  After indictment, if the

 8      person does not come and stand for the charges,

 9      then they are labeled an international fugitive.

10      I'm sorry I misspoke on that.

11          JIM WALDEN: Let's talk about the other side of

12      that though, because I think there's another side to

13      that.  Another way that you can make the argument.

14      Certainly I understand how the big news could be the

15      proliferation of antitrust codes.  And certainly as

16      there are more countries that adopt them, it gives

17      people less places to hide, and Norris may be a small

18      part of that.  But I think the significance that Joe

19      and Gary are putting on it presumes that the

20      Division's really going to pursue this as an

21      aggressive consistent strategy of getting

22      extraditions.  And one could look at the track

23      record up to date and wonder whether that is really

24      true.

25          I understand that for years there's been the
```

Page 41

1    prediction that it's eventually going to happen,

2    now it has, is the Division really going to commit

3    the resources to extraditing people from all over the

4    world in light of the fact that it already has a

5    very heavy docket of cases that are taking the time

6    of staff attorneys as it stands now?

7         SCOTT HAMMOND: Jim, I'm troubled by the fact

8    that you seem to be doubting my sincerity on this.

9         Well look, I'm just hearing people who

10   obviously I respect a great deal saying they think

11   this is the most significant development in 10

12   years or something.  You're damn right we're going to

13   be trying to do this, we know how important it is.

14   We know that we have to do this in order to get,

15   not just to bring, antitrust offenders to justice, but

16   also to create the incentives that we need to have

17   foreign nationals cooperate with our investigation

18   to bring to us evidence, documents, testimony that

19   we would otherwise have difficulty getting.

20        We're going to be doing it.  But on the

21   resource point, forget about it.  As I said we

22   don't even have to provide witness affidavits.  We

23   may begin, if we keep doing it, begin taxing the

24   resources of some foreign countries.  But from a

25   Division resource perspective and from OIA who

ABA White Collar Crime 2005 Speech          ABA - White Collar Crime                March 3, 2005
                                                Las Vegas, NV

                                                                              Page 42

1    assists us, it's nothing -- it's a drop in the bucket

2    compared to the bang for the buck we're getting on

3    this.

4         GARY SPRATLING: Scott, before we

5    leave the topic of developments.  Can you give us a

6    prediction on the next two or three developments

7    that you think are going to have major impacts in

8    the future.

9         SCOTT HAMMOND: Well, I'm going to go

10   through this quick as I said.  I can think of a

11   half dozen things that have happened just in the

12   last three months.  And the three I'm going to

13   mention also, just happened in the last three

14   months, on top of what we've just been talking

15   about.

16        One would be, it's a perfect segue from the

17   last topic, the Australian government has just

18   announced that it will be introducing criminal

19   penalties for cartel offenses.

20        Another country just announced, and I can tell

21   you it looks very promising, because in the paper

22   the opposition party to the party that's in power

23   right now in Australia, their reaction was two-fold.

24   One was, what took you so long?  And the second one

25   was, we're going to have to look at these five year

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime        March 3, 2005
                                          Las Vegas, NV

Page 43

1    maximums to see if it's long enough.

2        So I think I can predict with a fair degree of

3    certainty that we will be seeing criminal sanctions

4    in Australia within the year.

5        That is going to have a big impact in a lot of

6    ways that these gentlemen are better able to talk

7    about with respect to simultaneous leniency

8    applications and so forth.

9        Secondly, just a couple of weeks ago, I'll

10   mention as a recent development you may want to pay

11   attention to, the Antitrust Division just got

12   authority to use wiretaps in its investigations,

13   and by that I mean antitrust offenses are now a

14   predicate offense for seeking wiretap authority.

15   That legislation was just passed in mid-February.

16   So you know, that may be coming soon to an

17   investigation near you.

18       And the third development to keep an eye on

19   obviously, is sentencing-related issues.  You know

20   there's going to be a lot of talk in this conference

21   about Booker/Fanfan, and obviously the Division

22   like other prosecutors will have to adjust to that

23   case.  But you know, something that is unique to

24   the Antitrust Division that I would just point

25   your attention to with respect to sentencing, has

Page 44

```
 1      to do with our new legislation.  I hope all of you

 2      know this, but in June of last year the statutory

 3      maximums for antitrust offenses went way up.  So

 4      for individuals, the statutory maximum jail sentence

 5      went from three years to 10 years, and the

 6      statutory maximum fine under the Sherman Act for

 7      fines went from $10 million to $100 million

 8      dollars.

 9          The Congress, when it passed the legislation,

10      directed the Sentencing Commission to revisit 2R1.1,

11      which is the antitrust guideline, and told them to

12      make adjustments to that guideline to take into

13      effect the new statutory maximum.  I think you will

14      see that the Commission is going to do that, and I

15      suspect that what they will do is raise the base

16      offense level and also raise the fine with commerce

17      adjustments as well.

18          Now, I can tell you in that in the Division

19      we're giving a great deal of thought to and

20      preparing for and what I -- you ought to keep your

21      eye on is -- once those guidelines go up, how is

22      that going to effect the Division's sentencing

23      recommendations?

24          Obviously, I think you all know the

25      Department's mandate after Booker is to keep on
```

Page 45

1    recommending guideline sentences, so that much is

2    clear.  We will do that.

3          But what about 5-K's?  What is the Division

4    going to do in the 5-K situation if you received --

5    if you were in offense level 15, looking at an 18 to

6    24 month jail sentence before, and a 5-K got you a

7    three or four level drop and you got a sentence of

8    12 months or less, or nine months or whatever it was?

9    What's going to happen going forward when that same

10   defendant may be looking at a sentence of four, five

11   or six years?  Is he still going to be -- is the

12   Division in its 5-K, because oftentimes we use plea

13   agreements, going to be making the same sentencing

14   recommendation?  Probably not.

15         I mean, I don't think we can be following clear

16   directives from the Hill on how we should treat

17   antitrust offenses if there was an upward adjustment.

18   Do I think it's going to happen all at once?  No.  Do

19   I think it's going to be problematic?  Yes.  But this

20   is stuff that I'm going office to office about,

21   talking to our prosecutors getting them thinking

22   about it, so that when the guidelines are adjusted,

23   we'll have a policy in place and try to have

24   uniformity, as much as possible with respect to how

25   we deal with this issue.  Very important going

Page 46

1    forward.

2        GARY SPRATLING: Will Booker/Fanfan, Scott,

3    have any effect on the way the Division charges

4    cases? [inaudible]

5        SCOTT HAMMOND: No, I mean I don't

6    -- you know.  Blakeley was a problem.  Booker was a

7    relief after Blakeley.  I mean, we have sentencing

8    adjustments -- every single Antitrust Division,

9    virtually every single Antitrust Division

10   defendant has sentencing adjustments for volume of

11   commerce, or what have you.  If we have to prove

12   every single sentencing adjustment and prove it

13   beyond a reasonable doubt to a jury, that would have

14   been a headache.

15       Having to, you know life after Booker with

16   respect to charging positions, is not going to be a

17   big headache for the Antitrust Division.

18       GARY SPRATLING: Well what's with the next phase

19   then, you charge it, you've got some people who in

20   anticipation of charge are contemplating negotiating

21   a plea agreement.  Does the combination of Blakeley,

22   and Booker/Fanfan give a putative defendant a lever

23   against you in terms of reducing the amount of the

24   fine that it's willing to agree to and you are going

25   to press to get, by saying to you, "listen, you know

1   under these new decisions you've got to be able to

2   prove twice the gain, twice the loss.  We don't

3   think you have a prayer of doing that, so we're not

4   going to enter into this plea agreement.  We like all

5   the rest of it.  But that number you got down there,

6   we want that number down because of these decisions

7   and the responsibilities that are going to be imposed

8   upon you."  How do you react to that, and does that

9   work?

10      SCOTT HAMMOND: Well, it doesn't work.

11  And I'll explain why.  First of all, this doesn't

12  come up in plea negotiations with individuals.

13  We're not looking for fines or sentences above 10

14  years right now.

15      Secondly, now we're talking about fines above

16  the statutory maximum, which soon will be $100

17  million dollars.  Well it already is $100 million

18  dollars, and will be for conduct that postdates June

19  of 2004.  But for conduct that predates that, or

20  conduct that postdates that, that wants to go above

21  $100 million dollars, yes we do get arguments from

22  defense counsel that says "hey, you're going to have

23  to prove gain or loss, you're going to have to prove

24  to a jury beyond a reasonable doubt.  We have an

25  economist that says you can't do that.  And we've

Page 48

1    conducted a study and so we're willing to cooperate

2    and enter into a plea agreement with you all, but

3    you're going to have to take into account the fact

4    that you're going to have a difficult time with gain

5    and loss.  And you're not going to be able to rely

6    on that 10 percent proxy that's in the sentencing

7    guideline that doesn't require you to establish gain

8    or loss in antitrust cases."

9         And you know, I mean our response to that is

10   uniform.  We say, if you would like your day in

11   court, and if you would like to prove and litigate

12   the issue of gain or loss, we can do that.  But we

13   will do that at the end of our investigation.

14   We're not going to do it in the middle of our

15   investigation.  We're not going to stop our

16   investigation right now, go hire outside experts

17   and conduct a gain or loss calculation.

18        You want to litigate with the Division that's

19   fine, go to the end of the line.  You want to plead

20   guilty, you want to cooperate.  We're going to rely

21   upon the 10 percent proxy in the guidelines, we're

22   going to calculate a guidelines fine, we may then

23   depart substantially from that guidelines fine

24   based on your cooperation, we'll do a whole lot of

25   other things for you that we do for cooperating

Page 49

1    parties, but you can't have it both ways.

2        So again, these gentlemen to the right and

3    left of me know this dynamic, or at least know

4    better than I in terms of why companies do what

5    they do, but I'll tell you we've had no difficulty

6    obtaining fines above $10 million, above $100

7    million post-Apprendi, post-Blakeley, and post-

8    Booker.

9        GARY SPRATLING: Why don't we move to a new

10   subject, internal investigations.  Jim, suppose

11   your internal investigation has identified the

12   company's employees who were involved in the

13   activity and you're talking  to the board.  The

14   board wants to know, what do we have to do to

15   make sure that this conduct has stopped and what

16   should we do to discipline the employees who've

17   been involved in the illegal conduct?  We all know

18   that those are questions that the board frequently

19   puts to counsel reporting to them.  What advice do

20   you give them?

21       JIM WALDEN: I guess part of it depends on who

22   you're representing, whether you're representing

23   senior management, or you're representing the

24   board.

25       Oftentimes, when you're doing an internal

ABA White Collar Crime 2005 Speech        ABA - White Collar Crime                    March 3, 2005
Las Vegas, NV

Page 50

1   investigation, at least until about a year and half

2   ago, you're mostly representing senior management,

3   now it's more often that the board is actually doing

4   the investigation. But in those situations the

5   tension is always there.  There's always a tension

6   between finding all the facts, and getting rid of

7   the wrongdoers and usually you can't have it both

8   ways at least not at the same time.

9       And so there is a real danger of pushing

10  people out of the tent too quickly.  Even if you

11  simply remove people from their job

12  responsibilities and move them to a different area

13  of the company, that's a decision that's going to

14  carry risks.  The people know that employment

15  decisions are being made.  The person who's affected

16  may be less forthcoming, they may decide that he or

17  she wants a lawyer.

18      It may also have a residual impact on other

19  employees.  Especially if the decision is made to

20  prematurely terminate someone.  Other employees in

21  the internal investigation may not be completely

22  candid with you, for fear that they will be impacted

23  as well.  And so the advice that you have to give

24  when you're talking to the board is often very

25  difficult, because the board essentially, usually