# Exhibit 15F

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - -

| | | |
|---|---|---|
| STOLT-NIELSEN, S.A. and<br>STOLT-NIELSEN TRANSPORTATION<br>GROUP, LTD. | : | CIVIL ACTION |
| Plaintiffs | : | |
| | : | NO.  04-537 |
| vs. | : | |
| UNITED STATES OF AMERICA | : | |
| Defendant. | : | |

Philadelphia, PA
April 14, 2004

BEFORE:   HON. TIMOTHY J. SAVAGE, J

SECOND DAY
(AFTERNOON SESSION)

P R E S E N T:

For the Plaintiff:

WHITE & CASE
BY:  CHRISTOPHER M. CURRAN, ESQ.
GEORGE J. TERWILLIGER, ESQ.
J. MARK GIDLEY, ESQ.
GEORGE PAUL, ESQ.
601 Thirteenth Street, N.W.
Suite 600.
Washington, D.C. 20005-3807

DISK ENCLOSED

2

```
               BLANK ROME LLP.
          BY:  IAN COMISKY, ESQ.
               MATTHEW LEE, ESQ.
               One Logan Square.
               Philadelphia, PA 19103-6998
               For Stolt-Nielsen


               FINE, KAPLAN & BLACK.
          BY:  ROBERTA D. LIEBENBERG, ESQ.
               ALLEN D. BLACK, ESQ.
               GERARD A. DEVER, ESQ.
               23rd Floor
               1845 Walnut Street.
               Philadelphia, PA 19103-4723

               JAMES A. BACKSTROM, ESQ.
               Suite 200
               Two Penn Center.
               Philadelphia, PA 19102-1706.

               For RICHARD WINGFIELD


          For the Defendant:

          UNITED STATES DEPARTMENT OF JUSTICE
               Antitrust Division
          BY:  ROBERT E. CONNOLLY, ESQ.
               ANOTONIA R. HILL, ESQ.
               WENDY NORMAN, ESQ.
               The Curtis Center
               Suite 650 West
               7th and Walnut Streets
               Philadelphia, PA., 19106.

               FOR THE UNITED STATES


     (Proceedings recorded by mechanical stenography,
transcript produced by computer)
                     1:15 P.M.
                     1:15 p.m.
```

3

1  AFTERNOON SESSION
2  Appearances as noted, the following transpired in
3  open court:)
4  (JAMES M. GRIFFIN, resumed)
5  CROSS-EXAMINATION
6  BY MR. GIDLEY:
7  Q. Mr. Griffin, I want to go back to some of your
8  testimony on direct, sir.
9  Sir, you testified that you attended a meeting with
10 John Nannes on December 4, 2002, correct?
11 A. Yes.
12 Q. Could you keep your voice up?
13 A. Yes, 2002.
14 Q. Thank you very much.
15 Sir, you testified at that meeting you used the
16 term head fake; is that correct?
17 A. Yes.
18 Q. And sir, would you tell the Court to the best of
19 your recollection, what exactly you said about head fake at
20 that meeting?
21 A. It was in reference to the emails that had been
22 shown to us and the representation that that is when
23 Stolt-Nielsen withdrew from or ceased its activity, illegal
24 activity.
25 Q. What were your exact words?

4

1  A. I can't recall my exact words, but it was something
2  to the effect that if it was a head fake and you would not
3  qualify for leniency and if it were a conditional amnesty
4  agreement in effect, it would be revoked.
5  Q. Did you say this at the beginning or at the end of
6  the meeting, sir?
7  A. Near the end.
8  Q. What did Mr. Nannes say in response, if anything?
9  A. I don't recall. I don't recall what, if anything,
10 he said.
11 Q. At the December 4th meeting, did Mr. Nannes say
12 that not a single antitrust violation had occurred at
13 Stolt-Nielsen after March 31, 2002?
14 A. No, he did not say that.
15 Q. Did Mr. Nannes tell you that his law firm had
16 audited the SNTG antitrust compliance from March to November,
17 2002?
18 A. I do not believe he said that.
19 Q. Did Mr. Nannes say that Skadden, Arps investigated
20 all contacts with competitors after March 2002 at the December
21 4th meeting?
22 A. No, he specifically said that he had more
23 investigation to do.
24 Q. And Mr. Nannes was very early in his assignment
25 from Stolt-Nielsen; isn't that correct, on December 4th, 2002?

5

1  A. Well, I don't know that. I know that his first
2  contact with me was November 22nd and this was what is that,
3  12 days later or so?
4  Q. Between November 22nd and December 4th, you had a
5  series of phone calls with Mr. Nannes; is that correct?
6  A. That's correct.
7  Q. Sir, in the course of those phone calls, did you
8  tell Mr. Nannes there was a "shoot the messenger" issue that
9  the Division had?
10 A. I do not recall using that term, "shoot the
11 messenger."
12 Q. That's to the best of your recollection, you did
13 not use that term, sir, to Mr. Nannes?
14 A. I don't recall using it, no.
15 Q. Did you mention to Mr. Nannes that you were also
16 looking into Treasury allegations and that would also be an
17 issue with the application that SNTG was proffering to the
18 Division?
19 A. Yes, we talked about that. They weren't proffering
20 that to the Division, though.
21 Q. But, sir, did you mention to Mr. Nannes that there
22 was an issue about the Treasury Department investigation and
23 you needed to check that out in the course of approving the
24 amnesty application?
25 A. Yes.

Page 6

1  Q. Sir, that Treasury Department investigation is not
2  listed as something in your corporate Leniency Policy that you
3  look into; isn't that correct?
4  A. That's correct.
5  Q. But nonetheless, you told Mr. Nannes that was a
6  threshold issue for admission into the program; isn't that
7  correct?
8  A. I told him we needed to do some due diligence on
9  that. We weren't going to inadvertently give amnesty on that
10 issue.
11 Q. But, sir, didn't you say to Mr. Nannes that you
12 would not be in a position to approve the amnesty application
13 until you cleared the O'Brien issue, employment issue, lawsuit
14 issue as well as the Treasury Department issue; isn't that
15 correct?
16 A. Well, the way you have asked the question, no, but
17 I -- they were on two separate tracks. There was due
18 diligence I needed to do within the Department -- within the
19 government on the treasury issue and then, there was the issue
20 of whether or not the company had taken prompt and effective
21 action. So both of those issues were at work, yes.
22 Q. Let's go to the December 4th meeting and I want to
23 show you a demonstrative exhibit. I have given you several
24 books of exhibits, sir. If I can direct you to the second
25 book, tab one and it will be on the screen, as well.

Page 7

1  A. I see it.
2  Q. Can you see the exhibit?
3  A. Yes.
4  Q. It's been marked is as SND-1.
5     At the December 4th meeting, Mr. Nannes outlined a
6  series of steps that SNTG had taken?
7  A. Yes.
8  Q. One of the steps he outlined at the December 4th
9  meeting is that SNTG revised its antitrust handbook?
10 A. That's correct.
11 Q. Mr. Nannes also mentioned that the company had
12 implemented mandatory antitrust compliance training; isn't
13 that correct?
14 A. Yes, he did.
15 Q. Isn't it the case that Mr. Nannes also mentioned
16 that all agreements with competitors were to be in writing and
17 approved by counsel as part of the measures that were
18 implemented; isn't that correct?
19 A. I believe that's correct.
20 Q. Sir, directing your attention to item 4, isn't it
21 the case Mr. Nannes mentioned that written certifications had
22 been obtained by SNTG employees?
23 A. Yes.
24 Q. Didn't Mr. Nannes mention he gave the SNTG
25 antitrust policy to competitors that that had been given by

Page 8

1  SNTG in the spring?
2  A. Yes.
3  Q. Mr. Nannes also mentioned SNTG delivered its new
4  antitrust policy to some of its business partners?
5  A. That's correct.
6  Q. Mr. Nannes at the December 4th meeting gave you
7  those emails; isn't that correct?
8  A. Yes.
9  Q. Sir, at that meeting, did you ask Mr. Nannes what
10 dates the certifications had been obtained from the various
11 employees?
12 A. I don't believe I did.
13 Q. Did anyone from the government ask Mr. Nannes
14 during what time period the certifications had been obtained,
15 to the best of your recollection?
16 A. There was some discussion of that, yes.
17 Q. Did anyone from the government specifically ask
18 what the last date was of the last certification that was
19 turned in in 2002?
20 A. I believe we were told. I don't remember a
21 specific question, but I believe Mr. Nannes told us.
22 Q. Well, sir, as you sit here today, what is your
23 understanding as to the last certification that was turned in
24 in 2002 by the SNTG employees?
25 A. I believe it was not until sometime in the summer.

Page 9

1  Q. July, the end of July; is that correct?
2  A. I was going to say June or July.
3  Q. Now, Mr. Lee of SNTG sought those certifications in
4  a May, 2002 memo; isn't that correct?
5  A. I am not sure I have seen a May, 2002 memo.
6  Q. Let me direct your attention to tab 10 of book II,
7  sir.
8  A. Yes?
9  Q. It's a form memo with a date of May 14th and it's
10 under the signature or over the signature of Reginald J. R.
11 Lee, CEO of SNTG; do you see that?
12 A. Yes.
13 Q. Is this the first time you have examined this
14 document?
15 A. I believe that it is, yes.
16 Q. Turning the page under tab 10, there is a form,
17 SNTG antitrust compliance policy, do you see that?
18 A. Yes.
19 Q. Have you seen this before?
20 A. No.
21 Q. Have you seen this in a signed executed form?
22 A. No, I don't think I have seen this before?
23 Q. Let me direct your attention to tab 11, sir, if I
24 could.
25    Mr. Griffin, have you seen this document before.

Page 10

1  It's labeled for the record is Exhibit 51 and it's entitled:
2  "SNTG Antitrust Compliance Policy Confirmation."
3      Do you see that?
4  A. Yes.
5  Q. Have you seen that before?
6  A. No.
7  Q. It's July 31, 2002; is it not?
8  A. Yes.
9  Q. Weren't these compliance policies delivered to you
10 on July 9, 2003 at a meeting in the Justice Department?
11 A. They well could have been.
12 Q. But, you didn't look at the signed certifications;
13 is that correct?
14 A. I don't recall seeing this.
15 Q. Let me take you back to November 22, 2002 for a
16 minute.
17     Sir, when Stolt-Nielsen came in and phoned you, did
18 Stolt-Nielsen know whether there was a Government
19 investigation into the parcel tanker industry?
20 A. No, that was the first question.
21 Q. You had had this investigation open only for a
22 matter of hours when Mr. Nannes called, correct?
23 A. That's correct.
24 Q. Mr. Nannes's call was on Friday November 22, 2002,
25 correct?

Page 11

1  A. It was November 22nd. I don't recall whether it
2  was a Friday or not, but yes.
3  Q. You weren't in the office, so he left a voicemail;
4  is that correct?
5  A. That's right.
6  Q. You picked up the mail and you had a conversation
7  over the weekend, correct?
8  A. That's right.
9  Q. Now, sir, Friday Morning, the Wall Street Journal
10 article had come out, correct?
11 A. Yes.
12 Q. Can you describe for me the process of opening an
13 antitrust investigation that involves criminal charges?
14     Can you briefly outline that for me?
15 A. Well, it can be done in any number of ways, but if
16 we're opening a preliminary inquiry, it can be done by a phone
17 call, because that does not authorize any kind of compulsory
18 process and the staff or office calls me or calls the Director
19 and lays out what they want to do and they want to begin an
20 investigation, preliminary investigation, that authority can
21 be given orally. It will then be papered up by a short memo.
22 Q. When you say "papered up", when is the
23 investigation formally opened as a matter of Division policy?
24 Does not the paperwork have to be completed?
25 A. Formally opened in terms of -- yes, in terms of

Page 12

1  opening a file within the Department, the paperwork has to go
2  through.
3  Q. When was the file opened in this matter, sir?
4      THE COURT: Excuse me, are we arguing --
5      MR. GIDLEY: This is relevant to the questions
6  about SNTG employees and what John Nannes was applying for at
7  the time he made the phone call.
8      THE COURT: So it bears on the "A" and "B" sides.
9      MR. GIDLEY: Yes.
10     THE COURT: We're proceeding under "B", it's a
11 given.
12     MR. GIDLEY: The inquiry was opened hours earlier
13 by a phone call.
14     THE COURT: So what, they are under "B" the line of
15 your questions appear to me that you are suggesting that it
16 should have been subject to part 1, rather than "B" because
17 there really was an investigation going and what I am saying
18 to you it does not matter because they went in for "B."
19     MR. GIDLEY: I agree, it's limited to Part "B."
20     THE COURT: Tell me what this is relevant to?
21     MR. GIDLEY: I think it's relevant to whether or
22 not at the time that Mr. Nannes called, he knew he was going
23 for "A" or "B" side amnesty.
24     THE COURT: That Mr. Nannes knew?
25     MR. GIDLEY: Yes.

Page 13

1      THE COURT: Did he say he wasn't going for "B"?
2      MR. GIDLEY: And what was said by Mr. Nannes to Mr.
3  Griffin in the initial calls.
4      THE COURT: I don't understand the relevance of it
5  as to the issue that is before me.
6      MR. GIDLEY: I can move on, your Honor.
7      THE COURT: Okay.
8  Q. Let's go back to the December 4th meeting, Mr.
9  Griffin. If I understood your direct testimony, Mr. Nannes'
10 statement at the December 4th meeting was important to your
11 decision to admit Stolt-Nielsen; is that correct?
12 A. Yes.
13 Q. After the December 4th meeting the Division did not
14 send a letter memorializing any representation to Mr. Nannes?
15 A. That's correct.
16 Q. There is no reference to March 2002 in the January
17 15, 2003 agreement, correct?
18 A. That's correct.
19 Q. Nor, is there a reference to February 2002
20 discovery in the January 15th agreement, correct?
21 A. That's correct.
22 Q. Yesterday, you testified on direct that since
23 discovery might have been earlier than February 2002, you
24 couldn't put it into the agreement.
25     Do you recall that testimony?

Page 14

1  A. I didn't say we couldn't. I said I didn't think
2  there was any need to.
3  Q. You have the power and authority to put in a date
4  as to discovery in that agreement; isn't that correct?
5  A. If the applying company agrees to it, yes, we can
6  suggest terms.
7  Q. You have the power to change those terms including
8  specifying the date of discovery in the amnesty agreement
9  letter, correct, sir?
10 A. We could do that if it were accepted by the other
11 side.
12 Q. And did you propose that to Mr. Nannes, sir?
13 A. No.
14 Q. Let me direct your attention to the agreement
15 itself, it's in your first book. G-2, tab 1. If I may, let
16 me direct your attention to representation 1(a):
17     "SNTG represents to the Antitrust Division that, in
18 connection with the anticompetitive activity being reported
19 it:
20     "(a) took prompt and effective action to terminate
21 its part in the anticompetitive activity being reported upon
22 discovery of the activity."
23     Do you see that language, sir?
24 A. I do.
25 Q. Now, the words, "prompt", "effective" and "action",

Page 15

1  have those words, that four word phrase, has that appeared in
2  Division speeches before construing those three words?
3  A. I believe that we did in the 1998 speech.
4  Q. Let me direct your attention to the Spratling
5  speech at tab 3 and it's marked for identification as is in
6  Exhibit 30, pages 1 through 13.
7  A. What tab were you on?
8  Q. I am sorry, tab 3?
9     MS. LIEBENBERG: In my book it's Exhibit 32.
10 Q. You should be in Exhibit Book I.
11 A. I am in one.
12 Q. At tab 3?
13 A. Yes. Give me the page number again.
14 Q. I want to make sure we are literally on the same
15 page. Are you looking at the Gary Spratling, corporate
16 leniency questions and answers to recurring questions?
17 A. Yes.
18 Q. That was a speech given on April 1, 1998, correct?
19 A. Yes.
20 Q. By the way, this is the web version that's on the
21 web, correct?
22 A. That's right.
23 Q. Let me direct your attention to page 3, under a
24 section entitled terminating activity, 1, what is required,
25 let's skip down and pick up where it says: "Questions" I

Page 16

1  think it's the third sentence -- I am sorry the second
2  sentence?
3  A. Yes.
4  Q. "Questions have arisen as to what is required for a
5  corporation to terminate its part of the activity."
6     Do you see that?
7  A. I do.
8  Q. It says, first: "Termination does not require
9  announcement of withdrawal in the illegal activity to other
10 participants in the activity, although that would constitute
11 one means of termination."
12    Do you see that?
13 A. Yes.
14 Q. Is that a correct statement of Division's policy
15 today?
16 A. Yes.
17 Q. It was a correct statement at the time Mr. Nannes
18 contacted the Division; is that correct?
19 A. Yes.
20 Q. Next: "Termination can also be effectuated by
21 reporting the illegal activity to the Division and refraining
22 from further participation unless continued participation is
23 with Division approval."
24    Do you see that?
25 A. Yes.

Page 17

1  Q. Sir, is that a correct statement of Division
2  policy?
3  A. Yes, it is.
4  Q. So, termination can be affected by reporting
5  activity to the Division; is that correct?
6  A. That's correct.
7  Q. This paragraph does not purport to exhaust all the
8  different ways that someone can terminate activity, does it?
9  A. It does not.
10 Q. You will notice that in that sentence that was the
11 lead in:
12    "Questions have arisen as to what is required for a
13 corporation to terminate its part in the activity?"
14    The phrase, "prompt and effective action" isn't in
15 that part of the paragraph, correct?
16 A. Is it referred to in this paragraph?
17 Q. In those three sentences from "questions" through
18 the end of the paragraph.
19 A. That's right.
20 Q. In other words, those two following sentences
21 illustrate terminating its part in the activity, correct?
22 A. That's right.
23 Q. While we're here, let's go ahead and look at
24 paragraph 2: "Terminating Upon Discovery."
25    This is a long passage and I'll read it:

18

1  "Questions have also arisen about what it means for
2  the corporation to discover activity. More specifically, in
3  cases usually involving small closely held corporations, where
4  top executives, board members or owners participate in the
5  conspiracy, it has been suggested that the corporation may not
6  be eligible for amnesty, because the corporation's discovery
7  of the activity arguably occurred when those participants
8  joined the conspiracy.
9      "Under that approach, the corporation cannot be
10 said to have promptly terminated its participation in the
11 activity. Generally, the Division will consider the
12 corporation to have discovered the illegal activity at the
13 earliest date on which either the board of directors or
14 counsel for the corporation either inside or outside were
15 first informed of the conduct at issue.
16     "Thus, the fact that top executives, board members
17 or owners participate in the conspiracy will not necessarily
18 bar the corporation for eligibility for amnesty."
19     Is that a correct statement of Division policy?
20 A.  Yes, it is.
21 Q.  The reason for this policy, sir, is to negate the
22 harmful effects to the program of automatically imputing the
23 knowledge of the executives to the corporation; isn't that
24 correct?
25 A.  I am not sure I would say it quite that way, but

19

1  it's -- it is a way to avoid disqualifying companies on the
2  basis that their senior executives were involved in the
3  conduct.
4  Q.  Let's take a hypothetical example.
5      If a CEO is running a cartel, this language would
6  permit the company to come in, despite the fact that that have
7  senior officer is running the cartel, isn't that the case?
8  A.  That's the case, yes.
9  Q.  For this to work the Division has added a gloss to
10 the word, "discovery", so that the automatic imputation of the
11 CEO's knowledge to the corporation does not occur any more;
12 isn't that correct?
13 A.  For the purposes of determining when the
14 corporation learns of the conduct, so as to not automatically
15 disqualify companies whose senior executive officers are
16 involved in cartel activity, that's right.
17 Q.  The next sentence says:
18     "The purpose of this interpretation is to insure
19 that as soon as the authoritative representatives of the
20 company for legal matters, the board or counsel representing
21 the corporation, are advised of the illegal activity, they
22 take action to seize that activity."
23     Do you see that?
24 A.  Yes.
25 Q.  There is a reference to "authoritative

20

1  representatives" of the Corporation.
2      Do you see that?
3  A.  Yes.
4  Q.  Does this policy statement deal with the situation
5  where a general counsel consults with an outside lawyer and
6  they have a disagreement over whether or not there is an
7  antitrust violation at all?
8  A.  It does not specifically address that, no.
9  Q.  Let me take you back, sir, to the amnesty
10 agreement, book 1, tab 1, Government's Exhibit 2.
11 A.  Back to the Government book.
12 Q.  Either way, just as long as you have the amnesty
13 agreement in front of you.
14 A.  Okay. I have it.
15 Q.  Let's go to paragraph 3, second sentence, which
16 reads:
17     "Pursuant to that policy, the Antitrust Division
18 agrees not to bring any criminal prosecution against SNTG for
19 any act or offense it may have committed prior to the date of
20 this letter in connection with the anticompetitive activity
21 being reported."
22     Do you see that?
23 A.  Yes.
24 Q.  The second sentence says the Antitrust Division
25 agrees not to bring any criminal prosecution against SNTG for

21

1  any act or offense it may have committed prior to the date of
2  the letter, correct?
3  A.  Well, yes; that's part of the sentence.
4  Q.  Date of the letter is January 15, 2003?
5  A.  That's correct.
6  Q.  Now, in your capacity as Deputy Assistant Attorney
7  General, have you the power to change that language and set an
8  earlier date as a matter of your discretion, you have that
9  authority; do you not, sir?
10 A.  But this is basically the model letter that we came
11 up with. We could have drafted a different letter, I suppose.
12 Q.  You could specifically have put an earlier date in
13 this letter if you chose to; isn't that correct?
14 A.  Oh, you mean change this specific letter?
15 Q.  Yes, for instance if an issue arises about
16 discovery, you can say SNTG gets amnesty through March 2002.
17 We will take this one step at a time, you could have done
18 that, couldn't you have, sir?
19 A.  We could have suggested it if the company would
20 have agreed to it. We could have made that the agreement.
21 Q.  Let's go back to the December 4th meeting for a
22 minute. You can just set that aside.
23     The December 4th meeting was not a proffer meeting,
24 correct?
25 A.  It was not.

22

1   Q.   Mr. Nannes did not outline the evidence that he had
2   uncovered?
3   A.   He did not.
4   Q.   Because at that time, he had not uncovered the '98
5   conspiracy, correct?
6   A.   That, I don't know. I don't know what he had
7   uncovered. He was certainly saying that he was -- he wanted
8   to go forward with leniency that he had uncovered conduct that
9   would be subject to criminal prosecution, yes.
10  Q.   But, Mr. Nannes didn't talk about an exchange of
11  customer lists at that meeting?
12  A.   He did not give any specifics, no.
13  Q.   Did he not talk about a 1999 agreement or 2001
14  agreement, correct?
15  A.   No, he did not.
16  Q.   At the December 4th meeting when Mr. Nannes handed
17  those emails over, was there a discussion of Mr. Wingfield's
18  current employment status during that meeting?
19  A.   I believe that there was.
20  Q.   Did the Division indicate that Mr. Wingfield should
21  be fired as a result of being a participant in the antitrust
22  conspiracy?
23  A.   No.
24  Q.   How about anyone else, did the Division at the
25  December 4th meeting recommend that action be taken to either

23

1   move or suspend or terminate any of the employees that might
2   be involved in antitrust activity?
3   A.   No.
4   Q.   After the December 4th meeting did you have a
5   series of phone calls with Mr. Nannes?
6   A.   I know that we talked a few times after that. I
7   don't know whether -- I don't know how many times.
8   Q.   Do you have a recollection that Mr. Nannes was
9   calling on almost a daily basis because he was interested in
10  finding out whether a marker would be granted or not?
11  A.   This is interesting. I do not recall that, because
12  my recollection was that after the December 4th meeting, he
13  had a marker.
14  Q.   You don't recall a December 17th phone call where
15  the marker was granted, is that your testimony, sir?
16  A.   I don't, but the fact is, a marker was given and I
17  thought it was at the December 4th meeting.
18  Q.   I want to understand the Division's theory here.
19  The Division through you has revoked Stolt-Nielsen's amnesty,
20  correct?
21  A.   Yes.
22  Q.   You did that in a March 2, 2004 letter, correct?
23  A.   Correct.
24  Q.   I take it it's not your contention that Mr. Nannes
25  acted in bad faith at the December 4th meeting; is that

24

1   correct?
2   A.   I do not believe that he knowingly provided us
3   false information. No.
4       THE COURT: No one has made an allegation that he
5   acted in bad faith.
6       MR. CONNOLLY: That's correct, your Honor.
7       THE WITNESS: That's correct.
8   Q.   Your theory is the company misled Mr. Nannes into
9   what he said on December 4th; is that correct?
10  A.   My theory is that what -- the information that Mr.
11  Nannes gave us on December 4th was not correct. In fact, was
12  false, but I do not believe that Mr. Nannes knew that it was
13  false.
14  Q.   Did I direct your attention back to these six steps
15  and we can put that up on the screen to speed this along.
16  A.   Surely.
17  Q.   You don't contend today that these six steps did
18  not happen; is that correct?
19  A.   I do not -- oh, excuse me -- no, I do not question
20  that those steps occurred.
21  Q.   The handbook got revised, the training, the
22  certifications, the emails, those steps occurred, correct?
23  A.   To the best of my knowledge, they occurred, yes.
24  Q.   You are not contending otherwise at this point; is
25  that correct?

25

1   A.   I am not contending otherwise.
2   Q.   At the time Stolt-Nielsen approached you through
3   John Nannes, you did not have sufficient evidence to sustain a
4   conviction for anyone in the parcel tanker area?
5   A.   That's correct.
6   Q.   That's the (b)(2) factor?
7   A.   Yes.
8   Q.   The Division at the time the corporation comes in,
9   does not yet have evidence against the company that is likely
10  to result in a sustainable conviction, correct?
11  A.   We did not have that in November of 2002.
12  Q.   Do you have a recollection of a conversation with
13  John Nannes where you granted the marker and said he could
14  begin his investigation?
15  A.   No; I would not say you can begin your
16  investigation, because you can begin providing information to
17  us.
18  Q.   On January 8th, SNTG made a proffer to the Division
19  here in Philadelphia, correct?
20  A.   I am not certain of the date, but sometime between
21  mid December and January 15th, yes.
22  Q.   You are aware that a proffer was made?
23  A.   Yes.
24  Q.   After the proffer was made, did Mr. Connolly or one
25  of the staff call you to tell you how it went?

Page 26

1   A.   Yes.
2   Q.   What did they say?
3   A.   It was a general background proffer. I don't
4   remember the exact details, but basically I think the bottom
5   line was it went well but they had some follow-up questions.
6   Q.   Did they mention anything about lists, sir, on
7   January 8th or thereafter to you?
8   A.   I don't recall whether it was January 8th or not,
9   but yes.
10  Q.   Now, after January 8th, but prior to January 15,
11  2003, did you have some understanding that SNTG was providing
12  evidence that could be helpful in securing criminal
13  convictions of antitrust violations?
14  A.   Yes, they were providing documents and general
15  proffers of information.
16  Q.   And information, they were giving witnesses who
17  could testify about meetings with competitors in the 1998 and
18  2001 time periods; isn't that correct?
19  A.   Yes.
20  Q.   Identifying the meetings happened and being in a
21  position to say that what happened at those meetings was
22  illegal under the antitrust laws?
23  A.   That's correct.
24  Q.   It was on that basis you decided to move forward
25  with the January 15, 2003 agreement, correct?

Page 27

1   A.   That's correct.
2   Q.   Now, you had sent Mr. Nannes a draft of the
3   agreement back on November 24th, correct?
4   A.   No, what I sent him, it wasn't a draft of the
5   agreement, it was just the model letter.
6   Q.   Let's go back to your first exhibit book. We have
7   got the transmittal email.
8        Let me direct your attention, sir, to tab 5, SNX-1,
9   it starts with an email -- are you there?
10  A.   I am there.
11  Q.   Dated November 24, 2002, correct?
12  A.   Correct.
13  Q.   This is an email you sent?
14  A.   Yes.
15  Q.   The message is: "I'll call you tomorrow, Jim?"
16  A.   Yes.
17  Q.   The next couple pages are the model corporate
18  condition leniency record?
19  A.   Yes.
20  Q.   Let me direct your attention to the first page of
21  the letter. The model letter dated April 2, 2002.
22       Do you have see that?
23  A.   Yes.
24  Q.   Let's compare it first with the 1998 model letter
25  that Mr. Spratling attached to his speech, so if I can ask you

Page 28

1   to flip back quickly to the back end of the Spratling speech
2   which is at tab 3. It's on page 11 of 13.
3   A.   Okay.
4   Q.   Tab 3. So we're going to be comparing SNX-1 with
5   SNX-30. The model letter as of April 2, 2002 has the
6   anticompetitive activity being reported as a defined term.
7        Do you see that?
8   A.   (No response.)
9   Q.   That's the first sentence of representations I.
10  A.   April 2002 model?
11  Q.   That's right. Paragraph entitled:
12  "Representations."
13  A.   Yes.
14  Q.   Do you see where the anticompetitive activity being
15  reported is a defined term?
16  A.   Yes.
17  Q.   Then in 1(a), anticompetitive activity being
18  reported is inserted before the words: "Upon discovery",
19  correct?
20  A.   Yes.
21  Q.   Now, in the model letter in 1998, anticompetitive
22  activity being reported wasn't a defined term; isn't that
23  correct, if you look at page 11 of 13?
24  A.   Yes, I believe that's right.
25  Q.   In the model letter back in 1998, the

Page 29

1   anticompetitive activity being reported is not inserted into
2   the body of the "a" paragraph, do you see that, before the
3   words "upon discovery?"
4   A.   Well, it says: "Took prompt and effective action
5   to terminate its part in the activity upon discovery of the
6   activity."
7   Q.   The model letter says, "activity" and the 2002
8   letter has the entire phrase inserted, correct?
9   A.   Yes.
10  Q.   At the end of the first sentence, do you see where
11  it talks about an insert for the industry and insert for
12  geographic scope?
13  A.   Again, are we back at the 2002 letter?
14  Q.   We are, sir?
15  A.   Yes.
16  Q.   In the final agreement which is tab one of this
17  book, Government's Exhibit 2, the geographic scope is
18  transportation to and from the United States; isn't that
19  correct?
20  A.   That's correct.
21  Q.   That language obtains throughout the agreement,
22  correct?
23  A.   Yes.
24  Q.   And in fact, it's included down below in the
25  definition of the anticompetitive activity being reported,

30

1  representation, correct?
2    A.  Yes, that's correct.
3    Q.  This agreement makes the distinction between the
4  corporation SNTG and the individuals; does it not?
5        THE COURT:  Which one?
6        MR. GIDLEY:  The final signed agreement,
7  Government's Exhibit 2.
8        THE WITNESS:  Well, yes there are two different
9  paragraphs.
10   Q.  Right.  Paragraph -- I am sorry.
11   A.  One relating to the company and one relating to the
12  individuals, yes.
13   Q.  Paragraph 3 provides corporation leniency and
14  paragraph 4 provides individual leniency including officers
15  and employees, correct?
16   A.  Yes.
17   Q.  In paragraph 2, do you see the language:
18       "SNTG agrees to provide full, continuing and
19  complete cooperation."
20       And there are a series of sub paragraphs, do you
21  see that?
22   A.  Yes.
23   Q.  Let me direct your attention to paragraph 2(c), so
24  SNTG agrees to provide cooperation, including in "c", use its
25  best efforts to secure the ongoing full and truthful

31

1  cooperation of the current and former directors, officers and
2  employees of SNTG."
3       Correct?
4    A.  Correct.
5    Q.  There is a distinction there between the
6  Corporation's obligation to cooperate and providing best
7  efforts to get the individual employees, including officers to
8  cooperate, correct?
9    A.  Correct.
10   Q.  Similarly, the definition of SNTG at the top on
11  page 1 refers just to the corporate entities, correct?
12   A.  Yes.
13   Q.  And again, we are talking about Government's
14  Exhibit 2, right?
15   A.  Yes.
16   Q.  Now, during the December through January 2003
17  period, Mr. Nannes also mentioned SNTG was applying for
18  European Union Amnesty, correct?
19   A.  Yes, he did.
20   Q.  And the EU has a parallel program to the American
21  program, correct?
22   A.  It's very similar.
23   Q.  The EU does something called, "dawn raids",
24  correct?
25   A.  Yes.

32

1    Q.  Mr. Nannes said publicly that it would be difficult
2  because it would jeopardize its European Union application
3  because it would screw up the dawn raids; didn't he say that
4  to you?
5    A.  Something to that effect.
6    Q.  You understood it was important to Mr. Nannes and
7  SNTG that there be secrecy about the investigation until
8  Europe had a chance to do the dawn raids?
9    A.  Yes, it was important to the European
10  investigation, yes.
11   Q.  And the European investigation became publicized at
12  the end of February in a series of Wall Street Journal
13  articles, correct?
14   A.  Late February.  I think that's right.
15   Q.  It wasn't until that point that any other companies
16  came in to cooperate or offered to cooperate with the Justice
17  Department; isn't that correct?
18   A.  Yes, it was at that time that the European Union
19  conducted dawn raids and we served grand jury subpoenas.
20   Q.  Let me take you back to book 1 and now let's turn
21  to tab 7, if we could -- strike that.  Let's make that tab 6,
22  I am looking at a letter dated January 31, 2003.
23       That is SNX-17.  It's a letter dated January 31,
24  2003 from Mr. Connolly to Mr. Nannes.
25       This letter says at the end of the page:

33

1       "I suggest that Bjorn Jansen be interviewed, but I
2  am open to other suggestions based on Mr. Jansen's
3  availability or your view as to who best can provide
4  background information on the industry."
5       Do you see that?
6    A.  Yes.
7    Q.  The letter does not say anything about verifying
8  the representation in paragraph 1(a), correct?
9    A.  That's correct.
10   Q.  It does not also ask Mr. Nannes for evidence of a
11  conspiracy through the selection of the employee to be
12  interviewed, correct?
13   A.  Say that again?
14   Q.  This letter says that you should find an employee
15  that can provide background information on the industry,
16  correct?
17   A.  Yes.
18   Q.  But Mr. Nannes found witnesses who knew about the
19  conspiracy, correct?
20   A.  Yes, but I mean not necessarily in response to this
21  letter.  I am not following your question.
22   Q.  My question is this:
23       Mr. Connolly asked to interview an employee with
24  background information in the parcel tanker industry, right?
25   A.  That's right.

## Page 34

1  Q.  Mr. Nannes identified two employees who actually
2  had involvement in the antitrust conspiracy in response to
3  this letter; isn't that correct?
4  A.  Oh, okay, that's what I don't know. I don't know
5  whether he did that in response to this letter or not.
6  Q.  But two witnesses were interviewed very shortly
7  after the letter, correct?
8  A.  In February, yes.
9  Q.  Both knew about the conspiracy, correct?
10  A.  Yes.
11  Q.  And attachment a, the very first thing he asks for
12  is the customer list in this letter dated January 31, 2003,
13  correct?
14  A.  That's correct.
15  Q.  This is the first request from the Justice
16  Department, but it does not seek the certifications of SNTG
17  employees, does it, sir?
18  A.  No, it does not.
19  Q.  Directing your attention to the next tab, if I
20  could, it's a letter dated February 5, 2003?
21  A.  Yes.
22  Q.  This letter provides individual amnesty to Mr.
23  Bjorn Jansen?
24  A.  Yes.
25  Q.  His amnesty is through January 15, 2003, correct?

## Page 35

1  A.  That's correct.
2  Q.  So his amnesty isn't as of the date of this letter,
3  it's only through January 15, 2003?
4  A.  It's derivative of the company's amnesty, that's
5  right.
6  Q.  You could have put another date in there, could you
7  not have, you have that power?
8  A.  I suppose we could have.
9  Q.  Sir, let me direct your attention to tab 9 on
10  Exhibit 8, a letter dated April 8, 2003.
11      Let me direct your attention to the second
12  paragraph:
13      "The Antitrust Division has received specific
14  credible evidence that SNTG did not terminate its part in the
15  illegal activity in or about March, 2002."
16      Do you see that language?
17  A.  I do.
18  Q.  Isn't this the first time the Division mentioned
19  the March 2002 date in correspondence?
20  A.  No.
21  Q.  When is the March 2002 date referred to in
22  correspondence expressly in the terms March 2002 before this
23  letter?
24  A.  You mean in written correspondence?
25  Q.  Yes, sir.

## Page 36

1  A.  This may be the first written correspondence
2  referring to March 2002.
3  Q.  In the third paragraph, the Division suspends all
4  obligations of SNTG to cooperate under the terms of the
5  leniency letter?
6  A.  Yes.
7  Q.  Furthermore instead of voluntary interviews
8  witnesses will now be called in pursuant to subpoena, correct?
9  A.  Yes.
10  Q.  And they have to go get their own lawyers, correct?
11  A.  That's not a requirement.
12  Q.  Well, let me direct your attention to the top of
13  the second page.
14      "In light of the present circumstances, it is the
15  Division's position that Mr. Fecher should obtain separate
16  counsel."
17      Do you see that?
18  A.  Yes, I do.
19  Q.  That's because all of a sudden now the amnesty
20  application is in jeopardy, correct?
21  A.  That's right.
22  Q.  This letter does not have any mention of the words
23  "head fake"; does it, sir?
24  A.  No.
25  Q.  Were you consulted about their letter before it was

## Page 37

1  sent?
2  A.  Yes.
3  Q.  Did you have an opportunity to review this language
4  before it was sent?
5  A.  I don't recall if I reviewed it specifically before
6  it was sent. Mr. Connolly and I certainly talked about it.
7  Q.  Did you talk about the March 2002 date being in
8  this letter?
9  A.  I am sure that we did.
10  Q.  And you had a chance to see the final letter after
11  it was sent, correct?
12  A.  If not before, yes.
13  Q.  Before the letter was sent, did you mention to Mr.
14  Connolly that it might be a good idea to call in Mr. Nannes
15  and discuss this new turn of events and the facts?
16  A.  No, we talked about calling Mr. Nannes and letting
17  him know that this was coming.
18  Q.  In fact, you got a phone call the same day it was
19  faxed?
20  A.  Correct.
21  Q.  So there was no effective opportunity to come in
22  and meet with Mr. Connolly and the staff, was there, prior to
23  the letter being issued?
24  A.  Prior to the letter being issued, there was not.
25  Q.  After the letter was issued, all of the interviews

Page 38

1  of SNTG employees were conducted outside the presence of Mr.
2  Nannes with the Government; isn't that correct?
3     A.   I believe that's correct.
4     Q.   That would make it very difficult for Mr. Nannes to
5  know what these witnesses are now telling the Government;
6  isn't that correct?
7     A.   He wouldn't be there to be part of the interview.
8     Q.   So he wouldn't know what the issues are that are
9  coming up in the interviews and he won't be able to direct the
10 course of the interviews if there was anything productive to
11 be done in doing so, could he?
12    A.   No.
13    Q.   What opportunity did the Division offer to SNTG
14 after April 8th to cure whatever factual issue the Division
15 identified that caused it to send this letter?
16    A.   Well, there were numerous meetings and
17 conversations.
18    Q.   Well, for instance, you met with Mr. Nannes in late
19 April, correct?
20    A.   Yes.
21    Q.   Did you tell Mr. Nannes what the factual issue was
22 that the staff was having difficulty with, with witnesses?
23    A.   I did not lay out the specifics of the evidence
24 that we had, no, but certainly we identified the fact that the
25 prompt and effective action representation was not true.

Page 39

1     Q.   Other than that headline, did you outline a trade
2  route or employee or anything that would give him a specific
3  reference for exactly what it was that troubled the Division?
4     A.   A trade route? No.
5     Q.   You did not say that Mr. Jansen or Mr. Pickering
6  has not been forthcoming on "X" meeting or "Y" meeting,
7  correct?
8     A.   No, I did not identify the witness or the meeting.
9     Q.   And you did not direct Mr. Connolly to have that
10 kind of conversation with Mr. Nannes, correct?
11    A.   Correct.
12    Q.   At any time in the course of this investigation,
13 did you instruct Mr. Connolly to do the verification of the
14 1(a) representations before opening interviews of SNTG
15 employees?
16    A.   You mean before --
17    Q.   For instance before the February 5th meetings?
18    A.   No.
19    Q.   Let me direct your attention to tab 12, sir,
20 SNX-41.
21         This is a letter from Mr. Connolly and it says in
22 the first paragraph of the second sentence:
23         "As was discussed in a meeting on July 9th, the
24 Division will consider the corporation to have discovered the
25 illegal activity on the earliest date on which either the

Page 40

1  board of directors or counsel for the corporation either in
2  side or outside were first informed of the conduct at issue."
3         Correct?
4     A.   Yes.
5     Q.   That was an explicit reference to the Spratling
6  Speech?
7     A.   Yes.
8     Q.   Let me direct your attention to tab 15.
9     A.   All right.
10    Q.   You testified on direct there were two grounds for
11 revoking the amnesty, correct?
12    A.   Yes.
13    Q.   Let's go to Page 2, false representation. Second
14 paragraph.
15    A.   All right.
16    Q.   Specifically SNTG represented to the Division that
17 SNTG's in-house counsel learned of the illegal activity by no
18 later than February 2002 and by March 2002, SNTG had taken
19 prompt and effective action to terminate its part in the
20 activity?"
21         Do you see that?
22    A.   Yes.
23    Q.   Is that an accurate statement of the false
24 representation?
25    A.   Yes.

Page 41

1     Q.   Now, it does not say in that sentence that SNTG had
2  represented that all activity had ended by the end of March,
3  2002, does it?
4     A.   No.
5     Q.   Let me go to the "B" paragraph, "Failure To
6  cooperate."
7         "Paragraph 2 of the conditional leniency agreement
8  requires SNTG to provide full continuing and complete
9  cooperation in the Division's ongoing investigation including
10 providing a full exposition of all facts known to SNTG?"
11        That's the 2(a) language of the agreement, correct?
12    A.   Right.
13    Q.   Is there any dispute as to SNTG's cooperation under
14 paragraphs 2(b) through 2(g) of the amnesty agreement dated
15 January 15, 2003?
16    A.   May I look at it?
17    Q.   Certainly, it's tab 1.
18    A.   (Witness peruses document)
19    Q.   My question is: Your quotation is from paragraph
20 2(a), correct?
21    A.   That's correct.
22    Q.   Your paragraph on failure to cooperate does not
23 mention the obligations in 2(b) through 2(g); is that correct?
24    A.   That is correct.
25    Q.   There is no issue at this point that there is any

## Page 42

1  issue of whether or not they cooperated under paragraphs 2(b)
2  through 2(g), correct?
3     A.   The reason I hesitated a bit is because it's hard
4  to say that SNTG used its best efforts to secure the full and
5  truthful cooperation when one of their senior executives
6  provided false information -- excuse me, false information was
7  provided to us about the conduct of one of the senior
8  executives in connection with obtaining the leniency in the
9  first place.
10    Q.   Why isn't that referenced expressly in this letter,
11 sir?
12    A.   It is not expressly referenced in the letter, in
13 the letter of termination, you are right.
14    Q.   The next sentence says "SNTG has materially
15 breached this obligation by, among other things, falsely
16 representing true duration of its participation in the
17 conspiracy, correct?
18    A.   Correct.
19    Q.   By true duration, you are referring to this March
20 through November 2002 period, correct?
21    A.   Yes.
22    Q.   So that's very similar to our issue up above, it's
23 the same issue as the false representation with March 2002
24 through November 2002, correct?
25    A.   Well, the issues are similar and intertwined, yes.

## Page 43

1     Q.   In the second half of the sentence it says:
2          "And failing to fully disclose the roles made by
3  some of its senior executives."
4          Do you see that?
5     A.   Yes.
6     Q.   Again, that relates to this business of the March
7  through November 2002 period, correct?
8     A.   Yes.
9     Q.   Directing your attention GX-2, paragraph 2(a).
10 2(a) speaks in terms of facts known to SNTG, correct?
11    A.   Correct.
12    Q.   Not facts believed by SNTG, correct?
13    A.   It says, "facts known."
14    Q.   For the purpose of the Amnesty Program, GX-2 SNTG
15 is being represented by sophisticated antitrust counsel,
16 correct?
17    A.   Mr. Nannes, yes.
18    Q.   Isn't it the case with almost all of your amnesty
19 applications, that they come in with a specialized antitrust
20 lawyer sponsoring or assisting in the application?
21    A.   That's correct.
22    Q.   And when the lawyer gives you a proffer of what the
23 company knows, the lawyer does that on the basis of the
24 lawyer's investigation of the company, correct?
25    A.   That's what I understand, yes.

## Page 44

1     Q.   And for a lawyer to make a proffer in the first
2  place, he has to go and interview executives and employees of
3  the company, correct?
4     A.   Yes.
5     Q.   And the only way that lawyer gets information
6  sufficient to make a proffer is if individuals will
7  essentially incriminate themselves and describe illegal
8  antitrust conduct; isn't that the case?
9     A.   That's my understanding that you would undertake
10 interviews of the individuals involved, yes.
11    Q.   And if he interviewed or she interviewed all of
12 those employees and they all denied the conduct, there would
13 be nothing to proffer, correct?
14    A.   There would be nothing to proffer.
15    Q.   Let me direct your attention to paragraph 6,
16 "Authority and Capacity."
17         The Antitrust Division -- are you there?
18    A.   Yes.
19    Q.   "The Antitrust Division and SNTG represent and
20 warrant to each other that the signatories to this agreement
21 have the authority and capacity necessary to execute this
22 agreement."
23         Correct?
24    A.   Yes.
25    Q.   You see the word, "warrant" that's used there?

## Page 45

1     A.   Yes.
2     Q.   That word is not used in paragraph 1(a), correct?
3     A.   No, it is not.
4     Q.   Paragraph 1(a) is just a representation, correct,
5  there is no warrant in 1(a), correct?
6     A.   It's a representation.
7     Q.   The Division uses the words, "represent" and
8  "warrant" in their ordinary legal sense, correct?
9     A.   I am sure that we do.
10    Q.   You don't have any speeches that define the words
11 represent or warrant; do you?
12    A.   No.
13    Q.   Let's just skip a little bit up on page 1 of GX-2,
14 the phrase, "prompt and effective action to terminate", the
15 word, "prompt" modifies "action"; does it not?
16    A.   Yes.
17    Q.   And the word, "action" is used in its ordinary
18 sense, correct?
19    A.   Correct.
20    Q.   Sir, the dictionary definition of the word,
21 "action" is the process of doing something or from Webster's
22 the definition of "action" is simply the process of acting or
23 doing, correct?
24    A.   I will take your word for it. Yes.
25    Q.   The dictionaries seem to be emphasizing the idea

## Page 46

1  that "action" is a process, not an event, correct?
2  A.  Yes.
3  Q.  Now, in the 1(a) representation, the case that the
4  Division in the past has put a date of discovery into the
5  agreement?
6      MS. HILL:  I am sorry, could you just repeat that?
7  Q.  Isn't it the case that the Division in prior
8  amnesty letters has put a date of discovery, a specific date
9  into the amnesty agreement?
10     MS. HILL:  Objection, your Honor, as to relevance.
11     THE COURT:  Overruled.
12     THE WITNESS:  I can think of only one time.
13 Q.  But you can think of an instance?
14 A.  Yes.
15 Q.  Let's talk about the attorney-client privilege.
16 You knew at the time of the December 4th meeting there was an
17 issue with this lawyer, Mr. O'Brien, correct?
18 A.  Yes.
19 Q.  You saw the Wall Street Journal article?
20 A.  Yes.
21 Q.  Let's look at that Wall Street Journal article for
22 a quick second.  I have it at tab 17, in Volume I,
23 Government's Exhibit 6.
24 A.  Okay.
25 Q.  I directed your attention to the 5 paragraph, the

## Page 47

1  final sentence:
2     "Stolt-Nielsen has been engaged in antitrust
3  activities that violate U.S. and antitrust laws, international
4  law against price fixing and other illegal and collusive
5  conduct it did not elaborate on the alleged collusion."
6     Do you see that?
7  A.  I do.
8  Q.  You agree with me you can't secure antitrust
9  convictions using a state court complaint, could you, sir?
10 A.  Nor could we do so with the newspaper article.
11 Q.  Very good, sir.  You will see two paragraphs down
12 that in the complaint he is seeking the judge's permission,
13 Mr. O'Brien is bound by the attorney's duty of confidentiality
14 to his client.
15     Do you see that language?
16 A.  Yes, I do.
17 Q.  At any point in time, did the judge in that case
18 lift the attorney-client privilege?  Are you aware of that?
19 A.  I am not aware of that.
20 Q.  The Division did not condition SNTG's amnesty
21 application on a waiver of the attorney-client privilege?
22 A.  We did not.
23 Q.  You included language in the agreement that honored
24 the attorney-client privilege; is that correct?
25 A.  That is correct.

## Page 48

1  Q.  At no time after January 15, 2003, through April 8,
2  2003, did the Division condition participation in the program
3  on a waiver of the attorney-client privilege, correct?
4  A.  That is correct.
5  Q.  You have also seen letters from the staff that have
6  said the failure to waive the attorney-client privilege will
7  not be held as a lack of cooperation by the company, correct?
8  A.  Mr. Gidley, I don't know that I ever seen those
9  letters, but I certainly don't dispute that they exist.
10 Q.  I can pull the letter and the language is from a
11 letter that Mr. Connolly wrote us on February 5, 2004:
12     "The Government does not consider SNTG's assertion
13 of the attorney-client privilege to withhold these relevant
14 documents to be a violation of the conditional leniency
15 agreement."
16     Do you see that?
17 A.  I do.
18 Q.  Let's go back GX-2, tab 1 in your book.
19     The phrase, "prompt and effective action", you
20 don't have any speeches that say, prompt and effective action
21 must result in termination of antitrust activity within a
22 certain period of time, within 30 days or three months or six
23 months, do you?
24 A.  We never sought to define, "prompt."
25 Q.  I am sorry?

## Page 49

1  A.  No.
2  Q.  You never sought to define, "prompt and effective
3  action" in a speech?
4  A.  No.
5  Q.  Or effective, isn't that the case, as well?
6  A.  There is some discussion of effective, in the --
7  not separately, but in the 1998 speech, isn't there, about
8  what "termination" means and some of the examples?
9  Q.  There are illustrations of termination.
10 A.  There are illustrations -- there are illustrations,
11 yes.
12 Q.  I am not aware in the 1998 speech of any language
13 that construes the phrase "prompt and effective action", are
14 you?
15 A.  No.
16 Q.  While we have the agreement out, if an employee --
17 let's go back to the agreement, Government's Exhibit 2.
18     If an employee lies to the Antitrust Division
19 despite SNTG's best efforts.  SNTG has not breached the
20 cooperation agreement under 2(e), has it?
21 A.  Under 2(e)?
22 Q.  Yes, sir.
23 A.  Despite the company's best efforts to insure --
24 Q.  I am happy to repeat my question.
25     If an employee lies to the antitrust Division