# Exhibit 26

Case 1:06-cv-00474-RJL   Document 17-11   Filed 05/13/2006   Page 1 of 3

# Points of View | Commentary and Analysis

PAGE 50                                                                                           Legal Times ■ SEPTEMBER 26, 2005



For antitrust amnesty to work, wrongdoers must really come clean.

# True Confessions

BY DONALD I. BAKER

"Curiouser and curiouser!" Only Alice's famous phrase seems to do justice to the Amnesty Wonderland that has emerged in the federal courthouse in Philadelphia.

For the first time since its amnesty program was instituted in 1993, the Antitrust Division of the Department of Justice has revoked provisional amnesty previously granted to a corporation and its officials. For the first time ever, a federal court enjoined the division from bringing an indictment for Sherman Act violations.

Why has all this happened? How confident can the antitrust bar and its clients be that the Antitrust Division will treat them fairly if they disclose a conspiracy? What are the consequences of failing to make full disclosure or to promptly stop

SEE AMNESTY, PAGE 51

AMNESTY, FROM PAGE 50

onspiratorial activity? Will the division be willing to extend provisional immunity before it has completed an exhaustive investigation?

The answers to these important questions are likely to depend on how the U.S. Court of Appeals for the 3rd Circuit handles the government's appeal of an extraordinary district court decision in a strange case called *Stolt-Nielsen v. United States*.

### FIRST IN

Modern prosecution of cartels depends on maximizing rivalry and risks among knowledgeable participants. The goal is to play individuals against each other and their employers, as well as to play enterprises against each other, to run a murky race to obtain the rewards that come from being the first to confess the conspirators' misdeeds.

Immunity, lesser charges, and reduced sentences are among the carrots offered. Those seeking such advantages must have confidence in the reward but also in the risk that comes from failing to comply.

The Antitrust Division's amnesty program is a particularly important part of this effort. The division promises that the company to come forward first will receive amnesty for itself, its officers, and its employees if the program terms are met. The wrongdoing must be stopped, and the company must fully disclose its actions and cooperate with prosecutors. Only the "first-in" corporate whistleblower gets complete exemption from criminal liability.

Uncertainty is the bane of an amnesty program. Significant positive results have to be reliably promised. Otherwise, upon discovery of an antitrust conspiracy, a rational management might well decide simply to halt any participation in the conspiracy and pray for the relevant four-to-five-year statutes of limitations to run.

From the government's perspective, any amnesty grants must be handed out only to those individuals who, having ceased to conspire, come forward with truthful information useful in prosecuting other conspirators.

The Antitrust Division's amnesty program has been a brilliant success. It has been the source of most of the major international cartel cases prosecuted in the past decade and has yielded nearly $2 billion in fines.

### A STRANGE DANCE

The case now before the 3rd Circuit was highly unusual from the outset because the Antitrust Division did not first learn of the cartel from the amnesty applicant SNTG (Stolt-Nielsen Transportation Group, the U.S. subsidiary of a European company).

Rather it learned about the potential violation from an eye-catching story in the Nov. 22, 2002, edition of *The Wall Street Journal*, discussing a lawsuit brought against SNTG by its former general counsel, Paul O'Brien. His suit alleged that SNTG had been engaged in "illegal collusive conduct" in the international "parcel tanker" business (i.e., the maritime shipment of various specialty liquids). He further alleged that he had been forced to resign because SNTG had refused to discontinue its collusive conduct after he uncovered it.

SNTG immediately sprang into action. On the same day as the story appeared, its CEO hired a distinguished antitrust lawyer, John Nannes.

Almost immediately, Nannes contacted the deputy assistant attorney general responsible for criminal enforcement to begin the dialogue over whether amnesty would be available.

Antitrust Division officials were suspicious even though SNTG was the first conspirator through the door. What had happened, they wanted to know, when O'Brien had reported his findings to the company? Had the conspiratorial activities continued thereafter, as O'Brien alleged? If they had, SNTG would not be eligible for immunity.

At a meeting to respond to those concerns, Nannes explained that SNTG had tightened up its compliance program. He produced some e-mails purporting to show that SNTG had notified its competitors in March and April 2002 that it was withdrawing from any understandings with them.

On Jan. 15, 2003, the Antitrust Division formally agreed to grant SNTG conditional amnesty expressly conditioned upon (1) the accuracy of SNTG's representation that it "took prompt and effective action to terminate its part in the anti-competitive activity being reported upon discovery of the activity" (but with no date of "discovery" specified) and (2) SNTG's commitment "to provide 'full, continuing and complete cooperation' with respect to the facts relating to the activity."

### WARFARE BREAKS OUT

Things seemed quiet for more than a year, although, apparently, as early as April 2003, the Antitrust Division staff were privately warning SNTG's counsel about their growing concern over whether SNTG qualified for amnesty. This concern burst into the open on March 22, 2004, when SNTG's European parent issued a press release saying that the Justice Department had withdrawn SNTG's conditional amnesty.

This unprecedented turn of events occurred because other witnesses had informed the Justice Department that SNTG had continued to participate in cartel activities after O'Brien had blown the whistle in March 2002.

This participation, the Antitrust Division would ultimately explain in public, was inconsistent with SNTG's duty, as an amnesty applicant, to take "prompt and effective action to terminate its part ... upon discovery of the [anti-competitive] activity." The division also believed there had been some deliberate failures by SNTG officials to disclose these ongoing activities; hence they had violated the company's obligation of full cooperation.

Accordingly, the Antitrust Division notified SNTG that it intended to indict the company.

### STOLT-NIELSEN STRIKES BACK

SNTG responded by bringing an injunction action to prevent the Justice Department from prosecuting. It argued that the prosecution would violate the amnesty agreement.

In January 2005, the U.S. District Court in Philadelphia issued SNTG's requested injunction. It determined that SNTG had not breached its contractual obligations to the government. It found that "[n]either Nannes nor anybody else represented that SNTG's participation in the illegal activity had ended in March 2002," and that "DOJ agreed not to prosecute SNTG for any act or offense in connection with the reported anticompetitive activity it may have committed prior to the date of the letter, January 15, 2003."

Aside from these questionable factual findings, the court made a number of broad novel holdings: (1) "due process dictates that a court must decide whether there has been a breach of the [amnesty] agreement before it can be voided"; (2) post-indictment determination that the government had acted improperly "would be too late to prevent the irreparable consequences" for SNTG; and (3) "the burden on the government to obtain a pre-indictment judicial determination is minimal."

The District Court's decision to grant the injunction runs into an avalanche of appellate precedents holding that the proper course for anyone challenging breach of an immunity agreement is to move to dismiss the indictment; and that because post-indictment challenge is an adequate remedy at law, no pre-indictment injunction is proper. Thus reversal of the District Court's glaringly wrong analysis seems highly likely in the 3rd Circuit (or, if necessary, the Supreme Court).

### IMPLICATIONS FOR ENFORCEMENT

Quite apart from its legal errors, the District Court's decision was bad news for the Antitrust Division's successful amnesty program. The decision has generated uncertainty, confusion, and delay.

But it has also created a high-visibility opportunity for the 3rd Circuit to address the practical realities that have made the antitrust amnesty program so effective.

1. There is no history of the Antitrust Division acting arbitrarily in administering the program. Indeed, this appears to be the first case (in more than 100) in which it has revoked an amnesty grant to a first-in informant. The division has strong incentives to treat such applicants fairly to attract future volunteers. The general situation does not cry out for judicial intervention.

2. An applicant's obligation to promptly terminate (or report to the Antitrust Division) conspiratorial activities upon discovery is a fundamental element of the amnesty program. It increases the likelihood that cartel activities will be terminated sooner rather than later. It bears heavily on the reasonableness of granting a particular wrongdoer a complete pass on criminal liability. And by destabilizing the existing cartel through an abrupt termination, prompt termination encourages other conspirators to come forward and seek leniency immediately—rather than to wait and see if a prosecution looks likely and only then run in for leniency.

The government has asserted publicly that it believes SNTG engaged in precisely this type of gamesmanship by trying to "soft-land" the termination over an extended period.

3. Few experienced antitrust lawyers would regard SNTG as having done an effective job on its "prompt termination." The Antitrust Division's withdrawal of amnesty, therefore, should not cause alarm among those likely to be advising future amnesty applicants.

Contrary to the way the District Court looked at the issue, it was SNTG's state of knowledge, not its newly hired outside lawyer's, that was critical. SNTG apparently had been warned back in February and March 2002 by O'Brien, but it did not act until the allegations appeared in *The Wall Street Journal* eight months later. In the meantime, SNTG apparently continued to participate in the cartel.

4. The amnesty applicant's obligation of "full disclosure" is critically important, and it seems unlikely that SNTG and its officials met this obligation.

5. Amnesty is not just a matter between the applicant and the Antitrust Division. By granting amnesty, the division reduces the cooperation credit to be given a second-in or third-in conspirator in plea negotiations. An improper grant to an applicant that does not fully disclose may force the government to give additional immunities to culpable individuals to get missing evidence that the amnesty applicant should have provided.

### ENDORSE REALITY

The 3rd Circuit can blow away the recently generated fog in the amnesty area if it resists the temptation just to reverse the District Court. It would be most useful for the 3rd Circuit also to endorse the basic realities of the amnesty process.

The obvious purpose of the amnesty program is to generate concern and uncertainty among covert wrongdoers by giving substantial rewards to whoever breaks ranks first. For the program to work, the potential amnesty applicant has to be reasonably sure that it will be better off because it exposes itself.

Likewise, the government has to be reasonably sure that it will obtain new and useful information in the process and that the amnesty program will not be used to reward those who have perpetuated for as long as possible what they knew were illegal activities.

Finally, it is clearly educational for those who counsel companies to see how the Antitrust Division actually handled this unusual case—to remind ourselves and our clients that the prompt-termination and full-disclosure obligations are serious and that failure to meet them can jeopardize the first-in whistleblower's conditional amnesty.

---

*Donald I. Baker is a partner in D.C.'s Baker & Miller. He is a former member of the Antitrust Division staff, who served as the assistant attorney general in charge of the Antitrust Division from 1976 to 1977.*