# Exhibit 49

*Download the WordPerfect version*



# DEPARTMENT OF JUSTICE

## THE CORPORATE LENIENCY POLICY: ANSWERS TO RECURRING QUESTIONS

**GARY R. SPRATLING**
Deputy Assistant Attorney General
Antitrust Division
U.S. Department of Justice

Presented at the

ABA Antitrust Section
1998 Spring Meeting

Omni Shoreham Hotel
Washington, D.C.

April 1, 1998

## I
## Introduction

In August 1993, the Antitrust Division expanded its <u>Corporate Leniency Policy</u> (Amnesty Program) to increase the opportunities and raise the incentives for companies to report criminal activity and cooperate with the Division. The Amnesty Program was revised in three major respects. First, the policy was changed to ensure that amnesty is automatic if there is no pre-existing investigation. That is, if a corporation comes forward prior to an investigation and meets the program's requirements, the grant of amnesty is certain and is not subject to the exercise of prosecutorial discretion. Second, the Division created an alternative amnesty, whereby amnesty is available even if cooperation begins after an investigation is underway. Third, if a corporation qualifies for automatic amnesty, then all directors, officers, and employees who come forward with the corporation and agree to cooperate also receive automatic amnesty. In addition, executives of a corporation seeking amnesty after an investigation has begun will be given serious consideration for lenient treatment -- in the form of individual amnesty or individual immunity -- in exchange for their full cooperation. (See attached

Corporate Leniency Policy)

The Division's revised Amnesty Program was, and is, unique. No other governmental voluntary disclosure program creates as great an opportunity or incentive for corporations to come forward and cooperate. However, because the features of the revised program -- automatic amnesty, post-investigation amnesty and complete protection for cooperating individuals -- were such dramatic departures conceptually from traditional applications of corporate amnesty principles, many in the private bar initially took a wait-and-see approach to evaluate how the Division would apply the new program.

Over time, the antitrust bar's reservations have been replaced with a continually growing recognition of the program's merits and a respect for the Division's good faith in granting amnesty applications. The antitrust bar's changed attitude is reflected in both words and actions. Now, at continuing education programs for the antitrust bar, it is frequently members of the private bar, rather than government representatives, who raise the advantages of the Division's Amnesty Program. And the private bar's acceptance of the Program is demonstrated by its actions: under the old policy, on average only one corporation per year applied for amnesty, whereas under the revised policy, we have been receiving applications for corporate amnesty at a rate closer to one per month -- some of which have led to the largest and most significant matters on the Division's docket. In fact, recent amnesty applications have been key in uncovering and pursuing major domestic and international conspiracies, including some with the broadest impact we have ever seen. In the last six months alone, the Amnesty Program has resulted in nearly a dozen convictions and over $100 million in fines. Domestic and foreign firms, through their counsel, have come to realize that acceptance into the Amnesty Program can potentially save a company tens of millions of dollars in fines and can eliminate the threat of prosecution and incarceration for the firms' culpable executives.

The recent amnesty applications in the marine construction and graphite electrodes investigations are prime examples of the financial benefits of the Amnesty Program.[1] In the marine construction investigation, the amnesty applicant reported its role in a conspiracy to allocate customers and agree on pricing for marine construction contracts (such as contracts to build the decks of offshore oil and gas drilling and production platforms) in the major offshore oil and gas production regions of the world -- the North Sea, the Gulf of Mexico, and waters in the Far East. In return for its corporate confession and continuing cooperation, the company received amnesty and paid *zero dollars* in fines. Shortly after the investigation went overt, a corporate co-conspirator agreed to plead guilty and cooperate with the government's investigation. Though the company provided very valuable cooperation and received a significant reduction in its fine for that cooperation, it still paid a fine of *$49 million*.

In the graphite electrodes investigation, the cooperation of an amnesty applicant led to the execution of search warrants, the cracking of another international cartel and, shortly thereafter, a plea agreement with another corporate conspirator. In this case, the amnesty company paid *zero dollars* in fines, and the company next in the door after the amnesty applicant paid a *$29 million* fine. While nearly $30 million is a substantial saving to the amnesty company, even that measure may understate the financial benefits of amnesty in this case -- for two reasons:

1. the defendant's exposure was limited by the fact that it had less than a 20 percent market share in the United States; and

2. even with that market share, the defendant's Guidelines fine may have been above $75 million but for the timing and extraordinary value of its cooperation.

Therefore, as this investigation continues, the financial advantages of the Amnesty Program may become more apparent and more dramatic.

## II
## Clarifying The Division's Application of Its Corporate Leniency Policy

During the four years the Division's current Corporate Leniency Policy has been in effect, a number of questions have arisen about how the policy is to be applied in certain circumstances. In some instances, misplaced concerns or misinterpretations have resulted in corporations delaying their applications for amnesty or making no application at all. Since even a 24-hour delay can potentially cost a company a criminal conviction and tens of millions of dollars in fines, this section attempts to clarify the Division's application of the Corporate Amnesty Program with respect to several recurring issues.

### A. Terminating The Activity

#### 1. What Is Required

In setting out one of the conditions that must be met to obtain amnesty, sections A2 and B3 of the Amnesty Program provide, "The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity." Questions have arisen as to what is required for a corporation to "terminate its part in the activity." Termination does not require announcement of withdrawal in the illegal activity to other participants in the activity (although that would constitute one means of termination). Termination can also be effectuated by reporting the illegal activity to the Division and refraining from further participation unless continued participation is with Division approval.

#### 2. Terminating "Upon Discovery" When Top Executives Have Been Participants

Questions have also arisen about what it means for the corporation to "discover" the activity. More specifically, in cases (usually involving small, closely held corporations) where the top executives, board members, or owners participated in the conspiracy, it has been suggested that the corporation may not be eligible for amnesty, because the corporation's "discovery" of the activity arguably occurred when those participants joined the conspiracy. Under that approach, the corporation cannot be said to have promptly terminated its part in the activity. Generally, the Division will consider the corporation to have discovered the illegal activity at the earliest date on which either the board of directors or counsel for the corporation (either inside or outside) were first informed of the conduct at issue. Thus, the fact that top executives, board members, or owners participated in the conspiracy will not necessarily bar the corporation from eligibility for amnesty. The purpose of this interpretation is to ensure that as soon as the authoritative representatives of the company for legal matters--the board or counsel representing the corporation--are advised of the illegal activity, they take action to cease that activity. In the case of a closely held corporation in which the board of directors is never formally advised of the activity, because all members of the board are conspirators, the corporation still may qualify under this provision if the activity is terminated promptly after legal counsel is first informed.

### B. Restitution

1. **When The Division Ultimately Brings No Criminal Case**

   In setting out another condition that must be met to obtain amnesty, sections A5 and B6 of the Amnesty Program state, "Where possible, the corporation makes restitution to injured parties." In certain cases where a corporation has otherwise met the requirements for amnesty and agreed to pay restitution, the Division may ultimately determine that either

   a. the amnesty applicant has not engaged in any criminal antitrust conduct or

   b. even though the amnesty applicant has engaged in criminal antitrust conduct, prosecution of the other conspiracy participants is not justified under the Principles of Federal Prosecution given the weakness of the evidence or other problems with the case.

   The issue has arisen as to whether, in such cases, the amnesty applicant still has to pay the agreed-upon restitution. In cases in which the Division's investigation ultimately reveals that the amnesty applicant has not engaged in any criminal antitrust conduct, the Division will not grant amnesty because it is unnecessary. Obligations placed on the applicant by the Leniency Policy, the Division's conditional grant of amnesty, or the applicant's leniency agreement with the Division no longer apply once the Division determines there is no underlying criminal conduct. The Division will so advise the applicant in writing. Accordingly, there is no duty to pay restitution. If the amnesty applicant has already paid restitution or is in the process of so doing, the applicant must resolve the matter with the recipient.

   Once the Division decides not to grant amnesty, the applicant has no duty towards the Division, nor does the Division have any duty to help "reverse" any steps taken towards payment. In cases where the Division concludes that the amnesty applicant has engaged in criminal antitrust activity and conditionally grants the amnesty application, but later closes the investigation without charging any other entity in the conspiracy, the obligation to pay restitution remains in effect. The Division will notify in writing the amnesty applicant and the subjects of the investigation that the investigation has been closed. In such cases, the amnesty applicant can withdraw its application. In that case, the obligations undertaken by the applicant -- including the payment of restitution -- are no longer in effect. The Division, for its part, is technically no longer prohibited from prosecuting the applicant and will not provide any additional assurances of non-prosecution. Again, the Division will not assist in restoring any restitution already paid if the amnesty application is withdrawn. Also, once an applicant has fulfilled all of the conditions for amnesty and the Division has issued a final amnesty letter,[2] the Division will not permit the company to withdraw.

2. **"Where Possible"**

   The requirement in sections A5 and B6 that the applying corporation make restitution is qualified by the words "[w]here possible." The issue has arisen as to whether this language means that the amnesty agreement should contain a provision that similarly limits the requirement of restitution to payment "if possible" -- thereby deferring the determination as to whether restitution will be made to some time after the amnesty agreement is conditionally entered into and arguably putting that determination into the

hands of the amnesty candidate. There is a strong presumption in favor of requiring restitution in amnesty situations. Restitution will be excused only where, as a practical matter, it is not possible.

Examples of situations in which an applicant might be excused from making restitution include where the applicant is in bankruptcy and is prohibited by court order from undertaking additional obligations or where there was only one victim of the conspiracy and it is now defunct. Another example of where the Division will not require the applicant to pay full restitution is if it would substantially jeopardize the organization's continued viability. The issue of restitution is addressed in paragraph 2(g) of the model letter, which requires the applicant to make "all reasonable efforts, to the satisfaction of the Antitrust Division," to pay restitution. This contemplates that, at some point before conditional amnesty becomes final, the Division will make a determination that the applicant has satisfied any obligation to pay restitution and will so inform the applicant.

3. **"Injured Parties"**

The issue has arisen as to whether this phrase includes foreign parties in international conspiracies. "Injured parties" is intended to refer only to government entities, businesses and individuals located in the United States.

C. **Confession Truly A Corporate Act**

In setting out another condition that must be met to obtain amnesty, sections A4 and B5 state, "The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials." Other conditions that must be met for amnesty are set out in sections A3 and B4. Section A3 states, "The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation." Section B4 states, "The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation."

Issues have arisen as to whether, if individual corporate executives represented by independent counsel refuse to cooperate, the corporation is barred from amnesty on the basis that the confession is no longer a "corporate act" or that the corporation is not providing "full . . . and complete" cooperation. In order for the confession of wrongdoing to be a "corporate act" and in order for the cooperation to be considered "full, continuing and complete," the corporation must, in the Division's judgment, be taking all legal, reasonable steps to cooperate with the Division's investigation. If the corporation is unable to secure the cooperation of one or more individuals, that will not necessarily prevent the Division from granting the amnesty application. However, the number and significance of the individuals who fail to cooperate, and the steps taken by the company to secure their cooperation, are relevant in the Division's determination as to whether the corporation's cooperation is truly "full, continuing and complete."

D. **Partial Amnesty**

Questions have arisen as to whether a corporation that has been convicted of illegal antitrust activity -- or is the target of an investigation involving illegal antitrust activity where amnesty is no longer available -- can receive "partial amnesty" for criminal antitrust conduct that is

essentially unrelated to the conduct for which amnesty is no longer available. According to the policy, leniency means not criminally charging a firm "for the activity being reported." If a firm reports activity that is independent of the conduct for which amnesty is no longer available (because the company has been convicted, another firm has received amnesty, the investigation is too far advanced for amnesty, etc.), amnesty is still available for the other activity, provided that all the requirements of the Leniency Policy are met with respect to that conduct.

E. **Non-Prosecution Of All Employees Who Cooperate**

Part C of the Amnesty Program provides that "[i]f a corporation qualifies for leniency under Part A ... all directors, officers, and employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation." In some cases, certain directors, officers, and employees have had some awareness of, or incidental participation in, the illegal antitrust activity, but no significant involvement. In such cases, the issue has arisen as to whether, by acknowledging such awareness or incidental participation, such individuals will receive leniency even though it can be argued that they have not admitted "their involvement in the illegal antitrust activity" or admitted "their wrongdoing" -- because they were not "involved" and did not engage in "wrongdoing."

With respect to individuals, the principal purpose of the Corporate Leniency Policy is to encourage as many employees as possible to come forward with the company and cooperate fully with the Division and give complete and truthful accounts. The intent also is to assure all such employees that they will be granted some form of non-prosecution protection. Employees who committed no crime technically are not covered by the Leniency Policy, because there is nothing for which to give leniency. The model letter addresses in paragraph 4 the concern of giving appropriate assurances to all cooperating employees, those who need leniency and those who do not, by making *a non-prosecution commitment to all directors, officers and employees who cooperate.*

F. **Not The Leader Or Originator Of The Activity**

In order to obtain amnesty under Part A, according to section A6, it must be true that "[t]he corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity." Similarly, section B7 in Part B states: The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward. In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. . . .

Issues have arisen as to what it means to be "the leader in, or originator of, the activity." The Amnesty Program refers to "the" leader and "the" originator of the activity, rather than "a" leader or "an" originator. Accordingly, in situations where the corporate conspirators are viewed as co-equals or where there are two or more corporations that are viewed as leaders or originators, any of the corporate participants will qualify under this part of section A6 and may qualify under the more discretionary section B7.

G. **Former Employees**

Because the Corporate Leniency Policy makes no reference to how the Division will treat former employees of the amnesty applicant who were employed by the company during the conspiracy period, the issue has arisen as to how such employees should be treated. Part C of the Leniency Policy does not refer to former employees, so the Division is under no obligation to grant leniency to former employees who cooperate fully and provide complete and truthful information. However, the Division has the power to agree not to prosecute former employees who come forward. It is therefore permissible, and in many cases advisable, to negotiate with the applicant to include in the amnesty agreement protection for former employees on the same basis as current employees. The model letter provides optional language for the inclusion of former employees in paragraphs 2(c)-(f), 3, and 4.

## III
## Administrative Changes In Procedure For Handling Amnesty Applications

Part D of the Amnesty Program describes the Division's internal procedure for handling amnesty applications that are received by attorneys in Division Field Offices and Sections. The policy states that Division staff that receives the request for amnesty should forward its recommendation to the Office of Operations which, in turn, will review and forward it to the Assistant Attorney General for final decision. This procedure has been modified as a result of a Division reorganization in late 1997. The Office of Operations no longer has responsibility for criminal matters. Therefore, staff recommendations will be forwarded to the Deputy Assistant Attorney General ("DAAG") for Criminal Enforcement (through the Director of Criminal Enforcement) who will review and forward it to the Assistant Attorney General for final decision. Part D is designed to instruct Division attorneys and counsel for applicants on the procedure for handling amnesty applications. However, it is not meant to foreclose counsel's option of going straight to the DAAG for Criminal Enforcement or to the Director of Criminal Enforcement to make the amnesty application, if counsel for the applicant so chooses.

## IV
## Model Amnesty Letter

In the introductory paragraph of the attached model amnesty letter, the letter states that the applicant is conditionally accepted into the Corporate Leniency Program. The amnesty is conditional because it depends upon the applicant performing certain obligations over time (e.g., cooperation, restitution) as set forth in the letter. After all of the obligations have been met (usually after the matter has been concluded), the Division will issue the applicant a final amnesty letter confirming that the application has been granted. In addition, the introduction in the model amnesty letter addresses how the Division will treat information received from an amnesty applicant. First, the Division will not consider disclosures made by counsel in furtherance of the amnesty application to constitute a waiver of the attorney-client privilege or the work-product privilege. Second, the Division holds the identity of amnesty applicants in strict confidence, much like the treatment afforded to confidential informants. Therefore, the Division will not publicly disclose the identity of an amnesty applicant, absent prior disclosure by the applicant, unless required to do so by court order in connection with litigation.

## V
## Conclusion

With the business community's and the bar's growing appreciation of and interest in the Amnesty Program, the number of corporations that will consider whether to apply (and then decide to apply) for amnesty is expected to increase still further. It is hoped that this paper has assuaged any concerns of prospective amnesty applicants as to how the Division applies its Amnesty Program. Then, corporations that discover illegal antitrust activity within the organization and are weighing the option of reporting to the Division as part of an amnesty application can, rather than worrying about questions which are answered here, focus with clarity on the Amnesty Program's tremendous legal and financial benefits.

## FOOTNOTES

[1] As explained in the Model Amnesty Letter section below, the Division has a policy of treating the identity of amnesty applicants as a confidential matter, much like the treatment afforded to confidential informants. However, the two amnesty applicants discussed herein identified themselves as amnesty applicants by issuing press releases announcing their acceptance into the Amnesty Program.

[2] See Model Amnesty Letter section below, and introductory paragraph of attached letter.

---



U.S. Department of Justice

Antitrust Division

---

### Corporate Leniency Policy

The Division has a policy of according leniency to corporations reporting their illegal antitrust activity at an early stage, if they meet certain conditions. "Leniency" means not charging such a firm criminally for the activity being reported. (The policy also is known as the corporate amnesty or corporate immunity policy.)

### A. Leniency Before an Investigation Has Begun

Leniency will be granted to a corporation reporting illegal activity before an investigation has begun, if the following six conditions are met:

1. At the time the corporation comes forward to report the illegal activity, the Division has not received information about the illegal activity being reported from any other source;

2. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

   3. The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation to the Division throughout the investigation;

   4. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

   5. Where possible, the corporation makes restitution to injured parties; and

   6. The corporation did not coerce another party to participate in the illegal activity and clearly was not the leader in, or originator of, the activity.

B. **Alternative Requirements for Leniency**

   If a corporation comes forward to report illegal antitrust activity and does not meet all six of the conditions set out in Part A, above, the corporation, whether it comes forward before or after an investigation has begun, will be granted leniency if the following seven conditions are met:

   1. The corporation is the first one to come forward and qualify for leniency with respect to the illegal activity being reported;

   2. The Division, at the time the corporation comes in, does not yet have evidence against the company that is likely to result in a sustainable conviction;

   3. The corporation, upon its discovery of the illegal activity being reported, took prompt and effective action to terminate its part in the activity;

   4. The corporation reports the wrongdoing with candor and completeness and provides full, continuing and complete cooperation that advances the Division in its investigation;

   5. The confession of wrongdoing is truly a corporate act, as opposed to isolated confessions of individual executives or officials;

   6. Where possible, the corporation makes restitution to injured parties; and

   7. The Division determines that granting leniency would not be unfair to others, considering the nature of the illegal activity, the confessing corporation's role in it, and when the corporation comes forward. In applying condition 7, the primary considerations will be how early the corporation comes forward and whether the corporation coerced another party to participate in the illegal activity or clearly was the leader in, or originator of, the activity. The burden of satisfying condition 7 will be low if the corporation comes forward before the Division has begun an investigation into the illegal activity. That burden will increase the closer the Division comes to having evidence that is likely to result in a sustainable conviction.

C. **Leniency for Corporate Directors, Officers, and Employees**

   If a corporation qualifies for leniency under Part A, above, all directors, officers, and

employees of the corporation who admit their involvement in the illegal antitrust activity as part of the corporate confession will receive leniency, in the form of not being charged criminally for the illegal activity, if they admit their wrongdoing with candor and completeness and continue to assist the Division throughout the investigation. If a corporation does not qualify for leniency under Part A, above, the directors, officers, and employees who come forward with the corporation will be considered for immunity from criminal prosecution on the same basis as if they had approached the Division individually.

D. **Leniency Procedure**

If the staff that receives the request for leniency believes the corporation qualifies for and should be accorded leniency, it should forward a favorable recommendation to the Office of Operations, setting forth the reasons why leniency should be granted. Staff should not delay making such a recommendation until a fact memo recommending prosecution of others is prepared. The Director of Operations will review the request and forward it to the Assistant Attorney General for final decision. If the staff recommends against leniency, corporate counsel may wish to seek an appointment with the Director of Operations to make their views known. Counsel are not entitled to such a meeting as a matter of right, but the opportunity will generally be afforded.

*Issued August 10, 1993*



**U.S. Department of Justice**

**Antitrust Division**

[insert]

Dear [insert]:

This letter sets forth the terms and conditions of an agreement between the Antitrust Division of the United States Department of Justice and ABC, Inc., in connection with possible [insert description of conduct: e.g., price fixing, bid rigging, market allocation] or other conduct violative of Section 1 of the Sherman Act, 15 U.S.C. § 1, in the [insert generic description of industry: e.g., widget] industry [insert geographic scope--e.g., worldwide, in the United States]. This agreement is conditional and depends upon ABC, Inc., satisfying the conditions set forth below. After all of these conditions are met, the Division will notify ABC, Inc. in writing that the application has been granted. It is further agreed that disclosures made by counsel for ABC, Inc. in furtherance of the amnesty application will not constitute a waiver of the attorney-client privilege or the work-product privilege.

## AGREEMENT

1. **Representations:**

ABC desires to report to the Antitrust Division possible [e.g., price fixing] activity or other conduct violative of the Sherman Act in the [insert] industry [e.g., worldwide]. ABC represents to the Antitrust Division that, in connection with the anticompetitive activity being reported, it:

   a. took prompt and effective action to terminate its part in the activity upon discovery of the activity; and

   b. did not coerce any other party to participate in the activity and was not the leader in, or the originator of, the activity.

**2. Cooperation:**
ABC agrees to provide full, continuing and complete cooperation to the Antitrust Division in connection with the activity being reported, including, but not limited to, the following:

   a. providing a full exposition of all facts known to ABC relating to the reported activity;

   b. providing promptly, and without requirement of subpoena, all documents or other items in its possession, custody or control, wherever located, requested by the Antitrust Division, to the extent not already produced;

   c. using its best efforts to secure the complete, candid and truthful cooperation of its current [and former][1] directors, officers and employees, and encouraging such persons voluntarily to provide the Antitrust Division with any information relevant to possible [e.g., price-fixing] agreements or other conduct violative of 15 U.S.C. § 1 in the [insert] industry [e.g., worldwide];

   d. facilitating the ability of current [and former] directors, officers and employees to appear for such interviews or testimony as the Antitrust Division may require at the times and places designated by the Antitrust Division;

   e. using its best efforts to ensure that current [and former] directors, officers and employees who provide information to the Antitrust Division respond completely, candidly and truthfully to all questions asked in interviews, and grand jury appearances and at trial;

   f. using its best efforts to ensure that current [and former] directors, officers and employees who provide information to the Antitrust Division make no attempt either falsely to protect or falsely to implicate any person or entity; and

   g. making all reasonable efforts, to the satisfaction of the Antitrust Division, to pay restitution to any person or entity injured as a result of any [e.g., price-fixing] agreements or other conduct violative of 15 U.S.C. § 1 in the [insert] industry [e.g., worldwide], in which ABC was a participant.

**3. Corporate Leniency:**
Subject to verification of ABC's representations in paragraph 1 above, and subject to its full, continuing and complete cooperation, as described in paragraph 2 above, the Antitrust Division agrees conditionally to accept ABC into [Part A/Part B] of the Corporate Leniency Program, as explained in an Antitrust Division policy statement dated August 10, 1993 (attached). Pursuant to that policy, the Antitrust Division agrees not to bring any criminal prosecution against ABC for any

act or offense it may have committed prior to the date of this letter in connection with the anticompetitive activity being reported in the [insert] industry [e.g., worldwide]. The commitments in this paragraph are binding only upon the Antitrust Division, although, upon request of ABC, the Antitrust Division will bring this Agreement to the attention of other prosecuting offices or administrative agencies. If the Antitrust Division at any time determines that ABC has violated this Agreement, this Agreement shall be void, and the Antitrust Division may revoke the conditional acceptance of ABC into the Corporate Leniency Program. Should the Antitrust Division revoke the conditional acceptance of ABC into the Corporate Leniency Program, the Antitrust Division may thereafter initiate a criminal prosecution against ABC, without limitation. Should such a prosecution be initiated, any documentary or other information provided by ABC, as well as any statements or other information provided by any current [or former] director, officer or employee of ABC to the Antitrust Division pursuant to this Agreement, may be used against ABC in any such prosecution.

**4. Non-Prosecution Protection For Corporate Directors, Officers And Employees:**
Subject to ABC's full, continuing and complete cooperation, the Antitrust Division agrees that current [and former] directors, officers and employees of ABC who admit their knowledge of, or participation in, and fully and truthfully cooperate with the Antitrust Division in its investigation of the anticompetitive activity being reported, shall not be prosecuted criminally by the Antitrust Division for any act or offense committed [during their period of employment at ABC] prior to the date of this letter in connection with the anticompetitive activity being reported in the [insert] industry [e.g., worldwide]. Such full and truthful cooperation shall include, but not be limited to:

a. making his relevant personal documents and records available in the United States to attorneys and agents of the United States;

b. making himself available in the United States to attorneys and agents of the United States for interviews;

c. responding fully and truthfully to all inquiries of the United States in connection with [describe offense being reported], without falsely implicating any person or intentionally withholding any information;

d. otherwise giving the United States access to knowledge or information he may have relevant to [describe offense being reported]; and

e. when called upon to do so by the United States, testifying in trial and grand jury or other proceedings in the United States, fully, truthfully, and under oath, subject to the penalties of perjury (18 U.S.C. § 1621) and making false statements or declarations in grand jury or court proceedings (18 U.S.C. § 1623), in connection with [describe offense being reported].

The commitments in this paragraph are binding only upon the Antitrust Division, although, upon the request of ABC, the Antitrust Division will bring this Agreement to the attention of other prosecuting offices or administrative agencies. In the event a current [or former] director, officer or employee of ABC fails to comply fully with his/her obligations hereunder, this Agreement as it pertains to such individual shall be void, and any leniency, immunity or non-prosecution granted to such individual under this Agreement may be revoked by the Antitrust Division. Should any leniency, immunity or non-prosecution granted be revoked, the Antitrust Division may thereafter prosecute such person criminally, and any statements or other information provided by such person to the Antitrust Division pursuant to this Agreement may be used against him/her in such prosecution.

**5. Entire Agreement:**
This letter constitutes the entire agreement between the Antitrust Division and ABC, and supersedes all prior understandings, if any, whether oral or written, relating to the subject matter herein.

**6. Authority And Capacity:**
The Antitrust Division and ABC represent and warrant each to the other that the signatories to this Agreement on behalf of each party hereto have all the authority and capacity necessary to execute this Agreement and to bind the respective parties hereto.

The signatories below acknowledge acceptance of the foregoing terms and conditions.

Sincerely yours,


_____  Date: _____
Gary R. Spratling
Deputy Assistant Attorney General
Antitrust Division


_____  Date: _____
[Name]
ABC, Inc.


_____  Date: _____
[Counsel for ABC, Inc.]


---

[1] Former employees are not covered by the Leniency Policy, but may be included in the negotiated coverage of the agreement in appropriate cases. The decision on whether the Division includes former employees will depend on a number of factors, including whether the applicant company is interested in protecting its former employees and whether it has the ability to help to secure the cooperation of key former employees.