# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Stolt-Nielsen Transportation Group Ltd., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-2217 (RJL) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant. | ) |
| | ) |
| Stolt-Nielsen Transportation Group Ltd., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-0474 (RJL) |
| | ) |
| United States Department of Justice, | ) |
| | ) |
| Defendant. | ) |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant, United States Department of Justice ("DOJ"), moves for summary judgment pursuant to Fed. R Civ. P. 56. As set forth in the accompanying memorandum of points and authorities, defendant has conducted an adequate search in response to plaintiff's requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, and it has released all segregable responsive documents, except for records properly withheld

under the FOIA exemptions.  Accordingly, defendant is entitled to summary judgment.

Respectfully submitted,

_____/s/_____
KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney

____/s/_____
RUDOLPH CONTRERAS
D.C. Bar No. 434122
Assistant U.S. Attorney

____/s/_____
CHARLOTTE A. ABEL
D.C. Bar No. 388582
Assistant U.S. Attorney
Civil Division
555 Fourth Street, NW
Washington, D.C. 20530
(202) 307-2332

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| _____ | )
| Stolt-Nielsen Transportation Group Ltd., | )
| | )
| Plaintiff, | )
| | )
| v. | ) Civil Action No. 05-2217 (RJL)
| | )
| United States of America, | )
| | )
| Defendant. | )
| _____ | )
| | )
| Stolt-Nielsen Transportation Group Ltd., | )
| | )
| Plaintiff, | )
| | )
| v. | ) Civil Action No. 06-0474 (RJL)
| | )
| United States Department of Justice, | )
| | )
| Defendant. | )
| _____ | )

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT'S MOTION  FOR SUMMARY JUDGMENT**

Plaintiff, Stolt-Nielsen Transportation Group Ltd. ("Stolt-Nielsen"), the subject of an

ongoing grand jury investigation being conducted by the Antitrust Division of the United

States Department of Justice ("the Division" or "Agency"), filed fourteen Freedom of

Information Act ("FOIA") requests with the Division, twelve of which are the subject of this

litigation.  Plaintiff has stated that it "commenced this FOIA action to obtain access to the

Antitrust Division's 'publicity campaign' against it."  Plaintiff's Memorandum of Points and

Authorities in Support of Its Motion for Partial Summary Judgment at 1 (Civ. Action No. 06-

0474 (RJL)) (filed May 13, 2006) (emphasis added).  Plaintiff's overly broad FOIA requests, however, go far beyond public statements made by the Division that were made to offer guidance to the antitrust bar, and call for confidential investigative materials from the Stolt-Nielsen grand jury investigation, including investigative and case recommendation memoranda, communications with confidential sources, pleadings filed under seal pursuant to Federal Rule of Criminal Procedure 6(e), and confidential communications with foreign governments that are also investigating Stolt-Nielsen; internal deliberative and work product materials; and agreements with confidential sources in numerous additional grand jury investigations.  Disclosure of such materials would give unprecedented access to investigative files, not provided for by the FOIA, to a subject of a grand jury investigation.

For the reasons set forth below, the Agency's motion for summary judgment should be granted.  Attached hereto as Exhibit A is the public declaration by Ann Lea Richards, the Chief of the Division's FOIA Unit, which explains why the withheld and redacted material was exempt from disclosure under the FOIA.  Her declaration references an amended 2005 *Vaughn* Index and an amended 2006 *Vaughn* Index, which were filed with this Memorandum.[1]  The amended indexes are incorporated by reference herein and explain for

---

[1]    The 2006 *Vaughn* Index was amended because, after filing the index, it was discovered that some of the listed documents were given Bates numbers that were identical to Bates numbers for different documents listed on the 2005 *Vaughn* Index.  Thus, to avoid confusion, the 2006 documents with duplicative numbers were renumbered and the new Bates numbers were inserted on the amended 2006 *Vaughn* Index.  In addition, in the process of drafting this summary judgment memorandum, defendant corrected exemptions on two documents on the 2006 *Vaughn* Index that were inadvertently listed under the attorney-client privilege instead of the attorney work product doctrine, added 5 U.S.C. § 552(b)(2) exemptions to all withheld amnesty agreements on the 2006 *Vaughn* Index and to confidential investigative consultations with foreign antitrust authorities on both the 2005 and 2006 *Vaughn* Indices, added the 5 U.S.C. § 552(b)(5) exemption for the efficient operations of government privilege to private communications with foreign governments on both the 2005 and 2006 *Vaughn* Indices and made other harmonizing edits on the 2005 and 2006

each document the reason(s) why the withheld material is exempt from disclosure. Also attached hereto as Exhibit B is the public declaration of Scott D. Hammond, Deputy Assistant Attorney General for Criminal Enforcement for the Division, which sets forth key background material concerning the Division's criminal enforcement program, its Corporate Leniency Program, and the Division's cooperation and communications with foreign authorities.

To assist the Court in its resolution of the Agency's motion, set forth in Part I below is a summary of the facts relating to this case, a summary drawn primarily from Mr. Hammond and Ms. Richards' declarations. This is followed by Part II, which explains why, for each claimed exemption, the material withheld from plaintiff was properly withheld and addresses the issue of the segregability of the documents containing exempt material.

## I. FACTUAL BACKGROUND

A.    The Grand Jury Investigation and Related Leniency Litigation

As noted in the Hammond declaration (¶ 2, Exhibit B), the Antitrust Division investigates and prosecutes hard-core cartel offenses, such as agreements among competitors to fix prices, rig bids or allocate customers, territories, or sales volumes. Since the 1990's the highest priority of the Division's criminal enforcement program has been the investigation and prosecution of international cartels due to the increasing globalization of business and resulting opportunities for the formation of such cartels and the massive amounts of harm inflicted by these international cartels. (Hammond decl. ¶ 3, Exhibit B.) The Division's Corporate Leniency Program, pursuant to which a cartel member admits its participation in a

---

*Vaughn* Indices. (Richards decl. ¶ 27 n.21, Exhibit A.)

criminal antitrust violation and cooperates in the Division's investigation of its

coconspirators in return for protection from criminal conviction, fines, and jail terms for its

employees, has been a key part of the success of the Division's international anti-cartel

enforcement program.   (Hammond decl. ¶¶ 6-7, Exhibit B.)

On November 22, 2002, the Division began investigating the participation of Stolt-

Nielsen and other companies in price fixing, bid rigging and customer allocation in the

international parcel tanker shipping industry.[2]  On this date, the Wall Street Journal published

an article summarizing allegations about the cartel made by Stolt-Nielsen's former General

Counsel Paul O'Brien.  Shortly after the Division began its investigation, counsel for Stolt-

Nielsen approached the Division to inquire about entering the Division's Corporate Leniency

Program.

Leniency, or amnesty, is granted to an applicant in a two-step process.  Initially, the

applicant is granted a conditional amnesty letter.[3]  SNTG received a conditional leniency

letter on January 15, 2003.  The conditions in the initial letter include the verification of

certain specified representations by the applicant and the full, continuing and complete

cooperation of the applicant, as defined in the letter.[4]  The required representations include

---

[2]    Parcel tanker shipping is the ocean transport of bulk liquid chemicals, edible oils, acids and other specialty liquids in parcel tanker vessels.

[3]    *See* Amnesty Agreement between the Antitrust Division and Stolt-Nielsen and its affiliates (Jan. 15, 2003) (hereinafter "SNTG Amnesty Agreement"), attached as Exhibit C ("This agreement is conditional and depends upon SNTG satisfying the conditions set forth below.  After all of these conditions are met, the Division will notify SNTG in writing that the application has been granted.").  The SNTG Amnesty Agreement defined SNTG as Stolt-Nielsen Transportation Group Ltd. (Bermuda), its parent (including its ultimate parent), affiliates, and subsidiaries, but not including joint venture partners.  Defendant uses SNTG in this Memorandum to refer to the same entities.

[4]    *See* SNTG Amnesty Agreement ¶ 3 ("Subject to verification of SNTG's

the applicant's representation that it "took prompt and effective action to terminate its part in

the anticompetitive activity being reported upon discovery of the activity."[5]  The conditional

letter also provides that if the Antitrust Division determines that the applicant has violated the

agreement, the amnesty agreement "shall be void, and the Antitrust Division may revoke the

conditional acceptance of [the applicant] into the Corporate Leniency Program."[6]  If

subsequent investigation determines that all of the conditions in the conditional leniency

letter are satisfied, the Division notifies the applicant in writing that its application has been

granted.  (Hammond decl. ¶ 12, Exhibit B.)  In SNTG's case, however, as explained below,

the grand jury investigation soon revealed that representations made in the agreement were

false.

     Less than three months after entering a conditional leniency letter with SNTG, the

Division received credible evidence that SNTG had not taken prompt and effective action to

terminate its participation in the international parcel tanker shipping cartel upon its discovery as

required by the Division's Corporate Leniency Policy,[7] that it had provided false information to

---

representations in paragraph 1 above, and subject to its full, continuing and complete cooperation,
as described in paragraph 2 above, the Antitrust Division agrees conditionally to accept SNTG into
Part B of the Corporate Leniency Program . . . .").

    [5]      *See* SNTG Amnesty Agreement ¶ 1(a).

    [6]      *See* SNTG Amnesty Agreement ¶ 3.

    [7]      Two other corporate subjects and certain of their executives provided the Division
with evidence of the continuation of the parcel tanker cartel until November 2002 and later pleaded
guilty to a conspiracy that lasted until that date.  SNTG had told the Division it had withdrawn from
the conspiracy in March 2002, after Stolt-Nielsen's General Counsel had discovered evidence of the
conspiracy.  During this gap, the international parcel tanker cartel affected tens of millions of dollars
in U.S. commerce.  Answer at 5-6, *Stolt-Nielsen Transportation Group Ltd. v. U.S. Dep't of Justice*,
Civil Action No. 1:06-cv-00474 (RJL) (Dk. # 13-1).

the Division, and that it had withheld information about the cartel from the Division. Thus, the Division promptly notified SNTG in April 2003 that it was considering whether to withdraw its conditional leniency, and the Division suspended SNTG's obligations to cooperate with the Division pending resolution of SNTG's eligibility for amnesty. On June 24, 2003, Richard B. Wingfield, Executive Vice-President and Managing Director, Tanker Trading, for Stolt-Nielsen, a foreign national who was then residing in the United States, was criminally charged with conspiring to allocate customers, fix prices, and rig bids for parcel tanker shipping of products to and from the United States and elsewhere.

In February 2004, Stolt-Nielsen, its parent Stolt-Nielsen S.A., and Stolt-Nielsen executive Richard Wingfield filed civil actions in the Eastern District of Pennsylvania to enjoin the Division from seeking their indictment. The court placed the actions under seal and consolidated them. On March 2, 2004, the Antitrust Division rescinded SNTG's conditional leniency based on the grounds that: (1) SNTG had falsely represented in the agreement that it had taken prompt and effective action to terminate its anticompetitive activity upon discovering it; and (2) SNTG had failed to provide full and complete cooperation. This was the first time that the Division had ever revoked an applicant's conditional leniency. (Hammond decl. ¶ 13, Exhibit B.)

At a two day hearing in the district court on April 13-14, 2004, John Nannes, counsel for SNTG, and James Griffin, then Deputy Assistant Attorney General for Criminal Enforcement for the Antitrust Division, whose testimony was authorized pursuant to 28 C.F.R. § 16.21 *et seq.*, testified about the conditional leniency negotiations. Neither side called any witnesses involved in the conspiracy. Instead, the Antitrust Division, to protect grand jury secrecy during the ongoing grand jury investigation, submitted extensive grand jury material to the Court ex parte,

which detailed the continuation of the conspiracy until November 2002.[8]  At the hearing, counsel

for SNTG conceded that, despite the obligation to provide complete and truthful cooperation,

the company provided the Division with no evidence of its participation in the conspiracy past

March 2002 notwithstanding the fact that coconspirators had pleaded guilty to participating in

a parcel tanker shipping cartel that lasted until November 2002.[9]

On January 14, 2005, the district court entered final judgment, enjoining the Antitrust

Division from seeking an indictment of Stolt-Nielsen, its parent, or Richard Wingfield.  *Stolt-*

*Nielsen S.A. v. United States*, 352 F. Supp. 2d 553 (E.D. Pa. 2005).  The court concluded that,

under the terms of the conditional leniency agreement, SNTG was not required to have ceased

its illegal activity by March 2002 because the conditional leniency agreement did not specifically

mention that date.  The court also found that the Division received the benefit of its bargain

under the conditional leniency agreement because "SNTG's partners in the conspiracy were

prosecuted and convicted, and the conspiracy has been terminated."  *Id.* at 562.  Under its

interpretation of "benefit of the bargain," the court did not reach whether SNTG had disclosed

the full scope of the conspiracy or had fulfilled its obligation to provide complete and truthful

---

[8]      The District Court declined to consider the Government's *ex parte* evidence submission.  D. Ct. order  n.1,  *Stolt-Nielsen S.A. v. United States,* No. 04-CV-537 (E.D. Pa. filed June 9, 2004).

[9]      *United States v. Hendrikus Van Westenbrugge*, Crim. No. 03-806 (E.D. Pa. 2003), *available at* http://www.usdoj.gov/atr/cases/vanwest.htm; *United States v. Odfjell Seachem AS*, Crim. No. 03-654 (E.D. Pa. 2003), *available at* http://www.usdoj.gov/atr/cases/odfjell.htm; *United States v. Erik Nilsen*, Crim. No. 03-653 (E.D. Pa. 2003), *available at* http://www.usdoj.gov/atr/cases/nilsen.htm; *United States v. Bjorn Sjaastad*, Crim. No. 03-652 (E.D. Pa. 2003), *available at* http://www.usdoj.gov/atr/cases/sjaastad.htm.  Shortly after the hearing, an additional case was filed charging the continuation of the cartel until November 2002.  *United States v. Jo Tankers B.V.*, Crim.  No.  04-221  (E.D.  Pa.  2004),  *available at* http://www.usdoj.gov/atr/cases/tankers.htm.

cooperation nor whether SNTG's representation that it took prompt and effective action to end

its anticompetitive activity upon discovery was true.  In fact, the court found that the date on

which SNTG ended its participation in the conspiracy "was never clearly established." *Id.* at 562

n.10.  The court simultaneously granted the United States's motion to unseal the action,

including the trial transcripts and exhibits.[10]

The United States appealed the district court's ruling, and on March 23, 2006, the Third

Circuit Court of Appeals reversed the district court's order enjoining the United States from

indicting Stolt-Nielsen, its parent, or Wingfield.  *Stolt-Nielsen, S.A. v. United States*, 442 F.3d

177 (3d Cir. 2006).  The court of appeals applied the well-established rule that a federal court

cannot enjoin the initiation of a federal criminal prosecution.  Noting an injunction against

indictment would be an extraordinary remedy raising separation-of-powers issues, the court

concluded that the district court "lacked authority" to enjoin the United States from indicting

Stolt-Nielsen and Wingfield.  *Id*. at 187.   Finally, the court of appeals found that because the

district court had no authority to enjoin an indictment in this case, the district court's judgment

"lacks preclusive effect." *Id.* at 187 n.7.   Thus, if Stolt-Nielsen, its parent, or Wingfield are

indicted and again argue that the United States violated the SNTG Amnesty Agreement, the court

of appeals directed that the district court "must consider the Agreement anew and determine the

date on which Stolt-Nielsen[11] discovered its anticompetitive conduct, the Company's and

Wingfield's subsequent actions, and whether, in light of those actions, Stolt-Nielsen complied

---

[10]    The grand jury evidence submitted to the Court by the Division remained sealed pursuant to grand jury secrecy rules.

[11]    The court of appeals defined Stolt-Nielsen as including both Stolt-Nielsen and its parent Stolt-Nielsen S.A.  *Id.* at 179.

with its obligation under the Agreement to take 'prompt and effective action to terminate its part in the anticompetitive activity being reported upon discovery of the activity.'" *Id.*

On June 20, 2006, the Third Circuit denied a petition for rehearing *en banc* filed by Stolt-Nielsen, its parent, and Wingfield, and on July 13, 2006, denied their application for a stay of the mandate pending resolution of a petition for certiorari.  On July 20, 2006, the two Stolt entities and Wingfield filed a petition for certiorari, as well as an application for a stay of the mandate of the Third Circuit with the Circuit Justice for the Third Circuit.  Petition for Writ of Certiorari, *Stolt-Nielsen S.A.*, 75 U.S.L.W. 3035 (No. 06-97) and Application to Recall and Stay Mandate, *Stolt-Nielsen S.A.* (No. 06A79).  The Circuit Justice denied the stay on July 25, 2006. On July 25, 2006, the two Stolt entities and Wingfield filed a renewed application for a stay of the Third Circuit mandate, which was denied by the full Supreme Court on August 21, 2006. Stolt-Nielsen has indicated that if it is indicted, it intends to file a motion to dismiss based on the conditional leniency letter.[12]  Hence, continued protracted enforcement proceedings are expected regarding the amnesty revocation issue.

Because the revocation of an applicant's conditional leniency was unprecedented and because of the importance of the Division's amnesty program, the revocation generated intense interest in the antitrust defense bar and generated many questions as to the Division's future application of the program.[13]  Since 1993, in approximately 100 leniency cases, the Division had

---

[12]    Plaintiff's Response to Defendant's Motion to Consolidate at 2, *Stolt-Nielsen Transportation Group Ltd. V. United States*, Civ. Action No. 05cv2217 (RJL) (filed May 25, 2006) ("Stolt-Nielsen could be subject to indictment at almost any time.  The information that Stolt-Nielsen has requested through its FOIA requests is necessary in order for the Company to present an effective motion to dismiss.").

[13]    Gary R. Spratling, Gibson, Dunn & Crutcher, Chair of the Task Force Liaison to the International Competition Network's Cartel Working Group, Outline, ABA Section of Antitrust Law

never revoked a conditional corporate leniency until it revoked Stolt-Nielsen's conditional leniency. When the district court opinion was publicly issued in January 2005 enjoining the Division from indicting plaintiff, the district court simultaneously unsealed and made public the hearing record. Prior to this time, although Division officials were asked many questions about the revocation of SNTG's conditional leniency, the Division could not and did not comment on the specifics of the case. When the district court opinion was issued and accompanying record became public, there was great interest in the antitrust bar regarding the district court's unprecedented decision. Thus, the Division responded to such inquiries in public fora, such as ABA panel discussions. (Hammond decl. ¶ 14, Exhibit B.) The Division believed such comments based on the public record were necessary for the guidance of the antitrust bar in the continued use of the amnesty program, its most effective investigative tool. *See* 28 C.F.R. § 50.2(a)(2) ("[T]here are valid reasons for making available to the public information about the administration of the law.").

Part of the success of its Corporate Leniency Program has been the Division's willingness through speeches and other guidance, to explain to the antitrust bar how the program works. The antitrust bar relies on these speeches in giving counsel to their corporate clients. In fact, in its civil suit seeking an injunction against being indicted, Stolt-Nielsen cited many speeches given

---

2005 Fall Forum, Cartel Enforcement Roundtable ("[T]he US DOJ, in a move that attracted the attention of other enforcers and defense counsel around the world, revoked the conditional leniency of a Luxembourg shipping company, Stolt-Nielsen . . . .") (Exhibit D at ATR-3996); Kevin E. Grady, Alston & Bird, 2003-2004 Chair of ABA Section of Antitrust Law, E-mail ("I am forwarding a slightly revised list of questions for the Enforcers' Roundtable. The EC/Microsoft decision and the DOJ's . . . expulsion from the [corporate leniency] program of a company in the parcel tanker shipping case have led to these slight modifications. . . . [G]iven the recent developments mentioned above, we believe that the Section members would expect us to ask these types of questions.") (Mar. 25, 2004) (Exhibit E at ATR-2341-42).

by the Antitrust Division regarding the amnesty program. According to the Stolt-Nielsen and Stolt-Nielsen S.A. civil lawsuit regarding the amnesty revocation, Stolt-Nielsen used speeches by Division officials and other public pronouncements about the leniency program in deciding whether to seek leniency.[14]

Members of the antitrust defense bar have also written about the district court's unusual and now vacated opinion. *See* James Walden, Kristopher Dawes, *The Curious Case of Stolt-Nielsen S.A. v. United States*, THE ANTITRUST SOURCE (May 2005); and Donald Baker, *True Confessions*, LEGAL TIMES (September 26, 2005). Both Walden and Baker contacted the Division regarding their articles and requested that the Division review the draft articles and alert them to any errors. The Division reviewed the Walden/Dawes and Baker articles for factual errors and referred the authors to the public record to correct factual errors. *See* Exhibit F at ATR-015 (January 25, 2005 e-mail from Scott Hammond to James Walden: "I just sent you a fax with transcripts and exhibits from the public record . . . .").

B.     Plaintiff's FOIA Requests

Plaintiff has submitted to the Division fourteen FOIA requests, twelve of which are the subject of this action. The twelve that are subject to this action were submitted from June 2, 2005 through January 26, 2006. The requests seek internal Division notes of, and memoranda relating to, a Division meeting with SNTG counsel John Nannes; speeches by Division officials and any

---

[14]     Complaint at ¶¶ 8, 9, 10, and 12, *Stolt Nielsen S.A. v. United States*, Civil Action No. 04-537 (filed Feb. 6, 2004 E.D. Pa.), citing Scott D. Hammond, "A Review of Recent Cases and Developments in the Antitrust Division's Criminal Enforcement Program," March 7, 2002; Scott D. Hammond, "When Calculating the Costs and Benefits of Applying for Corporate Amnesty, How Do You Put a Price Tag on an Individual's Freedom?," March 8, 2001; Scott D. Hammond, "Lessons Common to Detecting and Deterring Cartel Activity," Sept. 12, 2000; *Stolt-Nielsen Complaint* at ¶ 14 ("Relying upon the Division's public statements regarding the Corporate Leniency Program, Stolt-Nielsen decided to pursue entry into that program.").

related documents which would include drafts and internal e-mails; documents relating to articles published about the SNTG amnesty litigation; documents relating to the opening of the Division's investigation of the parcel tanker shipping cartel, including a Wall Street Journal article and internal Division memoranda; communications by Division officials with foreign governments that are members of the International Competition Network[15] relating to Stolt-Nielsen or the parcel tanker shipping cartel investigation; Division communications with the press, bar associations, and individuals uninvolved in the SNTG amnesty litigation or the parcel tanker shipping investigation; communications with various attorneys in private practice who represent potential fact or victim witnesses in the parcel tanker shipping grand jury investigation; and every amnesty agreement entered by the Division since August 1993 when the Division's current Corporate Leniency Program was instituted.[16]

On September 13, the Division produced 280 pages of documents in response to plaintiff's First through Fifth FOIA requests and withheld additional documents.  On January 31, 2006, defendant supplemented its September 13, 2005 response, producing, in full, one page of an e-mail responsive to ATFY05-072 and ATFY05-113 that inadvertently had been redacted. On March 28, 2006, the Division produced a supplemental response of 134 pages for plaintiff's Second, Third, and Sixth FOIA requests, withheld 166 pages of documents, and informed plaintiff that a number of documents responsive to plaintiff's Sixth FOIA request had also been disclosed

---

[15]    The ICN is a multilateral organization of antitrust authorities from approximately 85 jurisdictions that addresses antitrust enforcement policy and practice issues and promotes convergence and cooperation among antitrust authorities.

[16]    The FOIA requests are described in detail in Ms. Richards' declaration (¶¶ 9-20, Exhibit A) and are attached hereto as Exhibits G-R.

in its September 13 production.  *See* Exhibits S, T, and U (Sept. 13, 2005, Jan. 31, 2006, and

March 28-29, 2006 letters respectively).[17]  On April 27, 2006, the Division produced 261 pages

of documents and withheld approximately 1,232 pages in response to plaintiff's Seventh through

Twelfth FOIA requests.  *See* Exhibits V-AA (April 27, 2006 letters).

## II.  ARGUMENT

A.    Legal Standard for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure provides that summary judgment "shall

be rendered forthwith if the pleadings, depositions, answers to interrogatories and admissions on

file, together with affidavits, if any, show that there is no genuine issue as to any material fact and

that the moving party is entitled to judgment as a matter of law."  In responding to a summary

judgment motion, the adverse party must "set forth specific facts showing that there is a genuine

issue" of fact.  FED. R. CIV. P. 56(e).

The moving party is entitled to summary judgment "where the non-moving party has failed

to make a sufficient showing on an essential element of [his or her] case to which [he or she] has

the burden of proof."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  Any factual assertions

contained in affidavits and other evidence in support of the moving party's motion for summary

judgment shall be accepted as true unless the facts are controverted by the non-moving party

through affidavits or other documentary evidence.  FED. R. CIV. P. 56(e).

In resolving the summary judgment motion, all reasonable inferences that may be drawn

from the facts placed before the Court must be drawn in favor of the non-moving party.  *Anderson*

---

[17]    The September 13 letter stated the Division was producing 277 pages, but as noted in the March 28 letter, the Division actually produced 280 pages on September 13.  According to the amended 2005 *Vaughn* Index, 191 pages of the documents produced in the Division's September 13 document production were responsive to the plaintiff's Sixth FOIA request.

*v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The inferences, however, must be reasonable, and the non-moving party can only defeat a motion for summary judgment by responding with some factual showing to create a genuine issue of material fact. *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). The non-movant has met its burden of showing that a dispute about a material fact is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Laningham v. U.S. Navy*, 813 F. 2d 1236, 1241 (D.C. Cir. 1987) (*per curiam*) (citing *Anderson,* 477 U.S. at 248*)*.

To determine whether a fact is material, one must refer to the substantive law. *Anderson*, 477 U.S. at 248. The Supreme Court has held that "[o]nly disputes over the facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.* Summary judgment should therefore be granted if the moving party submits "affirmative evidence that negates an essential element of the nonmoving party's claim" or demonstrates "that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." *High Tech Gays v. Defense Industrial Security Clearance Office*, 895 F.2d 563, 574, *reh'g denied*, 909 F.2d 375 (9th Cir. 1990) (citing *Celotex v. Catrett*, 477 U.S. 317, 331 (1986)).

Summary judgment is the preferred method of resolving cases brought under FOIA. Indeed, most actions brought under the FOIA are resolved in this fashion. *See, e.g., Miscavige v. IRS,* 2 F. 3d 366, 369 (11th Cir. 1993) (FOIA cases should be handled on motions for summary judgment once the documents in use are properly identified). Summary judgment should be freely granted where as here there are no material facts at issue and the agency is entitled to judgment as a matter of law. *See Alyeska Pipeline Service Co. v. EPA,* 856 F. 2d 309, 314-315 (D.C. Cir. 1988); *Military Audit Project v. Casey*, 656 F. 2d 724, 738 (D.C. Cir. 1981).

B.    Defendant Conducted an Adequate Search for Documents

Upon receipt of plaintiff's FOIA requests, the Antitrust Division searched for records responsive to Stolt-Nielsen's requests. The Chief of the Freedom of Information Unit of the Antiturst Division, Ann Lea Richards, is responsible for processing FOIA requests for the Antitrust Division. She assigned Stolt-Nielsen's requests to Wayne Foster, a paralegal specialist, for processing. After receiving plaintiff's first two FOIA requests on June 3, 2005 (control nunbers ATFY05-071 and 072), Mr. Foster began his search for responsive documents by searching the Division's records computerized index which contains information about each matter currently or formerly under investigation. The system may be searched by the name of a company, the name of an individual, or an industry code. The index revealed an open investigation and litigation relating to the plaintiff that was assigned to the Philadelphia Field Office. Mr. Foster, accordingly, contacted that Section, asking its Chief, Robert Connolly to search for the requested records. At approximately the same time, Mr. Foster contacted Mr. Hammond's office to obtain any responsive material. Between June 13, 2005 and January 26, 2006 the FOIA Unit received ten additional requests from plaintiffs, control numbers ATFY05-080, 088, 113, and 131 and ATFY06-003, 002, 019, 026, 038, and 040. Mr. Foster forwarded copies of those requests to Mr. Connolly and Mr. Hammond's offices and inquired whether there were any responsive documents in the offices' files on the ongoing investigation and litigation concerning plaintiff Stolt-Nielsen. Ultimately, in the search for responsive information, the AAG's and DAAG's offices, and the Division's Appellate, Foreign Commerce, and criminal litigating sections were contacted for responsive materials and conducted searches.

Upon receipt of these records, Mr. Foster, the paralegal specialist, reviewed carefully each document (and page) to determine whether it was responsive to one or more of the FOIA requests

and set aside the few that were not.  That accomplished, he re-reviewed each page to determine

whether the page or of some portion of it was exempt from disclosure pursuant to one or more of

the exemptions to the FOIA.  Documents exempt in their entirety were so marked.  Exempt

information in otherwise disclosable documents was bracketed for excision and the exemption

supporting the non-disclosure designation noted on the page next to the redaction.[18]  Once the

documents had been reviewed, they were forwarded to Ann Lea Richards for additional review and

any necessary changes.  When her review was complete, the material marked for redaction was

excised and copies of the remaining portions were made for production to plaintiff.

C.    Defendant Released All Responsive Segregable Records

The FOIA requires that if a record contains information that is exempt from

disclosure, any "reasonably segregable" information must be disclosed after deletion of the exempt

information unless the non-exempt portions are "inextricably intertwined with exempt portions."

5 U.S.C. § 552(b); *Mead Data Cent., Inc. v. United States Dept. of the Air Force*, 566 F.2d 242, 260

(D.C. Cir. 1977).  The Court of Appeals for the District of Columbia Circuit has held that a District

Court considering a FOIA action has "an affirmative duty to consider the segregability issue *sua*

*sponte*." *Trans-Pacific Policing Agreement v. United States Customs Service*, 177 F.3d 1022, 1028

(D.C. Cir. 1999).

In order to demonstrate that all reasonably segregable material has been released, the

agency must provide a "detailed justification" rather than "conclusory statements".  *Mead Data*, 566

F.2d at 261.  The agency is not, however, required "to provide such a detailed justification" that the

---

[18]    If the same exemption applied to a series of redactions, the exemption for first
redaction was identified but subsequent redactions based on that exemption were not marked with
the exemption.

exempt material would effectively be disclosed. *Id.* All that is required is that the government show "with 'reasonable specificity'" why a document cannot be further segregated. *Armstrong v. Executive Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996). Moreover, the agency is not required to "commit significant time and resources to the separation of disjointed words, phrases, or even sentences which taken separately or together have minimal or no information content." *Mead Data*, 566 F.2d at 261, n.55.

In this case, the two amended *Vaughn* Indexes compiled by the Antitrust Division provide "detailed justification" for the exemptions claimed. The indexes describe each record or portion of record withheld, identify the date of the document, the name of the author and recipient, the title and/or type of document, the exemption claimed and finally, the reasons why the record or portion of the record is exempt. The Division expressly considered the segregability of each document and concluded that no additional information could be released to the plaintiff without jeopardizing the ongoing investigation or litigation or the Division's anti-cartel enforcement program. To further describe the information sought would lead to disclosure of the very information sought to be protected. (Richards decl. ¶¶ 26-27, Exhibit A.)

D.   Defendant Properly Withheld Records Subject to FOIA Exemptions as
     Illustrated by the *Vaughn* Indexes

1.   *Internal Rules and Practices of the Agency-Exemption (2)*

Section 552 (b)(2) of FOIA exempts from mandatory disclosure records "related solely to the internal personnel rules and practices of an agency." 5 U.S.C. § 552(b)(2). Exemption (b)(2) applies primarily to two categories of materials: (1) internal agency matters so routine or trivial that they could not be "subject to ... a genuine and significant public interest;" and (2) internal agency matters of some public interest "where disclosure may risk circumvention" of statutes or

agency regulations. *Dep't of Air Force v. Rose*, 425 U.S. 352, 369-70 (1976); *National Treasury Employees Union v. U.S. Customs Service*, 802 F.2d 525, 528-30 (D.C. Cir. 1986); *Crooker v. Bureau of Alcohol, Tobacco and Firearms*, 670 F.2d 1051, 1073-74 (D.C. Cir. 1981). DOJ file numbers withheld in the documents referenced below are clearly trivial and have no genuine public interest. They are, accordingly, properly withheld from disclosure pursuant to Exemption 2 of the FOIA, 5 U.S.C. § 552(b)(2). *Davis v. United States Dep't of Justice*, No. 00-2457, slip op. At 8 (D.D.C. Mar. 21, 2003); *Branch v. FBI*, 658 F. Supp. 204, 208 (D.D.C. 1987); *Scherer v. Kelley*, 584 F.2d 170, 175-76 (7th Cir. 1978). Those records are listed in paragraph 28 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes.

The second category under Exemption 2, sometimes referenced in the governing case law as the "high (b)(2) category," *See Schiller v. NLRB*, 964 F.2d 1205, 1207 (D.C. Cir. 1992), exempts from mandatory disclosure documents relating to more substantive internal matters. *Id*. An agency is authorized to withhold documents in this category to the extent that disclosure would reveal techniques and procedures for law enforcement investigations or prosecutions, *id*.; would disclose guidelines for law enforcement investigations; or would risk circumvention of an agency statute or impede the effectiveness of an agency's law enforcement activities. *See Crooker*, 670 F.2d 1051 (D.C. Cir. 1981) (*en banc*); *Hardy v. ATF*, 631 F.2d 653, 656 (9th Cir. 1980).

Here the agency withheld amnesty agreements under Exemption 2 because if disclosed, they would reveal information relating to the operation of the Division's amnesty program and impede the effectiveness of that program. The Division routinely promotes the confidentiality of the amnesty program, and the program's confidentiality provides an incentive for amnesty application, which has advanced the majority of the Division's major cartel investigations. If the amnesty agreements are disclosed, it would interfere with ongoing or prospective enforcement

proceedings and would discourage future amnesty applicants due to loss of confidentiality. (Hammond decl. ¶¶ 6-11, Exhibit B.)  The withheld amnesty agreements are listed in paragraph 28 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes.

Likewise, the Division withheld documents relating to private investigative consultations with specific foreign antitrust enforcers about the investigation of Stolt-Nielsen or the parcel tanker industry under Exemption 2 because if disclosed, they would reveal information relating to the operation of the Division's international anti-cartel enforcement program.  These withheld records are listed in paragraph 28 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes. These communications were conducted in confidence, to assist each agency in the investigations of Stolt-Nielsen or the parcel tanker industry, and for the common goal of investigating, prosecuting, punishing, and deterring cartel activity.  The Division and foreign antitrust authorities routinely communicate, and provide advice to, one another in confidence, and such communications are vital for the effectiveness of international anti-cartel investigations and prosecutions.  If these communications with foreign authorities are disclosed, it would interfere with ongoing or prospective enforcement proceedings and would discourage such essential communications in the future due to loss of confidentiality.  (Hammond decl. ¶¶ 18-19, Exhibit B.)

### 2. Specifically Exempted by Statute - Exemption 3

Title 5 U.S.C. § 552(b)(3) allows for the deletion of information "specifically exempted from disclosure by statute (other than section 552(b) of this title), provided that such statute:  (A) requires that the matters be withheld from the public in such a manner as to leave no

discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld." *Id*.[19]  Rule 6(e) of the Federal Rules of Criminal Procedure explicitly bars disclosure of a "matter occurring before the grand jury," and serves to preserve the secrecy of the grand jury proceedings.[20]  It has long been recognized that FED. R. CRIM. P. 6(e) qualifies as a FOIA Exemption (b)(3) statute.  *See*, *e.g.*, *Church of Scientology International v. U.S. Dep't of Justice*, 30 F.3d 224, 235 (1st Cir. 1994); *Fund for Constitutional Government v. National Archives and Records Service*, 656 F.2d 856, 867-68 (D.C.Cir. 1981) (the argument that the Federal Rules of Criminal Procedure are not "statutes" for FOIA Exemption (b)(3) purposes was soundly rejected with respect to Rule 6(e).)

Rule 6(e) is precise in its description of the circumstances under which grand jury information may be disclosed, none of which are applicable here.  *See* FED. R. CRIM. P. 6(e)(3). First, disclosure may be made to a government attorney "for use in performing that attorney's duty," FED. R. CRIM. P. 6(e)(3)(A)(i).  Second, limited disclosure may be made to "government personnel" deemed necessary by a federal government attorney to assist federal government counsel in "performing that attorney's duty to enforce federal criminal law." FED. R. CRIM. P. 6(e)(3)(A)(ii). Third, disclosure may be made to enforce the Financial Institutions Reform, Recovery and Enforcement Act of 1989 or in civil forfeiture proceedings under federal law.  FED. R. CRIM. P.

---

[19]    "Exemption 3 differs from other FOIA exemptions in that its applicability depends less on the detailed factual contents of specific documents; the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage." *Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978).

[20]    In relevant part, Rule 6(e)(2) provides:  "Secrecy.  Unless these rules provide otherwise, the following persons must not disclose a matter occurring before the grand jury: (i) a grand juror; (ii) an interpreter; (iii) court reporter; (iv) an operator of a recording device; (v) a person who transcribes recorded testimony; (vi) an attorney for the government; or (vii) a person to whom disclosure is made under Rule 6(e)(3)(A)(ii) or (iii)."

6(e)(3)(A)(iii).  Other exceptions permit disclosure only by court order.  *See* FED. R. CRIM. P.

6(e)(3)(E)(i)-(v).  Thus, Rule 6(e) establishes particular criteria as to the withholding of information.

None of the criteria are applicable in this case.  Thus, because none of the Rule 6(e) exceptions

apply, the rule's "ban on disclosure is for FOIA purposes absolute and falls within subpart (A) of

Exemption 3."  *Fund for Constitutional Government*, 656 F.2d at 868.

  Therefore, the sole issue for decision in this case is whether the withheld material

logically falls within the scope and coverage of Rule 6(e).  In order to effectuate Rule 6(e)'s

objectives, "the scope of the secrecy is necessarily broad.  It encompasses not only the direct

revelation of grand jury transcripts but also the disclosure of information which would reveal 'the

identities of witnesses or jurors, the substance of the testimony, the strategy or direction of the

investigation, the deliberations or questions of the jurors, and the like.'"  *Fund for Constitutional*

*Government*, 656 F.2d at 869 (quoting *SEC v. Dresser Industries Inc.*, 628 F.2d 1368, 1382

(D.C.Cir. 1980)).

  The amended *Vaughn* Indexes describe the records that have been withheld pursuant to

Rule 6(e), and these documents are also listed in paragraph 29 of the Richards declaration, Exhibit

A.  These records include the request for grand jury authority, indictment recommendations, the

identities of witnesses before the grand jury, the subjects and the direction of grand jury

investigations, text of grand jury testimony, and grand jury exhibits.  This type of information has

been held to be governed by Rule 6(e) and thus excluded from release under FOIA by Exemption

(b)(3).  *Douglas Oil Co. of Calif. v. Petrol Stops Northwest*, 441 U.S. 211, 221-224 (1979); *United*

*States v. Procter and Gamble Co.*, 356 U.S. 677, 681-82 (1958); *Lopez v. Dep't of Justice*, 393 F.3d

345, 364 (D.C. Cir. 2005); *In re Sealed Case*, 192 F.3d 995, 1004 (D.C. Cir. 1999);  *Senate of*

*Puerto Rico v. U.S. Dep't of Justice*, 823 F.2d 574 (D.C. Cir. 1987); *Fund for Constitutional*

*Government v. National Archives and Records Serv.*, 656 F.2d 856, 869 (D.C. Cir. 1981); *United States v. Eastern Airlines*, 923 F.2d 241 (2d Cir. 1980); *In re Disclosure of Grand Jury Matters (Miller Brewing Co.*, 518 F. Supp. 163, 166 (D. Wis.), *modified on other grounds*, 687 F.2d 1079 (7th Cir. 1981)); *Lance v. Dep't of Justice*, 610 F.2d 202 (N.D. Ga. 1980).

Information is also withheld in full or in part pursuant to statutes that prohibit the disclosure of confidential information other than Rule 6(e). The statute applicable here requires that the information be withheld in such a manner as to leave no discretion on the disclosure. 5 U.S.C. § 552(b)(3)(A); *see also Irons and Sears v. Dann*, 606 F.2d 1215, 1219-1220 (D.C. Cir. 1979). The applicable statute cannot be identified because to do so would disclose the very information sought to be protected by the statute. These additional records withheld pursuant to Exemption (b)(3) are listed in paragraph 29 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes.[21]

   *3. Civil Discovery Privileges-Exemption 5*

Exemption (b)(5) protects "inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency." 5 U.S.C. § 552(b)(5). Courts have construed this language to exempt documents that would not ordinarily be available to an agency's opponent in a civil discovery context and to incorporate all evidentiary privileges that would be available in that context. *See United States v. Weber Aircraft Corp.*, 465 U.S. 792, 799 (1984); *FTC v. Grolier, Inc.*, 462 U.S. 19, 26 (1983); *Martin v. Office of Special Counsel*, 819 F.2d 1181 (D.C. Cir. 1987).

   **a. Deliberative Process**

---

[21]An index of these records identifying the statute at issue will be made available under seal for *in camera* inspection by the Court.

The deliberative process privilege is incorporated within Exemption 5.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 151 (1975).  The purpose of this privilege is to protect the "quality of agency decisions."  *Id.*   The policy underlying this privilege is to encourage open, frank discussions of policy matters between subordinates and supervisors, to protect against premature disclosure of proposed policies before they become final, and to protect against public confusion by disclosing reasons and rationales that were not in fact the ultimate grounds for the agency's action.  *See, e.g.*, *Russell v. Dep't of the Air Force*, 682 F.2d 1045, 1048 (D.C. Cir. 1982); *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *Jordan v. United States Dep't of Justice*, 591 F.2d 753, 772-73 (D.C. Cir. 1978) (en banc), *overruled in part on other grounds*, *Crooker v. Bureau of Alcohol, Tobacco & Firearms*, 670 F.2d 1051 (D.C. Cir.1981) (*en banc*).

Flowing from the policy considerations is the privilege's protection of the "decision making processes of government agencies."  *Sears*, 421 U.S. at 150.  The privilege protects not merely documents, but also the integrity of the deliberative process itself where the exposure of that process would result in harm.  *Dudman Communications Corp. v. Dept. of the Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987) ("Congress enacted Exemption 5 to protect the executive's deliberative processes – not to protect specific materials.");  *Greenberg v. Dept. of Treasury*, 10 F. Supp.2d 3, 16, n.19 (D.D.C. 1998); *Marzen v. HHS*, 825 F.2d 1148, 1155 (7th Cir. 1987) ("[E]xemption [5]protects not only the opinions, comments and recommendations in the draft, but also the process itself."); *Pies v. IRS*, 668 F.2d 1350, 1353-54 (D.C. Cir. 1981). As the Court in *Coastal States* held, the privilege protects "recommendations, draft documents, proposals, suggestions, and other subjective documents which reflect the personal opinions of the writer rather than the policy of the agency." *Coastal States*, 617 F.2d at 866.   Indeed, the

mere status of an agency decision within an agency decisionmaking process may be protectible if the release of that information would have the effect of prematurely disclosing "the recommended outcome of the consultative process . . . as well as the source of any decision." *Wolfe v. HHS*, 839 F.2d 768, 775 (D.C. Cir. 1988) (*en banc*).

In deciding whether a document should be protected by the privilege courts look to whether the document is "predecisional," whether it was generated before the adoption of an agency policy, and whether the document is "deliberative," whether it reflects the give-and-take of the consultative process. *Coastal States*, 617 F.2d at 866-68. A final decision is not essential for there to be a deliberative process which is protected by Exemption (b)(5). *See Access Reports v. Dep't of Justice*, 926 F.2d 1192, 1194 (D.C. Cir. 1991). And agencies may have multiple decisional processes associated with the same subject matter. *See Judicial Watch, Inc. v. Reno*, 2001 WL 1902811 (D.D.C. March 30, 2001) (involving records that contributed to follow-on decisions made by the Attorney General and the Department of Justice after the Attorney General's earlier decision to return Elian Gonzalez to Cuba).

Here, the documents withheld under the deliberative process privilege of Exemption 5 are documents that constitute inter-agency or intra-agency records leading up to a final decision, i.e., the ultimate course and scope of the ongoing criminal investigation and related litigation. *See generally Formaldehyde Inst. v. H.H.S.*, 889 F.2d 1118, 1121 (D.C. Cir. 1989). The records withheld under the deliberative process privilege prong of Exemption 5 are listed in paragraph 33 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes. They include notes and drafts compiled for a superior, evaluation

and staff deliberation, and instructions from a supervisor.  Release of this type of deliberative

document will harm the decision-making process of the Antitrust Division of the Justice

Department.  Release of pre-decisional deliberative material would discourage open, frank

discussions on those issues, disclose opinions and recommendations which formed an integral

part of the decision-making process, and could create public confusion due to disclosure of

reasons and rationales that were not in fact ultimately the grounds for agency action.  As such,

disclosure would have a chilling effect on discussions leading up to decisions because

individuals would be reluctant to express their views with candor.  *See Quarles v. Department

of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (observing that "the prospect of disclosure is less

likely to make an adviser omit or fudge raw facts, while it is quite likely to have just such an

effect" on materials reflecting agency deliberations); *Montrose Chemical Corp. v. Train*, 491

F.2d 63, 68 (D.C. Cir. 1974).

### b.  Attorney Work-Product Privilege

Exemption (b)(5) incorporates the attorney work-product privilege, in addition to the

"executive 'deliberative process' privilege that protects candid internal discussion of legal or

policy matters."  *Maricopa Audubon Society v. U.S. Forest Service*, 108 F.3d 1082, 1084 n. 1

(9th Cir. 1997). The attorney work-product privilege protects documents and other memoranda,

prepared by an attorney or others at the attorney's direction in contemplation of litigation,

which set forth the attorney's theory of the case and litigation strategy.  *Hickman v. Taylor*, 329

U.S. 495, 509-11, 67 S. Ct. 385, 91 L. Ed. 451 (1947); *A. Michael's Piano, Inc. v. Federal

Trade Commission*, 18 F.3d 138, 146 (2d Cir. 1994).  The *Hickman* Court recognized that "it is

essential that a lawyer work with a certain degree of privacy, free from unnecessary intrusion

by opposing parties and their counsel."  *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d

854, 864 (D.C. Cir. 1980) (quoting *Hickman*).  The courts have held that "if material is exempt

from FOIA disclosure because of the attorney work product privilege, the exemption does not

terminate at the close of the litigation for which the material was prepared."  *See FTC v.*

*Grolier, Inc.*, 462 U.S. 19, 28 (1983).  Rather "attorney work product is exempt from

mandatory disclosure without regard to the status of the litigation for which it was prepared."

*Grove v. Dept. of Justice, et al.*, 802 F. Supp. 506, 514 (D.D.C. 1992).

In this case the records withheld as attorney work product are listed in paragraph 31 of

the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn*

Indexes.  The types of documents withheld as attorney work product include materials prepared

in anticipation of litigation, notes compiled for a superior, drafts for supervisory approval,

proposed direct and cross examinations, legal theories, information provided by confidential

sources, identities of witnesses, confidential communications with officials of foreign

governments regarding investigative issues, advice, opinions, recommendations, staff analysis

and research, draft memoranda, thought processes, conversations with executive agency staff,

and internal communications between staff.  These types of materials should be excluded from

disclosure under FOIA because these documents would not ordinarily be available to Stolt-

Nielsen in a civil discovery context.

### c.  Efficient Operations of Government Privilege[22]

Many cartel violations have been detected because companies are willing to disclose

these crimes.  In addition, cooperation from foreign antitrust authorities is vital to the

---

[22]The government's rationale for claiming the efficient operations of government privilege set forth in this section apply with equal force to the government's claims below under Exemption 7 for law enforcement investigatory records.

Division's successful investigation and prosecution of international cartels.  Without such self-reporting and cooperation from foreign enforcers, substantially greater numbers of consumers would be harmed by such violations.  Thus, the Exemption (b)(5) privilege for information that would promote the efficient operations of the government has been asserted as a basis for refusing to release amnesty agreements and private cooperative consultations with specific foreign authorities about the investigation of Stolt-Nielsen and the parcel tanker industry. These records are listed in paragraph 34 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes.[23]

The efficient governmental operations privilege is included within the civil discovery privileges incorporated into Exemption (b)(5) of the FOIA, 5 U.S.C. § 552(b)(5).  *United States v. Weber Aircraft Corp.*, 465 U.S. 792, 802 (1984).  It protects inter- and intra-agency memorandum and letters obtained under a promise of confidentiality when confidentiality is necessary to ensure and/or encourage frank disclosures and disclosure is counter to the public interest.  *See Machin v. Zuckert*, 316 F.2d 336, (D.C. Cir. 1963) (confidential statements made to air crash safety investigators are privileged in civil discovery.)  Generally inter- and intra-communications refer to information exchanged internally within an agency or between two agencies of the United States.  *Department of the Interior et al.v. Klamath Water Users Protective Association*, 532 U.S. 1, 2 (2001).  But the Supreme Court has recognized a "consultant corollary" to Exemption 5 whereby "a document prepared for a Government agency by an outside consultant qualifies as an 'intra-agency' memorandum.  *Id*. at 2.  In this case, agreements with confidential informants and private cooperative consultations with

---

[23]The government has also claimed other exemptions for the for these same materials. including Exemption 2 *infra* and Exemption 7 *supra*.

specific foreign authorities qualify as intra-agency memoranda under the "consultant corollary" to Exemption 5.

The privilege is recognized because the government would not be able to obtain the information if the privilege did not exist. Substantial Sherman Act violations have been uncovered because of the willingness of companies to self-disclose so long as their cooperation remains confidential, and in addition, confidential cooperation from foreign authorities has been vital in the investigation and prosecution of international cartels. Thus, the privilege promotes the efficient operation of the Division's corporate leniency program and international anti-cartel program. (Hammond decl. ¶¶ 6-7, 9, 18-19, Exhibit B.)

4. *Unwarranted Invasion of the Privacy of Others - Exemptions 6 and 7(C)*

**a. Private v. Public Interest**

Exemptions 6 and 7(C) both require a balancing of the individual's right to personal privacy against the public's interest in shedding light on an agency's performance of its statutory duties. *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999), citing *United States Dep't of Defense Dep't of Military Affairs v. FLRA*, 964 F.2d 26, 29 (D.C. Cir. 1992), quoting *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976). In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under the FOIA: "[T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.'" *Lepelletier*, 164 F.3d at 46 (editing by the court, emphasis supplied, interior quotation marks omitted), quoting *United States Dep't of Defense v. FLRA*, 510 U.S.

487, 497 (1994). *See also U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 773 (1989). Information that does not directly reveal the operation or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." *Id.* at 775. Further, "something, even a modest privacy interest, outweighs nothing every time." *National Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989); *but see Lepelletier*, 164 F.3d at 48 (in extraordinary circumstance where the individuals whose privacy the government seeks to protect have a "clear interest" in release of the requested information, the balancing under Exemption 6 must include consideration of that interest).

      The requestor's identity, purpose in making the request, and proposed use of the requested information have no bearing on this balancing test. The Supreme Court has opined many times and in many ways that the Freedom of Information Act "is fundamentally designed to inform the public about agency action and not to benefit private litigants [citations omitted]." *N.L.R.B. v. Sears, Roebuck & Co.*, 421 U.S. 132, 144 (1975 ); *Tax Analysts v. United States Dep't of Justice*, 965 F.2d 1092, 1095 (D.C. Cir. 1992). A litigant's "rights under the Act are neither increased nor decreased by reason of the fact that it claims an interest in the [information sought] greater than that shared by the average member of the public." Id. at 144. "The Supreme Court has indicated that FOIA is emphatically *not* designed for use as a general discovery device for purposes of civil or criminal litigation." *Nishnic, et al. v. U.S. Department of Justice*, 671 F.Supp. 776, 813 (D.D.C. 1987). Moreover, at least one court has observed that permitting the FOIA to be used as a criminal discovery device would open the floodgates to FOIA litigation and contribute to the "already burdensome backlog of FOIA cases" thereby

"undermining the rights of those members of the public whom Congress primarily intended to benefit." *Kanter v. I.R.S., et al.*, 433 F.Supp. 812, 819 n.13 ( N.D. Ill. 1977).

Here plaintiff's interest in the information sought is private, not public. *See Nishnic*, at 791, citing, *Lloyd and Henniger v. Marshall*, 526 F.Supp. 485, 487 (M.D.Fla. 1981). Plaintiff admits that it is seeking to obtain documents to exonerate itself from criminal charges that might be brought in the future.[24] These motives have been held to be purely personal in nature. *See Cotton v. Heyman,* 63 F.3d 1115, 1120 (D.C. Cir. 1995); see also *Ellis v. United States*, 941 F.Supp. 1068, 1079 (D. Utah 1996), citing *Republic of New Afrika v. FBI*, 645 F. Supp. 117, 121 (D.D.C. 1986) ("rejecting fee request where plaintiff's motives were purely personal–to exonerate its members of criminal charges and circumvent civil discovery"); and *Guam Contractors Ass'n v. United States Dep't of Labor*, 570 F. Supp. 163, 169 (N.D. Cal. 1983) ("fee award improper where plaintiff used FOIA to get a head start on discovery"). If plaintiff is indicted it will be entitled to seek exculpatory information through criminal discovery. *See Barney v. IRS*, 618 F.2d 1268, 1273, citing *NLRB v. Robbins Tire & Rubber Co.*, 437 U.S. at 242, (FOIA "not intended to function as a private discovery tool....plaintiffs can access information through "normal pre-trial discovery channels."); *see also Kanter*, 433 F. Supp. at 816 ("FOIA cases treated as independent causes operating on a different plane from other litigation; parties in other litigation only entitled to that discovery provided by the rules applying to their suit.")

### b.  Personnel, Medical and Similar Files - Exemption 6

---

[24]    Plaintiff's Response to Defendant's Motion to Consolidate at 2 (Civ. Action No. 05cv2217 (RJL)) (filed May 25, 2006) ("The information that Stolt-Nielsen has requested through its FOIA requests is necessary in order for the Company to present an effective motion to dismiss [an indictment].").

Exemption 6 of the FOIA protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include <u>all information</u> that applies to a particular individual." *Lepelletier*, 164 F.3d at 46, (emphasis supplied), quoting *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982). The Court has also emphasized that "both the common law and the literal understanding of privacy encompass the individual's control of information concerning his or her person." *U.S. Dep't of Justice v. Reporters Committee for Freedom of the Press*, 489 U.S. 749, 763 (1989).

In this case the records withheld in full or part under Exemption 6, as listed in paragraph 35 of the Richards declaration, Exhibit A, and as referenced in the two amended *Vaughn* Indexes, were not necessarily compiled in connection with law enforcement purposes. For instance, page 3 of the amended 2005 *Vaughn* Index, references a communication from James Walden to Division staff. Mr. Walden's phone numbers were redacted because release could constitute an unwarranted invasion of his personal privacy. Similar redactions are referenced on pp. 7, 24, 25, 26, 29, and 115-120 of the amended 2005 *Vaughn* Index. Disclosure of the information referenced would not shed any light on the operation of the government but it would serve to needlessly publicize personal information about private individuals. The benefit to private individuals that results from protection of their personal information outweighs the benefit to the public (none here) derived from disclosure of personal information about private individuals. For this reason, the defendant properly withheld personal information about private individuals.

**c. Investigatory Records - Exemption 7(C)**

Exemption 7(C) of the FOIA exempts from mandatory disclosure information compiled for law enforcement purposes when disclosure "could reasonably be expected to constitute an unwarranted invasion of personal privacy."  5 U.S.C. § 552(b)(7)(C).  "[T]he term 'law enforcement purpose' is not limited to criminal investigations but can also include civil investigations and proceedings in its scope."  *Mittleman v. Office of Personnel Management*, 76 F.3d 1240, 1243 (D.C. Cir. 1996), citing *Pratt v. Webster*, 673 F.2d 408, 420 n.32 (D.C. Cir. 1982).  When, however, a criminal law enforcement agency invokes Exemption 7, it "warrants greater deference than do like claims by other agencies."  *Keys v. U.S. Dep't of Justice*, 830 F.2d 337, 340 (D.C. Cir. 1987), citing *Pratt*, 673 F.2d at 418.  A criminal law enforcement agency must simply show that "the nexus between the agency's activity . . . and its law enforcement duties" is "'based on information sufficient to support at least "a colorable claim" of its rationality.'"  *Keys*, 830 F.2d at 340, quoting *Pratt*, 673 F.2d at 421.

Exemption 7(C) consistently has been held to protect the identities of suspects and other persons of investigatory interest who are identified in agency records in connection with law enforcement investigations.  *Reporters Committee*, 489 U.S. at, 780; *Computer Professionals for Social Responsibility v. U.S. Secret Service*, 72 F.3d 897, 904 (D.C. Cir. 1996) (noting "'strong interest of individuals, whether they be suspects, witnesses, or investigators, in not being associated unwarrantedly with alleged criminal activity'", quoting *Dunkelberger v. Dep't of Justice*, 906 F.2d 779, 781 (D.C. Cir. 1990)).  Indeed, an agency may categorically assert Exemption 7(C) to protect the identities of witnesses or other persons mentioned in law enforcement files in such a way as to associate them with criminal activity.  *Reporters Committee*, 489 U.S. at 780; *Nation Magazine v. U.S. Customs Service*, 71 F.3d 885,

893, 895-896 (D.C. Cir. 1995); *SafeCard Services*, 926 F.2d at 1206.[24]  Individuals who

provide information to law enforcement authorities have protectable privacy interests in their

anonymity.  *Computer Professionals for Social Responsibility*, 72 F.3d at 904; *Farese v. U.S.

Dep't of Justice*, 683 F. Supp. 273, 275 (D.D.C. 1987).

　　　　In this case, the records withheld in full or part under Exemption 7(C), as listed in

paragraph 39 of the Richards declaration, Exhibit A, and as referenced in the two amended

*Vaughn* Indexes, were compiled by the Antitrust Division of the Department of Justice in

connection with its enforcement of federal antitrust laws.  *See* Richards decl. ¶¶ 36, 39, Exhibit

A.  The Agency has withheld the names of and other personal information (e-mail address and

phone numbers) concerning individuals, including Division staff, third parties, potential

witnesses, grand jury witnesses and confidential sources, officials of foreign governments

and/or ICN members, and potential targets of grand jury investigations, the disclosure of which

would needlessly invade their privacy.  This information is found in amnesty agreements and

other documents responsive to plaintiff's FOIA requests.  The disclosure of the identities of

these individuals would not shed any light on the operation of government and would not

provide any discernable benefit to the public.  Therefore, the benefit that inures to the

---

[24]  There is a narrow exception to this rule -- applicable when the withheld documents
themselves might shed light on allegations of illegal government agency activity.  As this Circuit
emphasized in *Spirko v. U.S. Postal Service*, 147 F.3d 992, 999 (D.C. Cir. 1998):

　　　　when . . . governmental misconduct is alleged as the justification for disclosure, the
　　　　public interest is "insubstantial" unless the requester puts forward "compelling evidence
　　　　that the agency denying the FOIA request is engaged in illegal activity" and shows
　　　　that the information sought "is necessary in order to confirm or refute that evidence."

(Emphasis added, *quoting Davis v. Department of Justice*, 968 F.2d 1276, 1282 (D.C. Cir. 1992).)

individuals as a result of protection of their identities and personal information in a law enforcement context outweighs the interest that the public has in disclosure - none.

     5.  *Open Criminal Investigation and Related Litigation - Exemption 7(A*)

     Exemption 7(A) authorizes agencies to withhold "records or information compiled for law enforcement purposes if production of such law enforcement records or information . . . could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C. § 552 (b)(7)(A). In defending an Exemption 7(A) withholding, the agency must show that (1) a law enforcement proceeding is pending, or reasonably regarded as prospective, *see Manna v. United States Dep't of Justice*, 51 F.3d 1158, 1164 (3rd Cir. 1995), or as preventative, *see, e.g.*, *Moorefield. v. United States Secret Serv.*, 611 F.2d 1021, 1026 (5th Cir. 1980), and (2) that the release of the information could reasonably be expected to cause some articulable harm. See Manna, 51 F.3d at 1164. An articulable harm occurs "whenever the government's case in court would be harmed by the premature release of evidence or information," *Nat'l Labor Relations Board v. Robbins Tire & Rubber Co.*, 437 U.S. 214, 232 (1978), or when disclosure would impede any necessary investigation prior to the enforcement proceeding. *Dickerson v. U.S. Dep't of Justice*, 992 F.2d 1426, 1429 (6th Cir. 1993). To satisfy this burden, the agency must provide at least a general description of the types of documents at issue sufficient to indicate the type of interference threatening the law enforcement proceeding. *Curran v. U.S. Dep't of Justice*, 813 F.2d 473, 475 (1st Cir. 1987); *Spannaus v. U.S. Dep't of Justice*, 813 F.2d 1285, 1287 (4th Cir. 1987) (holding that a categorical description of the withheld material is sufficient because any further details "would lead to disclosure of the very information sought to be protected").

Stolt-Nielsen, in its Eighth FOIA Request, seeks a copy of every amnesty agreement entered by the Division since its current Corporate Leniency Policy was instituted in August 1993.[25] This request involves approximately 100 grand jury investigations and approximately 100 amnesty letters. (Hammond decl. ¶ 11, Exhibit B.) The Division has withheld copies of amnesty agreements entered in grand jury investigations that do not involve Stolt-Nielsen, with the exception of five amnesty agreements that have been made public at Division trials.[26] As explained in more detail below, the release of information concerning applications for, or grants of, corporate leniency would impair the efficient functioning of the corporate leniency program, thereby hindering the Division's criminal antitrust enforcement efforts.

The Division's current Corporate Leniency Policy (also known as the "Corporate Amnesty Policy") has been in effect since August 1993. Through a corporate amnesty application, a company admits its participation in a cartel and cooperates in the prosecution of its coconspirators in return for protection from conviction, fines, and jail terms for its employees. The Division's amnesty policy is considered the cornerstone of its international anti-cartel enforcement program, is the Division's most effective generator of international cartel cases, and has led to the detection and prosecution of more international cartels than all of the Division's search warrants, consensual monitoring, and FBI interrogations combined. (Hammond decl. ¶¶ 6-7, Exhibit B.) It has become the Justice Department's most successful voluntary disclosure program. (Hammond decl. ¶ 7, Exhibit B.) Notwithstanding the benefit to the corporation, companies are reluctant to come forward in either domestic or international

---

[25]    ATFY06-002, Oct. 14, 2005 FOIA Request from Stolt-Nielsen, Exhibit N.

[26]    ATR-2012-2014, 2015-2018, 2023-2025, 4611-4616, and 4617-4621.

investigations and admit having violated the Sherman Act out of concern for reputation and

retribution by former coconspirators and damaged relations with customers.    Accordingly,

confidential treatment of their identities and information they provided is crucial.    As Mr.

Hammond explained in his declaration:

> [T]he Division concluded long ago that confidential treatment of amnesty applications is crucial.  In . . . speeches regarding the application of the amnesty program, the Division has emphasized the confidentiality of the amnesty program.  The Division 'holds the identity of amnesty applicants in strict confidence, much like the treatment afforded to confidential informants [and] [t]herefore, . . . will not publicly disclose the identity of an amnesty applicant, absent prior disclosure by the applicant, unless required to do so by court order in connection with litigation.'[27]  Moreover, amnesty negotiations are conducted with the express understanding that those negotiations and the information provided by the applicant will remain confidential, even after the investigation at issue is closed.  Even after an investigation is closed, confidential informants pursuant to the leniency program maintain an interest in keeping their identities and the information they disclose confidential due to fear of retribution by former coconspirators they implicated and damaged relations with customers.  Moreover, with respect to amnesty applications for international conspiracies, given that some foreign governments do not have statutes of limitations for cartel offenses and thus the applicant's foreign exposure remains, this continued confidentiality is particularly important.  Many leading members of the private antitrust bar who represent amnesty applicants have advised me that the Division's promise of confidentiality is a critical, and in some cases determinative, factor that companies rely upon in making a decision whether to self report pursuant to the Division's amnesty program.

(Hammond decl. ¶ 9, Exhibit B.)

---

[27]

Gary R. Spratling, Deputy Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, The Corporate Leniency Policy: Answers to Recurring Questions at 11, Speech Before ABA Antitrust Section's 1998 Spring Meeting (Apr. 1, 1998), available at: http://www.usdoj.gov/atr/public/speeches/1626.htm.

With respect to communications with foreign governments, Stolt-Nielsen, in its Fourth and Tenth FOIA Requests, seeks communications between Division officials and foreign governments that are members of the International Competition Network (ICN).[28]  The requests seek not only public speeches and presentations at ICN conferences, but also all communications, including e-mails, facsimiles, and other documents, between Division officials and ICN members relating to any investigation of Stolt-Nielsen or the parcel tanker industry.  The Division has released at least one ICN speech, planning e-mails among panelists at an ICN conference, and press releases or links to press releases provided to foreign enforcers.[29]  The Division has withheld documents relating to private investigative consultations with specific foreign enforcers regarding the investigation of Stolt-Nielsen or the parcel tanker shipping industry due to the need to maintain the confidentiality of those communications.  Multiple foreign antitrust agencies who are ICN members are also investigating Stolt-Nielsen and the parcel tanker industry.  The consultations that the Division had with specific foreign enforcers about the investigation of Stolt-Nielsen and the parcel tanker industry were conducted in confidence, to assist one another in such investigation, and for the common goal of investigating, prosecuting, punishing, and deterring cartel activity. (Hammond decl. ¶ 19, Exhibit B.)

Mr. Hammond explains that companies seeking corporate amnesty would not disclose their knowledge about and/or participation in a Sherman Act violation absent the expectation of confidential treatment for information disclosed to the government.  As Mr. Hammond further

---

[28]    ATFY05-088 and ATFY06-026, June 24, 2005 and Dec. 7, 2005 FOIA requests from Stolt-Nielsen, Exhibits J and P.

[29]    ATR-84-91, 2384-90, 2392-96, and 2482-84.

explained, "If amnesty letters were publicly available pursuant to FOIA, such a disclosure obligation could reasonably be expected to have a negative effect on the perception of the amnesty program. Amnesty applicants could perceive that the amnesty application process is no longer confidential, and hence the disclosure obligation would have a chilling effect on amnesty applications in both domestic and international investigations. Due to the importance of the Division's amnesty program, such a disclosure obligation could interfere with the Division's anti-cartel enforcement program, including both ongoing and prospective enforcement proceedings." (Hammond decl. ¶ 11, Exhibit B.) Disclosure of information in amnesty agreements could chill cooperation from applicants and interfere with current investigations by disclosing confidential information provided by the applicants and the applicants' status as confidential informants. Public disclosure could also discourage future amnesty applications in both ongoing and prospective investigations. Likewise, Mr. Hammond explained that "[t]o effectively investigate and prosecute international cartels, governments need to be able to communicate freely on investigative and prosecutorial issues regarding the cartels, whether in writing or verbally, without a concern that such communications could be publicly disclosed" and disclosure of communications with foreign authorities regarding the investigation of Stolt-Nielsen and the parcel tanker industry "could have a chilling effect on the investigations at issue, the willingness of foreign governments to communicate with the Division regarding other specific investigations[30] in the future, and hence the Division's international anti-cartel enforcement efforts in general." (Hammond decl. ¶ 18-19, Exhibit B.) Without the amnesty program and cooperation from foreign authorities, numerous cartels

---

[30]Mr. Hammond noted that the Division has over 60 grand jury investigations of international cartel behavior. (Hammond decl. ¶ 3, Exhibit B.).

would go undetected and unpunished and large numbers of consumers would be harmed by this egregious activity.

The Agency has withheld law enforcement records under Exemption 7(A) as listed in paragraph 38 of the Richards declaration, Exhibit A, and as referenced in the two amended *Vaughn* Indexes. The amended *Vaughn* Indexes provide a complete description of the types of documents withheld under 7(A), the disclosure of which would interfere with law enforcement proceedings. The pleadings, together with the Richards and Hammond declarations, describe the Division's ongoing criminal and civil litigation with Stolt-Nielsen, and prospective and preventative law enforcement efforts concerning illegal cartel activity. The Richards and Hammond declarations also articulate the harm that would result were it ordered to release confidential law enforcement records, including destruction or alteration of evidence (Richards decl. ¶ 37, Exhibit A), and witness intimidation, (Richards decl. ¶ 37, Exhibit A). Release would provide potential defendants with insights into the Division's strategy and the strength of its position, (Richards decl. ¶ 37, Exhibit A), chill necessary investigative communications with foreign governments (Hammond decl. ¶¶ 18-19, Exhibit B), and have a chilling effect on amnesty applicants. (Hammond decl. ¶¶ 9-11, Exhibit B).

6. *Confidential Sources - Exemption 7(D)*

Exemption 7(D) of the FOIA protects:

records or information compiled for law enforcement purposes [which] could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record or information compiled by a criminal law enforcement authority in the course of a criminal investigation or by an agency conducting a lawful national security intelligence investigation, information furnished by a confidential source.

5 U.S.C. § 552 (b)(7)(D).   Its purpose "is to keep open the Government's channels of confidential information."  *Birch v. United States Postal Serv.*, 803 F.2d 1206, 1212 (D.C. Cir. 1986).  Successful law enforcement investigations depend on information provided by individuals who may be exposed to relentless harassment and possible harm if their identities and the information they provided are revealed.  *Gula v. Meese*, 699 F. Supp. 956, 960 (D.D.C. 1988); *Duffin v. Carlson*, 636 F.2d 709, 712-13 (D.C. Cir. 1980).  Exemption 7(D) not only protects obviously identifying information, such as an informant's name and address, but also all information which would reveal the source's identity.  *See Stone v. Defense Investigative Serv.*, 816 F. Supp. 782, 788 (D.D.C. 1993) (protecting information that "was 'so singular that to release it would likely identify the individual, particularly to a knowledgeable party'").  Additionally, in order to prevent indirect source identification, even the name of a third party who is not a confidential source, but who acted as an intermediary for the source in his/her communications with the agency, can be withheld.  *Birch*, 803 F.2d at 1212.  Moreover, to protect the free flow of information from confidential sources, all information provided by a confidential source is protected from disclosure under the second prong of Exemption 7(D), even if the information is not source-identifying.  *Irons v. FBI*, 880 F.2d 1446, 1448 (1st Cir. 1989); *Duffin*, 636 F.2d at 712-13.  In order to invoke Exemption 7(D), an agency must show either that a source provided  information to it under express assurances of confidentiality or that circumstances support an inference of confidentiality.  *United States Department of Justice v. Landano*, 508 U.S. 165 (1993).  In this case, amnesty applicants are given express assurances of confidentiality.  With regard to correspondence with foreign governments, circumstances support an inference of confidentiality.

It is easy to see how confidential sources of information, domestic and foreign, might be harmed by the disclosure of their identities and the information they provided. A source, such as an amnesty applicant, providing confidential information regarding his or its own criminal activity or the activity of others could be subject to retaliation by customers or coconspirators. In addition, the law enforcement efforts of cooperating foreign governments could be stymied if the Agency were ordered to release the identities of sources and the substance of the information provided by the confidential source.

The Antitrust Division investigates and prosecutes criminally cartel activity, such as price-fixing, bid-rigging and market allocation agreements. (Hammond decl. ¶ 2, Exhibit B.) Increasingly due to globalization of the U.S. economy, cartel activity affecting consumers in the United States takes place in other countries. *Id.* ¶ 3. The interests of the Agency coincide with the interests of foreign governments in rooting out cartel activity. *Id.* ¶¶ 16-17. These combined interests have led to a cooperative exchange of information and coordination of investigative activities between the Division and foreign law enforcement governments and agents. *Id.* ¶¶ 5, 16-17. The Division receives information and tips from foreign officials including ICN members about cartel activity. *Id.* ¶¶ 5, 17-19.

The Division relies heavily upon confidential information as the basis for its law enforcement efforts directed to cartel activity. If the Division were forced to disclose this exchange of confidential information, it anticipates that foreign governments and confidential sources would simply not provide the information given the consequences that could result were their identities or the information provided disclosed. Even if the identities of the sources were protected, and the substance of the communications disclosed, the Division anticipates

that these sources would still be reluctant to voluntarily provide information for fear that disclosure of the information itself would reveal their identities, would lead to the discovery of their identities,  would lead to retaliation for the information provided, or in the case of information from foreign antitrust officials, would lead to interference with investigations.  The Division anticipates that without the free exchange of confidential information its hugely successful law enforcement efforts directed at cartel activity will be drastically curtailed.

Here, as noted above, Stolt-Nielsen has requested documents concerning communications with ICN members, including public speeches and presentations at ICN conferences as well as private communications relating to any investigation of Stolt–Nielsen or the parcel tanker industry.  (Hammond decl. ¶ 19, Exhibit B.)  The Division has withheld documents relating to private communications with foreign enforcers regarding the investigation of Stolt-Nielsen or the parcel tanker shipping in order to maintain the confidentiality of those communications.  *Id.*  These communications were intended to be confidential for the common goal of investigating cartel activity.  *Id.*  Disclosure of these communications would interfere with the ongoing criminal investigation of Stolt-Nielsen and the parcel tanker industry and would greatly reduce the likelihood that such exchanges will occur in the future.  *Id.*  The records that have been withheld  in full or in part pursuant to Exemption 7(D) are listed in paragraph 40 of the Richards declaration, Exhibit A, and are described in the amended 2005 and 2006 *Vaughn* Indexes.

### III.  <u>CONCLUSION</u>

For the reasons set forth above, the Court should grant defendant's Motion for Summary Judgment pursuant to FED. R. CIV. P. 56.

Respectfully submitted,


_____

KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney


_____

RUDOLPH CONTRERAS
D.C. Bar No. 434122
Assistant U.S. Attorney


_____

CHARLOTTE A. ABEL
D.C. Bar No. 388582
Assistant U.S. Attorney
Civil Division
555 Fourth Street, NW
Washington, D.C. 20530
(202) 307-2332