UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Stolt-Nielsen Transportation Group Ltd., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-2217 (RJL) |
| | ) |
| United States of America, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |
| | ) |
| Stolt-Nielsen Transportation Group Ltd., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 06-0474 (RJL) |
| | ) |
| United States Department of Justice, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

1.  The Antitrust Division of the U.S. Department of Justice is responsible for enforcing the federal antitrust laws and serving as the Federal Government's principal analyst of, and advocate for, competition policy.  (Richards decl. ¶ 3, Exhibit A[1].)

2.  Antitrust enforcement, which constitutes the principal function of the Division, involves investigating possible antitrust violations, conducting grand jury proceedings, preparing and trying antitrust cases, prosecuting appeals, and negotiating and enforcing final judgments.

---

[1]    All exhibit references in this Statement of Material Facts Not In Dispute refer to exhibits to the Memorandum Of Points And Authorities In Support Of Defendant's Motion For Summary Judgment.

(Richards decl. ¶ 3, Exhibit A.)

3.  It is the Division's policy to proceed by criminal investigation and prosecution in cases involving horizontal, *per se* unlawful agreements such as price fixing, bid rigging and horizontal customer and territorial allocations.  If proved, such activities violate Section 1 of the Sherman Act, 15 U.S.C. § 1.  When allegations of such offenses are brought to the attention of the Division, which occurred with regard to plaintiff, a grand jury is convened.  (Richards decl. ¶ 4, Exhibit A.)

4.  Cartels inflate prices, limit supply, lessen innovation, and inhibit efficiency, undermining the free enterprise system.  Due to the pernicious effect of cartels on competition and their lack of redeeming economic value, anti-cartel enforcement is the Division's highest enforcement priority and has been described as the "core antitrust mission."  (Hammond decl. ¶ 2, Exhibit B.)

5.  Beginning in the 1990's, the Division began to place a particular emphasis on the investigation and prosecution of international cartels, such as the parcel tanker shipping conspiracy at issue in the grand jury investigation underlying plaintiff's twelve FOIA requests that are the subject of this action.  This new emphasis was due to the increasing globalization of the U.S. economy and the resulting increased opportunities for the formation and success of international cartels targeting U.S. businesses and consumers.  (Hammond decl. ¶ 3, Exhibit B.)

6.  The Division has uncovered international cartels which have held cartel meetings in more than 100 cities and 35 countries around the world.  The Division has prosecuted corporations based in multiple foreign countries, including Belgium, Germany, Japan, Korea, Liechtenstein, Luxembourg, the Netherlands, Norway, Switzerland, and the United Kingdom,

2

and foreign individuals from Austria, Belgium, Canada, France, Germany, Italy, Japan, Korea, Mexico, the Netherlands, Norway, Sweden, Switzerland, and the United Kingdom.  Today, the Division's enforcement efforts against international cartels continue to be the highest priority of its criminal enforcement program, with over 60 sitting grand juries investigating international cartel behavior.  (Hammond decl. ¶ 3, Exhibit B.)

7.  When the Division began investigating international cartels, it faced enormous obstacles in obtaining the evidence necessary to prosecute the cartels.  Key evidence of such cartels was often beyond the Division's jurisdictional reach and foreign governments were reluctant to assist the Division in obtaining evidence in cartel investigations.  (Hammond decl. ¶ 4, Exhibit B.)

8.  As the Division began to devote more resources to the investigation and prosecution of international cartels, two key factors contributed to the Division's increasing ability to obtain evidence of international cartels and to prosecute the cartels successfully.  First, the cooperation of cartel insiders pursuant to the Division's Corporate Leniency Policy, cracked many international cartels.  Second, the Division developed strong cooperative relationships with foreign authorities that resulted in critical coordination and assistance from foreign authorities. (Hammond decl. ¶ 5, Exhibit B.)

9.  The Division has a Corporate Leniency Program pursuant to which a cartel member admits its participation in a criminal antitrust violation and cooperates in the Division's investigation of its coconspirators in return for protection from criminal conviction, fines, and jail terms for its employees.  The leniency, or amnesty, program has been a key part of the success of the Division's international anti-cartel enforcement program and is the Justice

3

Department's most successful voluntary disclosure program.  Confidentiality is a key component of the amnesty program's success.  (Hammond decl. ¶ 6-7, Exhibit A.)

10.  The Division's Corporate Leniency Policy, the current form of which was adopted in August 1993, provides amnesty for the first domestic or international company in a cartel that comes forward, admits its participation in a cartel, provides full cooperation with the Division's investigation of other corporate and individual conspirators, and meets the other stated requirements of the policy.  If the applicant and its cooperating executives qualify for amnesty, they will avoid criminal convictions, fines, and jail terms for the cartel offense.  After the current leniency policy was introduced in 1993, the number of companies seeking amnesty substantially increased, and cooperation of applicants under the current amnesty program has advanced the majority of the Division's international cartel investigations.  (Hammond decl. ¶ 6, Exhibit B.)

11.  Because cartels operate in secret, obtaining the cooperation of insiders is the best and frequently the only way to break open a cartel.  Obtaining such cooperation can lead to the termination of cartels, conviction of coconspirators, and recovery of damages by victims; can shorten an investigation by months or years; and can conserve scarce government resources. (Hammond decl. ¶ 7, Exhibit B.)

12.  The amnesty program is the Division's most effective generator of international cartel cases.  The success of the Division's Corporate Leniency Policy has led to the development of leniency programs by foreign governments around the world.  The Division has advised a number of foreign governments in the drafting and implementation of effective leniency policies. The convergence in the requirements of amnesty policies of different governments has led amnesty applicants to report their conduct to multiple jurisdictions simultaneously, which has

provided opportunities for coordinated investigative activities such as searches, interviews, and the service of subpoenas.  This convergence has strengthened anti-cartel enforcement in the United States and abroad.  Prior to this convergence in leniency programs, many amnesty applicants were deterred from applying for amnesty in one jurisdiction if they had greater exposure in another jurisdiction which had an ineffective amnesty program.  Thus, the efficient functioning of an amnesty program in one jurisdiction affects the efficient functioning of amnesty programs in other major jurisdictions.  (Id.)

13.  To promote understanding of the leniency program, the Division has given speeches and participated in numerous panel discussions explaining the program and answering questions generated by the program.  The antitrust defense bar's recognition of the value of the program has been critical to the success of the program and the willingness of companies to apply for leniency.  (Hammond decl. ¶ 8, Exhibit B.)

14.  In spite of the benefits of amnesty to corporations and their employees, companies are reluctant to come forward and admit their involvement in a cartel, whether domestic or international.  Among the reasons for the reluctance are fear of retribution by former coconspirators and concern over damaged relations with customers.  Accordingly, the Division concluded long ago that confidential treatment of amnesty applications is crucial.  In its speeches regarding the application of the amnesty program, the Division has emphasized the confidentiality of the amnesty program.  The Division "holds the identity of amnesty applicants in strict confidence, much like the treatment afforded to confidential informants [and] [t]herefore, . . . will not publicly disclose the identity of an amnesty applicant, absent prior disclosure by the

5

applicant, unless required to do so by court order in connection with litigation."[2]  Moreover, amnesty negotiations are conducted with the express understanding that those negotiations and the information provided by the applicant will remain confidential, even after the investigation at issue is closed.  Many leading members of the private antitrust bar who represent amnesty applicants have stated that the Division's promise of confidentiality is a critical, and in some cases determinative, factor that companies rely upon in making a decision whether to self report pursuant to the Division's amnesty program.

 (Hammond decl. ¶ 9, Exhibit B.)

15.    In this FOIA action, Stolt-Nielsen has requested a copy of every amnesty agreement entered by the Antitrust Division over the last thirteen years since the revision of the amnesty program in August 1993, a request which involves roughly one hundred grand jury investigations and roughly one hundred amnesty letters.  (ATFY06-002, Oct. 14, 2005 FOIA Request from Stolt-Nielsen; Hammond decl. ¶ 11, Exhibit B.)

16.    If amnesty letters were publicly available pursuant to FOIA, such a disclosure obligation could reasonably be expected to have a negative effect on the perception of the amnesty program.  Amnesty applicants could perceive that the amnesty application process is no longer confidential, and hence the disclosure obligation would have a chilling effect on amnesty applications in both domestic and international investigations.  Due to the importance of the Division's amnesty program, such a disclosure obligation could reasonably be expected to

---

[2]        Gary R. Spratling, Deputy Ass't Att'y Gen., Antitrust Div., U.S. Dep't of Justice, The Corporate Leniency Policy: Answers to Recurring Questions at 11, Speech Before ABA Antitrust Section's 1998 Spring Meeting (Ap. 1, 1998), *available at* http://www.usdoj.gov/atr/public/speeches/1626.htm.

interfere with the Division's anti-cartel enforcement program, including both ongoing and prospective enforcement proceedings.  (*Id.*)

17.  In recognition of the enormous harm caused by cartels and their lack of redeeming value, over the last several years, governments around the world have stepped up their own enforcement efforts against cartels.  Today many antitrust enforcers in multiple jurisdictions know each other and are searching for better ways to cooperate with each other.  It is now no longer uncommon for foreign authorities to provide investigative assistance to the Division and for the Division and foreign authorities to discuss investigative strategies and to coordinate the timing of searches, service of subpoenas, and drop-in interviews to avoid the premature disclosure of an investigation and the destruction of evidence.  (Hammond decl. ¶ 17, Exhibit B.)

18.  It is vital that the cooperative relations that the Division and foreign governments have worked diligently to develop and maintain continue in order for governments to be able to effectively investigate and prosecute international cartels.  The Division and foreign governments communicate with, and provide advice to, one another regarding investigative and prosecutorial issues in specific investigations with an understanding of confidentiality.  In these communications, the Division and foreign enforcers are pursuing the common goal of investigating, prosecuting, punishing, and deterring cartel activity.  Public disclosure of such communications could have an adverse effect on the specific investigation at issue, as well as on enforcement efforts in general and the willingness of foreign governments to engage in such communications in other investigations, whether current or future.  To effectively investigate and prosecute international cartels, governments need to be able to communicate freely on investigative and prosecutorial issues regarding the cartels, whether in writing or verbally,

without a concern that such communications could be publicly disclosed.  (Hammond decl. ¶ 18, Exhibit B.)

19.  Stolt-Nielsen has submitted two FOIA requests (fourth and tenth requests as detailed below) relating to the Division's communications with members of the International Competition Network (ICN).  The requests ask not only for public speeches and presentations at ICN conferences, but also ask for all communications, including e-mails, facsimiles, and other documents, between Division officials and ICN members relating to any investigation of Stolt-Nielsen or the parcel tanker industry.  (Exhibits J and P.)

20.  The Division has withheld documents relating to private communications with specific foreign enforcers regarding the investigation of Stolt-Nielsen or the parcel tanker shipping industry due to the need to maintain the confidentiality of those communications.  Some of these communications are official notifications regarding the parcel tanker investigation that were made to specific governments with common interests in combating cartels, and the disclosure of such communications could interfere with the investigation, could invade individuals' privacy rights, and would reveal information protected from disclosure to others by Federal Rule of Criminal Procedure 6(e).  In addition, the Division has withheld documents relating to investigative consultations with specific foreign enforcers relating to the parcel tanker investigation.  Multiple foreign antitrust agencies who are ICN members are also investigating Stolt-Nielsen and the parcel tanker industry.  Consultations that the Division had with specific foreign enforcers about the investigation of Stolt-Nielsen and the parcel tanker industry were conducted in confidence, to assist one another in such investigation, and for the common goal of investigating, prosecuting, punishing, and deterring cartel activity.  (Hammond decl. ¶ 19,

Exhibit B.)

21.  Between June 3, 2005 and January 26, 2006, while both the grand jury investigation of the parcel tanker industry and the related leniency litigation continued, plaintiff submitted the twelve FOIA requests at issue in this action to obtain documents for its leniency litigation against the government.  Plaintiff's Response to Defendants Motion to Consolidate at 2, <u>Stolt-Nielsen Transportation Group Ltd. v. U.S.</u>, Civil Action No. 05-2217 (filed May 25, 2006).

(Richards decl. ¶ 8, Exhibit A.)

22.  <u>Request ATFY05-071.</u>  Defendant received plaintiff's first two FOIA requests on June 3, 2005.  The first, ATFY05-071 (Exhibit G), sought:

> [A]ny and all internal memoranda or notes related to a December 4, 2002 meeting between Antitrust Division officials and John Nannes relating to SNTG's application to, and participation in, the Antitrust Division's Amnesty Program.

(Richards decl. ¶ 9, Exhibit A.)

23.  <u>Request ATFY05-072.</u>  Plaintiff's second request, also submitted on June 3, 2005, ATFY05-072 (Exhibit H) requested:

> [C]opies of, and notes related to, the following speeches given by Scott Hammond, Deputy Assistant Attorney General and [formerly the] Director of Criminal Enforcement [3]: (1) In Las Vegas, Nevada during the 19th Annual National Institute on White Collar Crime 2005, on March 3-4, 2005; (2) At the Spring 2005 American Bar Association Antitrust Section Meeting, on March 30 - April 1, 2005; (3) At the Langdon Hall 2005 Competition Law and Policy Invitational Forum in Canada on May 6, 2005; and (4) Any other public speeches or presentations in which Mr. Hammond discussed the Antitrust Division's pending action(s) against SNTG. . . .

---

[3]    Mr. Hammond was appointed Deputy Ass't Att'y Gen. in charge of criminal litigation in January 2005.

> [A]ny drafts of <u>The Curious Case of Stolt-Nielsen, S.A. v. United States</u>*/ and any comments, notes or other documents relating to this article that were prepared by any Antitrust Division employees, whether located in Washington, D.C. or the Antitrust Division's Philadelphia Field Office.
>
> */      Jim Walden and Kristopher Dawes, *The Curious Case of Stolt Nielsen, S.A. v. United States*, The Antitrust Source (March 2005).

(Richards decl. ¶ 10, Exhibit A.)

24. <u>Request ATFY05-080</u>.  On June 13, 2005 the Division received a third FOIA request, ATFY05-080 (Exhibit I), in which plaintiff requested:

> [A]ny and all documents relating to the opening of the antitrust investigation of the parcel tanker industry in November 2002, including but not limited to documents and information specifically relating to the following: (1) The article, '*Stolt-Nielsen Is Probed For Traffic With Iran*,' published in the *Wall Street Journal**/*; (2) The request to open an investigation by the Philadelphia Field Office of the Antitrust Division, including but not limited to the Preliminary Inquiry Request Memorandum and any memoranda to the Federal Bureau of Investigation requesting assistance; and (3) Any documents memorializing actions taken by the Antitrust Division in opening such investigation.
>
> **/      James Bandler & John McKinnon, *Stolt-Nielsen Is Probed For Traffic With Iran*, Wall St. J., Nov.22, 2002, at A3.

(Richards decl. ¶ 11, Exhibit A.)

25. <u>Request ATFY05-088.</u>  Two weeks later, on June 27, 2005, the defendant received a fourth FOIA request, ATFY05-088 (Exhibit J), seeking:

> [A]ny and all materials relating to presentations or communications by, or involving, officials of the Antitrust Division to the International Competition Network ('ICN') regarding any investigation of SNTG or the parcel tanker industry, or to the revocation of amnesty related to SNTG, including but not limited to:  1.  Presentations, speeches and discussions made to the ICN by any Antitrust Division officials or

10

any other ICN member relating to any SNTG investigation or to the
SNTG amnesty revocation; 2. Electronic mail or facsimile
communications between Antitrust Division officials and ICN
members relating to any SNTG investigation or to the SNTG amnesty
revocation; and 3. Any documents in the possession of the Antitrust
Division or its officials memorializing communications,
correspondence, presentations, meeting minutes or agenda relating to
any SNTG investigation or to the SNTG amnesty revocation with ICN
members.

(Richards decl. ¶ 12, Exhibit A.)

26. <u>Request ATFY05-113</u>. Two months later, on August 23, 2005, defendant received a

fifth FOIA request, ATFY05-113 (Exhibit K) seeking:

> [A]ny and all correspondence between Antitrust Division officials and
> Jim Walden and/or Kristopher Dawes of O'Melveny & Myers LLP
> related to the antitrust investigation into the parcel tanker industry,
> particularly relating to the article by Mr. Walden and Mr. Dawes.***/
>
> ***/    Jim Walden and Kristopher Dawes, *The Curious Case of
> Stolt-Nielsen v. United States*, The Antitrust Source (March 2005).

(Richards decl. ¶ 13, Exhibit A.)

27. <u>Request ATFY05-131</u>. The following month, on September 20, 2005, the defendant

received a sixth FOIA request, ATFY05-131(Exhibit L), seeking:

> [A]ny and all documents that reflect, memorialize, embody or contain
> communications to or from (1) the press, including trade press, (2) bar
> associations, or (3) any other external communications with individuals
> uninvolved in the litigation with SNTG or the investigation into the
> parcel tanker industry regarding SNTG or the investigation into the
> parcel tanker industry. In particular, SNTG requests (a)
> communications to or from James Bandler of the Wall Street Journal,
> (b) communications to or from reporter(s) at the Tradewinds
> publication, and (C) internal Department circulation of press stories
> regarding SNTG or the investigation into the parcel tanker industry.

(Richards decl. ¶ 14, Exhibit A.)

28.  Request ATFY06-003.  On October 14, 2005 the defendant received two more FOIA

requests.  In ATFY06-003 (Exhibit M), plaintiff requested:

> [A]ny and all documents that reflect, memorialize, embody or contain
> communications regarding the investigation into the parcel tanker
> industry, to or from.  (1) David S. Golub; (2) Jonathan M. Levine; (3)
> James M. Griffin, following his departure from the Antitrust Division in
> December 2004; and (4) Donald I. Baker, the author of a September 26,
> 2005 article in the *Legal Times* entitled True Confessions.

(Richards decl. ¶ 15, Exhibit A.)

29.  Request ATFY06-002.  ATFY06-002 (Exhibit N), received on October 14, 2005, sought

"any and all amnesty agreements entered into by the Antitrust Division from August 1993 to the

present."  (Richards decl. ¶ 16, Exhibit A.)

30.  Request ATFY06-019.  On November 9, 2005 the defendant received a ninth

request, ATFY06-019 (Exhibit O), seeking:

> [C]opies of speeches, speech outlines, audio or video recordings of
> speeches including audio tapes, video tapes, CD-ROM or DVDs,
> program materials announcing the speaking event, notes of any DOJ
> participant at a speech, emails relating to speeches, and any other
> documents related to any speeches (collectively "speeches and speech-
> related materials") by an Antitrust Division official, which discusses in
> any way SNTG, SNTG's status in the Division's Amnesty Program, the
> circumstances and rationale for the Division's attempted withdrawal of
> amnesty from SNTG, and/or the Antitrust Division's litigation with
> SNTG over SNTG's amnesty status in the Eastern District of
> Pennsylvania and the appeal to the Third Circuit and/or the
> investigation into SNTG (the "SNTG matters").  In particular, SNTG
> requests material related to:  (1) Any speeches and speech-related
> materials relating to speeches relating to the SNTG matters by Scott D.
> Hammond, Deputy Assistant Attorney General and Director of Criminal
> Enforcement, from June 2, 2005 (the date of SNTG's prior FOIA
> request, assigned control number ATFY05-072) to the present,
> including but not limited to the speeches given by Mr. Hammond (a) in
> New York City on September 14, 2005, and (b) in Brussels, Belgium on
> October 26, 2005; and (2) Any public speeches and speech-related

materials relating to speeches given by any other Antitrust Division official concerning the SNTG matters, including but not limited to Lisa Phelan (currently Chief, National Crime Enforcement Division), from March 1, 2004 to the present.

(Richards decl. ¶ 17, Exhibit A.)

31.  Request <u>ATFY06-026</u>.  On December 7, 2005 the plaintiff submitted its tenth FOIA request, ATFY06-026 (Exhibit P), seeking:

> [A]ny and all materials relating to communications, presentations or speeches by any Antitrust Division official, which discuss in any way SNTG, SNTG's status in the Division's Amnesty Program, the circumstances and rationale for the Division's attempted withdrawal of amnesty from SNTG, and/or the Antitrust Division's litigation with SNTG over SNTG's amnesty status in the Eastern District of Pennsylvania and the appeal to the U.S. Court of Appeals for the Third Circuit and/or the investigation into SNTG (the "SNTG matters") by officials of the Antitrust Division to the participants in the International Competition Network ("ICN").  The request includes, but is not limited to:  1.  Presentations, speeches and discussions ("speeches"), including copies of speeches, PowerPoint slides, speech outlines, audio or video recordings of speeches including audio tapes, video tapes, CD-ROM or DVDs, notes of any DOJ participant at a presentation or speech, email communications, and any other documents related to any speeches (collectively "speeches and speech-related materials") made to the ICN by any Antitrust Division officials or any other ICN member relating to the SNTG matters; 2.  Electronic mail or facsimile communications between Antitrust Division officials and ICN members relating to the SNTG matters; and 3.  Any documents within the possession or control of the Antitrust Division or its officials memorializing communications, correspondence, presentations, meeting minutes or agenda relating to the SNTG matters with ICN members.

(Richards decl. ¶ 18, Exhibit A.)

32.  Request <u>ATFY06-038</u>.  On January 24, 2006 the defendant received plaintiff's eleventh request, ATFY06-038 (Exhibit Q), seeking:

[C]opies of speeches, speech outlines, audio or video recordings of
speeches including audio tapes, video tapes, CD-ROM or DVDs,
program materials announcing the speaking event, notes of any DOJ
participant at a speech, emails relating to speeches, and any other
documents related to any speeches (collectively "speeches and speech-
related materials") by any Antitrust Division official, which discusses in
any way SNTG, SNTG's status in the Division's Amnesty Program, the
circumstances and rationale for the Division's attempted withdrawal of
amnesty from SNTG, and/or the Antitrust Division's litigation with
SNTG over SNTG's amnesty status in the Eastern District of
Pennsylvania and the appeal to the Third Circuit and/or the
investigation into SNTG (the "SNTG matters").  In particular, SNTG
requests material related to:  (1) Any speeches and speech-related
materials related to speeches relating to the SNTG matters by Scott D.
Hammond, Deputy Assistant Attorney General and Director of Criminal
Enforcement, from November 9, 2005 (the date of SNTG's prior FOIA
request, assigned control number ATFY06-019) to the present,
including but not limited to the speech given by Mr. Hammond at the
National Press Club in Washington, D.C. on November 16, 2005; and
(2) Any public speeches and speech-related materials relating to
speeches given by any other Antitrust Division official concerning the
SNTG matters, including but not limited to Lisa Phelan (currently
Chief, National Crime Enforcement Division), from March 1, 2004 to
the present.

(Richards decl. ¶ 19 Exhibit A.)

33.  Request <u>ATFY06-040</u>.  On January 26, 2006, plaintiff submitted its twelfth request,

ATFY06-040 (Exhibit R), seeking:

[A]ny and all documents that reflect, memorialize, embody, or contain
communications regarding the investigation into the parcel tanker
industry, to or from: (1)  Any attorney with St. Martin & Williams,
including but not limited to Conrad S.P. "Duke" Williams III; and (2)
Any attorney with Kasowitz, Benson, Torres & Friedman LLP,
including but not limited to:  (I) Hector Torres: (ii) Harold G. Levinson;
or (iii) Gary W. Dunn.[4]

(Richards decl. ¶ 20, Exhibit A.)

---

[4]        On March 24, 2006 and June 20, 2006, defendant received two additional FOIA
requests from plaintiff which are not the subject of this action.

34.  As is done with all FOIA requests, plaintiff's requests were assigned to one of the paralegal specialists in the Unit.  Wayne Foster is a paralegal specialist who has processed FOIA requests in the Division's FOIA Unit for nine years.  All of the requests were assigned to him as they were received. He began his search for responsive documents by searching the Division's computerized records index which contains information about each matter currently or formerly under investigation.  The system may be searched by the name of a company, the name of an individual, or an industry code.  The index revealed an open investigation and litigation relating to the plaintiff that was assigned to the Philadelphia Field Office.  Mr. Foster, accordingly, contacted that section, asking its Chief, Robert Connolly, to search for the records responsive to plaintiff's first two requests, ATFY05-071 and ATFY05-072.  At approximately the same time, he contacted Mr. Hammond's office to obtain any responsive material.  The Philadelphia Field Office and Mr. Hammond's office searched for the material requested, locating a small number of responsive documents.  Each time the defendant received another request from plaintiff, Mr. Foster contacted Mr. Connolly and Mr. Hammond's offices to have their offices search for documents responsive to the most recent request.  Given the time between plaintiff's requests, the Philadelphia Field Office conducted, in all, ten separate time consuming searches for responsive information.  Mr. Hammond's office conducted a similar number of searches.  Ultimately, the Division's AAG's and DAAG's offices, Appellate and Foreign Commerce Sections, and all Division criminal sections were contacted for responsive material and conducted searches.  (Richards decl. ¶ 21, Exhibit A.)

35.  Upon receipt of records located in response to the requests, Mr. Foster reviewed carefully each document to determine whether it was responsive to one or more of the FOIA requests and set

aside those that were not.  That accomplished, he re-reviewed each page to determine its public

availability under the FOIA.  Documents exempt in their entirety were so marked.  Exempt

information in otherwise disclosable documents was bracketed for excision and the exemption

supporting the non-disclosure was noted on the page next to the redaction.[5]  Once the initial review

was complete, the documents were forwarded to the Chief of the FOIA Unit, Ann Lea Richards, for

final review.  After her review was complete, documents to be withheld were segregated and the

information marked for redaction was excised using opaque tape.  The redacted documents and

documents to be released in full were copied and produced to plaintiff.

(Richards decl. ¶ 22, Exhibit A.)

    36.  In response to plaintiff's first five requests, (Exhibits G through K), on September 13,

2005, defendant released 280 pages of documents, some of which were redacted.  Additional

documents were withheld in full.  (Exhibit S.)  (Richards decl. ¶ 23, Exhibit A.)

    37.  On January 31, 2006 defendant supplemented its September 13, 2005 response, producing,

in full, one page of an e-mail responsive to ATFY05-072 and ATFY05-113 that inadvertently had been

redacted.  (Exhibit T.)  On March 28, 2006, defendant again supplemented its September 13, 2005

response to plaintiff's requests submitted in fiscal year 2005, producing, in response to ATFY05-072,

22 additional pages in full and withholding 36 pages in their entirety.  Defendant also produced three

pages of documents responsive to ATFY05-080.  Defendant also produced, in response to plaintiff's

sixth request, AFTY05-131, 109 pages, some of which were redacted, and withheld 130 pages in their

entirety.  (Exhibit U.)  Upon further review of the documents released in its September 13, 2005

---

[5]    In some instances when a number of redactions were made pursuant to the same
exemption, only the first redaction was marked with the exemption.

production, defendant determined that 191 pages of those documents, some of which were redacted,

were also responsive to ATFY05-131.  (Richards decl. ¶ 24, Exhibit A.)

    38.  On April 27, 2006, defendant responded to all of plaintiff's fiscal year 2006 requests

(Exhibits M-R), producing a total of 261 pages of documents, some of which are redacted, and

withheld in full 1,232 pages.  Specifically, with respect to plaintiff's seventh request, ATFY06-003,

defendant produced to plaintiff 158 pages of responsive documents, some of which were redacted, and

withheld 151 pages in their entirety.   (Exhibit V.)  With respect to plaintiff's eighth  request

ATFY06-002, defendant produced to plaintiff 14 pages of responsive documents, and withheld

additional pages in their entirety.   (Exhibit W.)  With respect to plaintiff's ninth request ATFY06-019,

defendant produced to plaintiff nine pages of responsive documents, some of which were redacted, and

withheld 33 pages in their entirety.  (Exhibit X.)  With respect to plaintiff's tenth request ATFY06-

026, defendant produced to plaintiff 14 pages of responsive documents, some of which were redacted,

and withheld 154 pages in their entirety.   (Exhibit Y.)  With respect to plaintiff's eleventh request

ATFY06-038, defendant produced to plaintiff 20 pages of responsive documents.   (Exhibit Z.)  With

respect to plaintiff's twelfth request ATFY06-040, defendant produced to plaintiff 46 pages of

responsive documents, some of which were redacted, and withheld 526 pages in their entirety.

(Exhibit AA.)  (Richards decl. ¶ 25, Exhibit A.)

    39.  In processing the documents responsive to plaintiff's FOIA requests, the defendant

complied in full with the reasonable segregation requirement of the Act, 5 U.S.C. § 552 (final

sentence), which reads:  "Any reasonably segregable portion of a record shall be provided to any

person requesting such record after deletion of the portions which are exempt under this subsection."

As noted above in ¶ 35, Mr Foster reviewed each page line by line to assure himself that he was

withholding from disclosure only information exempt pursuant to the Act.  In the FOIA Unit's review of the responsive records, it also adhered to the requirement to release all reasonably segregable information contained therein.  (Richards decl. ¶ 26, Exhibit A.)

40.  In preparing the *Vaughn* Indexes, defendant Bates numbered each page of previously produced records, those released in full, those withheld in full**,** and those released in redacted form. It also Bates numbered and produced with the ATFY05 and ATFY06 *Vaughn* Indexes 94 pages responsive to the ATFY05 requests and 30 pages responsive to the ATFY06 requests that had not been produced previously.  Each document on the Amended *Vaughn* Indexes is described by the following: Bates numbers, date, author(s), recipient(s), type or style of documents, exemption(s) used, and the FOIA request(s) to which the document responds and a statement of justification for the application of each exemption.  The first index, styled Civil Action No. 05-2217 (RJL), covers plaintiff's first six FOIA requests:  ATFY05-071; ATFY05-072; ATFY05-080; ATFY05-088; ATFY05-113; and ATFY05-131 (Exhibits G through L).  The second index, styled Civil Action No. 06-0474 (RJL), covers plaintiff's FY 2006 FOIA requests:  ATFY06-003; ATFY06-002; ATFY06-019; ATFY06-026; ATFY06-038; and ATFY06-040 (Exhibits M through R).  The Bates numbers in the Amended FY2005 *Vaughn* Index are in numerical order, but they are not in the Amended FY2006 *Vaughn*.  A number of  documents are responsive to both FY 2005 and FY 2006 FOIA requests and were listed in each *Vaughn*.  When listing documents responsive to both AF 2005 and 2006 requests on the 2006 *Vaughn* Index, the numbers were no longer sequential.  In addition, attached to each Amended *Vaughn* is a list of all individuals whose name, employer and title of whose names appear in each Amended *Vaughn* Index.  (Richards decl. ¶ 27, Exhibit A.)

41.  Exemption 2, 5 U.S.C. § 552(b)(2).  Exemption 2 provides for the non-disclosure of

"matters that are related solely to the internal personnel rules and practices of an agency." The

exemption consists of two parts: (1) "internal matters of a relatively trivial nature. . . and (2) more

substantial internal matters, the disclosure of which would risk circumvention of a legal requirement."

DOJ file numbers redacted from the documents listed below are clearly trivial and have no genuine

public interest. They are, accordingly, properly withheld from disclosure pursuant to Exemption 2 of

the FOIA, 5 U.S.C. § 552(b)(2). The second category under Exemption 2 exempts from mandatory

disclosure documents relating to more substantive internal matters, such as documents that would

reveal techniques and procedures for law enforcement investigations or prosecutions, would disclose

guidelines for law enforcement investigations, or would risk circumvention of an agency statute or

impede the effectiveness of an agency's law enforcement activities. Amnesty agreements are withheld

under Exemption 2 because if disclosed, they would reveal information relating to the operation of the

Division's amnesty program, would interfere with ongoing or prospective enforcement proceedings,

and would discourage future amnesty applicants due to loss of confidentiality. Likewise, the defendant

withheld documents relating to private investigative consultations with specific foreign enforcers about

the investigation of Stolt-Nielsen or the parcel tanker industry under Exemption 2 because if disclosed,

they would reveal information relating to the operation of the Division's international anti-cartel

enforcement program, would interfere with ongoing or prospective enforcement proceedings, and

would discourage such essential communications in the future due to loss of confidentiality. The

documents withheld in full or in part pursuant to Exemption 2 are listed in paragraph 28 of the

Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

42. FOIA Exemption 3, 5 U.S.C. § 552(b)(3), authorizes withholding information that is

"specifically exempted from disclosure by statute (other than [the Freedom of Information Act]),

19

provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue." Fed. R. Crim. P. 6(e) ("Rule 6(e)") qualifies as a so-called (b)(3) statute because, although it is a rule of criminal procedure, it was specially enacted by Congress, thereby attaining the status of a statute. Rule 6(e) prohibits an attorney for the government, and others, from disclosing "matter[s] occurring before the grand jury." Grand jury secrecy is vital to the investigative function of the grand jury. Releasing information such as the identities of witnesses or jurors, the substance of testimony, or the strategy or direction of the investigation would breach grand jury secrecy, compromising the grand jury process because secrecy: (a) encourages witnesses to come forward and testify freely and honestly; (b) minimizes the risk that prospective defendants will flee or use corrupt means to thwart investigations; (c) safeguards the grand jurors and the proceedings from extraneous pressures and influences; and, (d) protects accused persons who are ultimately exonerated. Because the parcel tanker grand jury investigation is on-going, a substantial amount of information responsive to plaintiff's FOIA requests, in full or in part, is exempt pursuant to Rule 6(e)'s prohibition against disclosure of "matter[s] occurring before the grand jury." Categories of information withheld in full or in redacted form are: staff memoranda to superiors recommending the filing of indictments, informations, and/or plea agreements; the identity of witnesses before the grand jury; documents concerning grand jury testimony; pleadings concerning the grand jury filed under seal; the identity of subjects of the grand jury; documents reflecting the direction of the grand jury; documents discussing testamentary and/or document subpoenas; responses to grand jury subpoenas other than document submissions; official foreign government notifications made pursuant to limited Rule 6(e) orders; and grand jury exhibits from other investigations. The documents withheld in full or in part pursuant to Exemption 3, 5 U.S.C. § 552(b)(3), and Fed. R. Crim. P. 6(e) are listed in paragraph 29 of the

Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes. Information is also withheld in full or in part pursuant to statutes that prohibit the disclosure of confidential information other than Rule 6(e). The statute applicable here cannot be identified because to do so would disclose the very information sought to be protected by the statute. Documents from which such statutorily protected information is withheld are listed in paragraph 29 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

43. Exemption 5 authorizes the non-disclosure of "inter-agency memorandums or letters which would not be available by law to a party . . . in litigation with the agency." 5 U.S.C. § 552(b)(5). The exemption encompasses privileges commonly recognized at common law, including the attorney work-product doctrine and the deliberative process privilege. Exemption 5 also includes the efficient operations of government privilege. Each is discussed separately below. (Richards decl. ¶ 30 , Exhibit A.)

44. The attorney work-product doctrine applies to memoranda and other documents created by an attorney or his or her designee in anticipation of litigation and applies to grand jury proceedings. It covers the following: trial and grand jury preparation material, including attorneys' selection of important facts and evidence; memoranda to superiors; memoranda intended for circulation among the staff; attorneys' notes related to actual or possible witnesses; memoranda to files reflecting the author's thought processes; lists of grand jury witnesses, potential witnesses, deponents, individuals interviewed, subpoena recipients and notes concerning the foregoing; litigation related analysis, including summaries, evaluations, opinions and mental impressions concerning legal theories; drafts of the foregoing documents as well as grand jury subpoenas, document schedules, drafts of pleadings (including motions and proposed orders), internal memoranda not listed above, drafts of speeches and

press releases; and staff notes about, among other matters, meetings and telephone conversations. Documents properly withheld in full or in part pursuant to the attorney work product doctrine prong of Exemption 5 are listed in paragraph 31 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

    45.  The deliberative process prong of Exemption 5 exempts from disclosure information that is inter or intra-agency, predecisional and makes recommendations or expresses opinions on legal or policy matters.  Information subject to the privilege reflects the give and take of the consultative process.  The doctrine is designed to prevent injury to the quality of the agency decision making process by chilling employees' willingness to express frank opinions and recommendations.  (Richards decl. ¶ 32, Exhibit A.)

    46.  Information withheld pursuant to the deliberative process privilege includes analysis and conclusions of fact based upon that analysis and recommendations formulated therefrom, and staff memoranda containing recommendations to superiors.  Documents properly withheld in full or in part pursuant to the deliberative process privilege prong of Exemption 5 are listed in paragraph 33 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

    47.  The efficient governmental operations privilege is a privilege included within the civil discovery privileges incorporated into Exemption 5 of the FOIA, 5 U.S.C. § 552 (b)(5).  (Richards decl. ¶ 34, Exhibit A.)  Like other (b)(5) privileges, it is intended to ensure frank and open discussion by protecting from disclosure information obtained under a promise of confidentiality when confidentiality is necessary to ensure and/or encourage frank disclosures.  The privilege exempts, for example, information provided to the government by companies seeking corporate amnesty who would not otherwise disclose their participation in a Sherman Act violation without an expectation of

confidentiality.  It also exempts information provided in private investigative consultations with

foreign government officials because Division and foreign officials rely on the confidentiality of those

communications to effectively communicate regarding investigative and prosecutorial issues.  It is for

this reason that the privilege is recognized – without it the government would not be able to obtain

such information.  As discussed above in ¶¶ 9-10, 14 and in the Hammond declaration ¶¶ 6-11 (Exhibit

B), the Division's leniency program is the cornerstone of its international anti-cartel enforcement

program and  companies in both domestic and international investigations are willing to self-disclose

their cartel offenses to obtain the benefits of amnesty so long as their cooperation remains confidential.

In addition, as noted in the Hammond declaration ¶¶ 5, 15-19 (Exhibit B), coordination with and

assistance from foreign governments is critical in the investigation and prosecution of international

cartels, and disclosure of investigative communications with foreign governments would have a

chilling effect on investigations at issue, the willingness of foreign governments to communicate with

the Division regarding other specific investigations, and the Division's international anti-cartel

enforcement program.  Accordingly, the privilege promotes the efficient operations of the Antitrust

Division's Corporate Leniency program, a very important program that is instrumental in finding and

prosecuting criminal violations of the antitrust law, and the efficient operations of the Division's

international anti-cartel enforcement program.  Information obtained from companies and individuals

in proffers to obtain leniency and the resulting leniency agreements, as well as documents relating to

private investigative consultations with foreign governments relating to the investigation of Stolt-

Nielsen or the parcel tanker industry are covered by the privilege.  The documents withheld in full

pursuant to the efficient operations of government privilege included in Exemption 5 are listed in

paragraph 34 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006

*Vaughn* Indexes.

48.  Exemption (b)(6) protects from disclosure "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." The only information redacted pursuant to Exemption 6 is personal telephone numbers and e-mail addresses contained in the documents listed in paragraph 35 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

49.  Exemption 7 authorizes the non-disclosure of "records or information compiled for law enforcement purposes." In this case, such information falls into the following categories: information generated or obtained during the ongoing parcel tanker grand jury investigation of plaintiff and other companies and individuals; indictments and informations arising from or proposed in that investigation; the ongoing litigation concerning plaintiff's grant and subsequent removal of conditional leniency; and other grand jury investigations involving amnesty applicants. The records reside in and were located primarily in the investigative and litigative files of the Philadelphia Field Office and the Office of the Deputy Assistant Attorney General. A small number of responsive documents were located in the files of other Division criminal sections and the Division's Appellate and Foreign Commerce Sections.  (Richards decl. ¶ 36, Exhibit A.)

50.  As stated previously, the parcel tanker grand jury investigation and related litigation are ongoing.  For the reasons discussed herein, release of information not already in the public domain is likely to harm the Division's current investigation and interfere with current and prospective enforcement proceedings.  Exemption 7(A) protects from disclosure "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information (A)could reasonably be expected to interfere with enforcement proceedings."

24

Exemption 7(A) protects against such interference by the harm likely to result from the premature production of law enforcement records.  In addition to the general prejudice to the government's parcel tanker investigation and related litigation that almost certainly will result from the premature release of these records, the following additional potential sources of harm are evident:

(a)      Destruction or alteration of evidence that remains to be discovered.  Each of the categories of records described above in ¶ 49 contains information, such as allegations of illegal conduct, the direction and scope of the investigation, and the statements of witnesses, that, if disclosed prior to the appropriate point in the litigation process in a subsequent enforcement proceeding, may result in potential defendants taking steps to alter or destroy evidence.

(b)      Witness Intimidation.  Each of the categories of documents described above in ¶ 49 contains information concerning the identification of individuals and potential witnesses who possess information relevant to the investigation.  Premature release of this information could lead to the possible intimidation of, or retaliation against, those individuals.

(c)      Scope and Direction of the Investigation.  Each of the categories of documents described above in ¶ 49 contains information that, if released prematurely, could damage any case the government might bring based on the current investigation by giving potential defendants insights into the government's strategy and the strength of its position.  There is no reasonably segregable portion of any of the documents responsive to plaintiffs' request that could be released without jeopardizing the ongoing investigation.  (Richards decl. ¶ 37, Exhibit A.)

(d)      Chilling of Cooperation.  The release of documents described above in ¶¶ 15 and 29 could interfere with cooperation from amnesty applicants in ongoing investigations by disclosing confidential information provided by the applicants and the applicants' status as confidential

25

informants and discourage future amnesty applications by causing amnesty applicants to perceive that the application process is no longer confidential.  The release of documents described above in paragraph 20 relating to investigative consultations with specific foreign enforcers could have a chilling effect on the instant investigation and the willingness of foreign authorities to communicate with the Division regarding other specific investigations.

51.  The documents withheld in full or released as redacted pursuant to Exemption 7(A) are listed in paragraph 38 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

52.  Exemption 7(C) protects from disclosure "matters that . . . are records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information . . .  (C) could reasonably be expected to constitute an unwarranted invasion of personal privacy."  Exemption (7)(C)'s privacy protection is particularly applicable in investigations by criminal law enforcement agencies, which the Division is, when, as here, it is investigating activities that are charged as criminal violations of the Sherman Act.  Accordingly, defendant has withheld in full the names of persons mentioned in records of this and other investigations, including subjects and others of investigatory interest, for example, persons who are mentioned in a recommendation to file indictments or informations; home addresses of individuals; and the identity of persons who were interviewed in the course of the investigation.  There is no public interest that would be served by the release of the such information.  The documents withheld in full or released as redacted pursuant to Exemption 7(C) are listed in paragraph 39 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

53.  Exemption (b)(7)(D) protects from disclosure "records or information compiled for law

26

enforcement purposes, but only to the extent that the production of such law enforcement records or information . . . (D) could reasonably be expected to disclose the identity of a confidential source, including a State, local, or foreign agency or authority or any private institution which furnished information on a confidential basis, and, in the case of a record of information compiled by a criminal law enforcement authority in the course of a criminal investigation . . . information furnished by a confidential source." As noted in ¶¶ 3 and 49 above, the Antitrust Division is a criminal law enforcement component of the U.S. Department of Justice and compiled the information at issue in this action to investigate the parcel tanker industry and in furtherance of other grand jury investigations as is discussed above. Conviction of a criminal violation of the Act offense brings with it serious financial consequences and potential jail sentences. Many persons who provide information to the Division about conspirators engaged in criminal violations engendering such sentences are concerned that their identity and the information they provide not be revealed; companies are concerned that they will loose favor in their industry, becoming subject to retaliation by customers, competitors and others with whom they deal, while individuals are concerned that they will be subject to harassment, loss of employability and/or social stigma and foreign government sources are concerned that such disclosure would interfere with cartel investigations. Thus, many seek explicit assurances of confidentiality before sharing any information. Others assume from the circumstances that their identity and any information they impart will be held in confidence. Defendant has withheld the identity of persons and information provided by such persons under both circumstances. Such information as may exist in the documents responsive to plaintiff's requests that would identify a confidential source and information provided by the source is exempt in full from disclosure pursuant to Exemption 7(D) of the FOIA. The records withheld in full or released as redacted pursuant to Exemption7(D) are listed in

paragraph 40 of the Richards declaration, Exhibit A, and are described in the Amended 2005 and 2006 *Vaughn* Indexes.

Respectfully submitted,


_____/s/_____
KENNETH L. WAINSTEIN
D.C. Bar No. 451058
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS
D.C. Bar No. 171538
Assistant U.S. Attorney


_____/s/_____
CHARLOTTE A. ABEL
D.C. Bar No. 388582
Assistant U.S. Attorney
Civil Division
555 Fourth Street, NW
Washington, D.C. 20530
(202) 307-2332