# Exhibit 6



# DEPARTMENT OF JUSTICE

# Criminal Enforcement Of Antitrust Laws: The U.S. Model

Address by

Thomas O. Barnett
Assistant Attorney General
Antitrust Division
U.S. Department of Justice

Presented at the
Fordham Competition Law Institute's
Annual Conference on International Antitrust Law and Policy
New York, New York

September 14, 2006

**Introduction**

I am greatly honored to participate today in the Fordham Competition Law Institute's thirty-third annual Conference on International Antitrust Law and Policy.  It is a great tribute to Barry Hawk's vision and energy that this conference has thrived for so long, and that it continues to prove its usefulness year after year.

In my time with you today I will talk about the United States' experience in criminal antitrust prosecutions and highlight the characteristics of the U.S. model that I believe have led to our successes.  I will also explain why I believe that the expansion of criminal antitrust enforcement in other jurisdictions, when done well, benefits United States consumers, and I will highlight some of the excellent work that antitrust prosecutors are doing in other jurisdictions.

**I.    The U.S. Experience in Cartel Enforcement**

Our Supreme Court has accurately labeled cartels "the supreme evil of antitrust." *Verizon Communications Inc. v. Law Offices of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004). The fixing of prices, bids, output, and markets by cartels has no plausible efficiency justification; therefore, antitrust authorities properly regard cartel behavior as *per se* illegal and a "hard core" violation of the competition laws.

The United States has long experience prosecuting cartels, and its efforts have yielded solid results.  Some of those results are quantifiable:  in fiscal years 2004 and 2005, and so far in 2006, the Antitrust Division of the Department of Justice has obtained fines of $360 million, $338 million, and $473 million, respectively, and has brought criminal cases against 69 firms. Some of the results are less tangible, but no less real:  the Division has uncovered evidence that some cartelists choose to compete in the United States, even while continuing cartel behavior in other nations, due to the fear of U.S. prosecution.

The Antitrust Division's anti-cartel enforcement program has been built over many years of dedicated effort.  Based on our experience, I will discuss seven practices that have contributed to the success of the program:  (i) focus prosecutors on "hard core" collusive activity; (ii) treat cartels as serious crimes; (iii) provide an amnesty program and "amnesty plus"; (iv) vigorously prosecute obstruction of justice; (v) charge cartels in conjunction with other offenses; (vi) provide transparency and predictability; and (vii) publicize these enforcement efforts.  Together these practices serve to emphasize the importance of cartel enforcement, change the cost-benefit calculation to cause firms to avoid or withdraw from cartel activity, and draw public attention to the harm that cartels cause and the public benefits from stopping them.

I will briefly discuss each of these practices to show why we think they are so critical.

<u>First</u>, prosecutors should focus on "hard core" collusive activity.  The most important step in prosecuting cartels, and particularly in deterring them, is to make clear to all that anti-cartel enforcement should be and is a priority.  One way we have done this in the United States is by separating criminal from civil enforcement.  Creating a specialized criminal enforcement team has allowed us to attract, train, and retain people whose passion is criminal enforcement.

At the same time, the Division focuses its criminal enforcement only on hard core violations.  By focusing narrowly on price fixing, bid-rigging, and market allocations, as opposed to the "rule of reason" or monopolization analyses used in civil antitrust law, we have established clear, predictable boundaries for businesses.  This narrow focus also helps conserve prosecution and judicial resources by reducing the number of potential cases and also by reducing the complexity of proof: proving the existence of an agreement establishes the violation

without the need for the detailed economic testimony common in civil antitrust actions.

Second, the penalty for cartel violations should fit the crime. Penalties should reflect the fact that cartels inflict enormous consumer harm with no corresponding efficiency gains. Because cartelists are capable of making a cost/benefit decision that discounts a possible fine as merely a cost of doing business illegally, cartel penalties not only should be large enough to negate financial incentives to conspire, but also should include substantial jail time for responsible individuals. Nothing is a greater deterrent and nothing is a greater incentive for a cartelist, once exposed, to cooperate in the investigation of his co-conspirators than the threat of substantial incarceration in a U.S. prison. Keeping our criminal cases focused on hard core conduct that has no plausible business justification – and that usually occurs in secret, accompanied by coverups and lies – also makes judges and juries feel more comfortable in sending these defendants to jail.

Third, a criminal antitrust program should provide for an amnesty or leniency option and for "amnesty plus." Amnesty programs are invaluable in detecting cartels and in collecting the evidence necessary to obtain a conviction. It is notoriously difficult to discover cartel behavior or, once discovered, to compile sufficient evidence to successfully prosecute cartel members in court. To penetrate the elaborate concealment strategies cartels use, prosecutors must have a tool to convert cartel members into cooperative witnesses, so that prosecutors can gain access to background information, testimony, and the documents that otherwise might be destroyed. Amnesty programs are such a tool.

Amnesty programs work by changing the cost/benefit calculation of cartelization. To do this properly, an amnesty program requires three elements.

3

- There must be severe sanctions for firms and individuals that do not obtain amnesty — not only severe as a general matter, but also severe as a relative matter, in terms of what is lost by not cooperating.  An amnesty program must provide significant benefits as compared with the alternative strategies of staying in a cartel or withdrawing but remaining silent.

- There must also be a genuine fear of detection.  Antitrust authorities must have a credible threat to discover cartel behavior.  If firms perceive that the risk of being caught by antitrust authorities is very small, stiff maximum penalties will not be sufficient to deter cartel activity or to cause firms to report their wrongdoing to authorities in exchange for amnesty.  Once that credible threat exists, the threat of being turned in by one's fellow corporate cartelists will increase.  It is also very helpful to have an individual leniency policy, which creates the potential for an amnesty race between a corporation and its own culpable employees.

- There must be predictability and transparency to the amnesty program.  The United States program is set forth in two documents — the Corporate Leniency Policy and the Individual Leniency Policy — that give potential applicants a high degree of assurance that, if they take the risk of coming forward, they will get the reward.  Transparency in the amnesty program thus makes it more likely that applicants will come in, and that the cartel will be broken up.

4

The Division's "Amnesty Plus" program serves the same purpose. "Amnesty Plus" refers to benefits that prosecutors can offer to a cartel member who discloses previously undetected antitrust offenses involving a cartel *different* from the one that first brought that cartelist to the prosecutors' attention. Amnesty Plus induces firms that are already under investigation to clean house and report violations in which it may be involved in other markets. Roughly half of the Division's current international cartel investigations were initiated by evidence obtained as a result of an investigation of a completely separate market. Most of the corporate defendants in international cartel cases are multinational companies selling hundreds of different products. The Division's experience is that if a company is fixing prices in one market, the chances are good that it is doing so in other markets, and that the executives involved in one cartel have likely been involved in others, or have worked with other executives who taught them the tricks of the collusion trade. The Division has had great success pursuing a strategy of "cartel profiling," in which one investigation eventually gives root to prosecutions in a half-dozen or more different markets. Through Amnesty Plus, exposure of a single member of a single cartel has the potential to bring a series of cartels tumbling down like a house of cards.

While I am on the topic of amnesty, I want to address the issue of revocation. The Division does not lightly reach the decision to revoke conditional amnesty once it has been granted. Indeed, we strongly prefer that conditional amnesty recipients successfully comply with their obligations and obtain unconditional amnesty. Since 1993, the Division has withdrawn amnesty in only one instance, a record which underscores the Division's commitment to the program. At the same time, however, the importance of our amnesty program requires that we protect the integrity of the process. If, for example, amnesty applicants misrepresent facts to us,

fail to stop their cartel activities promptly once they are discovered, or fail to cooperate, then the Division must protect the integrity of the program.

Fourth, to protect the integrity of their investigations prosecutors should vigorously prosecute obstruction of justice. Cartelists are frequently adept at concealment, which can include actively obstructing a prosecutor's investigation. To address this concern, the Cartels Working Group of the International Competition Network recommended in May 2006 that the punishment imposed for impeding a cartel investigation should be on par with punishment for the original offense. I endorse that view and commend the ICN's report as important reading.

Fifth, enforcers should charge antitrust crimes in conjunction with other offenses. Just as punishing obstruction of antitrust investigations emphasizes the importance of the antitrust offense being investigated, prosecutors should not hesitate to combine antitrust charges with charges of other crimes. Prosecutors frequently combine embezzlement charges with claims for illegal wire transfers or evidence destruction, for example, and the same approach is appropriate for cartel offenses. The Division has uncovered cartel activity in conjunction with crimes such as mail and wire fraud, bribery, money laundering, and tax offenses, to name just a few. Antitrust prosecutors should have the power and the inclination to pursue a cartelist for each and every criminal violation, both to vindicate such proscriptions on their own merits and to induce cooperation against other members of the cartel.

Sixth, the success thus far of the U.S. model suggests that jurisdictions should provide transparency and predictability in cartel enforcement. Informing market participants of the rules and likely consequences provides a critical foundation for effective deterrence. Businesses need to know where the line has been drawn so that they have an opportunity to conform their

behavior to the law.  Further, as discussed above, the success of an amnesty program depends on potential applicants having confidence that they will obtain the benefits of amnesty if they comply with a set of clear requirements.  In the United States' experience, cooperating parties come forward in direct proportion to the predictability and certainty of their treatment following cooperation.  Moreover, establishing transparent standards for other aspects of the criminal enforcement process, such as the decision to open a cartel investigation or the decision to bring charges makes prosecutors' jobs easier: they have a clear procedure to follow internally and a basis for explaining the fairness of their actions.

Finally, antitrust enforcers should publicize their anti-cartel efforts in order to maximize deterrence.  Deterrence is preferable to prosecution, both in terms of preventing competitive harm in the first place, and in terms of conserving enforcement resources.  Companies who have been invited to join a cartel will think long and hard about whether it is worth it if they know they will face harsh penalties and if they know that their co-conspirators have strong incentives to turn them in.  And if publicity is particularly effective, it can lead both to more complaints and to complaints that are more actionable, as cartel victims and amnesty applicants learn to give enforcers the specific information necessary to make a case.

## II.    The Mutual Benefits of Vigorous Cartel Enforcement in Other Jurisdictions

Although I have focused on how we do things in the United States, in a moment I will take a few minutes to draw attention to the efforts and successes of cartel prosecutions in other jurisdictions.  It is important for all of us here to take note of this good work being done elsewhere because the benefits of vigorous, principled cartel enforcement flow across borders.  In a number of ways, cartel enforcement in one country benefits citizens of another.

One benefit of increased international cartel enforcement is simply that cartels run a greater risk of detection with more investigators on the beat. Having colleagues in other jurisdictions focused on criminal enforcement also leads to greater success in our own prosecutions here at home, with easier access to evidence and witnesses.

Adding more jurisdictions to the list of countries with criminal enforcement also increases deterrence since it raises the cost of entering or continuing in cartels. For example, it makes it harder for cartels to coordinate where they can cartelize and where they cannot. We know that executives actively engaged in cartels in other countries have specifically decided not to fix prices in the United States, in order to reduce the risk of going to jail here. Increasing the number of jurisdictions that need to be avoided makes cartels harder to manage and less profitable.

Moreover, increasing cartel enforcement abroad reduces the number of safe harbors for executives who have engaged in cartel offenses and provides stronger incentives for those executives to accept responsibility and cooperate with Division investigations. Even if a fugitive resides in a country that would not extradite the defendant to the United States for an antitrust offense, a fugitive still runs the risk of being extradited if he or she travels outside his or her home country. If a defendant on an Interpol Red Notice list travels to a third country, that country may choose to detain the defendant and honor an extradition request from the United States. Thus, a fugitive is not only restricted from traveling to the United States, but also must avoid traveling to any other country that might initiate its own prosecution or extradition proceeding.

Of course, these benefits will flow only if cartels know they will face vigorous

prosecution. Such prosecutions are increasing, and I am pleased to observe the criminal enforcement accomplishments of a number of other jurisdictions.

Japan: In May 2005, the Japanese Fair Trade Commission (JFTC) cracked what many have described as the highest profile cartel case in the last 30 years in Japan, involving bid rigging on billions of dollars of steel bridge construction projects ordered by the government. The JFTC initiated a record number of criminal prosecutions against 26 companies, as well as 13 corporate officials, for their involvement in the cartel. On the heels of this high-profile prosecution, a number of major revisions to Japan's Antimonopoly Act became effective in January 2006. The amendments include a substantial increase in the administrative fine that the JFTC can impose on cartel participants, authority for the JFTC to obtain compulsory search warrants in investigations of cartel conduct that is likely to be prosecuted criminally, and the introduction of a Corporate Leniency Program. On May 31, 2006, the JFTC reported that it received twenty-six leniency applications between January 4, 2006 and March 31, 2006, evidencing the early success of Japan's new leniency program. On May 23, 2006, the JFTC again demonstrated its determination to use criminal process in cartel enforcement when it filed criminal accusations with the Prosecutor General against eleven companies for bid-rigging in connection with municipal disposal facility construction projects. These prosecutions and amendments, combined with the creation of a new Criminal Investigation Department within the JFTC's Investigation Bureau, signal a new era of increased accountability for companies and executives that engage in hard-core cartel violations in Japan.

Ireland: In March 2006, Ireland became the first country in Europe to obtain a criminal conviction after a jury trial for a competition offense. This conviction was the most recent

successful criminal prosecution stemming from a series of criminal price fixing charges brought by the Irish Director of Public Prosecutions against 24 defendants across the west of Ireland in the home heating oil industry, following an investigation by the Irish Competition Agency that included multiple raids.  The charges were brought under Ireland's 1996 Competition Act, which carries a maximum jail sentence of two years in prison and fines of up to the greater of 3.8 million Euros or 10% of turnover.  The Competition Act was revised in 2002, and prosecutions brought under the new Act carry more substantial penalties, including a maximum jail sentence of five years.  On April 19, 2006, following an investigation by the Irish Competition Authority, the Irish Director of Public Prosecutions brought its first case charging a violation under the amended Competition Act against a Cork businessman for aiding Ford dealers to fix their car prices.

Israel:  The Israel Antitrust Authority is a strong advocate of jail sanctions for individuals.  Jail sentences were imposed and served, for example, in the IAA's prosecution of a sophisticated fourteen-year cartel among virtually all Israeli manufacturers of floor tiles, which fixed prices and divided the market for floor tiles.  An executive of the leading company in the cartel received a nine month jail sentence, the economic advisor who coordinated and enforced the cartel received an eight month jail sentence, the executive of the second largest company in the cartel received a seven month jail sentence, and two other executives received five and three month jail sentences.  In denying an appeal of the alleged severity of the nine month sentence, the Israeli Supreme Court established that jail time is the proper sentence for economic felonies, given that cartelists do not engage in cartels because of economic or social duress but rather to pursue easy profits at the public's expense.

<u>United Kingdom</u>:  I am pleased to observe that, over the last six years, our colleagues in the United Kingdom have become among the strongest advocates in the international fight against cartels.  In 2000, the British government implemented a new competition law that prohibited cartels and other anti-competitive behavior, giving the Office of Fair Trading new investigative powers and expanding resources for detecting cartel activity.  The new powers included the creation of a corporate leniency program modeled after the Division's Leniency Program.  The Competition Act also imposed stiff fines for companies involved in cartels.  In 2001, the United Kingdom removed a side letter provision that had excluded antitrust assistance from the U.S.-U.K. Mutual Legal Assistance Treaty.  Then, in 2002, the U.K. Enterprise Act was passed, introducing criminal sanctions of up to five years in prison and an unlimited fine, effective in June 2003, for individuals who engage in hard-core cartels.

<u>Canada</u>:  Our colleagues in Canada offer an example for jurisdictions around the world for how a competition authority can work effectively with a separate prosecuting office.  While there can be challenges to effective cooperation between prosecutors and competition enforcers, the Bureau of Competition and Department of Justice attorneys do work well together in Canada.  This is particularly important in the leniency context, where leniency programs will wither where there is the potential for criminal exposure for cartel offenses and prosecutors do not commit to the program.  Canada can thus serve as a good example for others with this kind of system.

<u>European Commission</u>:  Finally, I am happy to note that cartel investigators in the Division have never worked as closely and as effectively with our colleagues in the European Commission as they do today.  A prime example is the convergence in our corporate leniency programs, which has led to a substantial increase in the number of firms reporting international

11

cartel activity to both authorities.  Simultaneous reporting has, in turn, provided our investigators with the opportunity to coordinate surprise raids on subjects in multiple jurisdictions.  As a result, we are able to preserve and gain access to valuable information that in the past would likely have been lost or out of our reach.

**Conclusion**

Thank you for your attention.  I look forward to the remarks of my fellow panelists and the discussion to follow.