# Exhibit 7



# ANTITRUST DIVISION MANUAL

### CHAPTER VII

### ANTITRUST DIVISION RELATIONSHIPS WITH OTHER AGENCIES AND WITH THE PUBLIC

.

A.  Liaison with the Federal Trade Commission
    1.  FTC Liaison and Clearance Procedures
        a.  Clearance Procedures
            i.   FTC Requests for Clearance
            ii.  Division Requests for Clearance
            iii. Preclearance Contacts in HSR Matters
        b.  Objections to Clearance
        c.  Resolution of Contested Matters
        d.  Criteria for Resolving Contested Clearances
    2.  Criminal Referrals
    3.  Exchange of Information--Access Requests
B.  Relationships With U.S. Attorneys
C.  Relationships With State Attorneys General
    1.  Antitrust Enforcement by State Attorneys General
        a.  The National Association of Attorneys General
        b.  NAAG Antitrust Task Force
    2.  Seeking Assistance from State Attorneys General
    3.  Providing Assistance and Information to State Attorneys General
        a.  Antitrust Division Procedures Under Section 4F of the Clayton Act
            i.   Informing the State of Antitrust Division Suits Under Section 4F(a)
            ii.  Providing State Attorneys General with Investigative Files and Other Materials Under Section 4F(b)
                a.  Antitrust Division Policy
                b.  Procedures Employed in Responding to 4F(b) Requests
            iii. Limitation on Disclosure of Investigative Files and Materials
                a.  Disclosure of Grand Jury Material--Closed Investigations or Pending Cases
                b.  Disclosure of Grand Jury Material--Open Investigations
                c.  Civil Investigative Demand Materials
                d.  Confidential Sources

           e.   Confidential Business Information
           f.   Premerger Notification Materials
           g.   Materials Obtained from Other Agencies
           h.   Division Work Product
        iv.   Restrictions on Use of Materials
        v.   Disclosure of Rule 6(e) Material for State Criminal
              Enforcement
      b.   Informal Requests for Information and Assistance VII-18
   4.   Referrals to and from State Attorneys General
   5.   Cooperating with State Attorneys General in Merger Investigations
      a.   Information Sharing Issues
      b.   Joint or Closely Coordinated Merger Investigations
        i.   Conducting Interviews with State Attorney General Staff
        ii.   CID Depositions with State Attorney General Staff
        iii.   Joint Settlements with State Attorney General
   6.   Cooperating with State Attorneys General in Civil Non-merger
      Investigations
   7.   Cooperation with State Attorneys General on Criminal Investigations
      a.   Cross-Designation Program
        i.   Procedures
        ii.   NAAG - Antitrust Division Protocol
      b.   Cooperation with State Attorneys General in Connection with
          Parallel State Civil Investigations
      c.   Global Settlements of Criminal Charges and State Attorneys
          General Civil Claims
D.   Relationships with Foreign Governments, International Organizations and
    Executive Branch Agencies with International Responsibilities
   1.   Background and Procedures
   2.   Liaison with the Department of State
   3.   Liaison with the Immigration and Naturalization Service
   4.   Direct Bilateral Antitrust Cooperation and Consultation with Foreign
      Governments
   5.   Cooperation with International Organizations
      a.   The Organization for Economic Cooperation and Development
      b.   The United Nations
      c.   Regional Trade Agreements
   6.   Competition Advocacy in United States International Trade Policy
      and Regulations
   7.   Committee on Foreign Investment in the United States
E.   Relationships With Federal Agencies That May Be the Victim of
    Anticompetitive Conduct
   1.   General
   2.   Department of Defense--Merger Investigations
F.   Congressional and Inter-Agency Relations
   1.   Legislative Program
   2.   Testimony; Written Legislative Reports
   3.   Interagency Clearance and Approval Procedures
   4.   Congressional Correspondence
   5.   Informal Congressional Inquiries
   6.   Resources
G.   Freedom of Information Act Requests and Procedures

1. Organization
2. Procedures
3. FOIA Exemptions
4. Other Information Not Subject to FOIA
   a. Personal Papers
   b. Grand Jury Records
   c. Records Subject to Court-Ordered Protective Orders
5. Antitrust Division Records Maintenance and Procedures
   H. Relationships with the News Media
      1. Press Releases
      2. Press Inquiries and Comments to the Press
   I. Citizens Calls and Complaints to the Antitrust Division
   J. Relationships With Client Agencies
      1. Appellate Section Relationships with Client Agencies
      2. Client Relationships Concerning Antitrust Damage Cases
      3. Economic Advice to Client Agencies

Appendix A
Protocol for Increased State Prosecution of Criminal Antitrust Offenses

Appendix B
Protocol for Coordination in Merger Investigations Between the Federal
Enforcement Agencies and State Attorneys General

Appendix C
Subpoenas Directed to the Division, its Employees, or Former Employees in
Matters Where the Division is Not a Party

.

---

# CHAPTER VII

## ANTITRUST DIVISION RELATIONSHIPS
## WITH OTHER AGENCIES AND WITH THE PUBLIC

This Chapter provides a brief guide to the Division's relationships with other agencies of the federal government and with the state governments, as well as relationships with the press and the public. Generally, the Division speaks to other agencies and to the public through its officially designated representatives. See Division Directive ATR-3000.1, "Communications with Outside Parties on Investigations and Cases." On occasion, and with prior approval, staff attorneys and economists may represent the Division in public or interagency forums, as described in this Chapter.

This Chapter also discusses the Division's working relationships with other law enforcement agencies, such as the Federal Trade Commission, U.S. Attorneys and state attorneys general; with foreign governments and international organizations; with members of Congress, congressional committees and staffs; with client agencies of the Department; and with the public, through press relations, responses

to citizen requests, and procedures employed with respect to Freedom of
Information Act requests. If an attorney, economist or paralegal within the
Division has specific questions about any of these relationships, he or she should
contact the designated person or office that can provide information or advice.

A. Liaison with the Federal Trade Commission

The Antitrust Division and the FTC have concurrent statutory authority to enforce
Sections 2, 3, 7, and 8 of the Clayton Act. Judicial interpretation of Section 5 of
the FTC Act permits the FTC to challenge conduct that also may constitute a
Sherman Act violation, and thus, there is an overlap with the Division in this area
as well. This overlapping antitrust enforcement authority necessitates coordination
between the two agencies to ensure both efficient use of limited resources and
fairness to subjects of antitrust investigations.

Traditionally, duplication of investigations has been avoided in two areas. First,
pursuant to a liaison agreement, the Department has referred all civil Robinson-
Patman Act matters to the FTC for action, and, second, the FTC routinely refers
possible criminal violations of the antitrust laws, such as price fixing, to the
Division. (The procedure to be followed on criminal referrals is discussed below.)
The two agencies enforce the balance of the antitrust laws--particularly merger
investigations (section 7 of the Clayton Act) and civil non-merger investigations
(sections 1 and 2 of the Sherman Act)--concurrently.

1. FTC Liaison and Clearance Procedures

Coordination is accomplished through the "clearance procedure." This procedure
was established pursuant to an interagency agreement to determine, as each case
arises, which agency would be the more appropriate one to handle the matter. The
first interagency agreement was informally instituted in 1938 and, since 1948, it
has been modified and formalized by several exchanges of correspondence
between the Assistant Attorney General for Antitrust and the Chairman of the
FTC. On December 2, 1993, the FTC and DOJ jointly issued "Clearance
Procedures for Investigations." These procedures, among other things, state the
criteria for resolving "contested matters"--matters on which both agencies have
sought clearance. On March 23, 1995, the FTC and DOJ jointly announced "Hart-
Scott-Rodino Premerger Program Improvements"; these improvements included a
commitment by each agency to resolve clearance on matters where an HSR filing
was made within, at most, nine business days of filing.

The agencies have agreed to seek clearance from each other in the following
instances: (1) where either proposes to investigate a possible violation of the law;
and (2) where either receives a request for a statement of agency enforcement
intentions, i.e., the Division's Business Review or the FTC's Advisory Opinion
procedures. Clearance must be obtained for all preliminary inquiries ("PIs"),
business reviews, grand jury requests that have not stemmed from an existing PI,
and any expansion of a previously cleared matter (to include, for instance, new
parties or different conduct). Neither agency may begin an investigation until
clearance is granted, although publicly available information may be collected and
government sources consulted prior to obtaining clearance. Outside private

parties--except for complainants who approach an agency on their own initiative--cannot be contacted until clearance is obtained. Also, complainants should be advised that clearance is unresolved before they invest substantial time and effort in making a presentation, although some will wish to proceed anyway. (In the event that an investigation is expanded to examine different parties or conduct, clearance should be obtained before proceeding with the expanded investigation.)

    a.  Clearance Procedures

        i.  FTC Requests For Clearance

In the Antitrust Division, clearance of proposed investigations is principally handled by the senior Special Assistant to the Directors--who is designated as the FTC Liaison Officer--and by the Premerger Notification Unit/FTC Liaison Office (often referred to as the Premerger Office). The clearance procedure operates as follows: When the FTC wishes to investigate a particular matter, it requests, through its liaison officer, the Division's clearance for the proposed investigation. This request is made through a clearance request form entered into an electronic database to which the Division's Premerger Notification Unit/FTC Liaison Office, as well as the FTC, have access. For a typical investigation, the clearance request specifies the firms to be investigated, the product line involved, the potential offenses, the geographic area, and the source of the allegation.

The Division's Premerger Notification Unit/FTC Liaison Office circulates the FTC's request for clearance by e-mail to the section, task force, and field office Chiefs who are most likely to have an interest in the proposed investigation. Each section Chief may object to clearing the investigation, "contest" clearance by e-mailing a PI Request Memo to the PI Request mailbox (cc-ed to the Special Assistant responsible for the section) seeking to investigate the same conduct, agree to clear the matter, agree to clear it with a caveat (i.e., a criminal caveat), or seek additional information about the FTC's proposed investigation. Requests for additional information should be made to the Division's FTC Liaison Officer, who will either obtain additional information from the FTC or refer the Chief to the FTC attorney requesting clearance. Chiefs notified concerning an FTC clearance request should indicate their decision no later than the return date indicated on the e-mail (usually within three working days). If no Chief objects and the appropriate Director of Enforcement approves, clearance is granted to the FTC. A clearance request that generates no objections or conflicts should be processed within a few days, which is why it is important to adhere to the return date indicated on the e-mail.

        ii.  Division Requests for Clearance

Similarly, clearance with the FTC of proposed Division investigations is also the responsibility of the Division's Premerger Notification Unit/FTC Liaison Office and FTC Liaison Officer. The clearance function is one aspect of the responsibility of the Directors of Enforcement to approve and supervise investigations undertaken by the Division. Once a PI Request Memo is submitted to the PI Request mailbox (and cc-ed to the Special Assistant assigned to that office), the Division's clearance request is submitted to the FTC so that the clearance process

can begin. For HSR matters, a PI Request Memo should be e-mailed to the PI Request mailbox no later than five days after the HSR filing (three days if the matter is a cash tender offer or 15-day bankruptcy matter, or two days for a 10-day bankruptcy matter). In the case of a Grand Jury, clearance is requested as soon as the Assistant Attorney General has approved the empaneling of a grand jury. Clearance requests submitted to the FTC are processed in roughly the same manner as the Division processes FTC requests.

Routine clearances generally take a few days, and non-HSR matters typically take a few days longer than HSR-matters. Matters which are subject to time pressure can receive expedited treatment. If expedited treatment is needed, that fact (and the reasons for it) should be indicated in the e-mail accompanying the PI Request Memo, and should also be communicated by phone to the FTC Liaison Officer. Except in extraordinary circumstances, clearance requests will not be relayed to the FTC until a PI Request Memo has been submitted by e-mailing it to the "PI Requests" mailbox. Once clearance has been granted and a preliminary investigation has been authorized, the Premerger Notification Unit/FTC Liaison Office will notify the appropriate Chief by e-mail. (In the case of a grand jury, once authorization has been granted and clearance has been obtained, the appropriate Chief will receive notification via e-mail from the Office of the Deputy Assistant Attorney General for criminal enforcement.

### iii.   Preclearance Contacts in HSR Matters

Because the FTC clearance procedure also applies to matters as to which a Hart-Scott-Rodino filing has been made, inquiries may not be made to filing parties, even if just for "clarification" of the filing, before clearance has been obtained. Should a question arise regarding the sufficiency of an initial HSR filing before clearance has been granted, inquiry to the filing party will be made by the FTC Bureau of Competition's Premerger Office. That office has responsibility for administering the Premerger Reporting Program and historically has supervised the determination of the sufficiency of initial filings. Division attorneys should channel such inquiries through their Chiefs to the FTC's Premerger Office. Other than contact with a filing party through the FTC's Premerger Office for this limited purpose, no attorney of either agency should contact any filing party or any other private person or firm in connection with a premerger filing without having first obtained clearance. Should a party initiate contact with either agency, the preclearance contacts policy requires that the other agency be given an opportunity to participate in any meetings or phone conversations. Accordingly, should a party contact the Division prior to clearance being granted, a meeting or phone call may be set up, but the FTC Liaison Officer should immediately be notified so that the FTC can be invited to participate. Similarly, Chiefs may occasionally be contacted by the FTC Liaison Officer to determine whether the Division is interested in participating in a meeting or phone call arranged by the FTC. Should a party submit documentary material prior to clearance being granted, the party should be encouraged to also make that material available to the FTC.

### b.   Objections to Clearance

Objections to clearance typically arise when both agencies have requested

clearance to investigate the same matter. Sometimes both agencies request clearance simultaneously, but more often in a contested case an agency requests clearance only after learning that the other agency has sought clearance. Matters on which both agencies have requested clearance are generally known as "contested matters" and are resolved as discussed below.

On rare occasions, an agency may refuse to grant clearance without seeking to investigate the matter itself. This may occur if, for instance, the agency denying clearance has an ongoing investigation or litigation with which the proposed investigation might interfere, or if the agency denying clearance has already examined the conduct in question and found no significant evidence of illegal activity. In such cases, the FTC Liaison Officer will typically discuss the matter with the staff, the Chief, the appropriate Director of Enforcement, and the relevant individuals at the FTC in an attempt to resolve the matter. Typically, either the requesting agency will withdraw its clearance request, clearance will be granted, or the agency denying the initial clearance request will ask to investigate the matter itself.

    c.   <u>Resolution of Contested Matters</u>

Once a matter is contested, the staff should prepare a "Contested Matter Claim Form." The Contested Matter Claim Form describes the conduct or merger sought to be investigated, and describes the relevant expertise the Division has with the product in question. <u>See</u> <u>infra</u> Section A.1.d (discussing criteria used to resolve contested clearances). Examples of Contested Matter Claim Forms are available from the FTC Liaison Officer. Staff should work closely with the FTC Liaison Officer in the preparation of the Claim Form. Claim Forms should be completed within a day after a matter is contested.

Claim forms are simultaneously exchanged between the Division and the FTC, and the respective liaison officers discuss the merits of each agency's claim. In a majority of cases, the liaison officers are able to resolve the dispute and the matter is either cleared to the Division or (after approval by the appropriate Director of Enforcement) cleared to the FTC. If the liaison officers are unable to resolve clearance, it is "escalated" to the appropriate Division Director and his or her counterpart at the FTC. If the matter remains unresolved following a discussion at this level, the matter is "escalated" to the relevant Deputy Assistant Attorney General and the FTC's Director of the Bureau of Competition. In the very rare instance where a matter is still unresolved after discussion at this level, the Assistant Attorney General will enter into negotiations with the FTC Chairman and resolve the matter. After a contested matter has been resolved, the section will be notified by e-mail by the Premerger Notification Unit/FTC Liaison Office. Should an attorney at any time want to know the status of a clearance request, he or she should contact the FTC Liaison Officer by phone or e-mail, or the Premerger Notification Unit/FTC Liaison Office by phone.

    d.   <u>Criteria for Resolving Contested Clearances</u>

The criteria for resolving contested merger matters are spelled out in some detail in the 1993 "Clearance Procedures for Investigations." The principal ground for

clearance is expertise in the product in question gained through a "substantial investigation" of the product within the last five years--or if neither agency has a substantial investigation within five years, ten years. "Substantial investigation" means any civil investigation where compulsory process was issued (i.e., CIDs or Second Requests), and documents were received and reviewed. Expertise in the "product" is obtained when the product involved in the prior, cited substantial investigation was the same product as that involved in the contested investigation, a substitute, a major input or output, or one produced using the same manufacturing process (in decreasing order of significance). Should both agencies have at least one substantial investigation of the same category (i.e., same product), the order of priority is as follows (in decreasing order of significance): litigated case; filed case; announced challenge or "fix-it-first"; ordinary Second Request merger investigation; and civil conduct investigation. Only if neither agency has a relevant substantial investigation, will non-substantial (including criminal investigations) typically be considered. The process is somewhat flexible, and if either agency has an ongoing investigation or an existing decree with which the proposed investigation may conflict, the matter will often be cleared so as to avoid conflicts.

The criteria for resolving civil non-merger contested matters are not as formal, but are similar to those used for merger matters. While rewarding expertise, they also give more weight towards initiative: in the absence of overwhelming expertise in an area, the matter generally will be awarded to the agency that first identified the potential competitive problem and developed the proposed investigation.

2.  Criminal Referrals

When a matter is before the Federal Trade Commission and the Commission determines that the facts may warrant criminal action against the parties involved, the Commission will send a written notice to the Antitrust Division and make available to the Division the files of the investigation following an appropriate access request. See infra Section A.3. The Director of Criminal Enforcement, through the Premerger Notification Unit/FTC Liasion Office, will refer the matter to the appropriate section, task force, or field office for review of the materials and for determination as to whether the matter should be presented to a grand jury. Determination should be made by the section or field office within 30 days of the referral, so that the Division can inform the Commission of its position in timely fashion.

If the Division determines that a matter should be referred to a grand jury, it will request that the Federal Trade Commission transfer the matter. If, on the other hand, the Division decides not to pursue the matter with a grand jury, then the Commission may proceed with its own investigation.

3.  Exchange of Information--Access Requests

The liaison procedure between the Division and the FTC also provides for the exchange of information and evidence between the agencies to the extent permitted by law and internal policies. If the FTC has conducted an investigation which involved materials that could be useful in an investigation being conducted

by the Division, the section or field office Chief should contact the Division's FTC Liaison Officer, who will make arrangements for the Division to obtain access to the appropriate files. If, upon examination, it is determined that copies of any of the materials would be of assistance to the staff, arrangements for copying should also be made through the Liaison Officer. Requests by the FTC for access to materials in the Division's possession are processed through the Division's Premerger Notification Unit/FTC Liaison Office. If an attorney or economist receives a direct request for access to, or copies of, Division files, such materials should not be made available until the matter is cleared through the Division's Liaison Officer.

B. Relationships With U.S. Attorneys

Relationships between the Antitrust Division and U.S. Attorneys are controlled by policies of the Department of Justice and the Division. For example, Department of Justice policy provides that U.S. Attorneys' offices should watch for manifestations of price-fixing, bid-rigging, or other types of collusive conduct among competitors that would constitute criminal violations of Section 1 of the Sherman Act. A U.S. Attorney with evidence of a possible antitrust violation should consult with either the Chief of the Antitrust Division's closest field office or the office of the Deputy Assistant Attorney General for criminal enforcement in Washington, D.C., to determine who should investigate and prosecute the matter. Most criminal antitrust investigations are conducted by the Antitrust Division's field offices and litigating sections because of their specific expertise in particular industries and markets. In some cases, however, it may be more advantageous for the U.S. Attorney's office to investigate and prosecute a matter, either on its own or in a joint investigation with the Antitrust Division.

The Antitrust Division, through the office of the Deputy Assistant Attorney General for criminal enforcement, may refer antitrust investigations to U.S. Attorneys, particularly those involving localized price-fixing or bid-rigging conspiracies. According to an Attorney General's Policy Statement, published at United States Attorney's Manual § 7-1.200, U.S. Attorneys are assigned the responsibility of enforcing Section 1 of the Sherman Act against offenses which are "essentially of local character, and which involve price-fixing, collusive bidding, or similar conduct. U.S. Attorneys shall handle such investigations and proceedings as the Assistant Attorney General in charge of the Antitrust Division may specifically authorize them to conduct." Once a U.S. Attorney's office accepts a referral, it will be primarily responsible for the investigation and prosecution of that matter.

All antitrust investigations conducted by a U.S. Attorney's office, whether initiated by that office or referred from the Antitrust Division, are subject to supervision by the Assistant Attorney General in charge of the Antitrust Division. See 28 C.F.R. § 0.40. Accordingly, the Division's approval is required at various stages of the investigation, such as empaneling a grand jury, recommending an indictment, or closing the matter. These procedures are described at United States Attorney's Manual § 7-2.000.

It is the policy of the Antitrust Division to create and maintain good working

relationships with all U.S. Attorneys. The Chiefs of the Division's field offices should maintain contact with all of the U.S. Attorneys within their geographic areas of responsibility. This liaison provides the U.S. Attorneys with a convenient contact to whom to refer complaints or other evidence of antitrust violations, and from whom to obtain information about antitrust matters and Division procedures. Additionally, close liaison provides the Division field offices with a ready source of information and support in complying with local court rules, procedures, and practices when Division attorneys are conducting investigations and litigating cases within the U.S. Attorney's jurisdiction. The relationship also is valuable when Division attorneys need the approval of the U.S. Attorney to apply to the local district court for immunity orders, or otherwise need local assistance. In order to develop and continue good relationships with U.S. Attorneys, it is necessary that all Division attorneys keep U.S. Attorneys apprised of all significant Division activities occurring within their districts. It is, for example, normal practice to present and explain to U.S. Attorneys, indictments, informations, and plea agreements.

Division attorneys who have particular questions or problems about dealing with U.S. Attorneys should consult with their field office or section Chiefs, or, where appropriate, with the Director of Criminal Enforcement or the Deputy Assistant Attorney General for criminal enforcement.

C. Relationships with State Attorneys General

The Antitrust Division is committed to cooperating with state Attorneys General. Effective cooperative between the Division and the states benefits the public through the efficient use of antitrust enforcement resources. Cooperation with the states gives the Division the benefit of "local counsel" who know the local markets well. It also promotes consistent enforcement and conserves resources at all levels of government involved.

The Division and state antitrust enforcers have cooperated frequently in the recent past. In 1994, the Division and state Attorneys General filed several joint civil actions and consent decrees. This represented a significant achievement, made possible by goodwill and effective coordination between the Division and the states.

The purpose of this section is to provide information and guidance regarding cooperation and interaction with state enforcers. It is most important to remember that although it is the policy of the Division to cooperate whenever possible with state Attorneys General, there is no formula or checklist for cooperation. The nature and level of cooperation are decided on a case-by-case basis, keeping in mind that conducting an effective and efficient investigation is our first priority. For example, investigations affecting primarily local markets within a state are more suitable for joint enforcement efforts. Other factors include the experience, interests and resources of a particular state Attorney General's office.

  1.  Antitrust Enforcement by State Attorneys General

The functions and organization of offices of state Attorneys General are similar to

those of the Department of Justice. A state Attorney General is the chief legal officer of his or her state. They typically bring civil suits on behalf of their states; represent their states and state agencies in civil suits; handle criminal appeals; and enforce antitrust, consumer protection and environmental statutes. The vast majority of resources in a state Attorney General's office are devoted to defending the state in civil litigation and criminal appeals.

State Attorneys General are authorized to bring civil federal injunction actions under Section 4 of the Clayton Act on behalf of the economies and citizens of their states. See Hawaii v. Standard Oil Co., 405 U.S. 251 (1972). Further, Section 4C of the Clayton Act authorizes state Attorneys General to bring damage actions, as parens patriae, on behalf of natural persons residing within their states. See 15 U.S.C. § 15c.

With the exceptions of Pennsylvania and Georgia, every state has enacted a civil antitrust statute that, at a minimum, includes a provision that parallels Section 1 of the Sherman Act. These statutes typically authorize the state Attorney General to seek treble damages on behalf of natural persons residing within the state, state agencies, institutions and political subdivisions; civil penalties; injunctive relief; and attorneys' fees and costs. See, e.g., Va. Code Ann. § 59.1-.15. These statutes also typically authorize the state Attorney General to issue Civil Investigative Demands compelling oral testimony, the production of documents and responses to written interrogatories to individuals and corporations in connection with antitrust investigations. State antitrust statutes also usually expressly require that they be interpreted in conformity with comparable federal antitrust statutes. See, e.g., Mass. Gen. Laws ch. 93, § 1; see also ABA Antitrust Law Section, State Antitrust Practice and Statutes (1990).

It is the practice of most state Attorneys General to file cases in federal court with pendent state antitrust claims. Most states are reluctant to bring actions in state court because most state court judges have little or no experience with antitrust cases.

Few state Attorneys General's offices have significant experience prosecuting criminal antitrust violations. Many state antitrust statutes do not have general criminal provisions. Every state, however, has criminal bid rigging and governmental fraud statutes.

The level of antitrust enforcement varies from state to state. Most state antitrust trial attorneys are responsible for consumer protection as well as antitrust enforcement.

Most state antitrust units are financed through direct appropriations from their state legislatures. Several states, however, finance their antitrust units, at least in part, through revolving funds that are funded by attorneys' fees and costs paid to the state in connection with settlements and judgments.

State Attorneys General, under the auspices of the National Association of Attorneys General ("NAAG"), often form working groups and ad hoc committees to coordinate investigations and litigation involving several states. Recent

examples of multi-state litigation are <u>State of New York v. Keds Corp.</u>, 1994-1 Trade Cas. (CCH) ¶70,549 (S.D.N.Y. 1994) (50 states and the District of Columbia) and <u>Hartford Fire Ins. Co. v. California</u>, 509 U.S. 764 (1993) (19 states). The states participating in multi-state investigations usually execute cost sharing agreements apportioning their costs based on population. Multi-state investigations and litigation are also supported by a fund established by NAAG for expert witness fees and expenses.

### a. The National Association of Attorneys General

Comprised of the Attorneys General of the fifty states and the chief legal officers of the District of Columbia (Corporation Counsel), the Commonwealths of Puerto Rico (Secretary of Justice) and the Northern Mariana Islands, and the territories of American Samoa, Guam, and the Virgin Islands, NAAG facilitates interstate cooperation among state Attorneys General on legal and law enforcement issues and conducts policy research and analysis of issues. The U.S. Attorney General is an honorary member.

The Attorney General is popularly elected in 43 states and appointed by the governor in five states (Alaska, Hawaii, New Hampshire, New Jersey, and Wyoming). In Maine, the legislature elects the Attorney General, and in Tennessee, the state Supreme Court appoints the Attorney General. In the District of Columbia, the Mayor appoints the Corporation Counsel, whose duties are similar to those of Attorneys General of the states.

NAAG has a full-time staff, headed by the Executive Director and General Counsel. Reporting to these officials are counsels who are responsible for specific projects and subject areas, including antitrust.

The Antitrust Committee, a standing committee of the organization, is responsible for all matters relating to antitrust enforcement (i.e., adoption of guidelines and resolutions). The president of NAAG appoints the chairperson, who serves a two year term.

### b. NAAG Antitrust Task Force

The NAAG Antitrust Task Force is comprised of state staff attorneys responsible for antitrust enforcement in their states. The Task Force, among other things, recommends policy and other matters for consideration by the Antitrust Committee, organizes the annual NAAG Antitrust Training Seminar and Conference and coordinates multi-state investigations and litigation. The Chairperson of the Task Force, who is appointed to a two-year term by the Chairperson of the Antitrust Committee, is the principal spokesperson for the states on antitrust enforcement.

### 2. Seeking Assistance from State Attorneys General

State Attorneys General's offices can often assist the Division. The Division often seeks information in the possession of state officials and agencies. Division attorneys should consult with the Division attorney designated as the state liaison

about contacting the state Attorney General's office whenever the need arises to contact an employee of a state agency. State Attorneys General, as the chief legal officers of their states, can be of tremendous assistance in obtaining information from state officials and agencies.

   3.   <u>Providing Assistance and Information to State Attorneys General</u>

      a.   <u>Antitrust Division Procedures Under Section 4F of the Clayton Act</u>

Pursuant to Section 4F of the Clayton Act, added by the Hart-Scott-Rodino Antitrust Improvements Act of 1976, the Division has the statutory responsibility to provide state Attorneys General with information, to the extent permitted by law, that may assist them in determining whether to bring a damage suit based upon violation of the federal antitrust laws.

The Division has adopted the following procedures to implement 4F consistently.

        i.   <u>Informing the State of Antitrust Division Suits Under Section 4F(a)</u>

Under Section 4F(a), 15 U.S.C. § 15f(a), the Antitrust Division notifies state Attorneys General when it believes the state may be entitled to recover damages as a result of the violation alleged in a civil or criminal antitrust prosecution filed by the United States. In making its judgment in such instances, the Division considers, among other relevant factors, the factual circumstances of the alleged violation, and the posture of the state as a potential damage claimant under existing law, and the likely effect of the alleged violation on cognizable state interests.

This notification procedure is not, under the statute, to be equated with routine public announcement of antitrust actions filed by the Division. Rather, this procedure will be used when, in the Division's judgment, a state damage action may lie based on the substantially same allegations made in a federal antitrust prosecution. This notification should be recommended by the investigative staff and assessed by the Chief of the Freedom of Information Act ("FOIA") Unit. The Chief of the FOIA Unit will make all notifications to the affected states under Section 4F(a).

Even without specific notification pursuant to Section 4F(a), state Attorneys General remain free to explore a potential Clayton Act damages action arising from any federal civil or criminal antitrust prosecution and to request, under Section 4F(b), investigative files and other materials of the Antitrust Division relevant to that actual or potential cause of action. This data will be made available to state Attorneys General under the standards for Section 4F(b) disclosure.

        ii.   <u>Providing State Attorneys General with Investigative Files and Other Materials Under Section 4F(b)</u>

          a.   <u>Antitrust Division Policy</u>

Section 4F(b), 15 U.S.C. § 4f(b), requires disclosure to the state Attorneys General "to the extent permitted by law" of any investigative files or other materials that may be relevant or material to an actual or potential state cause of action for damages under the Clayton Act. The Antitrust Division will disclose materials from its files to assist state Attorneys General to the maximum extent appropriate in fulfilling their state antitrust enforcement responsibilities. Thus, as a general practice, a liberal rule will apply to disclosures under Section 4F(b). There are, however, certain instances where, because of statute, case law or other constraints, non-disclosure, or a least protective limitations upon the disclosure made, may be necessary. The Antitrust Division retains discretion to determine the proper scope of Section 4F(b) disclosures.

This discretion will be exercised to further the overall policies embodied in the antitrust laws and the Hart-Scott-Rodino Antitrust Improvements Act of 1976. These policies favor vigorous federal and state enforcement of the antitrust laws, but occasionally a balance must be struck between immediate disclosure of investigative files and federal enforcement priorities and necessities. While it is the Division's policy to cooperate fully and liberally with state Attorneys General, in some instances disclosures may be delayed or limited to preserve the integrity of Antitrust Division prosecutions or investigations or its deliberations.

      b.   Procedures Employed in Responding to 4F(b) Requests

Requests for access to investigative files or other materials of the Antitrust Division, pursuant to Section 4F(b), should be made to the Chief of the FOIA unit, who is responsible for responding to such requests. A request from a state Attorney General may be made by the Attorney General or his or her designee, who shall be an official of the state government, e.g., an assistant attorney general in charge of antitrust enforcement in the state Attorney General's office. Requests on behalf of a state should not be made, and will not be honored, if they come from private counsel, even though the state may retain such counsel for the purpose of considering and filing an antitrust damage action on the state's behalf. See 15 U.S.C. § 15g(1).

The response from the Chief of the FOIA Unit to a request made under Section 4F (b) will indicate the general nature of the proposed disclosure and any conditions that may be imposed, such as protective arrangements or limitations, on further disclosure. Generally, the Chief of the FOIA Unit sends the state Attorney General relevant material such as the indictment or complaint in the case and copies of readily available memoranda, such as requests for preliminary inquiry or grand jury authority. The letter also informs the state Attorney General of the Division's intention to disclose relevant non-grand jury material that the state may request, the Division's position regarding disclosure of grand jury materials, and the name, address and telephone number of the section, task force, or field office Chief supervising the case whom the state antitrust attorneys may contact for further information regarding the case. The FOIA Unit will handle the arrangements for the disclosure of investigative files or other material.

      iii.   Limitation on Disclosure of Investigative Files and Materials

In response to a Section 4F(b) request, the Antitrust Division will make all relevant files and materials available to state Attorneys General with certain exceptions and limitations. These exceptions and limitations are not exhaustive, and peculiar circumstances may require modification or extension of these standards. Any such modification that affects the interests of the state Attorneys General under Section 4F(b) will be made known to them promptly.

a.   Disclosure of Grand Jury Material--Closed Investigations or Pending Cases

When the Division's investigative files requested by a state Attorney General contain grand jury materials or other data referring to grand jury materials, disclosure of such materials is prohibited without a court order. Section 4F(b) does not create an exception to Rule 6(e). See Illinois v. Abbott & Assocs., Inc., 460 U.S. 557 (1983). Moreover, the state Attorney General must demonstrate "particularized need" before the district court may issue a disclosure order. See id.; see also Douglas Oil Co. v. Petrol Stops Northwest, 441 U.S. 211 (1979). Nonetheless, the district court should consider the congressional intent reflected in Section 4F(b) in weighing the public interest served by disclosure to a governmental body to determine if the particularized need standard has been met.

Notwithstanding this interpretation of Rule 6(e), if the grand jury investigation and any resulting litigation have been terminated, the Division usually will not oppose an application by the state Attorney General under Rule 6(e) for disclosure pursuant to Section 4F(b) if the state is contemplating or has initiated suit. There may be, however, some circumstances where particular factors may compel the Division to seek limitations on the disclosure of grand jury materials, even though the underlying prosecution has been terminated. These instances may involve specific hardships upon individual grand jury witnesses or other similar factors. These will be considered on a case-by-case basis, and the Division's position will be explained fully to the states in such instances.

In circumstances where a grand jury investigation is completed, but a resulting prosecution is still pending, the Division ordinarily will resist disclosure of investigative materials under Section 4F(b) until the prosecution is completed at the district court level. In addition to secrecy considerations, the Division must preserve its litigation posture and, in some instances, disclosure could compromise an effective conclusion of the Division's action.

Under some circumstances, the Division may not oppose a 6(e) request by a state even though its prosecution is still pending, if appropriate limitations on use and further disclosure are provided for and are embodied in the court's disclosure order. For example, because of the pendency of a criminal trial, disclosure may be made to the state Attorney General and his or her immediate staff solely for their use in preparing a damage action. In such situations, the Division will insist that these materials not be disclosed to any other parties to the litigation or otherwise be used until the termination of the federal prosecution. These instances will be dealt with on a case-by-case basis, but generally the Division will not oppose limited disclosure--as ordered by the court under Rule 6(e)--if (a) no harm to the Government's prosecution will result, and (b) acceptable limitations on subsequent

disclosure can be achieved.

### b. Disclosure of Grand Jury Material -- Open Investigations

Where the Division has an open investigation, disclosure of investigative files pursuant to Section 4F(b) generally will be denied. The timing of the release of files under Section 4F(b), as distinguished from the ultimate release of such files, is left to the discretion of the Antitrust Division. The effectiveness of the investigation is potentially compromised by making investigative files available during its pendency. As a matter of practice, the Division will deny disclosure of investigative files in all pending grand jury investigations. If a state moves for disclosure of grand jury materials while the investigation is continuing, the Division will oppose such motions.

### c. Civil Investigative Demand Materials

Materials obtained by Civil Investigative Demand will not be disclosed under Section 4F(b). There is no provision in the law for disclosure of such data, except where the party from whom the materials are obtained consents to the disclosure. See 15 U.S.C. § 1313(c)(3).

### d. Confidential Sources

The identity of confidential sources will not be disclosed pursuant to Section 4F (b). This is necessary to ensure the future cooperation of these and other sources, especially since they often rely on a promise that their identities will not be revealed.

### e. Confidential Business Information

Confidential business information is protected from disclosure by federal law. Accordingly, where such information is part of investigative files, that data will not be disclosed to state Attorneys General under Section 4F(b).

### f. Premerger Notification Materials

All files or materials obtained by the Antitrust Division under the premerger notification provisions of the Hart-Scott-Rodino Antitrust Improvements Act of 1976 are protected by law from disclosure. Accordingly, such data will not be disclosed to state Attorneys General under Section 4F(b). This includes the fact that a filing has been made and its date.

### g. Materials Obtained from Other Agencies

Files or materials obtained from the Internal Revenue Service or other federal investigative agencies frequently are protected by law from disclosure outside the Department of Justice. Federal investigative agencies, as a matter of practice, frequently require the Division to limit disclosure of files or materials generated by those agencies. Therefore, access by state Attorneys General to investigative files and material generated outside of the Antitrust Division will be denied unless

the agency in question permits release and disclosure is not otherwise prohibited by law.

Certain FBI files and materials may or may not be disclosable. Frequently, the FBI conducts or assists in conducting federal criminal antitrust investigations. Information derived from its efforts may be incorporated in Antitrust Division files and, as such, revealed under Section 4F(b). However, raw FBI investigative reports will not be disclosed, as a matter of course, under Section 4F(b) unless the FBI allows disclosure. Recourse to the FBI or other investigative agencies for such data usually may be made by the state Attorneys General by direct request or under the Freedom of Information Act.

### h.  Division Work Product

The Antitrust Division ordinarily will limit the disclosure of its work product analyses and other deliberative memoranda to state Attorneys General under Section 4F(b). This is necessary to protect the candor and effectiveness of communications within the Division and to preserve and foster the integrity of its enforcement programs and the recommendations and analyses of its staff.

Ordinarily, these limitations do not result in complete denial of access to investigative files or materials; rather, only particular memoranda or portions of such memoranda are withheld. Such refusals often limit the timing and extent of such disclosure rather than preventing disclosure altogether. Finally, Division staff may be able orally to discuss issues relating to the investigation in a way that substantially assists the state attorneys without jeopardizing or unduly exposing internal Division deliberations.

### iv.  Restrictions on Use of Materials

Except as described above, the Division usually will not seek to impose additional restrictions on the use by state Attorneys General of investigative data disclosed pursuant to Section 4F(b). Under special circumstances, the Division may set other restrictions on investigative data if there is a need for continued secrecy.

### v.  Disclosure of Rule 6(e) Material for State Criminal Enforcement

The Supreme Court added subdivision 6(e)(3)(C)(iv) to Fed. R. Crim. P. 6(e) in an amendment effective August 1, 1985. Its purpose, as stated in the Advisory Committee notes, was to eliminate "an unreasonable barrier to the effective enforcement of our two-tiered system of criminal laws . . . [by allowing] a court to permit disclosure to a state or local official for the purpose of enforcing state law when an attorney for the government so requests and makes the requisite showing."

The subdivision reads as follows:

(C) Disclosure otherwise prohibited by this rule of matters occurring before the grand jury may also be made . . .

(iv) when permitted by a court at the request of an attorney for the government, upon a showing that such matters may disclose a violation of state criminal law, to an appropriate official of a state or subdivision of a state for the purpose of enforcing such law.

If the court orders disclosure of matters occurring before the grand jury, the disclosure shall be made in such manner, at such time, and under such conditions as the court may direct.

Fed. R. Crim. P. 6(e)(3)(C)(iv). It is both the intent of the amended rule, and the policy of the Department of Justice,[1] to share such grand jury information wherever it is appropriate to do so. Thus, the phrase "appropriate official of a state or subdivision of a state" shall be interpreted to mean any official whose official duties include enforcement of the state criminal law whose violation is indicated in the matters for which permission to disclose is to be sought. This policy is, however, subject to the caution in the Advisory Committee notes that "[t]here is no intention to have Federal grand juries act as an arm of the state."

It is thus clear that the decision to release or withhold such information may have significant effects upon relations between federal prosecutors and their state and local counterparts, and that disclosure may raise issues that go to the heart of the federal grand jury process. In this respect, the Assistant Attorney General in charge of the Criminal Division (who is a member of the Advisory Committee) promised the Advisory Committee that prior to any request to a court for permission to disclose such grand jury information, authorization would be required from the Assistant Attorney General in charge of the Division having jurisdiction over the matters that were presented to the grand jury.[2] It is the policy of the Department that such prior authorization be requested in writing in all cases. A copy of such requests shall be sent to all federal investigating agencies involved in the grand jury investigation.

To ensure that grand jury secrecy requirements are not violated in the submission of such requests, the following legend should be placed at the top and bottom of each page of the request:

GRAND JURY INFORMATION:
Disclosure restricted by Rule 6(e), Federal
Rules of Criminal Procedure

In addition, the entire packet should be covered with a plain white sheet having the word "SENSITIVE" stamped or typed at the top left and bottom right corners.

Division attorneys seeking permission to apply for a disclosure order for materials obtained in an antitrust investigation must submit a memorandum to the Deputy Assistant Attorney General for Criminal Enforcement so that the approval of the Assistant Attorney General may be sought. The memorandum should provide the following information:

1. title of grand jury investigation and involved target(s);

2. origin of grand jury investigation;

3. general nature of investigation;

4. status of grand jury investigation;

5. state(s) for which authorization to disclose grand jury matters is sought;

6. nature and summary of information sought to be disclosed;

7. general nature of potential state offenses;

8. impact of disclosure to state(s) on ongoing federal grand jury investigative efforts or prosecutions;

9. extent of prior state involvement, if any, in federal grand jury proceedings under Rule 6(e)(3)(A)(ii);

10. extent, if any, of state knowledge or awareness of federal grand jury investigation;

11. existence, if any, of ongoing state investigations or efforts regarding grand jury matters sought to be disclosed; and

12. any additional material necessary to enable the Assistant Attorney General to evaluate fully the factors set forth in the following paragraph.

In making a determination on whether to authorize obtaining permission to disclose, the Assistant Attorney General must consider all relevant factors including whether:

1. the state has a substantial need for the information;

2. the grand jury was convened for a legitimate federal investigative purpose;

3. disclosure would impair an ongoing federal trial or investigation;

4. disclosure would violate a federal statute (e.g., 26 U.S.C. § 6103) or regulation;

5. disclosure would violate a specific Departmental policy;

6. disclosure would reveal classified information to persons without an appropriate security clearance;

7. disclosure would compromise the government's ability to protect an informant;

8.  disclosure would improperly reveal trade secrets; and

9.  reasonable alternative means exist for obtaining the information contained in the grand jury materials to be disclosed.

All attorneys should be aware that there is no requirement that a "particularized need" be established for the disclosure under Rule 6(e)(3)(C)(iv), but there should be substantial need. The need to prosecute or to investigate ongoing or completed state or local felony offenses will generally be deemed substantial.

If the request is authorized, the staff attorney who seeks permission to disclose shall include in the proposed order a provision that further disclosures by the state officials involved shall be limited to those required in the enforcement of state criminal laws.

A copy of any order <u>denying</u> a request for permission to disclose should be sent to the office of the Deputy Assistant Attorney General for criminal enforcement.

   b.   <u>Informal Requests for Information and Assistance</u>

The overwhelming majority of state Attorney General requests for assistance and information are informal. State Attorneys General's offices have limited antitrust resources and on occasion will request assistance from the Division. State attorneys find consulting informally with Division attorneys and economists to be very helpful. It is the policy of the Division to comply with informal requests for information and assistance by state Attorneys General whenever possible. Sharing thoughts and ideas with state enforcers is critical to enhancing state antitrust enforcement.

   4.   <u>Referrals to and from State Attorneys General</u>

The Division actively encourages state Attorneys General to refer to the Division significant criminal and civil matters. Regular contact with state antitrust officials is therefore important.

Whenever a state refers a matter to the Division, the state should be advised generally of the status of any subsequent investigation. Providing the state with information will encourage future referrals. If a referral results in an enforcement action, the state Attorney General's referral of the matter to the Division should be publicly acknowledged.

It is Division policy to refer criminal and civil matters whose possible effects are predominantly local to state Attorneys General for possible investigation. When referring a matter to a state Attorney General, as much information as practical regarding the matter should be communicated to the state official responsible for antitrust enforcement.

   5.   <u>Cooperating with State Attorneys General in Merger Investigations</u>

State Attorneys General have become increasingly active in merger enforcement.

They are more likely to have an interest in transactions involving goods or services purchased directly by consumers or state and local governments and that primarily affect local markets. It is the policy of the Antitrust Division to cooperate with state Attorneys General on mergers that affect local markets when practical. Division attorneys reviewing such transactions should give serious consideration to contacting the offices of the state Attorneys General whose states the transaction may affect to discuss possible cooperation. The state Attorneys General may have an interest in the transaction and may be contemplating opening an investigation.

Early coordination with state Attorneys General benefits the Division, the states and the parties. It is not uncommon for the parties to desire the Division and the state Attorneys General to coordinate their respective investigations. Close coordination allows the parties to avoid the additional costs of responding to duplicative investigations. Moreover, close cooperation between the Division and the states facilitates the consistent application of the antitrust laws, making it less likely that a state Attorney General and the Division will arrive at different conclusions concerning a merger. State Attorneys General are free to challenge and seek divestiture in transactions that a federal agency declines to challenge. See California v. American Stores, 495 U.S. 271 (1990). The likelihood of such a challenge is reduced when there is significant coordination and cooperation.

    a.   Information Sharing Issues

The HSR and Antitrust Civil Process Acts restrict significantly the ability of the Division to share information with state enforcement officials. It is Division policy to treat the fact of a filing of HSR forms, the date the resulting waiting periods end and the issuance of Second Requests as confidential information under the HSR statute. The ACPA prohibits the disclosure of answers to CIDs. The Division also maintains the confidentiality of its work product.

In response to two Court of Appeals decisions prohibiting disclosure of HSR materials to state Attorneys General, NAAG in 1988 adopted the Voluntary Pre-Merger Compact (NAAG Compact). See Lieberman v. FTC, 771 F.2d 32 (2d Cir. 1985); Mattox v. FTC, 751 F.2d 116 (5th Cir. 1985). The NAAG Compact allows parties to an HSR merger to file with a designated state liaison copies of the initial HSR filing, any Second Request, and Second Request filing. The states agree to keep all information they receive pursuant to the Compact confidential, except in connection with a state challenge of the transaction. In exchange for providing the information to the state, the state agrees not to issue compulsory process during the waiting period. Under a 1994 amendment to the NAAG Compact, the states reserve the right to issue compulsory process if the parties decline to produce voluntarily any information requested by a state that is not produced pursuant to a Second Request.

In 1997, the Division, FTC, and NAAG reached agreement on a protocol (found at Appendix B of this chapter) to facilitate coordination of parallel state and federal merger investigation as much as possible within statutory constraints. Prior to any disclosure of materials to a state Attorney General, the protocol requires the parties to submit a letter to the Division (1) agreeing to provide the liaison state

with all information submitted to the Division and (2) waiving the HSR and CID confidentiality provisions to the extent necessary to allow discussions of protected materials between the Division and state Attorneys General. Once the waiver letter from the parties is received, the Division will provide the liaison state with the Second Request and CID schedules of the parties and third parties and the HSR waiting period expiration date.

In absence of a waiver, cooperation with a state is restricted. The state may, however, be provided with non-HSR and CID information and directed to public sources. The Division may also provide the states with CID schedules, with confidential information redacted. The identities of CID recipients should not be redacted.

> b.   Joint or Closely Coordinated Merger Investigations

At the outset of any cooperative effort with state enforcers, it is imperative that Division attorneys discuss with state attorneys the level and nature of possible cooperation. Early discussions will help to avoid misunderstandings between the state and the Division that could prove harmful not only to the investigation but also to the Division's relationships with state Attorneys General. Division attorneys should determine in the initial discussions with state staff the level of the state's interest in the transaction. In the event the state wishes to take an active role in the investigation, issues that should be discussed include possible joint interviews of witnesses, coordination of CID depositions and review of documents.

> i.   Conducting Interviews with State Attorney General Staff

There may be several advantages to conducting interviews with state enforcers. Conducting interviews with state staff conserves state and Division resources by avoiding duplicative interviews. Many witnesses desire to be interviewed jointly by the state and the Division in order to avoid the time and expense of separate interviews. Joint interviews can only be done with the advance consent of the witness. In some cases, however, joint interviews may not be practical or feasible. The needs of the investigation and the enforcement interests will generally dictate the best approach.

Division and state staffs should establish ground rules for interviews. The state, for instance, may wish only to participate in interviews of certain witnesses. On the other hand, the state may wish to be given notice, when possible, of all interviews and the opportunity to participate. Similarly, the Division staff may wish to obtain a commitment from the state to give Division staff notice of and the opportunity to participate in witness interviews conducted by state staff. Agreement should be reached in advance as to who will be the primary questioner in the interview, and whether an opportunity will be provided to other participants to ask their own questions either during the body of the interview or after the primary questioner has completed his or her questions.

> ii.   CID Depositions with State Attorney General Staff

With the oral or written consent of the witness, state staff attorneys have been permitted to attend CID depositions. The state's attendance at CID depositions avoids possible duplicative depositions under state CID statutes. On the other hand, having additional attorneys present may tend to make the witness more circumspect. Before inviting state staff attorneys to participate in CID depositions, staff should consult with the appropriate Director of Enforcement and consider alternatives such as reviewing questions with the state in advance and providing a copy of the transcript to the state, which may be done with the written consent of the witness.

Participation by Division staff in state CID depositions may be an alternative when a witness declines to consent to the participation of the state attorneys in CIDs under the ACPA. Most state Attorneys General interpret their state CID statutes to allow the participation of Division attorneys without the consent of the witness. Division attorneys may participate in state CID depositions as long as it is clear that the depositions can be used in any subsequent Division challenge of the transaction regardless of whether the state is a party to the litigation.

Finally, in past cooperative efforts, the Division and the state have divided the taking of depositions, with the state deposing certain witnesses under a state CID statute and the Division deposing the remaining witnesses under the ACPA. Assigning certain witnesses to be deposed by the state staff may, in appropriate circumstances, allow for more efficient use of Division and state resources. It may also result in a somewhat more informative deposition if the witness is confronted with fewer attorneys. Division staff must be certain that the state CID depositions may be used in any challenge by the Division.

### iii.  Joint Settlements with State Attorneys General

The parties may wish to pursue a settlement with the Division and the states simultaneously. Division and state Attorney General staff should in those instances reach an understanding in advance concerning the state's participation in settlement discussions with the parties.

### 6.  Cooperating with State Attorneys General in Civil Non-merger Investigations

Civil enforcement is the "bread and butter" of the typical state Attorney General's antitrust enforcement program. As with merger investigations, the appropriate level of cooperation with a state Attorney General is determined on a case-by-case basis depending upon the Division's need for additional personnel, the state's parallel need for support, the benefit to the parties of governmental coordination, the cost of any delay the coordination would entail, and the complexities of coordination. Discussions with the state staff in the early stages of the investigation are crucial. Just as with merger investigations, Division attorneys should discuss with their state counterparts such issues as joint interviews, CIDs and document review, as well as the timing of phases of the investigation.

An additional issue that should be discussed early in the investigation is whether the state intends to seek damages. The state's pursuit of damages may make joint

settlement negotiations difficult. Because the Division usually seeks injunctive relief, the parties may wish to reach agreement on a decree and then negotiate separately with the state concerning damages.

Similarly, most state statutes have civil penalty and attorneys' fees provisions. Subjects of an investigation may resist paying civil penalties or attorneys' fees to the state, possibly making joint settlement negotiations with the state difficult even if there is no separate state claim for damages. Accordingly, it should also be determined whether the state intends to seek penalties and/or attorneys' fees.

7. <u>Cooperation with State Attorneys General on Criminal Investigations</u>

As stated above, most state Attorneys General are primarily concerned with recovering civil damages on behalf of natural persons residing within their states, and state agencies, institutions and political subdivisions harmed by unlawful conduct. An increasing number of state Attorneys General, however, have recently established active criminal antitrust enforcement programs.

a. <u>Cross-Designation Program</u>

In 1984, as part of the Division's efforts to strengthen cooperation with state Attorneys General in the prosecution of criminal antitrust matters, the Division instituted the Cross-Designation Program. The program allows the Division to stretch enforcement resources through the appointment of state prosecutors to assist the Division on grand jury investigations. As with civil investigations, state prosecutors often have special knowledge of local markets that may prove helpful in a grand jury investigation. The program also provides state prosecutors opportunities to gain experience in criminal antitrust enforcement, experience that hopefully will result in increased criminal antitrust enforcement by state Attorneys General.

Every attorney selected for the program will be appointed as a Special Assistant to the United States Attorney General, pursuant to 28 U.S.C. § 515(a), and will be detailed to the Antitrust Division. Section 515(a) authorizes Special Assistants, when specifically directed by the Attorney General, to conduct any kind of criminal legal proceeding, including grand jury proceedings, which United States Attorneys are authorized by law to conduct.

Special Assistants initially will be appointed for six months, on the basis of a name and fingerprint check, pending completion of a full-field background investigation by the Federal Bureau of Investigation. The appointment may be extended upon satisfactory completion of the background investigation.

Special Assistants will serve without compensation other than that which they receive through their existing employment with the state. A Special Assistant will report to and act under the direction of the Chief of the field office, task force, or section conducting the investigation or prosecution or such other attorney or attorneys in the Antitrust Division as the Chief may designate. A Special Assistant may be terminated at any time and without cause or notice. Each Special Assistant must take an oath of office and must agree to abide by all restrictions applicable to

attorneys employed by the Department of Justice against the disclosure to unauthorized persons of information obtained in the course of service as a Special Assistant, including the restrictions of Rule 6(e) of the Federal Rules of Criminal Procedure regarding the disclosure of grand jury materials.

### i.  Procedures

Requests to participate as a cross-designee for a particular investigation should be made to the office of the Deputy Assistant Attorney General for criminal enforcement, who will arrange with the Personnel Unit for the appropriate forms to be sent to the state Attorney General. Upon the return of the completed forms to the Division, including three fingerprint cards, the Personnel Unit will arrange for a name and fingerprint check by the FBI. Once this has been completed, the applicant will be notified of his/her six-month appointment pending completion of the FBI's full-field background investigation. The Special Assistant must sign the appointment letter and oath of office and return them to the Division. Thereafter, the section, task force, or field office Chief is notified of the appointment and is sent a copy of the appointment letter and oath. These should be filed with the clerk of court in the district where the investigation is being conducted. The section, task force, or field office Chief should also request a grand jury letter of authority for the Special Assistant, which may also be filed with the clerk. Upon completion of the full-field investigation, the Special Assistant's term of appointment may be extended to one year from the original appointment date.

### ii.  NAAG - Antitrust Division Protocol

NAAG and the Division in 1994 agreed upon a protocol concerning the cross designation of state attorneys. (A copy of the protocol is found in Appendix A to the chapter.) The purpose of this protocol is to address several of the issues that may arise in connection with the cross designation of state attorneys, particularly when the state has potential civil treble damage claims involving the same subject matter as the grand jury investigation.

The simultaneous participation by a Special Assistant in the grand jury investigation and a civil action brought by the state Attorney General involving the same subject matter presents potentially significant Rule 6(e) problems. The state commits under the protocol to delay the filing of any damage action involving the subject matter of the grand jury investigation until the completion of all prosecutions at the district court level. There is an exception when the state faces the possible expiration of the statute of limitations of its civil claims.

Simultaneous civil and criminal proceedings may be unavoidable in many circumstances because the Clayton Act and most state antitrust statutes impose a four year statute of limitations on civil treble damage antitrust actions. See 15 U.S.C. § 15b.[3] By contrast, there is a five year statute of limitations for criminal antitrust actions. See 18 U.S.C. § 3282. Whenever the state Attorney General files a civil action during the pendency of a grand jury investigation to preserve a civil claim, the protocol requires the state Attorney General to assign separate staff to handle the civil action and to ensure that the civil staff and any person supervising the civil staff be screened from any information obtained in

connection with the grand jury investigation.

Simultaneous criminal and civil proceedings provide opportunities for defense counsel to use civil discovery to depose government witnesses. The commitment under the protocol to delay the filing of civil damage actions significantly benefits the Division because it prevents this potential misuse of civil discovery.

It is crucial to the success of any joint effort that Division and state attorneys discuss at the outset the issues covered by the protocol. Division staff should obtain a commitment from the official in the state Attorney General's Office responsible for antitrust enforcement that the state will adhere to the protocol.

> b. Cooperation with State Attorneys General in Connection with Parallel State Civil Investigations

It is not uncommon for a state Attorney General to conduct a civil investigation at the same time the Division is conducting a grand jury investigation of the same conduct. It is in the interests of the Division and the state Attorney General to coordinate their respective investigations to the extent practical. For the reasons stated in the previous section, the Division may request that the state Attorney General defer filing a civil action involving the subject matter of a grand jury investigation during the pendency of the investigation if it appears that a state civil action may interfere with an ongoing Division prosecution. The Division will not make such a request if the state is faced with the possible expiration of the statute of limitations. The state has significant incentives to ensure that a state civil action does not interfere with possible criminal prosecutions by the Division. Guilty pleas and convictions constitute prima facie evidence of liability in Sherman Act civil actions. See 15 U.S.C. § 16(a).

Division staff should also determine whether the state is contemplating taking CID depositions of possible targets and government witnesses. Since most state CID statutes authorize the state Attorney General to grant immunity to and compel the testimony of witnesses, state CID depositions of possible targets of a grand jury investigation could present significant Kastigar problems for the Division in any subsequent prosecution of a state CID witness. See Kastigar v. United States, 406 U.S. 441 (1972).

Testimony compelled under a state grant of immunity cannot be used against the witness in a federal criminal prosecution. Murphy v. Waterfront Comm'n, 378 U.S. 52 (1964) (constitutional privilege against self-incrimination protects a state witness against incrimination under federal as well as state law and a federal witness against incrimination under state as well as federal law). Accordingly, when a defendant in a federal criminal trial has previously testified pursuant to a state grant of immunity, the Division has the burden of establishing that the immunized testimony has not tainted its evidence. See Murphy, 378 U.S. at 79.

Division attorneys should ensure that they are not exposed to the immunized CID testimony of a potential target. The state should be requested not to disclose to the Division the CID deposition testimony of any witness. Since most state CID statutes contain strict confidentiality provisions, there should be little likelihood of

public disclosure of the testimony, except for use in a state proceeding. In most instances, the federal criminal proceeding will be concluded prior to any state proceeding in which the CID deposition testimony might be disclosed.

Insulating Division staff from exposure to immunized testimony does not end the inquiries concerning the use of the testimony against a defendant. North v. United States, 920 F.2d 940 (D.C. Cir. 1990). The Court in North found that Kastigar is instead violated whenever the prosecutor puts on a witness whose testimony is shaped, directly or indirectly, by compelled testimony, regardless of how or by whom he was exposed to that compelled testimony. See North, 920 F.2d at 942.

The state's use of a defendant's immunized testimony in interviews or depositions of individuals who subsequently testify in a criminal trial raises Kastigar issues similar to those in North. In the course of questioning witnesses, a state prosecutor might disclose portions of the defendant's immunized testimony, which the witnesses could then arguably use to shape their testimony in the subsequent federal criminal trial. Demonstrating that witnesses questioned by state prosecutors under these circumstances did not shape their testimony could be difficult and time-consuming. Accordingly, the Division may request that the state, in the spirit of cooperation, refrain from immunizing possible targets of Division grand jury investigations.

State CID depositions of cooperating witnesses may also present problems. Because state CID deposition transcripts may be discoverable, transcripts of testimony of cooperating witnesses are sources of possible impeachment. As an alternative, the state could interview the cooperating witnesses without recording or transcribing the interview. The state prosecutor's notes should be protected from discovery under the work product doctrine. If government witnesses are willing to cooperate with the state, Division staff should consider requesting that the state refrain from taking the witness' CID depositions until the completion of the criminal trial. This type of request has been made of state Attorneys General in the past with good results for all involved.

    c.  <u>Global Settlements of Criminal Charges and State Attorneys General Civil Claims</u>

One area of concern for state Attorneys General is the situation in which the Division accepts a plea from a defendant requiring the payment of a substantial fine that renders the defendant unable to pay civil damages to the state. Where the state has potential civil claims arising out of conduct that is the subject of a Division criminal enforcement action and the defendant may be experiencing financial difficulties, there are two options that Division staff should explore with state staff. Division staff could attempt to negotiate a plea agreement that requires the defendant to pay restitution to the state. The state should be consulted concerning the amount of restitution. The other option is a global settlement that includes a plea agreement with the Division and a civil settlement with the state. The Division and the state would determine the maximum amount of criminal fines and civil damages the defendant could pay and remain viable, and then decide on the amounts to be paid as criminal fines and civil damages. The Division has successfully negotiated plea agreement restitution provisions and

global settlements with state Attorneys General in the past.

D. Relationships with Foreign Governments, International Organizations and Executive Branch Agencies with International Responsibilities

   1.  Background and Procedures

Because of the increasing globalization of trade and commerce, the Division's work frequently requires contact with foreign governments, companies and individuals. Contact with foreign individuals and entities is subject to the requirements of various international agreements to which the United States is a party. In addition, direct contact by Division attorneys with foreign nationals and entities may raise sovereignty concerns in foreign countries and, in some instances, constitute a violation of the foreign country's laws. Matters with international aspects, therefore, often raise issues of special concern and should always be brought to the attention of the Foreign Commerce Section.

In addition to imposing obligations on the Department, many of the international agreements to which the United States is a party and the international relationships which the Department maintains also present opportunities both for obtaining assistance in specific investigations and enhancing overall cooperation efforts in international antitrust enforcement. It is the responsibility of the Foreign Commerce Section to maintain these relationships with foreign governments and international organizations, as well as to work with the Department of State and other Executive Branch agencies with international responsibilities in order to ensure that the Department fulfills its responsibilities under its international agreements.

Among the international agreements likely to be of interest to Division attorneys are the bilateral mutual legal assistance treaties ("MLATs"), pursuant to which the United States and a foreign country agree to assist one another in criminal law enforcement matters. MLATs create a routine channel for obtaining a broad range of legal assistance in foreign countries, including taking testimony or statements from witnesses, providing documents and other physical evidence in a form that would be admissible at trial, and executing searches and seizures. The U.S. currently has MLATs in force with approximately 20 countries; many others have been signed but are not yet in force.

The Criminal Division's Office of International Affairs ("OIA") acts as liaison for the Department with regard to incoming and outgoing assistance requests under the MLATs. OIA also maintains relationships for the purpose of obtaining legal assistance in criminal law enforcement matters with many other countries. Assistance requests from countries with which the United States does not have an MLAT usually take the form of letters rogatory--requests from a U.S. court to a foreign court--although some such countries may accept a less formal MLAT-like request. The Foreign Commerce Section works closely with OIA on matters relating to foreign discovery requests, and is responsible for assisting Division attorneys who desire to obtain foreign-located information. Foreign Commerce should be consulted prior to the transmission of any assistance request to OIA.

As indicated above, various countries, including some of our important trading partners, have domestic laws or policies which may impact efforts by the Division to obtain information from foreign nationals or corporations. Because of the varying requirements that foreign governments impose, it is important that the Foreign Commerce Section be apprised of any actions which Division attorneys plan to undertake which may raise international issues.

The United States is also party to a number of bilateral and multilateral international agreements which require the notification of foreign governments about proposed actions to be taken by the Division which may affect their interests. Many foreign governments consider their interests to be affected by Division actions in a wide range of circumstances: such as when the Division seeks information or documents located in their countries; when we investigate or otherwise have dealings with their firms or citizens; or when conduct which we are investigating occurred in whole or in part in their countries. These agreements include our bilateral cooperation agreements with Australia, Canada, the European Communities, and Germany, and the OECD's Revised Recommendation of the Council Concerning Cooperation Between Member Countries on Anticompetitive Practices Affecting International Trade (1995).

Notification of contemplated Division investigative or enforcement action that may affect another country's interests is intended to avoid misunderstandings that may affect our future ability to enforce the antitrust laws. It is the responsibility of the Foreign Commerce Section to carry out the Department's notification obligations under these agreements.

In accordance with Division Directive ATR 3300.2, "Notification of Antitrust Activities Involving Foreign Companies, Individuals or Governments," any section or field office Chief responsible for a matter potentially relating to foreign commerce should keep the Foreign Commerce Section fully apprised so that section can perform its various responsibilities. Proposed actions as to which the Foreign Commerce Section must receive advance notification are set forth more fully in Directive 3300.2. In essence, Foreign Commerce must be informed:

    a. when authorization is requested for an investigation (including business reviews), case or competition advocacy that may involve substantial interests of a foreign government, foreign national, or foreign corporation. Most commonly, this will involve situations in which:

        i. a foreign national, foreign corporation or a U.S. corporation in which a foreign company owns a substantial interest is a subject or target of a criminal or civil non-merger investigation, or a merging party in a merger investigation;

        ii. the investigation involves conduct that occurred in whole or part outside the United States; or

        iii. the activities which are the subject of their investigation may have been wholly or in part required, encouraged or approved

by a foreign government;

    b.  as soon as staff learns or has reason to believe that any of the circumstances described in the preceding paragraph are present in the investigation;

    c.  before information, documents or evidence is sought (whether through subpoena, CID or voluntary request) which is or may be located outside the United States;[4]

    d.  before information is sought from a foreign national (even if the foreign national is located in the United States when the request is made);

    e.  before seeking to conduct interviews or depositions in another country;

    f.  before requesting information or cooperation from foreign antitrust authorities, or other agencies of a foreign government;

    g.  before sending out target letters in a criminal investigation to foreign individuals or corporations, or to U.S. corporations in which a foreign entity owns a significant interest;

    h.  before entering into settlement discussions or plea negotiations with a foreign entity or individual, or a U.S. company in which a foreign entity has a substantial ownership interest; or

    i.  when staff is contacted by or on behalf of a foreign individual, entity or government.

    2.  <u>Liaison with the Department of State</u>

The notifications described above are generally transmitted to the relevant foreign governments through the Department of State. Notifications are sent by the Antitrust Division to the State Department's Office of Multilateral Trade Affairs, for transmission through diplomatic channels. That Office also routes these notifications to State Department desk officers responsible for the countries to which the notifications are addressed. This allows the State Department to consider whether the actions or proposed actions described in the notifications have any foreign policy implications, and to consult with the Division on any issues raised by the notification. The Foreign Commerce Section is charged with the responsibility to act as liaison with the State Department with regard to these notifications.

    3.  <u>Liaison with the Immigration and Naturalization Service</u>

As the number of Division investigations involving potential foreign subjects and/or witnesses increases, the Division has, with increasing frequency, requested the Immigration and Naturalization Service to establish border watches to check

for the entry into the United States of relevant foreign nationals. Criteria for the implementation of a border watch and sample border watch requests can be obtained from the appropriate Special Assistant or the office of the Director of Criminal Enforcement.[(5)] Such requests are coordinated through the office of the Director and must be signed by the Assistant Attorney General. If a border watch is implemented, as soon as the need for the watch passes, a letter should be sent to INS--through the office of the Director--requesting that the border watch be lifted.
[(6)]

The increase in the Division's international enforcement effort has also resulted in an increase in the number of foreign individuals charged in the Division's criminal cases. For many of these defendants, an important inducement to submit to U.S. jurisdiction is the ability to resume travel for business activities in the United States. Since, however, the INS considers criminal violations of the Sherman Act to constitute "crimes involving moral turpitude," see 8 U.S.C. § 1182 (a)(2)(A)(i)(I), foreign nationals convicted of such crimes may be subject to exclusion or deportation from the United States. The Division has therefore entered into a Memorandum of Understanding ("MOU") with the INS pursuant to which each component agrees to cooperate with the other in their respective enforcement obligations. The MOU, signed in 1996 by the Assistant Attorney General and the Commissioner of the INS, establishes a protocol whereby the Antitrust Division may petition the INS to preadjudicate the immigration status of a cooperating alien before the alien enters into a plea agreement or pleads to a crime. Division attorneys who wish to consider whether the MOU might be applicable in their matters should consult with the Director of Criminal Enforcement or the Deputy Assistant Attorney General for criminal enforcement before entering into discussions with counsel.

4.  Direct Bilateral Antitrust Cooperation and Consultation with Foreign Governments

In order to further the Division's goal of promoting the cooperation of foreign governments in our antitrust enforcement efforts, the Foreign Commerce section is responsible for seeking and maintaining bilateral understandings with antitrust enforcement agencies in other countries. The Division over the past several years has developed close bilateral relationships with antitrust officials of numerous countries. In certain instances, understandings have been reached on the obligations of governments as to notification, consultation, and cooperation in antitrust matters.

Formal bilateral antitrust cooperation agreements exist with Australia, Canada, the European Communities and the Federal Republic of Germany. In addition to setting out notification and consultation obligations, these agreements contemplate the exchange of information between the parties on matters relating to each other's enforcement interests. These agreements, however, do not override domestic laws of either country, including confidentiality laws. Regular consultations are held with antitrust officials of Canada, the European Union and Japan; similar consultations are held on an ad hoc basis with other countries. Close informal ties are maintained with antitrust authorities in other countries. Relationships with foreign antitrust authorities, whether or not they have resulted in the execution of

formal agreements, are often helpful in facilitating the execution of law enforcement assistance requests.

In 1994, Congress passed and the President signed the International Antitrust Enforcement Assistance Act (the "IAEAA"). The IAEAA gives the Department and the Federal Trade Commission the authority to enter into bilateral agreements with foreign antitrust authorities which would, among other things, allow the exchange of otherwise confidential information. The Division is engaged in discussions about such agreements with competition officials of several countries.

5. Cooperation with International Organizations

a. The Organization for Economic Cooperation and Development

The Division, along with the FTC and State Department, represent the United States in the Organization for Economic Cooperation and Development ("OECD") Committee on Competition Law and Policy. This Committee and its working groups normally meet three times a year at the OECD headquarters in Paris to consider issues of common concern to the 28 member countries of the OECD, including cooperation in antitrust enforcement, regulatory reform and the sharing of experience in particular substantive areas. The Division also participates, along with the Office of the United States Trade Representative, FTC, and State and Commerce Departments, in the OECD's Joint Committee on Trade and Competition.

b. The United Nations

The Antitrust Division participates in international conferences of the United Nations. These include meetings of Experts on Competition Law and Policy, held under the auspices of the United Nations Conference on Trade and Development (UNCTAD), to monitor a voluntary international antitrust code of conduct adopted in 1980 by the U.N. General Assembly, and to discuss competition law and policy generally. This work is coordinated with the Department of State and other U.S. government agencies. This work is currently supervised in the Division by the Foreign Commerce Section, with the cooperation of other sections when needed.

c. Regional Trade Agreements

The Antitrust Division participates in a number of negotiations and working groups related to regional trade agreements. The Division chairs the U.S. delegation to a working group on trade and competition under chapter 15 of the North American Free Trade Agreement, and participates with other U.S. government agencies in competition policy working groups associated with the Free Trade Area of the Americas and Asia-Pacific Economic Cooperation. The Division will also play an important role in the working group to be established in 1997 by the World Trade Organization to study issues relating to the interaction between trade and competition policy.

6. Competition Advocacy in United States International Trade Policy and Regulation

The Division, through the Foreign Commerce Section, represents the Attorney General at the staff level in several interagency committees involved in the formulation and implementation of U.S. international trade and investment policies. In addition to regular participation in interagency deliberations, the Division from time to time participates in U.S. Government delegations negotiating agreements with other governments. These activities usually are coordinated by the Office of the United States Trade Representative ("USTR") and/or other parts of the Executive Office of the President. USTR conducts considerable interagency work through the Trade Policy Review Group, a body on which the Division represents the Department of Justice.

The Division is a principal advocate of competition as the cornerstone of American international economic policy. In addition, the Division actively seeks to provide advice in trade negotiations on the antitrust implications of proposed trade agreements. Finally, the Division advises USTR or other agencies on the antitrust implications of various trade policy options, in order to ensure consistency with the antitrust laws.

7.  Committee on Foreign Investment in the United States

The Division, through the Foreign Commerce Section, represents the Attorney General at the staff level on the Committee on Foreign Investment in the United State ("CFIUS"). CFIUS, which is chaired by the Secretary of the Treasury, reviews and advises the President concerning certain international transactions pursuant to section VII of Title VII of the Defense Production Act of 1950, 50 U.S.C. app. 2071, commonly referred to as the Exon-Florio provision. This statute authorizes the President to suspend or prohibit any merger, acquisition, or takeover, by or with a foreign person, of a person engaged in interstate commerce in the United States when, in the President's view, such foreign person might take action that threatens to impair the national security.

E. Relationships With Federal Agencies That May Be the Victim of Anticompetitive Conduct

In some instances, federal agencies may be the victim of conduct that violates the antitrust laws. Agencies involved in procurement--such as the Department of Defense, the Department of Housing and Urban Development, the Environmental Protection Agency, etc.--may be victimized by bid-rigging or other criminal conspiracies. Similarly, federal agencies can also be adversely affected by civil antitrust violations: in particular, mergers in industries like defense can have their greatest impact on federal government procurement.

1.  General

With the exception of the mergers involving the Department of Defense (discussed below), no special procedures are required to contact personnel at other federal agencies who may have knowledge relevant to civil or criminal antitrust violations. Generally, when information is required from other federal agencies, it is obtained relatively informally on a consensual basis. In the event that a federal agency is reluctant to provide information voluntarily, staff should consult with

the appropriate Director of Enforcement or Deputy Assistant Attorney General.

In addition, if an investigation involves procurement by a federal agency, staff should consider seeking the assistance of that agency's Inspector General's Office. IG agents have in the past proven to be very helpful in collecting and analyzing bid or pricing data, in interviewing potential witnesses, and in helping Division attorneys to understand a particular agency's procurement system and regulations. No special Division procedures are required for obtaining the assistance of IG agents, and staff should make whatever arrangements are appropriate directly with the Inspector General's office for the agency involved.

   2.   Department of Defense--Merger Investigations

The Defense Science Board Task Force on Antitrust Aspects of Defense Industry Consolidation, which included representatives of the Division and the FTC, issued a report in 1994 that creates the framework for investigations of mergers in the defense industry. The report recognized that the Department of Defense's ("DoD") knowledge of the defense industry and its "unique perspective on the health of the industrial base" can contribute to an informed review of defense mergers by the enforcement agencies. Although the Division makes the ultimate decision on whether to challenge any defense merger that it investigates, it is committed to "give significant weight to [DoD's] views in the national security implications and competitive aspects of a proposed transaction."

On a practical level, the report established the Office of the Deputy Under Secretary of Defense for Industrial Affairs and Installations ("DUSD") as the central point of contact on antitrust issues. The DUSD uses both its own permanent staff and attorneys detailed from the DoD General Counsel's office. Throughout any defense merger investigation, the office of the DUSD will arrange all interviews with knowledgeable DoD staff and will coordinate information provided to the Division while conducting a parallel investigation. Division staff should contact the Director of Merger Enforcement before initiating contact with DUSD on a matter. Division staff is expected to develop strong working relationships with DoD staff working on the investigation and should seek appropriate waivers to share confidential information received through discovery with DoD staff. In most cases, DoD will, at the completion of its review and discussion with Division staff, formally communicate its views on the competitive impact of a proposed transaction and any proposed relief to the Division.

When reviewing HSR filing in the defense industry, staff should not "early terminate" the waiting periods without clearance from the appropriate Deputy Assistant Attorney General, to allow DoD the opportunity to convey to the Division any competitive concerns.

F. Congressional and Inter-Agency Relations

The Legal Policy Section is responsible for ensuring consistency in the Division's congressional relations and in its dealings with other federal agencies on matters affecting the Administration's legislative program.

1. Legislative Program

The Legal Policy Section advises the Assistant Attorney General and other senior policy officials on matters affecting the Division's legislative program. The Section draws on the resources of the Division as a whole in identifying legislative matters of importance to the Division, and in developing and articulating the Division's position on pending legislation.

Division staff should contact the Legal Policy Section if they become aware of legislation that may impact the policy interests of the Antitrust Division or the enforcement of the antitrust laws. Members of the Division are also encouraged to bring possible legislative initiatives to the attention of the Chief of the Legal Policy Section who is responsible for evaluating, developing and presenting such initiatives to the Division's senior policy officials. Legislative proposals must be approved by the Assistant Attorney General before being discussed outside of the Division. Staff acting in an official capacity should not offer views on pending legislation or discuss legislative initiatives without first consulting the Chief of the Legal Policy Section.

2. Testimony; Written Legislative Reports

The Antitrust Division is often asked to testify before Congress or to prepare a written report stating the Administration's views on pending or proposed legislation. The Legal Policy Section is responsible for coordinating the Division's response to such requests. The preparation of testimony and written reports is supervised by the Chief of the Legal Policy Section, working closely with senior Division policy officials. When appropriate, the Legal Policy Section will consult sections for assistance. Both testimony and written comments require the approval of the Assistant Attorney General and clearance by the Department; in addition, both are subject to interagency review and final clearance by the Office of Management and Budget. The Legal Policy Section is responsible for obtaining all necessary clearances.

In reviewing proposed legislation, attorneys and economists should consider carefully the potential impact of such legislation on the antitrust laws and the enforcement of those laws. A proposal's impact on the operations of the Antitrust Division should also be considered. Written comments and reports should be tailored according to the significance and complexity of the legislation and its importance to the Division. As written testimony and legislative reports frequently become part of the public record, careful attention is necessary at all stages of the drafting process.

3. Interagency Clearance and Approval Procedures

Before transmittal to Congress, legislative proposals or comments from Executive Branch agencies, including testimony and written reports, must be reviewed and cleared by the Office of Management and Budget ("OMB"). The Antitrust Division participates in OMB's interagency clearance process in both an originating and reviewing capacity.

In the case of legislative materials originating within the Antitrust Division, once such materials have been approved by the Assistant Attorney General, the Legislative Unit transmits them to the Department's Office of Legislative Affairs ("OLA"), which in turns submits them to OMB for interagency clearance and approval.

OMB referrals of other agencies' proposals that are sent to the Department for comment are transmitted to OLA where they are logged-in and, if designated for review by the Antitrust Division, delivered to the Legislative Unit. In most instances, the Legislative Unit will promptly forward these proposals to the section, task force, or field office with substantive responsibility for the subject matter for review and comment. Such referrals are subject to only cursory review by Legislative Unit staff prior to delivery to the appropriate component. After receipt by the appropriate component, OMB referrals require priority handling, with strict attention to internal deadlines established by the Legislative Unit.

Staff comments, including written comments intended for submission to OMB, should be e-mailed to the Legislative Unit. Whenever possible, comments should be cleared by a section supervisor; however, this requirement may be waived for referrals requiring a same day response. "No comment" replies should also be e-mailed to the Legislative Unit, for record purposes.

Draft comments need not be prepared as formal memoranda; however, written comments must be in a form that is suitable for direct transmission to OMB clearance officials. Given the strict deadlines that accompany OMB referrals, the Legislative Unit does not provide drafting assistance, unless by pre-arrangement.

### 4.   Congressional Correspondence

Incoming congressional mail addressed to Main Justice or bearing the Department's central zip code, 20530, is sorted by the Department's Mail Referral Unit and entered into a Department-wide correspondence management database. It is then transmitted to the Department's Executive Secretariat, where each item is assigned a file number and specific instructions for reply. Correspondence designated for handling by the Antitrust Division is then transmitted to the Legislative Unit, where it is downloaded, logged on the Division's Correspondence and Complaint Management System and assigned to an appropriate section, task force, or field office within the Division for the preparation of a draft reply.

Drafts must conform to standards developed by the Office of the Attorney General for controlled correspondence, see DOJ Correspondence Policy, Procedures, and Style Manual, as well as all relevant Department and Division policy guidelines on communications with Members of Congress and the disclosure of confidential information. See Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases." Attorneys are expected to meet the internal reply deadline assigned by the Legislative Unit and any item-specific drafting instructions contained in the transmittal materials.

Prior to transmitting a draft to the Legislative Unit, staff should clear proposed

replies with their section, task force, or field office supervisor, who should review drafts not only for their content, but also for conformance to Department standards.

Staffs are expected to notify the Legislative Unit whenever it appears that additional time will be needed for the preparation of a draft reply. In addition, all congressional correspondence delivered directly to an individual or office within the Division should be referred to the Legislative Unit for handling. Specific procedures for the management of congressional correspondence and other high priority mail are addressed in Division Directive ATR 2710.1, "Procedures for Handling Division Documents."

    5.   Informal Congressional Inquiries

The Division often receives informal inquiries from congressional staff and other congressional sources. In order for the Division to be aware of the nature and extent of its congressional contacts, all telephone, fax and e-mail inquiries from congressional sources should be directed to the Legal Policy Section's Legislative Unit. Inquiries will be screened by the Chief of the Legislative Unit and, when necessary, cleared for handling by appropriate Division personnel. If a Division attorney or economist has occasion to discuss matters of interest to the Division with congressional staff without prior clearance, the Chief of the Legislative Unit should subsequently be informed of the nature and content of the communication. See also Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases." These occasions should be infrequent, as congressional inquiries should ordinarily be referred to the Legislative Unit.

    6.   Resources

The Legislative Unit maintains extensive legislative files on congressional activities. Its files include archival materials from previous sessions of Congress and records of the Division's contacts with Congress, such as written testimony, legislative reports prepared at the request of a congressional committee, and correspondence with individual members of Congress. These materials and other legislative resources are available to members of the Antitrust Division upon request. The Unit's permanent files are a useful record of the Division's participation in past legislative initiatives, and their use is encouraged.

The Legislative Unit also has access to a variety of resources that can made available upon request to Division personnel. Legislative resources include the Congressional Monitor, Congressional Record, the Congressional Quarterly, the Weekly Compilation of Presidential Documents and various online databases. In addition, the Unit may query the Department's correspondence database for information on Members' correspondence history with the Division and correspondence statistics generally.

All Division professionals are encouraged to use the resources of the Legislative Unit and to contact Unit personnel whenever they need information or have questions about legislative matters.

G. Freedom of Information Act Requests and Procedures

　　1.　Organization

Since the passage of the Freedom of Information Act ("FOIA") in 1966, 5 U.S.C. § 552, individuals, public interest groups, corporations, and other entities have been provided access to various categories of governmental records unless access is specifically limited by one of the exemptions to the Act. The 1996 amendments to FOIA make clear that information maintained electronically is covered by the Act. Requesters have a right, within reasonable limits, to request that information be provided in the format of their choice. In response to the Act, the Department of Justice established FOIA Offices in its various organizational entities, including the Antitrust Division. Final determinations of FOIA matters within the Antitrust Division are made by the Director of Operations. The final Departmental responsibility for making a determination relating to the Act generally rests with the Office of Information and Privacy. The Antitrust Division's FOIA Unit is staffed by a Freedom of Information Act Officer, paralegals and support personnel. It is part of the Office of Operations.

　　2.　Procedures

FOIA requests that relate to the work of the Antitrust Division are generally directed to the Division's FOIA Unit for processing. It should be noted that the requester of the information is responsible for the cost of reproducing the materials requested, as well as search and processing cost where applicable.

Attorneys in the Division who have worked on a matter about which information has been requested are consulted regularly. The 1996 amendments to the Act impose strict time limits for responding to FOIA requests. Accordingly, attorneys who are consulted by the FOIA Unit should respond expeditiously and provide all possible assistance.

Division attorneys who directly receive requests for Division documents either by telephone or in person should advise the requestor to contact the Freedom of Information Act Officer of the Antitrust Division. The request should be in writing and should describe as specifically as possible the documents requested. Attorneys receiving such calls should immediately notify the Division's FOIA Unit of the request to expedite processing of such requests.

　　3.　FOIA Exemptions

Generally, all "agency records" are available to the public under the Freedom of Information Act, except for nine categories of exempt information.[7] The application of these exemptions generally is discretionary and much information falling within their scope is released to the public.

The exemptions to FOIA are:

　　Exemption 1 -- Classified Documents

This exemption covers national security information that has been properly classified under the standards and procedures of the Executive Order in effect at the time the document was classified. Classified documents can only be processed by employees in the FOIA Unit with the appropriate security clearance.

### Exemption 2 -- Internal Personnel Rules and Practices

This exemption has been interpreted by most courts to apply to: (1) internal agency matters where there is no substantial and legitimate public interest in disclosure, such as procedures for obtaining parking spaces or determining cafeteria hours; and (2) more substantial internal matters the disclosure of which would allow circumvention of a statute or agency regulation.

### Exemption 3 -- Materials Exempted by Other Statutes

This exemption protects information that is specifically exempted from disclosure by another statute. The statutes that pertain to Division matters are: (1) Fed R. Crim. P. Rule 6(e) (grand jury information), (2) 15 U.S.C. § 18a(h) (Hart-Scott-Rodino premerger notification information); (3) 15 U.S.C. § 1314(g) (civil investigative demand material); (4) 15 U.S.C. § 4305(d) (National Cooperative Research and Production Act filings); and (5) 15 U.S.C. § 4019 (commercial or financial information protected by the Export Trading Company Act). Information obtained from other agencies also may be protected by statutes applicable to their areas of responsibility, e.g., the FTC Improvements Act and the income tax statutes.

The coverage of the different statutes varies. For example, copies of actual CID requests generally are not protected while Hart-Scott-Rodino Second Request letters and grand jury subpoenas generally are protected. It also should be noted that excerpts from and descriptions of information received pursuant to the statutes noted above as they appear in transmittal letters and internal memoranda are exempt to the same extent as the source documents.

Copies of statutorily exempt information are released under FOIA only when they have become part of a public trial record.

### Exemption 4 -- Confidential Business Information

This exemption protects both the interests of submitters of proprietary business information and the interests of the government in obtaining access to such information. The exemption covers two categories of agency records: (1) trade secrets; and (2) information that is (a) commercial or financial, (b) obtained from a person, and (c) confidential or privileged. The exemption does not cover commercial or financial information generated by the government, but only information obtained from outside the federal government.

The courts have adopted a narrow definition of the term "trade secret" that is limited to "a secret, commercially valuable plan, formula, process or device that is used for the making, preparing, compounding, or processing of trade commodities and that can be said to be the end product of either innovation or substantial

effort." <u>Public Citizen Health Research Group v. FDA</u>, 704 F.2d 1280, 1288 (D.C. Cir. 1983). Under this definition of trade secret, there must be a direct relationship between the information and the productive process.

Applicable standards under the second category of exemption 4, nondisclosure of commercial or financial information, generally depend upon whether the submitter was obliged to provide the information or submitted it voluntarily. Information that the submitter was required to provide generally must be released unless disclosure either would impair the government's ability to obtain similar information in the future, or cause substantial competitive harm to the submitter. <u>See National Parks & Conservation Ass'n v. Morton</u>, 498 F.2d 765 (D.C. Cir. 1974). Commercial or financial information submitted voluntarily is categorically protected provided it is not customarily disclosed to the public by the submitter. <u>See Critical Mass Energy Project v. NRC</u>, 975 F.2d 871 (D.C. Cir. 1992) (en banc), <u>cert. denied</u>, 507 U.S. 984 (1993). If coverage is unclear, the FOIA Unit will consult with staff attorneys and economists to determine the nature of the commercial or financial information and whether it is exempt under the Act. In addition, under the Department's regulations, 28 C.F.R. § 16.7, the Unit will consult with the submitter as appropriate.

Promises of confidentiality by the Division are pertinent in applying this exemption, but they are not always dispositive. The FOIA Unit <u>always</u> should be consulted before any promises of confidentiality are given to parties from whom we have requested information. <u>See supra</u> Chapter III, Sections C.3, E.7.

Exemption 5 -- Attorney Work Product

This exemption applies to interagency or intra-agency memoranda or letters that would not be available by law to a party. It encompasses the attorney work product, deliberative process, attorney-client and other discovery privileges.

The attorney work product privilege protects documents prepared by attorneys in contemplation of litigation. The privilege also applies to documents prepared by other Division employees and outside expert consultants who are working with an attorney on a particular investigation or case. Unlike the deliberative process privilege, discussed below, factual information generally is included within the attorney work product privilege. <u>See Martin v. Office of Special Counsel</u>, 819 F.2d 1181 (D.C. Cir. 1987). The termination of an investigation or case does not alter the applicability of the attorney work product privilege. <u>See FTC v. Grolier, Inc.</u>, 462 U.S. 19 (1983).

The deliberative process privilege (often referred to as the executive privilege) is much more limited as it covers only internal government communications that are pre-decisional and deliberative. The purpose of the privilege is to prevent injury to the quality of agency decisions. The privilege does not cover post-decisional documents that explain decisions that already have been made. Further, it normally does not apply to essentially factual information unless such information is so intertwined with the analysis or so clearly reflects the internal deliberative process employed by the Division as to make segregation of factual portions impossible.

The attorney-client privilege covers confidential communications between an attorney and the attorney's client relating to a legal matter for which the client has sought advice. This privilege seldom arises with regard to Division documents. It may apply in certain circumstances to communications between the Division and another government agency.

It should be noted that an important caveat in the application of Exemption 5 is the requirement that "each agency . . . shall make available for public inspection -- (A) final opinions . . . made in the adjudication of cases." 5 U.S.C. § 552(a)(2)(A). Under this FOIA provision, final opinions and any documents incorporated by reference in such final opinions must be made public regardless of the exemption under the Act. See Sears Roebuck & Co. v. NLRB, 421 U.S. 132 (1975). However, the Supreme Court expressly declined to decide whether a prosecutor's decision not to file a case or seek an indictment is a final opinion. As such, a case-by-case determination is usually necessary.

## Exemption 6 -- Materials that Involve Invasion of Personal Privacy

This exemption covers matters such as personnel, medical, and similar files that would cause an unwarranted invasion of personal privacy if disclosed. In applying this exemption, the Division must balance the public interest in disclosure against the invasion of privacy the disclosure would cause.

## Exemption 7 -- Investigatory Records

Exemption 7 has several sub-parts that protect a variety of different investigatory records. Exemption 7(A) exempts in general non-public documents relevant to an open and active investigation or case. This exemption may also be applied to closed files where those files are relevant to another open investigation or case.

Exemption 7(B) exempts materials that would deprive a person of a right to a fair trial or an impartial adjudication.

Exemption 7(C) protects those records that reveal personal privacy information similar to that described in Exemption 6.

Exemption 7(D) protects the identity of a confidential source and, in criminal and lawful national security intelligence investigations only, confidential information furnished by that source. In other investigations, this exemption protects the identity of confidential sources, but not necessarily the information furnished except to the extent that the information could be used to identify the confidential source. Sources are considered confidential if they request an express promise of anonymity or if they have provided information in circumstances where the assurance of confidentiality may be reasonably inferred. This exemption applies not only to real persons but also to corporations, trade associations, domestic and foreign governments, and law enforcement sources.

Exemptions 7(E) and (F) protect confidential investigative techniques and procedures and information that would endanger the life or safety of law enforcement personnel, respectively.

Exemptions 8 and 9 -- Financial Records and Geological and
Geophysical Information

These exemptions respectively cover records relating to examination of banks and
other financial institutions by agencies that supervise them and records containing
well information, together with other types of geological information. They
generally are not issues that arise in an antitrust context.

4.    Other Information Not Subject to FOIA

Three types of records that are not subject to the Act are worthy of special note.
These are:

a.    Personal Papers

Personal papers of individual employees are not subject to disclosure under the
Freedom of Information Act. Such personal papers include handwritten documents
as well as other papers and information that the individual maintains for his own
private use and are not part of the official record of any investigation or case. See
Division Directive ATR-2710.1, "Procedures for Handling Division Documents";
Bureau of Nat'l Affairs v. Department of Justice, 742 F.2d 1484 (D.C. Cir. 1984).

b.    Grand Jury Records

Many courts have held that grand jury materials are not subject to the Freedom of
Information Act and may only be disclosed if the court releases them from the
confidentiality requirements of Rule 6(e). This problem often arises in the course
of treble damage litigation and 4F requests by the states. In those situations, the
Division must make an independent determination of what position to take
regarding a request for various types of grand jury information. See supra Section
C.3.

c.    Records Subject to Court-Ordered Protective Orders

Where records are placed under court-ordered protective orders, they generally are
not subject to the Act and may only be released upon application to the court. As
with grand jury information, the Antitrust Division must determine its response on
a case-by-case basis.

5.    Antitrust Division Records Maintenance and Procedures

Antitrust Division attorneys, economists, and paralegals should always carefully
review materials that are placed in official files of the Division to determine that
they are official records and are properly within those files. E-mails that reflect
official government activity should be printed out and placed in the official file. If
it is clear to the attorney at the time the record is made or placed in the file that it
would involve confidential information or material that would be exempt from
FOIA, it is appropriate to make a notation on the document at the time it is placed
within the Division files stating that the document is "FOIA sensitive." This will
assist the FOIA Unit in determining whether the document comports with a proper

exemption or is not otherwise subject to the Act. When confidentiality agreements are made under the terms and conditions outlined above, such agreements should be placed in the file in writing to make those reviewing the files for FOIA purposes aware of the circumstances and the reasons for such confidentiality.

Consistent with the Division's commitment to release information under FOIA that is relevant to the request and that does not fall within a specific exemption or is not subject to the Act, attorneys, economists, and paralegals should be familiar with the Division's directive relating to sensitive information and document retention and destruction. See Division Directive ATR-2710.4, "Safeguarding Sensitive Information" and Division Directive ATR-2710.1, "Procedures for Handling Division Documents."

If any other questions arise as to a proper application of FOIA, or commitments regarding the Act, Division personnel should confer with the Division's FOIA Unit.

H. Relationships with the News Media

The Antitrust Division generally communicates with the media through the Department's Public Affairs Office. A Public Affairs Specialist from the Office of Public Affairs is assigned to handle all antitrust press matters and a close liaison is maintained with that Press Officer, and the entire Office, through the Assistant Attorney General, the Deputy Assistant Attorneys General, and the Directors of Enforcement. Where appropriate, the Public Affairs Office may contact a section, task force, or field office Chief or an attorney to obtain specific information about a matter. The Chief or attorney contacted should provide clarifying information to the Public Affairs Office and should point out whatever information is sensitive or cannot be released publicly, and the reasons for that practice.

1. Press Releases

The Division communicates with the media through the issuance of press releases describing significant matters such as case filings, business review letters, consent decrees, judgment terminations, regulatory filings, and important administrative and policy decisions of the Division. News conferences are held to announce significant enforcement actions. When sending forth a recommendation or pleadings for action, the staff attorneys who are responsible for a particular matter should send a proposed press release to the responsible Director of Enforcement when appropriate. Press releases are also reviewed by the appropriate Deputy Assistant Attorney General and the Assistant Attorney General. The press release is reviewed and modified, if necessary, and the approved copy is sent to the Public Affairs Office. The Public Affairs Press Officer who handles Antitrust Division matters will determine whether any change or clarification is necessary, and discuss the matter with the appropriate sources within the Division. The Division's procedures are set forth in Division Directive ATR-3000.1, "Communications with Outside Parties on Investigations and Cases."

When possible, the proposed press release will be forwarded from the Director's office to the Public Affairs Office at least two business days before it is scheduled

for release to allow time for review and editing. Accordingly, if at all possible, the staff should forward its final draft press release to the appropriate Director's office at least four business days before filing to permit review by the Director, appropriate Deputy Assistant Attorney General, and Assistant Attorney General.[8] Staff should ensure in the days leading up to filing that the office of the appropriate Director is aware of the filing date.

In addition, when an indictment, civil case or consent decree is publicly filed, the attorney immediately should inform the appropriate Director's office of the filing. This office will then inform the Public Affairs Office that the press release should be issued. The attorney handling the matter should not call the Public Affairs Office to authorize release of a press statement.

The Division uses relatively standardized press statements relating to the return of indictments, filing of civil cases, termination of cases by consent decree, consent to termination of judgments and issuance of business review letters. Press releases are available in the Work Product Data Bank as well as on the Division's Internet site. The staff should contact the appropriate Special Assistant if assistance is needed in finding examples of press releases issued in cases similar to their own.

    2.  <u>Press Inquiries and Comments to the Press</u>

It is the policy of the Department of Justice and the Antitrust Division that public out-of-court statements regarding investigations, indictments, ongoing litigation, and other activities should be minimal, consistent with the Department's responsibility to keep the public informed. Such comments as are made are handled through the Department's Public Affairs Office.

Because charges that result in an indictment or a civil action should be argued and proved in court, and not in a newspaper or broadcast, public comment on such charges should be limited out of fairness to the rights of individuals and corporations and to minimize the possibility of prejudicial pre-trial publicity.

Division attorneys should be familiar with the provisions of Division Directive ATR-3000.1, "Communications with Outside Parties on Investigations and Cases"; 28 C.F.R. § 50.2, "Release of Information by Personnel of the Department of Justice Relating to Criminal and Civil Proceedings,"; and the Department's Media Guidelines issued by Attorney General William P. Barr on January 14, 1993.

The following summarizes the applicable policy considerations

    1.  Information about investigations, indictments, and civil cases should be provided equally to all members of the news media subject to specific limitations imposed by law or court rule or order. Written releases relating to the essentials of the indictment, complaint or other pleadings are usually prepared and distributed as outlined above. <u>See</u> <u>supra</u> Section G.1.

        Any other comments that need to be made on a particular investigation or series of investigations should be handled by the Public Affairs Office

which will coordinate with the appropriate Director of Enforcement or Deputy Assistant Attorney General. Attorneys should not take it upon themselves to make such comments to the press or even release the identity of staff members or others involved in the course of the investigation.

2. Generally, not even the existence of particular criminal investigations should be acknowledged or commented upon. Where the Antitrust Division has undertaken an investigation or inquiry as a result of a referral from another agency or individual, and that agency or individual has publicly said that such referral has been made, or if the matter has received a significant amount of publicity, the Department, upon inquiry, may acknowledge the existence of an investigation into a particular industry. Investigation of overall industry or market practices may be acknowledged by the Public Affairs Office, the appropriate Director of Enforcement or Deputy Assistant Attorney General, e.g., "The Antitrust Division is conducting an investigation into the marketing practices of the widget industry."

   In antitrust investigations, reference to the name of an individual or particular company should be subject to the Department's general "no acknowledgment" rule except in merger investigations (see 3., below).

3. In situations involving filings made under the Hart-Scott-Rodino Premerger Notification Rules, the Antitrust Division will not disclose the fact that companies have filed under the Act. However, the Division will confirm an investigation of a proposed transaction based on the fact that the Department and the Federal Trade Commission are required under the law to look at transactions that meet certain threshold requirements. A Division attorney should never comment further.

4. In virtually every instance where a Division attorney or other representative receives a press inquiry, he or she should not personally respond. Such calls should be referred to the Public Affairs Office of the Department (202-616-2771), which will handle the matter.

In general, the Antitrust Division and the Department have a policy of openness, fairness, decency and civility to all. The Division does not wish to prejudice the rights or affect the interests of anyone accused of a crime or a civil violation of the law. Accordingly, press relations should be based on a common sense view of the guidelines set forth herein.

I. Citizen Calls and Complaints to the Antitrust Division

Among the responsibilities of Division personnel is that of answering calls and letters from citizens who are complaining to, offering information to or seeking information from the Division. The following principles and Division Directive ATR 2770.1, "Procedures for Handling Public Complaints and Inquiries," should guide Division personnel in responding to citizen calls and letters.

1. Division personnel answering citizen telephone calls, usually attorneys or paralegals, should identify themselves as such and encourage the caller to

communicate his information, noting that the Division will give it careful consideration. In the case of calls requesting information, the recipient should try to answer the request subject to the specific limitations found in Division Directive ATR 3000.1, "Communications with Outside Parties on Investigations and Cases," and 28 C.F.R. § 50.2.

2.   All calls and letters should receive attention even when they advance complaints and information of no significance to antitrust enforcement. Every citizen complaint must be entered in a log maintained by the section, task force, or office, or referred to the New Case Unit. When Division personnel recognize that another law enforcement or other agency is responsible or may be interested in the complaint, the caller or correspondent should be referred to that agency. For this reason, Division personnel should be familiar with other agencies and should have appropriate addresses and phone numbers available. The United States Government Manual is a good resource for this information. Division personnel also should have available the address and telephone number of the nearest regional office of the Federal Trade Commission because calls that do not indicate violations of law enforced by the Division still may indicate trade practices policed by the FTC. See supra Section A. The Division often forwards valuable information to other law enforcement agencies.

3.   Telephone callers who offer information anonymously should be accommodated. Experience has shown that after the caller becomes acquainted with the Division employee answering the call, the caller often is willing to be identified and even to meet with Division personnel. Callers requesting anonymity should be advised that it will be helpful if they identify themselves in some way, and give an address or phone number where they may be contacted in the future.

4.   Division personnel should elicit as much pertinent information as possible when it becomes clear that the call may have some antitrust significance. Depending on the complaint, this information may include the names of the parties involved, the line of commerce, viable substitutes in the product market, the annual financial size of the product market, the geographic market, the nature and specific incidents of alleged antitrust violations, any anticompetitive effects of the alleged violations, information regarding the alleged antitrust violator's intent, the extent to which the alleged antitrust violator monopolizes or dominates the market, the approximate market shares of other competitors in the market and ease of entry into the market. Division personnel should keep orderly notes of such telephone conversations. Fragmented information and cursory complaints sometimes prove significant in light of information later brought to the Division's attention.

5.   If a call or letter has some significance to antitrust enforcement, Division personnel should encourage the citizen to submit any documents or other material which may illustrate the complaint. The caller or correspondent should be advised that such documents will be returned if she wishes.

Callers and correspondents should also be encouraged to contact Division personnel at any point at which they discover more information.

6. If the call has some antitrust significance, the recipient should consult the AMIS reports and other files, see supra Chapter VI, Section B.1, to determine whether the information may be of immediate use to any other Division section, task force, or field office, to a U.S. Attorney, or state attorney general.

7. Some callers or correspondents may seek advice on business decisions, in the belief that their decisions may help or hinder the Division in its investigation or a later prosecution or for some other reason. Callers should never be advised how to conduct their business. They should be told that only private counsel may provide such advice.

8. Citizens and businessmen who want Division clearance of proposed activity should be advised that the Division has a Business Review Procedure. Information concerning the manner of requesting a business review should be provided to the caller or correspondent. See supra Chapter III, Section H.

9. Division personnel should never counsel callers or correspondents on any matter or render opinions as to the legality or illegality of any practice. Only the most general description of the antitrust laws or references to cases already brought are proper responses to citizen inquiries seeking the Division's views of specific practices. Callers and correspondents may be referred to any literature on the subject which may be helpful.

10. Citizens frequently ask what will happen to information they give the government over the phone or by letter. Unless it is obvious that the information should be referred to another agency or does not relate to any matter for which the Division has responsibility, the proper response is that the information will be considered by the Division in light of the laws it is charged with enforcing. Citizens should be advised that even information of possible antitrust significance may not result in Division prosecution for myriad reasons, including insufficient evidence, limited Division resources, or legal barriers. Division personnel should not promise to keep citizens advised of the status or outcome of any investigation. Likewise, Division personnel should never advise citizens that any particular action will be taken by the Division.

11. It is a good practice to acknowledge citizen complaints and information. Brief letters indicating one of the following responses are appropriate:

    a. the Antitrust Division believes that the information disclosed by the citizen may have antitrust significance and is studying it, and the citizen may be assured that the Division will take whatever action is warranted;

    b. the Division believes the complaint may indicate a violation of laws other than those enforced by the Division and hence the citizen's

information is being referred to the U.S. Attorney, the state attorney general, the FTC, or some other agency;

   c.  the Division believes that the citizen's information does not relate to any law enforced by the Division but that the citizen should contact another law enforcement agency which the letter identifies; or

   d.  the Division has reviewed the complaint and does not plan to take further action at this time.

All letters should state that the Division nonetheless appreciates the caller's or the correspondent's interest in the enforcement of the antitrust laws.

12.  Division personnel receiving citizen complaints and calls should bear in mind that citizens have a right to advise the Department of Justice of information they believe may assist in the enforcement of the antitrust laws, and that while many citizen contacts do not advance the enforcement of the antitrust laws directly, some will. Every citizen call and letter should be treated with courtesy and should receive consideration.

13.  As part of its mission to develop new civil cases, the New Case Unit responds to citizen complaints made directly to it. (Such direct complaints to the New Case Unit are made by telephone (202-307-2040), the Internet (newcase@justice.usdoj.gov), or mail.) Division personnel may refer to the New Case Unit complaints that require some pre-investigation development, but are not readily dismissable. In such cases, Division personnel should inform the New Case Unit paralegal about the complaint and possible theories to investigate via telephone at the number listed above, or via e-mail addressed to the "New Case Unit." Division personnel should forward the complaint documents to the New Case Unit via inter-office mail.

J. Relationships With Client Agencies

The Antitrust Division occasionally represents or assists other federal offices and agencies.

  1.  Appellate Section Relationships with Client Agencies

The following procedures govern the Appellate Section's relations with client agencies:

   a.  The general counsel of an agency informs the Division of any matter which requires Division representation. As soon thereafter as possible, the agency should be provided with the names, direct mailing addresses, and telephone numbers of the Division attorneys to whom the case has been assigned. The agency should be requested, in turn, to provide the Division attorneys with the names, direct mailing addresses, and telephone numbers of the agency attorneys to whom communications should be directed.

   b.  Copies of all significant documents filed in court, and other memoranda,

should be sent to the client agency immediately upon receipt, service, or preparation.

c.  The agency should always be notified in advance of any significant hearings or arguments, depositions, or other proceedings affecting its interest in the matter.

d.  The Antitrust Division should always consult with agencies in advance regarding the position that the Division will urge in court. Under no circumstances should any case be compromised or settled without advance consultation with a client agency unless the agency has clearly indicated that some other procedure is acceptable.

2.  <u>Client Relationships Concerning Antitrust Damage Cases</u>

The Division is often required to give advice to agencies that receive notifications of class action settlements or determinations in private antitrust cases involving products or commodities they have purchased. In these situations, the appropriate Director should be consulted. Division attorneys may inform the agency that, in the event the agency believes it has suffered damages pursuant to the price-fixing or bid-rigging arrangement, either the Antitrust Division or the Civil Division will investigate any damage claim under the treble damage provisions of Section 4A of the Clayton Act, 15 U.S.C. § 15(a), or the treble damages and forfeiture provisions of the False Claims Act, 31 U.S.C. §§ 231 <u>et seq.</u>

A staff that is contemplating a treble damage action under Section 4A of the Clayton Act, 15 U.S.C. § 15(a), should notify the agency in question and work in close liaison with the attorneys and purchasing agents of that agency. As noted above, the Division should always consult with and make determinations in conjunction with the agency before filing, litigating, compromising, or settling a case. In addition, claims for damages to the federal government generally may not be filed or settled without approval from the Civil Division.

Other types of questions by the General Counsel's Office of client agencies to a particular section, task force, or field office should be referred to the appropriate Director or Deputy Assistant Attorney General. When the question involves a litigation matter, the appropriate Director should be consulted.

3.  <u>Economic Advice to Client Agencies</u>

Antitrust Division economists provide damage estimates, valuation methodologies and economic analyses in connection with cases or projects in other Department of Justice divisions and offices.

The Corporate Finance Unit regularly performs financial and corporate analyses for the other Department of Justice divisions and offices. CFU services on behalf of the Civil Division and the Environment and Natural Resources Division are provided and paid for pursuant to annual contracts.

Appendix A
## PROTOCOL FOR INCREASED STATE PROSECUTION OF CRIMINAL ANTITRUST OFFENSES

The Antitrust Division of the United States Department of Justice is announcing a new protocol for increased state prosecution of criminal antitrust offenses. The Department has developed a program for increased prosecution by State Attorneys General of some criminal antitrust matters that have been previously prosecuted by the United States. This protocol defines the circumstances where the Antitrust Division of the United States Department of Justice ("Division") may transfer prosecutorial responsibility, including the relevant evidence, for certain antitrust offenses to State Attorneys General.

This protocol is based on the following principles:

1. The effective criminal prosecution of certain antitrust offenses having particularly local impacts shall not be compromised;

2. The traditional role of States as the treble damage plaintiff on behalf of state and local governmental purchasers of goods and services shall not be undermined;

3. The criminal prosecution of certain antitrust offenses having particularly local impacts shall, wherever appropriate, be conducted by the State Attorney General for the affected locality; and

4. Any transfer of prosecutorial responsibility under this protocol shall be undertaken at the earliest practicable point in the development of that matter.

In general, this procedure will be implemented for offenses including, but not limited to, bid rigging and/or price fixing in localized markets. The Division's willingness to forebear criminal prosecution of a particular matter in favor of a State Attorney General would in large part depend on the Division's understanding that:

1. the State Attorney General has the legal and personnel resources to undertake the criminal prosecution; and

2. the State Attorney General is willing to undertake the criminal prosecution.

Wherever the foregoing conditions are met and the offense has an appropriate local impact, the Division will, to the extent permitted by law and Division policy, transfer to that State Attorney General all of the evidence and other materials in its possession relevant to the offense. Such transfer of evidence will include requesting any required court orders pursuant to Fed. R. Crim. P. 6(e)(3)(C)(iv) permitting the State Attorney General's access to federal grand jury materials for the purpose of state criminal law enforcement. Nothing contained herein, however, precludes the Division from initiating its own prosecution.

Circumstances may arise where a particular State Attorney General either lacks the authority to criminally prosecute antitrust offenses under state law or the available criminal remedies under state law are comparatively inadequate. In such cases, personnel from the State Attorney General's office may be considered for appointment to assist Division attorneys in the prosecution of appropriate local impact cases for the United States under the supervision and direction of the Division. These appointments will be made under the guidelines developed by the Division.

For purposes of this protocol, such an appointment does not necessarily require the State to forebear from using the same attorney as counsel in any follow-up civil, treble damage litigation prosecuted on behalf of the victims of the offense he/she prosecuted criminally for the United States; provided, however, that any such follow-up state litigation will not be initiated prior to (1) the conclusion of the Division's criminal proceedings, and (2) the issuance by the court in the relevant jurisdiction of any required orders pursuant to Fed. R. Crim. P. 6(e).

When necessary to preserve a claim from the running of the statute of limitations, nothing contained in the foregoing shall prevent a State Attorney General from filing such follow-up state litigation prior to the conclusion of the Division's criminal proceedings provided: any attorney appointed to assist the Division in the criminal proceeding shall have no involvement in such follow-up state litigation prior to the conclusion of the Division's criminal proceedings; and such State Attorney General has not relied, directly or indirectly, upon any matter occurring before the grand jury, absent an order pursuant to Fed. R. Crim. P. 6(e), in the preparation or prosecution of any such follow-up state litigation.

Particular cases may arise where the scope of the offense to be charged has localized impacts in more than one state, for example, bid rigging on school construction contracts let by school districts in adjacent states. If the Division decides to transfer such matters, the Division, in consultation with the affected Attorneys General, will decide which state(s), if any, should undertake such prosecution(s).

---

## Appendix B
## PROTOCOL FOR COORDINATION IN MERGER INVESTIGATIONS BETWEEN THE FEDERAL ENFORCEMENT AGENCIES AND STATE ATTORNEYS GENERAL

Some mergers and acquisitions may become subject to simultaneous federal and state investigations by either the Antitrust Division of the U.S. Department of Justice ("Antitrust Division") or the Federal Trade Commission ("FTC"), and one or more State Attorneys General. To the extent lawful, practicable and desirable in the circumstances of a particular case, the Antitrust Division or the FTC and the State Attorneys General will cooperate in analyzing the merger. This protocol is intended to set forth a general framework for the conduct of joint investigations with the goals of maximizing cooperation between the federal and state enforcement agencies and minimizing the burden on the parties.

I. CONFIDENTIALITY

These joint investigations are generally nonpublic in nature and will routinely involve materials and information that are subject to statutes, rules, and policies governing when and how they may be disclosed. Participating agencies are required to protect confidential information and materials ("confidential information") from improper disclosure. Confidentiality obligations continue even if a receiving agency subsequently decides to pursue an enforcement avenue different from that chosen by one or more of the other agencies.

Agencies receiving confidential information from another agency ("the originating agency") will agree to take all appropriate steps to maintain its confidentiality, including:

1. timely notification to the originating agency of discovery requests or public access requests for that information;

2. a vigorous assertion of all privileges or exemptions from disclosure claimed by the originating agency;

3. intervention in legal proceedings, or provision of assistance to the originating agency in intervening in legal proceedings, if necessary, to assert such privileges or exemptions; and

4. complying with any conditions imposed by an agency that shares information it deems to be confidential.

Any agency that becomes aware that confidential information has been disclosed in contravention of this Protocol will promptly advise all other agencies conducting the joint investigation of the disclosure so that its significance and implications for further information-sharing can be assessed.

II. PROCEDURES INVOLVING THE MERGING PARTIES

The merging parties may be required to produce documents or other information to the Antitrust Division or FTC pursuant to the Hart-Scott-Rodino Antitrust Improvements Act of 1976 ("HSR Act"), Civil Investigative Demands, or other compulsory process, and to State Attorneys General pursuant to subpoena or other compulsory process. To minimize the burden on the merging parties and to expedite review of the transaction, the merging parties may wish to facilitate coordination between the enforcement agencies.

The Antitrust Division and the FTC will, with the consent of the merging parties, provide certain otherwise confidential information to State Attorneys General. The acquiring and acquired persons in the transaction must:

A. agree to provide the states, according to the National Association of Attorneys General Voluntary Premerger Disclosure Compact, or otherwise, all information submitted to the Antitrust Division or the FTC pursuant to the HSR Act, Civil Investigative Demands, or other compulsory process, or

voluntarily; and

B.   submit a letter to the Antitrust Division or the FTC that waives the
confidentiality provisions under applicable statutes and regulations to allow
communications between the Antitrust Division or FTC and State Attorneys
General.[9]

Where these requirements have been satisfied, the Antitrust Division or FTC will
provide to the state investigating the merger or, if there is a multistate working
group, to the coordinating state:[10]

1.   1. copies of requests for additional information issued pursuant to the HSR
Act ("second requests");

2.   copies of civil investigative demands issued pursuant to the Antitrust Civil
Process Act and copies of subpoenas and civil investigative demands issued
by the FTC; and

3.   the expiration dates of applicable waiting periods under the HSR Act.

III. CONDUCT OF JOINT INVESTIGATION

The following is intended to set forth suggested guidelines that may be followed to
coordinate merger investigations by State Attorneys General and the FTC or
Antitrust Division. All applicable investigatory, work product, or other privileges
shall apply to any material exchanged.

A.   STRATEGIC PLANNING

1.   Coordination between federal and state enforcement agencies may be
most effective at the earliest possible stage of a joint investigation. It
should begin with an initial conference call among the FTC or
Antitrust Division and State Attorneys General. To the extent lawful,
practicable, and desirable in the circumstances of a particular case,
subjects of the conference calls should include:

2.   Identification of lawyers and other legal and economic team members
working on the case, and assignment of areas of responsibility.

3.   Identification of potential legal and economic theories of the case to
be developed and assignment of research projects. It may be
appropriate for state and federal enforcers to share memoranda, papers
and/or briefs prepared in similar prior matters with appropriate
redactions for confidential information, as well as those prepared
during the current investigation to the extent permitted by the
participating agencies.

4.   Identification of categories of data, documents, and witness testimony
needed to be obtained, and strategies for obtaining and sharing such

information, including to the extent lawful, practicable, and desirable, the initiation of requests seeking the consent of past and future submitters to disclosure of such information. State Attorneys General should particularly be encouraged to take responsibility for obtaining data located within their respective geographic areas or maintained by state or local governmental agencies.

5.  Identification of potential consulting economists or other experts.

6.  Where multiple states are involved, understandings should be reached on how information can be most conveniently exchanged. For example, the coordinating state might assume responsibility for transmitting documents received from the FTC or Antitrust Division to other State Attorneys General.

B.  DOCUMENT PRODUCTION

Coordinating both the request for, and review of, documentary materials can reduce the parties' burden and facilitate the agencies' investigation. To the extent lawful, practicable, and desirable, three steps should be taken in connection with issuing a second request or subpoenas, CID's, or voluntary requests for information from the merging parties or third parties:

1.  Consideration of ideas from other investigating agencies on the content and scope of the request.

2.  Providing correspondence to other investigating agencies memorializing agreements with parties to narrow or eliminate request specifications.

3.  Division of responsibility among investigating agencies for document review and exchange of summaries and indices.

C.  WITNESS EVIDENCE/EXPERTS

To the extent lawful, practicable, and desirable in a particular case, the State Attorneys General and the FTC or Antitrust Division should coordinate the joint development of testimonial evidence. The investigating agencies should try to integrate their efforts to the maximum extent possible. Specifically:

1.  Identification and development of lists of potential interviewees/deponents should be undertaken in a coordinated manner. States should be encouraged to use their greater familiarity with local conditions/business to identify interviewees and schedule interviews.

2.  Joint interviews and/or depositions of witnesses should be coordinated whenever lawful, practicable and desirable. An early understanding should be reached regarding the extent to which notes of interviews will be maintained and exchanged. Coordination of deposition summaries should also be discussed.

3.  State Attorneys General and the FTC or the Antitrust Division should coordinate responsibility for the securing of declarations or affidavits.

4.  State Attorneys General and the FTC or the Antitrust Division should discuss early during a joint investigation whether to employ experts jointly or separately. If the latter, a method should be provided for exchange of economic views/theories among the experts and with staff economists. The preparation of expert affidavits/testimony should be closely coordinated.

## IV. SETTLEMENT DISCUSSIONS

To achieve the full benefits of cooperation it is imperative that federal and state antitrust enforcement agencies collaborate closely with respect to the settlement process. While each federal and state governmental entity is fully sovereign and independent, an optimal settlement is most likely to be achieved if negotiations with the merging parties are conducted, to the maximum extent possible, in a unified, coordinated manner.

It will normally be desirable for federal and state enforcement agencies to consult on settlement terms in advance of any meeting with the merging parties where settlement is likely to be discussed. Where possible, any such meeting should be attended by both federal and state representatives. Furthermore, each enforcement agency should keep the other enforcement agencies advised of communications regarding settlement with a merging party.

If any federal or state antitrust enforcement agency determines that circumstances require it to pursue a negotiation or settlement strategy different from that of the other investigating agencies, or decides to close its investigation, it should disclose that fact immediately.

## V. STATEMENTS TO THE PRESS

It is important that understandings be reached between the enforcement agencies regarding the release of information to the news media. These agreements should cover the timing of and procedures for notifying the other enforcement agencies prior to the release of any information to the press.

---

## EXHIBIT 1A

To: Assisant Director for Premerger Notification
Bureau of Competition
Federal Trade Commission
Washington, D.C. 20580

With respect to [the proposed acquistion of X Corp. by Y Corp.] the undersigned attorney or corporate officer, acting on behalf of [indicate entity], hereby waives confidentiality protections under the Hart-Scott-Rodino Act, 15 U.S.C. 18a(h), the

Federal Trade Commission Act, 15 U.S.C. §§ 41 et seq., and the Federal Trade Commission's Rules of Practice, 16 C.F.R. §§ 4.9 et seq., insofar as these protections in any way limit confidential communications between the Federal Trade Commission and the Attorney(s) General of [insert pertinent State(s)].

Signed:

Position:

Telephone:

---

## EXHIBIT 1B

To: Director of Operations
Antitrust Division
Department of Justice
Tenth Street and Pennsylvania Avenue, N.W.
Washington, D.C. 20530

With respect to [the proposed acquisition of X Corp. by Y Corp.] the undersigned attorney or corporate officer, acting on behalf of [indicate entity], hereby waives confidentiality protections under the Hart-Scott-Rodino Act, 15 U.S.C. 18a(h), the Antitrust Civil Process Act, 15 U.S.C. §§ 1311 et seq., and any other applicable confidentiality provisions, for the purpose of allowing the United States Department of Justice and the Attorney(s) General of [insert pertinent State(s)] to share documents, information and analyses.

Signed:

Position:

Telephone:

---

## EXHIBIT 2

### CORRESPONDENCE/MEMORANDUM DEPARTMENT OF JUSTICE

Date: September 6, 1996
To: Antitrust Contacts
From: Kevin J. O'Connor
Assistant Attorney General

Subject: Memorandum of Clarification of Liaison and Coordinating States Under the NAAG Voluntary Pre-Merger Disclosure Compact

As our experience with the NAAG Voluntary Pre-Merger Disclosure Compact ("Compact") grows, additional questions concerning its application inevitably arise. The purpose of this memo is to clarify the distinction between the "liaison

state" under the Compact and any multistate working groups or litigating groups which may be formed to deal with a matter that is the subject of a filing under the Compact.

## LIAISON STATE

The function of the liaison state under the Compact is to receive the filing and to notify forthwith all signatories to the Compact of the filing and the identity of the merging parties. Upon request, the liaison state must permit signatories of the Compact to inspect the documents or obtain a photocopy of the filing from the liaison state. In short, the liaison state serves a ministerial function of receiving and distributing, upon request, copies of the confidential filings of the prospectively merging parties.[11]

## COORDINATING STATE

In certain cases, two or more states may investigate or litigate regarding a particular transaction. This may occur whether or not the Compact has been invoked. As is the case with any Multistate Antitrust Task Force Working Group, the process of joint investigation and litigation operates largely by consensus. Although each enforcement agency retains its sovereignty, the synergies achievable from a joint investigation can only be realized if the states share a common interest in goals and process and organize effectively. Typically, the states most directly, and adversely, impacted by a proposed transaction, will take the lead in such investigations provided they have the resources to do so.

*Chair Selection:* Where a group of investigating states decides to work together, it will often be desirable to have a coordinating or "chair" state. The coordinating or "chair" state should be determined by the states actively involved in the investigation and litigation after consultation with the Chair of the Multistate Antitrust Task Force. The criteria for choosing a "coordinating state" should include, for example, whether the prospective chair state is (a) likely to be adversely affected by a proposed transaction, (b) is in a position to commit resources to the investigation, and (c) can coordinate effectively with the other states and the federal agencies that may be involved in reviewing the same transaction. Under these criteria, the state assuming the role of coordinating state is not necessarily the same state identified by the Compact as the state undertaking the largely ministerial duties set forth in the Compact.

*Chair Function:* The function of the coordinating state shall be to coordinate the investigative and enforcement activities of the working group states, to coordinate with any federal agency collaborating with the states, and to facilitate settlement discussions. Again, because this is largely a consensual process, the coordinating state should do all of the above in consultation with the other investigating states and federal agencies.

*Settlement Negotiations:* Because merger investigations often occur in a very short time frame, and because the issue of settlement is often raised during that time frame, it is imperative that the coordinating states and the investigating federal agency consult and collaborate early and often regarding terms and process of

settlement. The interested enforcement agencies are more likely to achieve an optimal resolution by presenting the merging parties, to the maximum extent feasible, with a united front. If an individual enforcement agency, state or federal, determines that its interests require pursuing a negotiation or settlement strategy separate from the cooperating states and federal agencies, it is incumbent upon that agency to disclose its posture at the earliest possible opportunity and to implement its strategy in a way which minimizes any adverse impact upon the other states and enforcement agencies.

---

# APPENDIX C

## Subpoenas Directed to the Division, its Employees, or Former Employees in Matters Where the Division is Not a Party

This section addresses the procedures that should be followed when a Division employee or former employee is served with a subpoena arising out of litigation to which the Division is not a party, where the subpoena requires the production of any document from Division files, disclosure of any information relating to material in Division files, or testimony concerning matters within the scope of a Division employee's or former employee's employment.

The Division generally has no more than 14 days from the date a subpoena is served to object to or move to quash the subpoena, see Fed. R. Civ. P. 45(c)(2)(B), and the failure to file a timely objection to the subpoena could result in a decision that the Division has waived objections to the subpoena. Therefore, if a Division employee or former employee receives a subpoena for either testimony or other information, both the Freedom of Information Act ("FOIA") Unit and the Special Assistant in Operations assigned to the section that handled the matter that the subpoena concerns should be notified immediately -- by e-mail and by telephone - - and a copy of the subpoena should be forwarded to the Chief of the FOIA Unit [1]. The Special Assistant in Operations will advise the appropriate Director of Enforcement of the subpoena.

Typically, the FOIA Unit, and in some cases, the relevant Director of Enforcement, will contact the Civil Division and/or, when appropriate, the Office of the United States Attorney for the district from which the subpoena was issued, see 28 C.F.R . § 16.22, and it will request representation in connection with responding to the subpoena. After consultation with the FOIA Unit, the Civil Division, through its Federal Programs Branch, may agree to represent the Division in connection with the subpoena, including any motion practice, deposition, or court hearing, or it may arrange for representation of the Division by an Assistant United States Attorney (AUSA). The Civil Division attorney or AUSA is typically responsible for asserting any appropriate objections to a subpoena for testimony or documents, in consultation with the represented Division employee, the FOIA Unit, and, when appropriate, the Division's appellate section and front office.

The Department has published regulations governing compliance with such

subpoenas, see 28 C.F.R. § 16.21 et seq., which are commonly referred to as the Touhy regulations. See United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951). Anyone who serves or seeks to serve a subpoena on the Division or its employees should be advised of these regulations in writing. The FOIA Unit, in conjunction with the Civil Division attorney or AUSA handling the matter, will ensure that the subpoena proponent is notified of the regulations.

The Touhy regulations provide that testimony by a current or former Division employee in a state or federal case to which the Division is not a party concerning information obtained in the course of person's employment cannot proceed without authorization. Such authorization is obtained from the Assistant Attorney General or a designated Deputy Assistant Attorney General. Before authorization will be considered, the party seeking testimony (the proponent) must, pursuant to the Touhy regulations, see 28 C.F.R. § 16.22 (c), provide an affidavit or statement setting forth a summary of the testimony sought and its relevance to the proponent's proceeding. Attorneys representing the Division may move to quash for failure to provide the required statement. Alternatively, the FOIA Unit or the Civil Division attorney or AUSA representing the Division may negotiate another means for providing a statement by the employee. Once the proponent has complied with the Touhy regulations, the AAG or designated DAAG may authorize the testimony by a letter setting forth the scope of testimony that may be provided and limiting the testimony with respect to certain matters. Alternatively, the AAG or designated DAAG may decline to authorize the testimony, and the proponent will be so notified.

Before authorization for the disclosure of information other than oral testimony will be granted, the proponent must also provide a summary of the information sought and its relevance to the proponent's proceeding. See 28 C.F.R. § 16.22(d). The staff that handled the matter the subpoena concerns will then locate the responsive material, review it to determine whether any privileges apply, and identify the privileged material. Correspondence regarding objections to disclosure will be coordinated with the FOIA Unit. No documents or information will be disclosed pursuant to a nontestimonial subpoena without the express prior authorization of the AAG or the designated DAAG.

If the AAG or designated DAAG decides that there should be limited disclosure or no disclosure of testimonial or nontestimonial information, the subpoena proponent will not agree to the limitation or withdrawal of the subpoena, and any appropriate litigation regarding the subpoena is unsuccessful, the AAG will seek authorization for the nondisclosure from the Deputy Attorney General. Touhy and its progeny protect from prosecution any government employee (or former employee) who complies with a properly authorized directive not to disclose subpoenaed information or to disclose information only within certain limits. See United States ex rel. Touhy v. Ragen, 340 U.S. 462 (1951).

The FOIA Unit will retain copies of the subpoena and will keep records of the following information regarding the subpoena, in addition to any other information that it determines to be relevant: the person on whom the subpoena was served, the date and time of service, and the date by which a response must be filed. The FOIA Unit should also be kept informed of all developments in the

proceedings regarding the subpoena and should be sent copies of all papers filed in connection with the subpoena.

.

---

## FOOTNOTE TO APPENDIX C

[1] In some cases, subpoenas are served on the "custodian of records" of the Division or on a section, field office, or U.S. Attorney's office, rather than on a specific Division employee, and are then forwarded to a Division employee. It is important for the Division employee who receives a subpoena from any source to note carefully on whom the subpoena was initially served and when, and to forward that information to the FOIA Unit.

---

## FOOTNOTES

1. The Department's position is stated in a memorandum dated December 9, 1985, from the Assistant Attorney General in charge of the Criminal Division to the other Divisions' Assistant Attorneys General.

2. In the case of a multiple-jurisdiction investigation (e.g., tax, non-tax), requests should be made to the Assistant Attorney General of the Division having supervisory responsibility for the principal offense(s) being investigated.

3. But see 15 U.S.C. § 16(i) (tolling the statute of limitations during the pendency of a antitrust suit by the United States).

4. Division attorneys who believe they may wish to seek foreign-located documents or testimony to further their investigations should contact the Foreign Commerce Section as early as possible in their investigation. This should be done even if the request for foreign-located information will be communicated to an individual, company or lawyer in the United States.

5. Although border watch letters vary somewhat, a typical sample follows:

VIA FACSIMILE
ORIGINAL VIA REGULAR MAIL

Mr. Michael D. Cronin
Assistant Commissioner (Inspections)
Immigration and Naturalization Service
Room 7228, CAB Building
425 Eye Street, N.W.
Washington, D.C. 20536

Dear Mr. Cronin:

The Antitrust Division of the Department of Justice is currently conducting an investigation of possible violations of the United States antitrust laws. In connection with this investigation we request your assistance in detecting the entrance of the following foreign nationals into the United States and determining their whereabouts during their stay in the United States.

If an individual listed on the following pages is discovered entering the United States, we request that the Immigration and Naturalization Service briefly detain (under X02 status) and obtain certain information from the individual, and notify the Antitrust Division as soon as possible by contacting Special Agent [name], Federal Bureau of Investigation, on his pager at (area code + number), or at the main switchboard number, (area code + number) .

The following information should be obtained from any individual listed below upon entry into the United States: purpose of trip, passport number, social security number (if available), date of birth, home address, and specific travel plans and dates in the United States, including flight plans (verified by a review of tickets), cities to be visited, and the names of any hotels or persons with whom the individual will be staying. To assure a positive identification, agents should ask whether the individual is currently or has been recently employed by the listed employer.

| **Name** | **Citizenship** | **Other Information** | |
|---|---|---|---|
| John Doe | United Kingdom | Date of Birth: | 4/19/67 |
| | | Social Security Number: | N/A |
| | | Place of Birth: | London, United Kingdom |
| | | Employer: | English Widgets, Ltd. |
| | | Business Address: | 1600 Pennsylvania Ave. London, United Kingdom |
| | | Business Telephone: | 865-000-01 |
| | | Last Known Home Address: | N/A |

Please notify Special Agent (name) of the date on which a border watch for this individual becomes effective.

Sincerely,

Joel I. Klein
Assistant Attorney General

The contact person listed can be an FBI agent or a Division attorney. Listing multiple individuals increases the likelihood that at all times someone will be reachable.

6. A sample letter lifting the watch is as follows:

VIA FACSIMILE

Mr. Michael D. Cronin
Assistant Commissioner (Inspections)
Immigration and Naturalization Service
Room 7228, CAB Building
425 Eye Street, N.W.
Washington, D.C. 20536

Dear Mr. Cronin:

The Antitrust Division of the Department of Justice is currently conducting an investigation of possible violations of the United States antitrust laws. In connection with this investigation, we previously have requested your assistance in detecting the entrance of certain foreign nationals into the United States.

We have recently been in contact with counsel for an individual whose name we previously requested you place on the border watch. Therefore, we request that the individual identified below be deleted from INS's border watch list.

| **Name** | **Citizenship** | **Other Information** | |
|---|---|---|---|
| John Doe | United Kingdom | **Date of Birth:** | 4/19/67 |
| | | **Place of Birth:** | London, United Kingdom |
| | | **Last Known Home Address:** | N/A |
| | | **Former Employer:** | English Widgets, Ltd. |

Please notify [name] at (area code + telephone number) when the watch for the above-named individual has been terminated. Thank you for your continuing cooperation in this matter.

Sincerely,

Joel I. Klein
Assistant Attorney General

7. Drafts and handwritten notes that are not distributed to staff nor placed in the official file are generally not considered "agency records" and hence are not required to be produced.

8. A draft press release should typically be forwarded along with the case recommendation. <u>See</u> <u>supra</u> Chapter III, Section G.2. Four days before filing, staff should contact the appropriate Director's office, notify it of the proposed filing date, and ensure the Director's office has the final staff draft of the release.

9. Examples of such a letter are annexed hereto as Exhibit 1.

10. Pursuant to the NAAG Voluntary Pre-Merger Disclosure Compact, the merging parties may reduce their burden of complying with multiple state subpoenas by providing a set of all required materials to the designated "liaison state." The role of the liaison state is ministerial in nature. It differs from that of the "coordinating state," which is responsible for coordinating the investigation and any resulting litigation. The differences between the roles of the liaison and coordinating states are described more fully in the memorandum annexed hereto as

Exhibit 2. Depending on the investigation, these roles may be performed by the same state or different states.

11. The Compact lists the order of preference for identifying the liaison state upon whom the merging parties may serve a copy of their filings. This order of preference includes: First, the principal place of business of the acquiring party to the merger; second, the attorney general of the state which is the principal place of business of the acquired party; third, the attorney general of the state of incorporation of the acquiring party; and, fourth, the attorney general of the state of incorporation of the acquired party. If no member of the Compact falls within the foregoing four preferences, the parties may make a filing upon the chair of the Multistate Antitrust Task Force or any other member of the Compact who is willing to act as liaison state for such transaction.