# Exhibit 23

# 05-1480

IN THE UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

STOLT-NIELSEN, ET AL.
  *Plaintiffs-Appellees*,

v.

UNITED STATES OF AMERICA,
  *Defendant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**JOINT APPENDIX
VOLUME 1 OF 3
(Pages JA-1 to JA-51)**

George J. Terwilliger III
Christopher M. Curran
J. Mark Gidley
WHITE & CASE LLP
701 Thirteenth St., NW
Washington, DC 20005
(202) 626-3600
  *Attorneys for Plaintiff-Appellee*
  *Stolt-Nielsen S.A. and Stolt-Nielsen*
  *Transportation Group, Ltd.*

Allen D. Black
Roberta D. Liebenberg
Gerard A. Dever
FINE, KAPLAN AND BLACK, R.P.C.
1845 Walnut St.
Suite 2300
Philadelphia, PA 19103
(215) 567-6565
  *Attorneys for Plaintiff-Appellee*
  *Richard B. Wingfield*

John J. Powers III
John P. Fonte
U.S. DEPARTMENT OF JUSTICE
Antitrust Division
950 Pennsylvania Ave., NW
Room 3224
Washington, DC  20530
(202) 514-2435
  *Attorneys for Defendant-*
  *Appellant United States*
  *of America*



IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

- - - - -

| | | |
|---|---|---|
| STOLT-NIELSEN, S.A. and<br>STOLT-NIELSEN TRANSPORTATION<br>GROUP, LTD. | : <br> : <br> : | CIVIL ACTION |
| Plaintiffs | : <br> : | NO. 04-537 |
| vs. | : <br> : | |
| UNITED STATES OF AMERICA | : <br> : | |
| Defendant. | : | |

Philadelphia, PA
April 14, 2004

BEFORE:    HON. TIMOTHY J. SAVAGE, J

SECOND DAY
(AFTERNOON SESSION)


P R E S E N T:


For the Plaintiff:

WHITE & CASE
BY:  CHRISTOPHER M. CURRAN, ESQ.
GEORGE J. TERWILLIGER, ESQ.
J. MARK GIDLEY, ESQ.
GEORGE PAUL, ESQ.
601 Thirteenth Street, N.W.
Suite 600.
Washington, D.C. 20005-3807

```
            BLANK ROME LLP.
        BY:  IAN COMISKY, ESQ.
           MATTHEW LEE, ESQ.
            One Logan Square.
         Philadelphia, PA 19103-6998
            For Stolt-Nielsen



          FINE, KAPLAN & BLACK.
      BY:  ROBERTA D. LIEBENBERG, ESQ.
           ALLEN D. BLACK, ESQ.
           GERARD A. DEVER, ESQ.
              23rd Floor
           1845 Walnut Street.
         Philadelphia, PA 19103-4723


         JAMES A. BACKSTROM, ESQ.
              Suite 200
           Two Penn Center .
         Philadelphia, PA 19102-1706.

          For RICHARD WINGFIELD



            For the Defendant:

    UNITED STATES DEPARTMENT OF JUSTICE
            Antitrust Division
      BY:  ROBERT E. CONNOLLY, ESQ.
           ANOTONIA R. HILL, ESQ.
           WENDY NORMAN, ESQ.
            The Curtis Center
             Suite 650 West
          7th and Walnut Streets
         Philadelphia, PA., 19106.

           FOR THE UNITED STATES
```

     (Proceedings recorded by mechanical stenography,
transcript produced by computer)
                1:15 P.M.
                1:15 p.m.

AFTERNOON SESSION

Appearances as noted, the following transpired in open court:)

(JAMES M. GRIFFIN, resumed)

CROSS-EXAMINATION

BY MR. GIDLEY:

Q. Mr. Griffin, I want to go back to some of your testimony on direct, sir.

Sir, you testified that you attended a meeting with John Nannes on December 4, 2002, correct?

A. Yes.

Q. Could you keep your voice up?

A. Yes, 2002.

Q. Thank you very much.

Sir, you testified at that meeting you used the term head fake; is that correct?

A. Yes.

Q. And sir, would you tell the Court to the best of your recollection, what exactly you said about head fake at that meeting?

A. It was in reference to the emails that had been shown to us and the representation that that is when Stolt-Nielsen withdrew from or ceased its activity, illegal activity.

Q. What were your exact words?

A. That's correct.

Q. Now, you had sent Mr. Nannes a draft of the agreement back on November 24th, correct?

A. No, what I sent him, it wasn't a draft of the agreement, it was just the model letter.

Q. Let's go back to your first exhibit book. We have got the transmittal email.

Let me direct your attention, sir, to tab 5, SNX-1, it starts with an email -- are you there?

A. I am there.

Q. Dated November 24, 2002, correct?

A. Correct.

Q. This is an email you sent?

A. Yes.

Q. The message is: "I'll call you tomorrow, Jim?"

A. Yes.

Q. The next couple pages are the model corporate condition leniency record?

A. Yes.

Q. Let me direct your attention to the first page of the letter. The model letter dated April 2, 2002.

Do you have see that?

A. Yes.

Q. Let's compare it first with the 1998 model letter that Mr. Spratling attached to his speech, so if I can ask you

to flip back quickly to the back end of the Spratling speech which is at tab 3. It's on page 11 of 13.

    A.    Okay.

    Q.    Tab 3. So we're going to be comparing SNX-1 with SNX-30. The model letter as of April 2, 2002 has the anticompetitive activity being reported as a defined term.

    Do you see that?

    A.    (No response.)

    Q.    That's the first sentence of representations I.

    A.    April 2002 model?

    Q.    That's right. Paragraph entitled: "Representations."

    A.    Yes.

    Q.    Do you see where the anticompetitive activity being reported is a defined term?

    A.    Yes.

    Q.    Then in 1(a), anticompetitive activity being reported is inserted before the words: "Upon discovery", correct?

    A.    Yes.

    Q.    Now, in the model letter in 1998, anticompetitive activity being reported wasn't a defined term; isn't that correct, if you look at page 11 of 13?

    A.    Yes, I believe that's right.

    Q.    In the model letter back in 1998, the

anticompetitive activity being reported is not inserted into the body of the "a" paragraph, do you see that, before the words "upon discovery?"

A. Well, it says: "Took prompt and effective action to terminate its part in the activity upon discovery of the activity."

Q. The model letter says, "activity" and the 2002 letter has the entire phrase inserted, correct?

A. Yes.

Q. At the end of the first sentence, do you see where it talks about an insert for the industry and insert for geographic scope?

A. Again, are we back at the 2002 letter?

Q. We are, sir?

A. Yes.

Q. In the final agreement which is tab one of this book, Government's Exhibit 2, the geographic scope is transportation to and from the United States; isn't that correct?

A. That's correct.

Q. That language obtains throughout the agreement, correct?

A. Yes.

Q. And in fact, it's included down below in the definition of the anticompetitive activity being reported,

representation, correct?

A. Yes, that's correct.

Q. This agreement makes the distinction between the corporation SNTG and the individuals; does it not?

THE COURT: Which one?

MR. GIDLEY: The final signed agreement, Government's Exhibit 2.

THE WITNESS: Well, yes there are two different paragraphs.

Q. Right. Paragraph -- I am sorry.

A. One relating to the company and one relating to the individuals, yes.

Q. Paragraph 3 provides corporation leniency and paragraph 4 provides individual leniency including officers and employees, correct?

A. Yes.

Q. In paragraph 2, do you see the language:

"SNTG agrees to provide full, continuing and complete cooperation."

And there are a series of sub paragraphs, do you see that?

A. Yes.

Q. Let me direct your attention to paragraph 2(c), so SNTG agrees to provide cooperation, including in "c", use its best efforts to secure the ongoing full and truthful

cooperation of the current and former directors, officers and employees of SNTG."

Correct?

A. Correct.

Q. There is a distinction there between the Corporation's obligation to cooperate and providing best efforts to get the individual employees, including officers to cooperate, correct?

A. Correct.

Q. Similarly, the definition of SNTG at the top on page 1 refers just to the corporate entities, correct?

A. Yes.

Q. And again, we are talking about Government's Exhibit 2, right?

A. Yes.

Q. Now, during the December through January 2003 period, Mr. Nannes also mentioned SNTG was applying for European Union Amnesty, correct?

A. Yes, he did.

Q. And the EU has a parallel program to the American program, correct?

A. It's very similar.

Q. The EU does something called, "dawn raids", correct?

A. Yes.

that "action" is a process, not an event, correct?

A. Yes.

Q. Now, in the 1(a) representation, the case that the Division in the past has put a date of discovery into the agreement?

MS. HILL: I am sorry, could you just repeat that?

Q. Isn't it the case that the Division in prior amnesty letters has put a date of discovery, a specific date into the amnesty agreement?

MS. HILL: Objection, your Honor, as to relevance.

THE COURT: Overruled.

THE WITNESS: I can think of only one time.

Q. But you can think of an instance?

A. Yes.

Q. Let's talk about the attorney-client privilege. You knew at the time of the December 4th meeting there was an issue with this lawyer, Mr. O'Brien, correct?

A. Yes.

Q. You saw the Wall Street Journal article?

A. Yes.

Q. Let's look at that Wall Street Journal article for a quick second. I have it at tab 17, in Volume I, Government's Exhibit 6.

A. Okay.

Q. I directed your attention to the 5 paragraph, the

final sentence:

"Stolt-Nielsen has been engaged in antitrust activities that violate U.S. and antitrust laws, international law against price fixing and other illegal and collusive conduct it did not elaborate on the alleged collusion."

Do you see that?

A. I do.

Q. You agree with me you can't secure antitrust convictions using a state court complaint, could you, sir?

A. Nor could we do so with the newspaper article.

Q. Very good, sir. You will see two paragraphs down that in the complaint he is seeking the judge's permission, Mr. O'Brien is bound by the attorney's duty of confidentiality to his client.

Do you see that language?

A. Yes, I do.

Q. At any point in time, did the judge in that case lift the attorney-client privilege? Are you aware of that?

A. I am not aware of that.

Q. The Division did not condition SNTG's amnesty application on a waiver of the attorney-client privilege?

A. We did not.

Q. You included language in the agreement that honored the attorney-client privilege; is that correct?

A. That is correct.

Q. At no time after January 15, 2003, through April 8, 2003, did the Division condition participation in the program on a waiver of the attorney-client privilege, correct?

A. That is correct.

Q. You have also seen letters from the staff that have said the failure to waive the attorney-client privilege will not be held as a lack of cooperation by the company, correct?

A. Mr. Gidley, I don't know that I ever seen those letters, but I certainly don't dispute that they exist.

Q. I can pull the letter and the language is from a letter that Mr. Connolly wrote us on February 5, 2004:

"The Government does not consider SNTG's assertion of the attorney-client privilege to withhold these relevant documents to be a violation of the conditional leniency agreement."

Do you see that?

A. I do.

Q. Let's go back GX-2, tab 1 in your book.

The phrase, "prompt and effective action", you don't have any speeches that say, prompt and effective action must result in termination of antitrust activity within a certain period of time, within 30 days or three months or six months, do you?

A. We never sought to define, "prompt."

Q. I am sorry?